

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NATIONAL COUNCIL ON
COMPENSATION INSURANCE, INC.,
solely as Attorney-In-Fact for the participating
companies of the National Workers
Compensation Reinsurance Pool,

                   Plaintiff,

    vs.

AMERICAN INTERNATIONAL GROUP,
INC., AIG CASUALTY COMPANY F/K/A
BIRMINGHAM FIRE INSURANCE
COMPANY OF PENNSYLVANIA, AIU
INSURANCE COMPANY, AMERICAN
HOME ASSURANCE COMPANY,
AMERICAN INTERNATIONAL PACIFIC
INSURANCE COMPANY F/K/A
AMERICAN FIDELITY COMPANY,
AMERICAN INTERNATIONAL SOUTH
INSURANCE COMPANY F/K/A
AMERICAN GLOBAL INSURANCE
COMPANY, AMERICAN
INTERNATIONAL SPECIALTY LINES
INSURANCE COMPANY F/K/A ALASKA
INSURANCE COMPANY, COMMERCE
AND INDUSTRY INSURANCE COMPANY,
INC., GRANITE STATE INSURANCE
COMPANY, ILLINOIS NATIONAL
INSURANCE COMPANY, INSURANCE
COMPANY OF THE STATE OF
PENNSYLVANIA, NATIONAL UNION
FIRE INSURANCE COMPANY OF
PITTSBURGH, NEW HAMPSHIRE
INDEMNITY COMPANY, and NEW
HAMPSHIRE INSURANCE COMPANY,

                   Defendants.

**07CV2898
JUDGE GETTLEMAN
MAG. JUDGE MASON**

**⌐FILED**

**MAY 2 4 2007**
**MAY 2 4 2007**
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

## COMPLAINT

The National Council on Compensation Insurance, Inc. ("NCCI"), solely in its capacity as Attorney-in-Fact for the participating companies of the National Workers Compensation Reinsurance Pool ("NWCRP" or "NWCRP Participating Companies"), by and through its attorneys, complains of American International Group, Inc. ("AIG"), AIG Casualty Company f/k/a Birmingham Fire Insurance Company of Pennsylvania, AIU Insurance Company, American Home Assurance Company, American International Pacific Insurance Company f/k/a American Fidelity Company, American International South Insurance Company f/k/a American Global Insurance Company, American International Specialty Lines Insurance Company f/k/a Alaska Insurance Company, Commerce and Industry Insurance Company, Inc., Granite State Insurance Company, Illinois National Insurance Company, Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, New Hampshire Indemnity Company, and New Hampshire Insurance Company (all of which are collectively referred to as the "AIG Companies" and when combined with AIG as the "AIG Defendants") as follows:

## I. NATURE OF THE CASE

1.     This action arises out of the AIG Defendants' long-term fraudulent underreporting of workers compensation premium and evasion of related financial obligations to the NWCRP Participating Companies.  At the direction of the NWCRP Board of Governors, as further explained below, this action is brought by NCCI solely in its capacity as Attorney-in-Fact for the NWCRP Participating Companies.

2.     The NWCRP was established in 1970 based on a concept that insurance companies writing workers compensation insurance should be able to participate in an arrangement that equitably apportions the premium, losses and expenses arising from the residual, or assigned risk, workers compensation insurance market.  In general terms, the residual

market is comprised of employers who have been unable to get an insurer to voluntarily provide workers compensation coverage, and coverage is "assigned" to a specific insurer who must provide coverage under rates and terms specified by law. Generally, the residual market system operates pursuant to a variety of state laws, regulations and contracts aimed at making workers compensation insurance available to all employers and, using reinsurance and related mechanisms, provides an equitable premium-based apportioning of the losses associated with residual market workers compensation policies. This system is predicated, like the overall insurance regulatory system, on insurance companies acting honorably and truthfully in their disclosure of annual workers compensation premium and other financial reporting.

3.    On the basis of certified financial reports containing premium information provided by the NWCRP Participating Companies, the NCCI, acting as Administrator on behalf of the NWCRP Participating Companies, contractually apportions residual market results among the NWCRP Participating Companies on the basis of their voluntary workers compensation market share as determined by reported premium. Over many of the years at issue, the reinsurance of residual market policies provided through the NWCRP experienced many billions of dollars of losses that were allocated among the NWCRP Participating Companies through this premium-based reinsurance. Many of these insurance companies faced serious financial challenges due to the operation of this process and the allocation of financial responsibility for these residual market losses.

4.    In a rejection of the fundamental aims of the NWCRP, the AIG Defendants sought to avoid economic hardships associated with the allocation of workers compensation residual market losses by scheming to cheat fellow workers compensation insurance companies and others who rely on the AIG Defendants' certified workers compensation premium reports

2

and financial disclosures.  This case has been filed to redress the AIG Defendants' false reporting schemes and the breach of legal duties and trust owed to fellow workers compensation insurance companies who participated in the NWCRP.

5.      In 2005, in the midst of federal and state investigations and ensuing enforcement action taken against AIG for false financial reporting, bid-rigging and other unlawful conduct, it was disclosed that the AIG Defendants had engaged in a series of longstanding false premium reporting practices with the purpose and effect of evading state insurance taxes and residual market obligations.    The revelations from this investigation confirmed that AIG's senior management, including Chairman and CEO Maurice Greenberg, senior executives Thomas Tizzio, Richard L. Thomas and/or other parties, directed or caused wholly-owned and controlled AIG affiliates to submit false and falsely certified financial statements and reports that deliberately underreported workers compensation premium information.    Indeed, as further discussed below, these astonishing disclosures revealed that the AIG Defendants had been intentionally issuing false financial reports for decades in order to manage earnings and obtain other valuable benefits by understating the true amount of the workers compensation premium written by their affiliated companies.  This false reporting activity rendered AIG's past and current public and other financial reporting inaccurate and misleading.

6.      In a further extraordinary development, the regulatory investigations disclosed that the AIG Defendants' false workers compensation premium reporting activities had been the subject of an internal investigation in 1991 and 1992. That internal investigation, which was led by the most senior legal officer in the public company, produced a formal report that acknowledged and detailed the company's unlawful conduct. In addition to describing in detail the false premium reporting practices, the AIG report determined that the false workers

3

compensation premium reporting activities at issue reflected business practices that were "permeated with illegality."

7.    Despite the admission that the AIG Defendants' workers compensation reporting practices were unlawful and exposed the organization and responsible executives to civil liability in the hundreds of millions of dollars (in 1992 dollars) as well as criminal prosecution for fraud, AIG's senior management and other executives and advisors who were privy to the internal investigation failed to put an end to the false workers compensation premium reporting, correct AIG's false and falsely certified financial statements, or make restitution.

8.    To the further detriment of those who relied on AIG's premium reporting, AIG officials, including corporate legal counsel, failed to take proper and lawfully required action to preserve evidence of the false premium reporting misconduct or disclose the material contingent liability and adverse financial consequences for other insurers resulting from the false reporting schemes. Indeed, the circumstances reflect instead that the AIG Defendants and other insiders embarked upon a cover-up of the false premium reporting conduct. This cover-up included the failure to retain relevant records and the destruction of evidence. It continues to the current day in the form of AIG's refusal to disclose to the victims of its fraud all relevant information about its false premium reporting practices -- practices conducted under the influence of certain managers and officers of AIG who were aware of the schemes and failed to take proper action in 1992 or thereafter to end the false workers compensation premium reporting and to preserve relevant records.

9.    As uncovered in the internal and external investigations of AIG, certified annual financial reports and other materials containing falsified workers compensation premium figures were regularly issued by the AIG Companies for the purpose and with the effect of evading state

taxes levied on workers compensation business and AIG's equitable share of financial responsibility for the NWCRP's allocated residual market losses. These false financial reporting practices were fraudulent and had the purpose and substantial effect of both depriving the NWCRP Participating Companies of the funds that they were forced to pay in residual market assessments as a result of AIG's evaded obligations, and requiring the other NWCRP Participating Companies to assume substantially greater financial responsibility in the form of reinsurance liability for residual market losses than if AIG and its concerned companies had truthfully reported their premium.

10.    In settlements between AIG and enforcement authorities in 2006, AIG admitted and apologized for its acknowledged false premium reporting and professed to adopt appropriate financial reporting, governance and business codes of conduct. AIG also agreed as part of the settlement to deposit hundreds of millions of dollars into a settlement fund for victims of the false workers compensation premium reporting.

11.    As part of a $1.6 billion settlement with New York and federal authorities, AIG paid approximately $42 million to various states for its admitted and related tax evasion, seeking no release. AIG also committed to pay at least $301 million dollars to the victims of its longstanding practice of making false reports of its workers compensation premium. The AIG Defendants have yet to make restitution for the financial injury caused to the NWCRP Participating Companies, and the AIG Defendants remain fully exposed to civil liability for their admitted false premium reporting conduct.

12.    The AIG Defendants' premium reporting fraud and cheating spans decades and involves thousands of pages of submissions and sworn filings of knowingly false and underreported workers compensation premium information. These false representations were

intended to be relied upon, and were in fact relied upon by the recipients, including NCCI, as Administrator for the NWCRP Participating Companies, who used the AIG Defendants' false responses to financial data calls, statistical reports and other false reports for allocating the proportional financial responsibility for NWCRP reinsurance liabilities, and for making residual market assessments.

13. The AIG Defendants' false premium reporting took a variety of forms, including, but not limited to, the following measures (collectively referred to as the "AIG False WC Premium Reporting Schemes") by which the AIG Defendants knowingly and falsely reported applicable workers compensation premium to state tax authorities and NCCI:

A. The AIG Defendants filed false responses to financial data calls, statistical reports, annual financial reports and other false reports with state authorities and the NCCI, which knowingly underreported the true and actual extent of workers compensation premium written by AIG affiliated companies by mischaracterizing workers compensation premium as non-workers compensation premium;

B. The AIG Defendants used a 50% pay-in program where half the maximum amount of workers compensation premium was collected at policy inception and the balance was booked as reinsurance assumed premium;

C. The AIG Defendants used an 18 month close-out program where workers compensation premium was booked as general liability premium;

D. The AIG Defendants falsely booked $25 million per quarter of workers compensation premium as reinsurance assumed premium; and

E. The AIG Defendants used policy forms, including Indemnity Agreements, which had not been filed or approved, and which would not qualify for approval in most states, in order to falsely underreport workers compensation premiums.

14. The Defendants formulated and executed the AIG False WC Premium Reporting Schemes under the direction and leadership of the company's senior management, including AIG executives Greenberg, Tizzio, and Thomas. Thomas and others active in the conduct at issue,

6

including the later cover-up and destruction of related evidence, today remain in positions of authority at AIG. Those individuals acted in furtherance of AIG's long-time Chairman Greenberg's infamous proclamation that he wanted every "unfair advantage" in the operation of the AIG businesses.

15. Based on the financial benefits generated by the AIG False WC Premium Reporting Schemes, the AIG Defendants assisted in advancing AIG's overall operating performance and value and secured compensation and other benefits for participating AIG executives and other complicit persons.

16. While deceitfully purporting to be responsible industry participants, through service on related NCCI and NWCRP Boards and committees, and active participation in efforts to reform and improve the residual market for workers compensation insurance, the AIG Defendants secretly took advantage of fellow workers compensation insurance companies that struggled under the same financial hardships in the workers compensation residual market but did not resort to financial reporting fraud and cheating in order to reduce their losses.

17. In fundamental harm to the residual market reinsurance mechanism and the NWCRP Participating Companies, the AIG Defendants and affiliates responsible for the false certification of annual financial statements and related reports caused hundreds of millions of dollars in direct damage as well as interest and other consequential damages in excess of $1 billion. The NCCI, in its capacity as Attorney-in-Fact for the NWCRP Participating Companies that were deceived and injured by the AIG False WC Premium Reporting Schemes brings this action to recover full and fair restitution.

18. This action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, and asserts common law fraud, an action for an accounting, and claims based

7

on an open, current and mutual account, breach of contract, promissory estoppel and unjust enrichment.

## II. PARTIES AND RELEVANT INDIVIDUALS

19.     The NWCRP is a residual market reinsurance mechanism through which licensed workers compensation insurance companies reinsure certain workers compensation residual market policies. The insurance companies participating in the NWCRP reinsurance are referred to as "NWCRP Participating Companies." The NWCRP Participating Companies are parties to certain agreements establishing a contractual reinsurance mechanism that provides reinsurance for a smaller group of the NWCRP Participating Companies, known as "servicing carriers," that issue and service residual market policies.

20.     The NCCI is a not-for-profit corporation. The NCCI administers the NWCRP on behalf of the NWCRP Participating Companies and in such capacity provides various financial and accounting support services for the reinsurance mechanism. By contract, the NCCI has been appointed to serve as the Attorney-in-Fact for the NWCRP Participating Companies in connection with claims based on or involving any matter relating to the Articles of Agreement. (See Articles of Agreement, Article V, § 12, a true and correct copy of which is attached hereto as Exhibit A.) The Board of the NWCRP has duly authorized and directed NCCI, solely in its capacity as Attorney-in-Fact to the NWCRP Participating Companies, to prosecute the claims asserted in this action.

21.     Defendant AIG is a corporation incorporated under the laws of the State of Delaware, which, through its subsidiaries and affiliates, engages in a broad range of insurance and insurance-related activities in the United States and abroad. AIG is a publicly-traded holding company which, through its subsidiaries and affiliates, serves as the largest underwriter of commercial and industrial insurance in the United States.

22.     Each of the AIG Companies named as a Defendant herein is a subsidiary or affiliate of AIG that is or was at some relevant time a participating company in the NWCRP.

23.     Maurice Greenberg served as the Chairman and Chief Executive of AIG prior to his forced removal in 2006 following state and federal investigations and enforcement against AIG and him personally that brought the false premium reporting schemes to light.

24.     Thomas Tizzio served as the President of AIG for many years, including the years between 1991 and 1997, and subsequently served as Senior Vice Chairman. Tizzio retired in 2006, but remains an Honorary Director and advisor to AIG.

25.     Richard L. Thomas managed AIG's Office of Workers Compensation prior to 1996 and subsequently served as a Senior Vice President and Chief Underwriting Officer. Thomas is still employed by AIG as a senior executive.

### III. JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper under 18 U.S.C. §§ 1965(a) and (b) because the AIG Defendants reside in this district, are found in this district, have an agent in this district, transact affairs in this district, or the ends of justice require that any parties residing in other districts be brought before this district court.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.     NWCRP's Role in the Residual Market for Workers Compensation Insurance**

28.     The workers compensation insurance market in most states is composed of two distinct parts, the voluntary market and the assigned risk or residual market.  The voluntary market is comprised of employers who are able to obtain insurance through the ordinary means of application through an agent or broker, without resorting to the residual market.  In contrast, the residual market consists of employers that are unable to procure workers compensation insurance through ordinary means in the voluntary market.  As a condition of being licensed to write workers compensation insurance in the voluntary market, most states require insurance companies to participate in the residual market.

29.     The NWCRP was established to provide insurance companies an option for complying with the requirement that they participate in the residual market.  Since 1970, the NWCRP has facilitated the equitable sharing of residual market losses in over 40 states, as explained below.

30.     The NWCRP mechanism equitably apportions the losses of the residual market through reinsurance.  The NWCRP Participating Companies provide reinsurance to certain NWCRP Participating Companies, known as "servicing carriers," that are designated to issue workers compensation policies to employers who obtain workers compensation insurance in the residual market.  The NWCRP mechanism provides for the quota share apportionment of reinsurance results based on the amount of voluntary market workers compensation written premium reported by the NWCRP Participating Companies in reports provided in response to financial data calls, statistical reports, sworn annual financial statements and other reports to the NCCI and other parties.

31.     Each of the NWCRP Participating Companies is required to annually report to the NWCRP's Administrator, NCCI, its net direct written workers compensation premiums by year by state, as specified in the NWCRP Articles of Agreement. The NWCRP Participating Companies' written submissions to the NCCI include net direct written workers compensation premium data as sworn in annual financial reports which are filed with insurance regulators in each state where an insurance company is licensed. NCCI relies upon the financial call reports, statistical reports and annual financial reports for each participating company for the purpose of verifying the accuracy of the premium and other financial information submitted to NCCI.

32.     Based on these annual reports and sworn premium figures, NCCI calculates each participating company's share of residual market losses and related expenses. For each year, the NCCI calculates a reinsurance participation ratio for each participating company based on the ratio of the total amount of premiums that the specific participating company reported that it wrote in the voluntary market in a calendar year to the total amount of premiums that all NWCRP Participating Companies reported they wrote in the voluntary market in that same calendar year.

33.     In its capacity as Administrator and on behalf of the NWCRP Participating Companies, NCCI issues quarterly statements to the NWCRP Participating Companies showing the relevant participating company's allocated share of residual market premiums, losses, and expenses. Each participating company then becomes liable for its share of the NWCRP operating losses, and is obligated to remit any cash balance owed to the NCCI. Every quarter, NCCI sends such statements to NWCRP Participating Companies throughout the United States, including such companies in Illinois and in this District.

34.     Each of the NWCRP Participating Companies, including the AIG Companies, have an account with NCCI arising from the quota share reinsurance mechanism.     These accounts are open to future adjustments as a result of changes in premium, losses, and expenses incurred over time.  These accounts are current as a result of the fact that adjustments have been made to these accounts within the last 12 months.  These accounts are mutual as a result of the fact that adjustments to the account can be favorable or unfavorable to the NWCRP Participating Companies and credit and debit balances are offset against one another.

**B.     AIG's False and Fraudulent Reporting of Workers Compensation Premium**

35.     For several decades, the AIG Defendants, with assistance by AIG executives and other persons, directed and participated in schemes to mischaracterize, falsely report and falsely book workers compensation premiums as other premiums in order to reduce expenses, inflate profits and enrich themselves.

36.     The AIG False WC Premium Reporting Schemes were designed to and had the effect of allowing the AIG Defendants to reduce expenses by evading premium tax obligations in various states and their full and fair share of residual market assessments. As a result of the AIG Defendants' knowing underreporting of workers compensation premiums, the NWCRP Participating Companies received quarterly statements from the Administrator that apportioned reinsurance obligations based on AIG's false premium reports, effectively repeating those false statements to all NWCRP Participating Companies, and thus imposing upon those NWCRP Participating Companies disproportionately higher shares of liability for the ultimate losses arising from the workers compensation residual market.  The financial injury to the other NWCRP Participating Companies, based on AIG's own admissions, runs into the hundreds of millions of dollars excluding interest and other relevant sanctions, including disgorgement and exemplary damages.

37.    Over the course of the AIG False WC Premium Reporting Schemes, the unlawful nature of the false reporting was brought directly to the attention of AIG's senior management. AIG was advised that the false reporting practices were illegal, needed to be changed, and that restitution must be made to victims. The AIG Defendants, operating at the direction and control of senior management and other insiders, ignored these reports, continued the false reporting of premiums, continued to falsify sworn financials, and continued to intentionally benefit from the financial gains created by the false reporting.

38.    In 1991 and 1992, AIG's General Counsel, Michael Joye, led an internal investigation of the company's workers compensation business practices. As a result of this investigation, AIG determined that the AIG Defendants' conduct with respect to booking and reporting workers compensation premiums "involve[d] various intentional violations of State and Federal law." AIG further determined that its workers compensation business was "permeated with illegality." A copy of the Internal Investigation Memorandum, as filed by the New York Attorney General in May 2005, is attached hereto as Exhibit B.

39.    Interviews conducted during AIG's internal investigation reveal further admissions that the Defendants engaged in widespread and long running false premium reporting practices with full knowledge and direction from senior management. One employee stated that AIG Chairman Greenberg "knows the whole program" and "wants it this way." Another employee stated, "[y]ou should be aware that [Greenberg] knows about this and has approved it." One employee stated that the false reporting schemes had been reported to AIG's senior management and that the Chairman and CEO did not want to change things to "make it legal - he wants to continue as is."

40.     The report of the internal investigation describes a litany of illegal and fraudulent

acts performed by the AIG Defendants:

> The major elements of illegality include false reporting of [workers
> compensation] premiums as [general liability] premiums, exceeding maximum
> legal [workers compensation] premiums, avoiding residual market and other
> [workers compensation]-related assessments and expenses, avoiding premium
> taxes, overcharging clients for residual market assessments and premium taxes,
> booking fictitious premiums and assets, SEC reporting violations, illegal rebates
> to insureds and intentional use of unfiled, unapproved contracts which would not
> qualify for regulatory approval in most States.

41.     As detailed in AIG's own internal investigation report, the AIG Defendants

engaged in various business practices that individually and collectively were designed to, and in

fact had the effect of, evading state premium taxes and residual market assessments and other

unlawful purposes.

42.     The AIG Defendants utilized what was termed the "18 Month Closeout Program"

to falsely report workers compensation premiums as general liability premiums. Under the "18

Month Closeout Program" the AIG Defendants purported to terminate workers compensation

policies at the first adjustment point 18 months after policy inception. The AIG Defendants then

calculated the refund of workers compensation premium due to the insured and recorded the

refund on their books as having been paid. At the same time, the AIG Defendants recorded on

company books that an amount equal to the workers compensation refund that was paid to AIG

as a "Stop-Gap Liability Policy" premium, which premium was reported as general liability

premium. AIG determined in 1992 that "[t]hese [were] book entries only; no actual cash was

paid." Further, additional premiums generated at later adjustment points by the purportedly

cancelled workers compensation coverage under this program were also booked and falsely

reported by the AIG Companies as general liability premiums.

43. The AIG Defendants also used a 50% pay-in program where half the maximum amount of workers compensation premium was collected at policy inception and the balance was booked as reinsurance assumed premium. The AIG Companies booked an amount equal to the uncollected portion of the premium at the inception of the policy as a reinsurance assumed premium and as an asset. AIG later admitted that "[t]hese constitute[d] fictitious premiums and assets on the books of AIG as there [were] no reinsurance contracts and these [were] not reinsurance premiums."

44. The AIG Defendants also booked $25 million per quarter of expected workers compensation premium as reinsurance assumed premium. AIG admitted that a "practice [had] been instituted of taking down $25 million each quarter of the expected [workers compensation] retroactive premiums and recording it as premium income on an accrual basis." "This premium [was] booked as reinsurance assumed premiums instead of [workers compensation] premiums" in violation of state statutes and regulations which require premiums to be reported by line of business, and with the purpose and effect of cheating the NWCRP Participating Companies.

45. AIG management was repeatedly advised by multiple executive level personnel that the misreporting of workers compensation premium as reinsurance assumed premium was fraudulent and in need of correction. A number of reports to this effect were written and then not retained by AIG, destroyed or never revealed by the company. A number of such reports, on information and belief, were destroyed or not retained as part of the ongoing effort to conceal the true nature and extent of the fraud.

46. The AIG Defendants also used policy forms, including Indemnity Agreements, which had not been filed or approved and which would not qualify for approval in most states, in order to misrepresent the total amount of AIG's reported workers compensation premiums. AIG

15

employees "intentionally ignored" the only insurance policy forms approved for use with workers compensation insurance.

47.    The AIG Defendants filed false responses to financial data calls, false statistical reports and falsely sworn financial reports with states and the NCCI, as Administrator for the NWCRP Participating Companies, that knowingly and intentionally omitted the true and actual extent of workers compensation premium written by AIG Companies and other affiliated companies.

48.    The AIG False WC Premium Reporting Schemes allowed the AIG Defendants to report a much lower volume of workers compensation premiums than they actually wrote. The AIG Defendants also knew and intended that AIG's false statements of workers compensation premium would be used as the basis to calculate, and then effectively incorporated into, all of the NWCRP quarterly statements issued by NCCI as Administrator on behalf of the NWCRP Participating Companies. Because apportionment of the losses from the residual market policies reinsured by the NWCRP Participating Companies is based on reported premium volume, the AIG Defendants' underreported workers compensation premium had the effect of substantially reducing in their share of financial responsibility, assessments and expenses owing under reinsurance obligations with the NWCRP Participating Companies. It also increased the share of such liabilities assumed, and such assessments and expenses paid, by all the other NWCRP Participating Companies.

49.    As of January 1992, AIG determined that the amount of workers compensation premium that went unreported was in the range of $300-$400 million annually and yielded "an unlawful benefit in the range of $60-$80 million or more annually."

50.     AIG admitted that the evaded assessments were "of necessity, paid as additional assessments by the other insurance companies subject to the [workers compensation] residual market assessments," including, in particular, the NWCRP Participating Companies.

51.     AIG also concluded that the company practice of booking retrospective workers compensation premiums as reinsurance assumed premiums also "avoid[ed] the payment of State premium taxes, residual market assessments and other fees and assessments that apply to written direct [workers compensation] premiums but don't apply to reinsurance premiums." AIG knew and acknowledged in 1992 that "the annual unlawful benefit to AIG" just from this form of false financial reporting was in the "range of $15-$20 million."

52.     AIG further admitted that its false premium reporting conduct was in violation of law and created civil liability to the NWCRP Participating Companies who were injured thereby:

> A jury could find that the above conduct constitutes various kinds of State and Federal civil and criminal violations, including common law fraud, mail fraud, Securities Act violations, RICO violations, State statutory and regulatory violations, State tax fraud and breach of contract. In addition, this conduct would be a violation of the proposed new Federal insurance fraud statute if it becomes law in early 1992 as expected. The RICO statute, in addition to stringent criminal penalties, provides a treble damages civil action to private plaintiffs. **Potential plaintiffs who could take advantage of this and other causes of action are the other insurance companies who have to pick up AIG's share of residual market assessments and other assessments**, the States who lose premium tax payments to which they are legally entitled and AIG's insureds who pay for residual market assessments and premium taxes that AIG does not report or pay. Also possible are class actions by such plaintiffs seeking bad faith and punitive damages. If successful, such class actions would result in astronomical damages awards against AIG. (Emphasis added).

53.     Over the course of the false reporting schemes, the Defendants knew that "the level of management involvement and culpability, the amount of money involved and the widespread nature of the illegal activities are such that [AIG is subject to federal criminal prosecution and] a Federal conviction would expose AIG to fines and penalties in the hundreds of millions of dollars and would cause the loss of jobs and careers of numerous long-time

employees of AIG. The situation is so serious that it could threaten the continued existence of senior management in its current form."

54.     The AIG Defendants disregarded their counsel's recommendation that specific "corrective actions" be taken to reduce exposure to criminal and civil prosecution. The AIG Defendants rejected the company's top legal officer's express direction that steps be immediately taken to end the illegal conduct, discharge the employees involved, pay restitution to the states, residual market participants and other victims, and adopt appropriate compliance measures. Other reports addressing the fraudulent nature of the company's premium reporting and business practices were similarly ignored.

55.     Although AIG retained two major law firms following the company's own internal investigation in 1991 and 1992, the AIG Defendants have never publicly disclosed any report from either law firm contradicting the AIG internal investigation findings.

56.     Despite the clear and intentional injury of the admitted false reporting conduct, AIG took no disciplinary action against any of the responsible executives, including the Chairman and CEO Greenberg, its President Tizzio, or Thomas, the executive that ran the workers compensation line of business, or others involved in the conduct at issue.

57.     Over all years at issue, and as noted by the New York Attorney General in its enforcement action, the Defendants have continued to restate false financial data in certified filings and reports.

58.     The AIG Defendants, AIG senior management, and advisors further failed to adopt measures to end the premium reporting fraud, took no steps to properly record the known and internally reported misconduct as a material contingent liability, and otherwise failed to

protect the public company and its shareholders from the material, continuing and concealed civil and regulatory exposure created by the AIG False WC Premium Reporting Schemes.

59.     AIG continued the false premium reporting conduct for decades, and for at least 15 years following the 1991-1992 internal investigation, when the illegal and fraudulent conduct was finally exposed in the course of regulatory enforcement proceedings.

60.     During that period of time, and through the present, AIG engaged in a course of conduct that constitutes an effort to avoid detection of their known and admitted wrongdoing in connection with workers compensation premium reporting.

61.     Following repeated internal objections and notice of the AIG False WC Premium Reporting Schemes, the AIG Defendants failed to take action under existing document retention policies to preserve records and other evidence of the company's misconduct.  By allowing relevant information concerning the AIG False WC Premium Reporting Schemes to be destroyed or lost, the Defendants, as well as their responsible company officers and employees, acted knowingly and contrary to legal and corporate requirements pertaining to preservation of information involving matters giving rise to material liability and risk of enforcement investigations.

62.     AIG's ongoing illegal conduct and the AIG False WC Premium Reporting Schemes would have remained hidden and undetected but for the fact that AIG became the subject of a number of enforcement investigations by the New York Attorney General ("NY AG"), the New York Superintendent of Insurance ("NY DOI"), the Securities And Exchange Commission ("SEC"), the United States Department of Justice ("DOJ"), and other agencies in 2004.

63.     In the course of government investigations into bid-rigging, false financial disclosures and other fraudulent conduct by AIG and affiliated companies, the company's internal investigation findings and admissions of the false premium reporting schemes came to the attention of government investigators. The AIG False WC Premium Reporting Schemes thus became the subject of regulatory enforcement as well as threatened criminal prosecution.

64.     The external investigations culminated in February 2006 with multiple settlements resolving pending and threatened actions between AIG and the NYAG, NY DOI, SEC and DOJ. AIG agreed to pay at least $1.6 billion in fines and restitution, adopt various business reforms, and accept an appointed corporate monitor to supervise AIG's business conduct and public financial reporting.

65.     As part of the 2006 settlements, AIG paid a fine of $100 million to the State of New York for its unlawful insurance business practices. AIG also agreed to pay, without any conditions or release, approximately $42 million to states where the AIG Defendants had evaded premium taxes through aspects of the AIG False WC Premium Reporting Schemes. AIG also agreed to pay a minimum of $301 million to a fund that was supposed to address claims by victims for limited aspects of the AIG False WC Premium Reporting Schemes.

66.     The AIG settlements did not offer full and fair restitution to the NWCRP Participating Companies that were injured by the AIG False WC Premium Reporting Schemes. The full extent of the AIG Defendants' admitted wrongdoing has been concealed by AIG and remains to be fully exposed.

67.     Based on AIG's admissions and reasonable estimates of the benefits gained as a result of the AIG False WC Premium Reporting Schemes, total damages easily exceed $1 billion.

68.    At all relevant times, the AIG Defendants had a duty to refrain from issuing knowingly false statements and falsely certified financial reports disclosing workers compensation premium information. AIG's false financial reports were issued to, and relied upon by, the NWCRP Participating Companies to their substantial financial detriment.

69.    The NWCRP Participating Companies reasonably relied on the AIG Defendants' false and falsely sworn workers compensation premium reports, which, upon use by NCCI as Administrator on behalf of the NWCRP Participating Companies, caused the AIG Defendants to incur artificially reduced shares of the residual market operating results for decades. As a result of the knowingly false premium reporting, the AIG Companies and other affiliates evaded hundreds of millions of dollars in liabilities, assessments and cash remittances that the NWCRP Participating Companies were improperly left to bear. The AIG Defendants enjoyed the unfair competitive advantage of fraudulently suppressed residual market obligations and liabilities, and thus a lower cost structure, for decades, which in turn allowed AIG to increase market share, maintain a higher surplus and greater capacity, obtain other "unfair advantages," and inflict other direct financial injury to the NWCRP Participating Companies.

70.    The AIG Defendants' false and illegal reporting conduct continues to cause financial harm to the NWCRP Participating Companies and will continue to do so into the future because workers compensation insurance claims remain open to loss development as claims by injured workers mature and evolve until workers reach retirement or die.

**C.    Fraudulent Concealment and Ongoing Impact**

71.    AIG has admitted that the residual market assessments that were evaded "results in an unlawful benefit to AIG in the range of $60-$80 million or more annually" for one practice and $15-$20 million annually for another similar false reporting practice. Based on these and other admitted wrongful benefits, the AIG Defendants concealed the false premium reporting

conduct for as long as possible and have never filed true and accurate financial reports with state tax authorities or the NCCI.

72.     AIG has recently attempted to submit to various state insurance regulators "amended" statements of workers compensation premium for some of the years in question. AIG's current efforts to substitute new false statements of premium for the years in question are acts in furtherance of their fraudulent schemes and evidence of their original fraud and ongoing wrongdoing.

73.     The AIG Defendants failed to preserve documents and other materials that would reveal the true extent of their unlawful business practices, all as part of an effort to avoid accountability for their false and fraudulent actions.

74.     The AIG False WC Premium Reporting Schemes were publicly revealed in the spring of 2005. AIG continued to submit false and fraudulent premium information to state insurance regulators and to the NCCI, year after year on forms that require disclosure of current premium data as well as premium data for the previous decade by year by state by line of business.

75.     AIG's fraudulent conduct is ongoing. AIG has admitted that it improperly booked and reported premium on insurance policies issued between 1985 and 1996, at a minimum. These insurance policies remain open to further loss development and thus the premium figures presently used by NCCI for apportioning the premium, losses and expenses of the residual market remain inaccurate. The AIG False WC Premium Reporting Schemes are still causing the AIG Defendants to underreport premium in 2007, and will continue to do so for the foreseeable future.

76.     The AIG Defendants' false premium reporting schemes are still having an ongoing financial impact on the NWCRP Participating Companies for several reasons. The AIG Defendants' fraudulent business practices occurred in its loss-sensitive business, which is a type of insurance where the price, or the premium, fluctuates over the course of decades based on the claims experience of the insured. Furthermore, the NWCRP Participating Companies each have open and continuing liabilities to the reinsured servicing carriers, and the other NWCRP Participating Companies, for every policy year. As a result of the AIG False WC Premium Schemes, the assessments made by the NCCI, on behalf of the NWCRP Participating Companies, on AIG in 2007 have been and will continue to be understated for the foreseeable future.

## V. CLAIMS

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c),
### Racketeer Influenced And Corrupt Organizations
### (Against AIG)

77.     The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

78.     This action is brought under Title 18 U.S.C. § 1964(c) for violations of Title 18 U.S.C. § 1962(c) as described more fully below. In sum, AIG, along with other distinct persons acting as affiliates, insiders and/or agents, engaged in an enterprise that, over decades, repeatedly and continuously defrauded the NWCRP Participating Companies by sending NCCI (i) false and falsely sworn financials that underreported the true amount of workers compensation written by the AIG Companies and other affiliates and (ii) checks or other payment forms which underpaid the NWCRP Participating Companies for the amounts that were really owed relating to residual market losses and liabilities.

79.     In perpetrating this series of frauds against the NWCRP Participating Companies, AIG, among other violations, violated the federal mail fraud statute well over 100 separate and distinct times. Because AIG and other parties operated an enterprise through a pattern of racketeering activity to the injury of the NWCRP Participating Companies, the Plaintiff seeks federal remedies, including treble damages and litigation costs, available under RICO, along with compensatory and punitive damages for AIG's acts of fraud and destruction of evidence of its frauds.

**Association-In-Fact Enterprise**

80.     At all times material to this Complaint, AIG together with the AIG Companies constituted an association-in-fact "enterprise" as the term is defined in Title 18 U.S.C. §§ 1961(4) and 1962(c). The common purpose of this enterprise was to commit multiple and ongoing frauds against the NWCRP Participating Companies, conceal that fraudulent and unlawful conduct, and effectively steal hundreds of millions of dollars associated with the NWCRP residual market system.

81.     At all times material to this Complaint, AIG and insider AIG personnel including Thomas Tizzio, Richard L. Thomas, inside counsel for AIG and others ("AIG Executives") were "persons" within the meaning of Title 18 U.S.C. §§1961(3) and 1962(c) and participated in the operation and management of the enterprise. As set forth herein, each of the named participants in the enterprise had a distinct role in committing the frauds and each received proceeds or benefits from the frauds. AIG and the AIG Executives were members of, and therefore distinct from, the enterprise.

82.     The association-in-fact enterprise operated to corrupt the AIG Companies and use those separate corporate forms to defraud the NWCRP Participating Companies of monies relating to residual market losses and allocated financial assessments and liabilities payable by

24

AIG Companies and other affiliates to NCCI, as Administrator for the NWCRP Participating Companies.

83.　　On information and belief, during the approximate period 1970 to 2005, AIG and the AIG Executives violated Title 18 U.S.C. § 1962(c) by conducting or participating in, directly or indirectly, the conduct of the affairs of the association-in-fact enterprise through a pattern of racketeering activity that was designed to and did result in the fraudulent and wrongful conversion of money from the NWCRP Participating Companies for the improper and illegal use and benefit of AIG, the AIG Executives and others complicit in the racketeering activity.

84.　　The pattern of racketeering activity consisted of separate and distinct violations of the federal mail fraud statute, Title 18 U.S.C. § 1341. The essence of the scheme involved the submission of false premium figures to NCCI, as Administrator for the NWCRP Participating Companies, which served to improperly reduce the amount of residual market losses and liabilities to be allocated to and paid by the AIG Companies and other affiliates involved in the workers compensation insurance business.

85.　　The schemes to defraud the NWCRP Participating Companies relied upon the use of the mail. On numerous occasions, over the 1970 to 2005 period, AIG and the AIG Executives knowingly and with the intent to defraud the NWCRP Participating Companies, caused false and falsely sworn financial statements and checks or other payment forms which underpaid the proper amount of residual market losses attributable to the AIG Defendants' workers compensation business to be sent to NCCI through the mail in furtherance of the AIG False WC Premium Reporting Schemes and overall scheme to defraud. These mailings were ongoing and each use of the mail to send falsified premium figures and checks or other payment forms constituted separate and independent violations of the mail fraud statute.

86.     The AIG and AIG Executives' racketeering activity was frequent and ongoing during the 1970-2005 period as each new mail fraud was perpetrated and destruction of evidence or other wrongful acts were taken to further and conceal the accomplished goals of the scheme.

87.     Each successive mail fraud was related to the AIG False WC Premium Reporting Schemes and overall scheme to defraud the NWCRP Participating Companies. These acts, as further detailed below, constitute a "pattern of racketeering activity" within the meaning of Title 18 U.S.C. §§ 1961(1) and 1961(5).

88.     The activities of the enterprise affected interstate commerce. For example, the funds that were obtained by fraud from the NWCRP Participating Companies involve workers compensation insurance companies engaged in a national market. In addition, the NWCRP Participating Companies do business in a national insurance marketplace and the injury and damages sustained due to the fraud has affected their ability to compete in that marketplace.

89.     As a direct and proximate result of the AIG and AIG Executives' racketeering activities and violations of Title 18 U.S.C. § 1962(c), the NWCRP Participating Companies have been injured in their business and property.

**Conduct Of The Enterprise And False Reporting Scheme, Purpose And Objectives**

90.     As set forth above, AIG and the AIG Executives have participated in the operation and management of the alleged association-in-fact enterprise. The enterprise has an existence and separate structure apart from its constituent members. The enterprise also has an existence and structure that is separate and distinct from the pattern of unlawful racketeering activity involving the repeated violations of Title 18 U.S.C. § 1341 beginning in approximately 1970 and continuing to sometime after 2005.

91.     AIG and the AIG Executives participated in the conduct and operation of the enterprise by means including:

A.  Devising the nature and mechanics of the false reporting, booking and characterization of workers compensation premiums scheme including the conscious decision to abuse AIG corporate subsidiary forms (including the AIG Companies and others) in order to insulate AIG and AIG Executives from regulatory enforcement and other liability, widely disperse the wrongful and unlawful conduct, make the fraudulent scheme harder to detect and better conceal the nature and extent of the lies and wrongdoing serving to cheat and deprive the NWCRP Participating Companies and others of money;

B.  Directing the false reporting, internal and external accounting, and other mischaracterization of workers compensation premiums in order to maximize AIG revenues, avoid expenses in the form of money owed to the NWCRP Participating Companies, reduce tax and other business expenses and achieve other benefits by their lies and illegal conduct including the generation of bonuses and other rewards to AIG and qualifying AIG Executives;

C.  Using agreements to further the mischaracterization of workers compensation premiums and execute and conceal the false statements and repeated acts in violation of the mail fraud laws;

D.  Developing the underreporting, false booking, and mischaracterization of workers compensation insurance premiums practices described above in the AIG False WC Premium Reporting Schemes in connection with the corporate books and records, including financials, and external reports on an annual and other basis to state insurance authorities and business partners owed the duty of truthful and correct premium reporting, including the NWCRP Participating Companies;

E.  Coordinating and directing AIG's and AIG Companies' executives and employees in the generation and issuance of false and falsely sworn financial reports and other false certifications to insurance regulators, tax authorities, and to the NWCRP Participating Companies through NCCI, as part of an overall effort to falsely issue seemingly consistent and seemingly accurate accountings and other reports in order to avoid detection and payments of premium assessments and defraud the NWCRP Participating Companies by depriving them of money owed by AIG and its affiliated companies;

F.  Intentionally concealing and covering up internal investigation reports and findings by AIG in January 1992, and taking further steps such as allowing the destruction of evidence including other internal written reports detailing the admitted fraudulent acts, in order to assist the enterprise in concealing the fraudulent underreporting and other admitted "illegality," avoiding detection by regulatory or enforcement authorities as

27

well as by victims such as the NWCRP Participating Companies, and denying all injured parties rightful and complete restitution and other damages; and

G.     Coordinating strategy, reporting and other business practices among AIG and affiliated entities, including the AIG Companies, in order to continue to gain "unfair advantage" and protect the scheme architects and participants who led and directed the lies and other fraudulent and illegal premium reporting conduct, including the destruction of evidence and concealment of the scheme, preserve the benefits of the proceeds of the unlawful reporting and tax and residual market avoidance scheme, avoid damage to the AIG corporate share value and reputation, and defeat efforts to obtain a full accounting and just restitution for the knowing and intentional fraudulent conduct.

92.     AIG and the AIG Executives further participated in the operation and control of the enterprise as follows:

A.     By communicating with respect to the design and implementation of the scheme to mischaracterize, understate and falsely report workers compensation premiums and other related scheme conduct;

B.     By directing affiliated AIG companies and employees to generate and file knowingly false reports that presented understated information concerning the nature and volume of workers compensation and other premiums on a state by state and year by year basis;

C.     By directing affiliated AIG companies and employees to destroy or fail to retain internal notes and reports and other documents that would evidence the full nature and extent of the fraudulent scheme and to create false internal records in an effort to conceal the AIG False WC Premium Reporting Schemes;

D.     By directing affiliated AIG companies and employees to file false reports to insurance and tax authorities and other parties, including the NWCRP Participating Companies, concerning the amount of workers compensation premiums collected on a state by state and year by year basis; and

E.     By further directing affiliated AIG companies and employees to continue the false reporting and other fraudulent conduct following numerous and repeated internal whistleblower reports noting the fraudulent and unlawful nature of the business practices and calling for their termination and appropriate remedial action.

**Pattern Of Racketeering**

93.     AIG and the AIG Executives conducted and participated in the conduct of the affairs of the enterprise through multiple predicate acts of mail fraud in violation of Title 18 U.S.C. § 1341. AIG and the AIG executives also aided and abetted violations by others of these laws, within the meaning of Title 18 U.S.C. § 2.

94.     The AIG and AIG Executives' unlawful conduct included use of the mails to deliver and disseminate false responses to financial data calls, false statistical reports, falsely sworn financial statements and other reports, agreements, correspondence, policy materials, premium reports and notices, payments of NWCRP residual market obligations, reports to insurance regulators, federal and state tax returns, and tax and other payments by clients and insurers for the purpose of an unlawful scheme to obtain money by false misrepresentations in violation of the mail fraud statute.

95.     The materials transmitted by mail, including false and fraudulent premium reports submitted to insurance regulators and to NCCI, as Administrator for the NWCRP Participating Companies, contained knowing and intentional misrepresentations or omissions that were intended to deceive the NWCRP Participating Companies. These misrepresentations and omissions included:

> A.     False certifications concerning the true and correct amount of workers compensation premiums generated by the AIG Companies on a state by state and year by year basis;
>
> B.     Fraudulent and undisclosed agreements used to further the overall fraud and schemes to falsely report, mischaracterize and understate workers compensation premiums;

C.   Underreporting of the true nature and volume of workers compensation premiums and business in annual and other reports;

D.   Falsely booking fictitious premiums and assets;

E.   Falsely reporting and booking workers compensation premiums as general liability, reinsurance assumed premium and other forms of premium;

F.   Falsely reporting in annual, unit statistical and other reports to insurance regulators and NCCI, among others, the amount of workers compensation premiums on a state by state and year by year basis; and

G.   Falsely certifying and claiming to have correctly and accurately reported all workers compensation premiums on a state by state and year by year basis.

96.   The AIG and AIG Executives' misrepresentations and frauds were material and NCCI and the NWCRP Participating Companies relied on them in connection with the apportioning of the operating results of the residual market.

97.   As a result, the NWCRP Participating Companies have been injured in their business or property by the AIG and AIG Executives' overt acts of mail fraud and by their directing, aiding, and abetting others to commit such unlawful acts.

**Predicate Racketeering Acts**

98.   Beginning in or about 1970 and continuing through to nearly the present, AIG and the AIG Executives conducted the affairs of the alleged enterprise through a pattern of racketeering activity, by committing or aiding and abetting the commission of hundreds of predicate acts of racketeering activity, being violations of Title 18 U.S.C. § 1341, as set forth herein.

99.     The pattern of racketeering activity, consisted of the following specific and

exemplar acts, among others:

**Racketeering Act One: Mailing of Fraudulent Annual Report of Workers Compensation Premium to NCCI:** On or about February 28, 1974, AIG, American Home Assurance Company, Commerce and Industry Insurance Company, Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company, New Hampshire Insurance Company, Granite State Insurance Company, American Fidelity Company, Illinois National Insurance Company, Inland National Insurance Co., and New Hampshire Indemnity Co., for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. On or information and belief, both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 1973, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Two: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about March 29, 1979, AIG, American Home Assurance Company, Commerce and Industry Insurance Company, Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company, and the New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. On information and belief, both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 1978, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Three: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about February 29, 1984, AIG, American Home/National Union Companies, and the New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the NWCRP Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. On information and belief, both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 1983, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Four: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI, as Administrator for the NWCRP Participating Companies:** On or about March 8, 1989, AIG, the American Home/National Union Companies, and the New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 1988, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Five: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about February 28, 1994, AIG, National Union Fire Insurance Company of Pittsburgh, and the American Home/National Union Companies, and on or about February 16, 1994, the New Hampshire Insurance Companies and American International Specialty Lines Insurance Company, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the NWCRP Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by,

contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 1993, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Six: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On or about February 24, 1999, AIG, and the American Home/National Union/New Hampshire Insurance Companies, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the NWCRP Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by portions of these companies' statutory Annual Statements, which were signed by, contemporaneously or shortly thereafter, portions of their statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 1998, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Seven: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On information and belief, on or about March 2004, AIG, Illinois National Insurance company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, Commerce and Industry Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, American Home Assurance Company, Insurance Company of the State of Pennsylvania, AIU Insurance Company, and New Hampshire Insurance Company, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the NWCRP Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the

net direct workers compensation premiums on a nationwide and state by state basis for the year 1993, all in violation of Title 18 U.S.C. §§ 1341 and 2.

**Racketeering Act Eight: Mailing of Fraudulent Annual Report of Workers Compensation Premium to the NCCI:** On information and belief, on or about March 2006, AIG, Illinois National Insurance Company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, Commerce and Industry Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Insurance Company of the State of Pennsylvania, AIU Insurance Company, and New Hampshire Insurance Company, for the purpose of executing and attempting to execute the AIG False WC Premium Reporting Schemes, knowingly caused to be mailed to the NCCI, as Administrator for the NWCRP Participating Companies, a Report of Net Direct Written Workers Compensation Premiums in response to the NCCI's request for Call Number One. This Report was accompanied by, contemporaneously or shortly thereafter, portions of these companies' statutory Annual Statements reflecting the amount of annual net direct workers compensation premium, which were certified by the President, Secretary and Treasurer or Comptroller of these companies and filed in every state in which they were licensed to write insurance and with the NAIC. Both the Report of Net Direct Workers Compensation Premium and the Annual Statement pages mailed to the NCCI falsely reported the net direct workers compensation premiums on a nationwide and state by state basis for the year 2005, all in violation of Title 18 U.S.C. §§ 1341 and 2.

100.    Each of the specified and other racketeering acts of the AIG and AIG Executives was related, had the same or similar purpose of executing the scheme and unlawful conduct alleged herein, involved the same or similar participants and method of commission, had similar results, and directly impacted similar victims, including the NWCRP Participating Companies.

101.    To effectuate the illegal scheme, AIG and the AIG Executives have used or caused the use of mails in interstate commerce to deliver insurance agreements, NWCRP quarterly statements calculated on the basis of and incorporating AIG's false statements of workers compensation premium, residual market assessment payments, workers compensation premium and financial reports and other materials comprising or related to the AIG False WC Premium Reporting Schemes. AIG and the AIG Executives have also received agreements, communications, correspondence, assessments and payments from the mails or commercial

interstate carriers relating to the quota share reinsurance mechanism as administered by NCCI on behalf of the NWCRP Participating Companies.

102.    AIG and the AIG Executives have engaged in a pattern of racketeering activity as defined at Title 18 U.S.C. § 1961(5) by committing at least two acts of racketeering as set out in this Complaint within the past 10 years.

**WHEREFORE**, Plaintiff requests judgment in its favor , as Attorney-in-Fact for the NWCRP Participating Companies, and against AIG, and that the Court grant the following relief:

    a)  Compensatory damages in an amount to be determined at trial;

    b)  Treble the amount of compensatory damages;

    c)  Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

    d)  Such other and further relief as the Court deems just and equitable.

**COUNT II**
**Violation of 18 U.S.C. § 1962(d),**
**Racketeer Influenced and Corrupt Organizations**
**(Against AIG)**

103.    The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

104.    As set forth herein, AIG and the AIG Executives agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, AIG and the AIG Executives intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

105.    AIG and the AIG Executives agreed that at least two of the predicate acts of mail fraud would be committed in furthering the common purpose of the enterprise to commit multiple and ongoing frauds against the NWCRP Participating Companies through the AIG False WC Premium Reporting Schemes.

106. The purpose of the enterprise and the object of the racketeering activity was for AIG and the AIG Executives to obtain substantial economic benefit in the form of money that was retained as a result of the avoidance of the residual market liabilities and assessments that were wrongfully caused to be assumed or paid by other NWCRP Participating Companies. It was further the object of the conspiracy that AIG and the AIG Executives concealed from Plaintiff and the NWCRP Participating Companies and other victims the acts in furtherance of the conspiracy.

107. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

108. As a direct and proximate result of the AIG and AIG Executives' racketeering activities and violations of 18 U.S.C. § 1962(c), the NWCRP Participating Companies have been injured in their business and property.

**WHEREFORE**, Plaintiff requests judgment in its favor, as Attorney-in-Fact for the NWCRP Participating Companies, and against AIG, and that the Court grant the following relief:

a) Compensatory damages in an amount to be determined at trial;

b) Treble the amount of compensatory damages;

c) Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d) Such other and further relief as the Court may deem just and equitable.

### COUNT III
### COMMON LAW FRAUD
### (Against the AIG Defendants)

109. The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

110.     Beginning some time in the 1970s, the AIG Defendants have made numerous false and misleading statements about their workers compensation insurance premiums and business. Specifically, the AIG Defendants knowingly and repeatedly, year after year, submitted false and inaccurate responses to financial calls, false statistical reports, and false annual statements and thereby knowingly submitted false and inaccurate premium data to NCCI, as Administrator for the NWCRP Participating Companies.

111.     The AIG Defendants' false and inaccurate reports, annual statements and submissions to  NCCI were material, in that accurate disclosure of the volume of their workers compensation insurance business was and is essential to the equitable allocation of the premium, losses, and expenses of the residual market reinsurance mechanism administered by the NCCI for the NWCRP Participating Companies.

112.     The AIG Defendants made the foregoing false statements about their workers compensation premiums with knowledge that the statements were false.

113.     The AIG Defendants made their false and misleading statements with the intent that NCCI and the NWCRP Participating Companies rely on their statements for such matters as the equitable apportionment of the operating results of the residual market for workers compensation insurance.

114.     In reliance on the AIG Defendants' false reports and representations, NCCI, as the administrator for the NWCRP Participating Companies, issued invoices and quarterly statements to the AIG Companies and assessed sums against the AIG Defendants that did not accurately represent, but understated, their true and proper share of residual market reinsurance obligations. Further, in reliance on the same false reports and representations by the AIG Defendants, NCCI, as administrator for the NWCRP Participating Companies, issued invoices and quarterly

statements that overstated the other NWCRP Participating Companies' respective shares of residual market reinsurance obligations. The NCCI and the NWCRP Participating Companies in fact relied upon the false and misleading statements made by the AIG Defendants in allocating the premium, losses, and expenses of the NWCRP's residual market reinsurance mechanism.

115. As a direct and proximate result of their reliance on the false reports and misrepresentations made by the AIG Defendants, the NWCRP Participating Companies have suffered substantial financial harm in an amount to be proven at trial.

**WHEREFORE**, Plaintiff requests judgment in its favor, as Attorney-in-Fact for the NWCRP Participating Companies, and against the AIG Defendants, granting the following relief:

a) Actual damages in an amount to be determined at trial;

b) Punitive damages in an amount to be determined at trial;

c) Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d) Such other and further relief as the Court may deem just and equitable.

## COUNT IV
## ACCOUNTING
### (Against the AIG Defendants)

116. The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

117. The NCCI, as Attorney-in-Fact for the NWCRP Participating Companies, has no adequate remedy at law for the false premium underreporting by the AIG Defendants.

118. The NCCI, as Attorney-in-Fact for the NWCRP Participating Companies, has a compelling need for discovery to understand the scope and the consequences of the premium underreporting by the AIG Defendants.

119. The NWCRP Participating Companies have been defrauded by the AIG Defendants and thus the NCCI, as Attorney-in-Fact for the NWCRP Participating Companies, needs the equitable remedy of an accounting to understand the scope and the consequences of the fraudulent underreporting by the AIG Defendants.

120. The NY AG's enforcement action revealed that the AIG Defendants have failed to preserve evidence of their false reporting and other wrongdoing. The NCCI, as Attorney-in-Fact for the NWCRP Participating Companies, seeks an equitable remedy in the form of an accounting to understand the circumstances and consequences of the destruction of evidence by the AIG Defendants between the time AIG's unlawful conduct began and the present.

121. The NWCRP Participating Companies have a mutual account that is highly complex by its nature as a national quota share reinsurance mechanism and thus the NCCI, as Attorney-in-Fact for the NWCRP Participating Companies, needs the equitable remedy of an accounting to understand the scope and the consequences of the fraudulent underreporting by the AIG Defendants.

122. To enable the NWCRP Participating Companies to obtain full and fair restitution and to force AIG to identify and disgorge all of the wrongfully obtained benefits of the AIG False WC Premium Reporting Schemes, an accounting must be made on an enterprise-wide basis for the full economic return obtained by the AIG Defendants as a result of the false premium reporting schemes.

**WHEREFORE**, Plaintiff requests judgment in its favor, as Attorney-in-Fact for the NWCRP Participating Companies, and against the AIG Defendants and that the Court grant the following relief:

a) Require AIG Defendants to submit to an immediate accounting;

b) The costs of bringing suit including reasonable attorneys' fees; and

c) Such other and further relief as the Court may deem just and equitable.

## COUNT V
## ACTION ON AN OPEN, CURRENT AND MUTUAL ACCOUNT
### (Against the AIG Defendants)

123.   The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

124.   Each of the NWCRP Participating Companies, including the AIG Defendants, have a highly complex account arising from the quota share reinsurance mechanism administered by the NCCI on behalf of the NWCRP Participating Companies.

125.   These accounts are open to current and future adjustments as a result of changes in premium, losses, costs and expenses.

126.   These accounts are current as a result of the fact that adjustments have been made to each of these accounts within the last 12 months.

127.   These accounts are mutual as a result of the fact that adjustments to each of these accounts can be favorable or unfavorable to the NWCRP Participating Companies or the AIG Defendants.

128.   As a direct and proximate result of the AIG Defendants' failure to accurately report premium to the NCCI, the open, current and mutual account between each of the AIG Defendants and the NWCRP Participating Companies has been improperly computed, offset and balanced in an amount to be proven at trial.

**WHEREFORE**, Plaintiff requests judgment in its favor as Attorney-in-Fact for the NWCRP Participating Companies, and against the AIG Defendant, and that the Court grant the following relief:

a) Require the AIG Defendants to submit to an immediate accounting;

b) Restitution for damages caused to the NWCRP Participating Companies in an amount to be determined at trial;

c) Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d) Such other and further relief as the Court may deem just and equitable.

## COUNT VI
## BREACH OF CONTRACT
### (Against the AIG Defendants)

129.    The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

130.    The NWCRP Participating Companies and the AIG Companies have at all times material to this action been parties to Articles of Agreement.

131.    Under the Articles of Agreement, the AIG Defendants have a duty to submit accurate premium data to the NCCI, as Administrator for the NWCRP Participating Companies, so that the quota share reinsurance mechanism may equitably apportion the premium, losses, and expenses of the residual market for workers compensation insurance in NWCRP states.

132.    The AIG Companies, with the assistance of AIG, repeatedly breached their contractual obligations by submitting false and inaccurate premium data to NCCI, in its capacity as Attorney-in-Fact for the NWCRP Participating Companies.

133.    The NWCRP Participating Companies have performed all material obligations under the Articles of Agreement.

134.    As a direct and proximate result of the AIG Defendants' breach of contract, the NWCRP Participating Companies have incurred substantial damages in specific amounts to be proven at trial.

**WHEREFORE**, Plaintiff requests judgment in its favor, in its capacity as Attorney-in-Fact for the NWCRP Participating Companies, and against the AIG Defendants and that the Court grant the following relief:

a) Actual damages in an amount to be determined at trial;

b) Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

c) Such other and further relief as the Court may deem just and equitable.

## COUNT VII
## PROMISSORY ESTOPPEL
### (Against the AIG Defendants)

135.	The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

136.	The AIG Defendants made clear and unambiguous promises to the NWCRP Participating Companies to fairly and accurately report their workers compensation premium.

137.	The NWCRP Participating Companies relied on the AIG Defendants' promises to fairly and accurately report their workers compensation premium to the NCCI, in its capacity as Attorney-in-Fact for the NWCRP Participating Companies.

138.	The reliance the NWCRP Participating Companies on the AIG Defendants' promise to fairly and accurately report their workers compensation premium to NCCI was reasonable and foreseeable to the AIG Defendants.

139.	As a direct and proximate result of the AIG Defendants' promise to fairly and accurately report their workers compensation premium to NCCI, the NWCRP Participating Companies suffered substantial financial harm in an amount to be proven a trial.

**WHEREFORE**, Plaintiff requests judgment in its favor, in its capacity as Attorney-in-Fact for the NWCRP Participating Companies, and against the AIG Defendants, and that the Court grant the following relief:

a) Disgorgement of all unlawfully gained profits from deceptive, fraudulent and unjust practices in an amount to be determined at trial;

b) Restitution for damages caused to the NWCRP Participating Companies in an amount to be determined at trial;

c) Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d) Such other and further relief as the Court may deem just and equitable.

## COUNT VIII
## UNJUST ENRICHMENT
### (Against the AIG Defendants)

140.    The Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

141.    The AIG Defendants have unjustly retained substantial benefits from their underreporting to the financial harm and other detriment of the NWCRP Participating Companies.

142.    The retention of the benefits arising from the AIG Defendants' underreporting of workers compensation premium violates the fundamental principles of justice, equity and good conscience.

143.    The amount by which the AIG Defendants have been unjustly enriched will be proven at trial.

**WHEREFORE**, Plaintiff requests judgment in its favor, in its capacity as Attorney-in-Fact for the NWCRP Participating Companies, and against the AIG Defendants, and that the Court grant the following relief:

a) Disgorgement of all unlawfully gained profits from deceptive, fraudulent and unjust practices in an amount to be determined at trial;

b) Restitution for damages caused to the NWCRP Participating Companies in an amount to be determined at trial;

c) Prejudgment interest, along with the costs of bringing suit including reasonable attorneys' fees; and

d) Such other and further relief as the Court may deem just and equitable.

## VII. JURY DEMAND

Plaintiff hereby demands trial by jury as to all appropriate claims pursuant to Rules 38 and 39 of the Federal Rules of Civil Procedure.

Dated: May 24, 2007

Respectfully submitted,

National Council on Compensation Insurance, Inc.
solely as Attorney-in-Fact for the participating
companies of the National Workers
Compensation Reinsurance Pool

By: _____
    One of its attorneys

Rowe W. Snider
Patrick S. Coffey
Matthew T. Furton
Lord Bissell & Brook LLP
111 South Wacker Drive
Chicago, IL 60606
312.443.0700
Attorneys for Plaintiff National Council
on Compensation Insurance, Inc. as
Attorney-in-Fact for the participating
companies of the National Workers
Compensation Reinsurance Pool

45

**Local Rule 3.2 Notification of Affiliates Disclosure Statement**

In accordance with Local Rule 3.2 of the United States District Court for the Northern District of Illinois, the Plaintiff National Council on Compensation Insurance, Inc. has no affiliates as defined by Local Rule 3.2.

# EXHIBIT A

**NWCRP ARTICLES OF AGREEMENT**

Adopted January 1, 1970
Amended May 20, 1970
Amended May 19, 1971
Amended March 2, 1972
Amended May 18, 1973
Amended March 7, 1974
Amended May 15, 1974
Amended May 21, 1975
Amended March 29, 1977
Amended May 20, 1981
Amended May 19, 1982
Amended June 15, 1983
Amended June 20, 1984
Amended June 19, 1985
Amended January 1, 1991
Amended July 1, 1992
Amended January 1, 1993
Amended March 5, 1997
Amended January 1, 1999
Amended January 1, 2002

Reprinted ___, _____

1

**NWCRP Articles of Agreement**

**Effective January 1, 2002**

Whereas, the undersigned parties hereto (hereinafter referred to as "participating companies" or "participants") are engaged in the business of insuring against liability under workers compensation acts of the United States of America, of the various states, territories thereof and of the District of Columbia (hereinafter referred to generally as State or States, as the context may require); and

Whereas, in addition to being participating companies they also may be members of Workers Compensation Insurance Plans or other assigned risk workers compensation insurance plans (hereinafter referred to as "Insurance Plans") that are in effect in various states and which generally provide for the issuance of workers compensation policies to employers who are in good faith entitled to workers compensation insurance as defined in the Insurance Plans but are unable to procure such insurance in a regular manner; and

Whereas the participating companies desire to adopt these Articles of Agreement to assist in providing efficient, cost-effective insurance to policyholders who qualify for insurance protection under Authorized Insurance Plans and, further, for the benefit of the participating companies, in order to facilitate their fulfillment of their obligations under an Insurance Plan provided that the Plan's design, structure, and administration is acceptable to the Board of Governors and the participating companies; and

Whereas, the participating companies desire that the premiums, losses, costs and/or expenses arising under certain policies issued pursuant to Authorized Insurance Plans, whether as separate or combined components, be equitably distributed among the participating companies by reinsuring such policies under these Articles of Agreement on a quota share or aggregate excess of loss basis, or other reasonable and equitable basis approved by the Board of Governors, thereby mitigating the risk of undue loss to any one of the participating companies on account of any such policy and permitting the underwriting results, expenses and administration to be accounted for in a cost-effective and consistent manner; and

Whereas, the participating companies desire to form a mechanism to allow for the efficient and cost-effective provision of reinsurance to the Servicing Carriers selected under Authorized Insurance Plans, where such mechanism would provide efficient, centralized administration, including accounting, statistical and actuarial services, among other appropriate activities related to such reinsurance and the spreading of risk; and

2

Whereas, the participating companies desire that employers needing multistate coverage and who are in good faith entitled to workers compensation insurance as defined in the Authorized Insurance Plans be able to obtain efficient, cost-effective coverage under Authorized Insurance Plans through a single Servicing Carrier and under a multistate policy, where appropriate, thereby helping to reduce the cost of such insurance; and

Whereas, the participating companies have a direct financial interest in, and wish to be assured that, the reinsured Servicing Carriers under Authorized Insurance Plans provide efficient, cost-effective policyholder services, including claims handling and loss prevention services, and further, that Servicing Carriers diligently collect premium due under policies issued by the Authorized Insurance Plans; and

Whereas, the participating companies must be able to rely upon the integrity and dependability of the administrators of the Authorized Insurance Plans, and the selected Servicing Carriers, to achieve the purposes of these Articles of Agreement; and

Whereas, the administration of Authorized Insurance Plans, including but not limited to the efficient and effective performance by the Plan Administrator of its duty to appropriately supervise the reinsured Servicing Carriers, is of substantial interest to the participating companies; and

Whereas, the participating companies may wish to propose new, amended, or revised Insurance Plans, where such changes are appropriate to allow participating companies to be assured that the benefits of these Articles of Agreement shall remain available in the most efficient, cost-effective and reasonable manner.

Now, therefore, for the purpose of reinsuring policies issued pursuant to Authorized Insurance Plans, for the protection of each participating company from the extraordinary hazards incident to the issuance of such policies, and to achieve the other purposes described above or elsewhere in these Articles of Agreement, the undersigned participating companies hereby subscribe to, become parties to, and adopt these Articles of Agreement.

████████

███████████████████████████████

Unless otherwise provided herein, all terms defined in any Authorized Insurance Plan shall have the same meaning in these Articles of Agreement.

The terms "net premiums written," "net workers compensation insurance premiums written," "workers compensation premiums written" and "workers compensation insurance premiums," wherever used in these Articles of Agreement, shall mean the gross direct premiums charged less all premiums (except dividends and savings refunded under participating policies) returned to policyholders for all Workers Compensation and Occupational Disease Insurance, exclusive of premiums for risks subject to these Articles of Agreement, and for risks written under National Defense Projects Rating Plan and under excess policies. (An excess workers compensation insurance policy is a policy issued to provide coverage for amounts above a self-insured retention.)

"Authorized Insurance Plan" wherever used herein shall mean an Insurance Plan (i) approved by the insurance regulator in any state that provides workers compensation insurance to employers who are in good faith entitled to such insurance but are unable to procure such insurance in a regular manner and (ii) which has been authorized by the Board of Governors under Article V, Section 7.

The term "Workers Compensation" and the word "Workers" wherever used within these Articles of Agreement mean Workers or Workmen's as applicable.

The term "Reinsurance Agreements" shall mean those reinsurance agreements entered into among the Servicing Carriers and the participating companies pursuant to these Articles of Agreement. These Reinsurance Agreements reinsure the direct insurance obligations of the Servicing Carriers, who issue insurance policies in their own names directly to policyholders under the Authorized Insurance Plans.

The term "Administrator" shall mean the entity designated by the Board of Governors to provide the necessary administrative services as are required to achieve the purposes of these Articles of Agreement.

The term "Servicing Carrier(s)" shall mean those licensed insurers who (i) have been selected pursuant to the Authorized Insurance Plans to issue to employers who are eligible for such coverage direct workers

4

compensation insurance policies, as defined in those Plans, such policies being issued in the insurer's own name; and (ii) with respect to such policies, have ceded reinsurance pursuant to the Reinsurance Agreements provided for in these Articles of Agreement.

[redacted]

[redacted]

1. **Purpose.** The purpose of this Agreement is to provide participating companies with an option for complying with Authorized Insurance Plan requirements by permitting the participating companies to share in the experience of certain assigned risks through reinsurance, thereby reducing both administrative costs and the annual fluctuation in the liability of participating companies arising from Authorized Insurance Plan participation. Under the Insurance Plans, an employer who qualifies for coverage is assigned to a carrier to issue and service the policy of insurance issued to such employer. For those participating companies that elect to subscribe to these Articles of Agreement, assignments are made to Servicing Carriers that are appointed pursuant to the Authorized Insurance Plans to write and service the policies issued to employers, which policies are then reinsured by the participating companies. The service provided by the Servicing Carriers is the provision of direct insurance, which includes underwriting and issuing the policy, auditing and collection of premiums, paying all premium and loss based taxes and assessments, providing loss control, and defending and paying claims.

All participating companies must enter into Reinsurance Agreements with Servicing Carriers ("Reinsurance Agreements") for the purpose of sharing through reinsurance, whether as separate or combined components, the premiums, losses, costs and/or expenses of the policies assigned to the Servicing Carriers. These Reinsurance Agreements distribute premiums, losses, costs and/or expenses and define the obligations among the Servicing Carriers and the participating companies. These Articles of Agreement are intended to: (1) facilitate the reinsurance by establishing uniform rules and procedures; (2) provide a framework which permits the participating companies to agree upon such rules and procedures in the future; and (3) provide a mechanism for resolving disputes arising under the Reinsurance Agreements and these Articles of Agreement.

The relationship between the Servicing Carriers and the participating companies shall be administered by such organization as provided for in a separate administration agreement (herein "Administration Agreement"). The Administrator's duties and obligations with respect to such administration are established by: (i) the Authorized Insurance Plans; (ii) these Articles of Agreement; and (iii) Administration Agreement. The Administrator is also designated as an agent for the participating companies to enter into contracts on their behalf to carry out the purposes of these Articles including but not limited to the Reinsurance Agreements.

2.  **Limitations.** No Insurance Plan for any state shall be brought within the scope of these Articles of Agreement and the rules and procedures adopted hereunder unless these Articles of Agreement have been authorized for and incorporated as part of the Insurance Plan that has been filed with the insurance regulator in such state and approved, or the Articles of Agreement are otherwise approved by the insurance regulator.

These Articles of Agreement shall apply to policies issued to employers whose risks have been assigned to and accepted by Servicing Carriers in accordance with any Authorized Insurance Plan and the terms herein.

Commencing on January 1, 1999, these Articles of Agreement shall be applicable to each Authorized Insurance Plan for terms of three (3) calendar years, unless action is taken pursuant to Article V, Section 8. At the end of each such term, these Articles shall automatically renew for an additional three (3) year term unless the Board of Governors shall recommend to the participating companies that no such renewal should be extended to that Authorized Insurance Plan. Any such recommendation by the Board shall be presented to the participating companies no later than the regular meeting of participating companies to be held during June of the third year of any such term for a specific Authorized Insurance Plan. Any such recommendation is subject to ratification by the affirmative vote, in person or by proxy, of participating companies writing at least $66^2/_3\%$ of the total net workers compensation premium written by all participating companies in such state during the latest available calendar year.

6

██████████

██████████

1. **Participation.** Any company licensed to write workers compensation insurance in any state that has an approved Authorized Insurance Plan may become a participating company by subscribing to these Articles of Agreement. Any State Workers Compensation Insurance Fund established by law also may become a participant by subscribing to these Articles of Agreement. The Board of Governors may permit participation at its sole discretion to any group, organization, association or other entity it deems appropriate, subject to such entity subscribing to these Articles of Agreement.

   A company that elects to become a participating company need not participate in the reinsurance in all states where the Articles of Agreement apply. If, however, a participating company is part of a group or affiliation, its election as to which states it will participate in the reinsurance pursuant to these Articles of Agreement must be the same for all companies affiliated in the group. At the time a company becomes a participant, it must identify all affiliated companies and notify the Administrator which states it will participate in the reinsurance provided under these Articles of Agreement. Thereafter, any participating company may withdraw from providing reinsurance in any state by giving notice as required in paragraph 2 below subject to the withdrawal of all affiliated companies from such state or states.

2. **Withdrawal.** Any participating company may withdraw as a participating company with respect to the reinsurance in a given state or states only on December 31 of any year and must give ninety (90) calendar days' advance written notice to the Administrator. Any withdrawal must be made by all companies affiliated within a group.

3. **Expulsion.** The Board of Governors, by affirmative vote of at least nine (9) members then holding office and eligible to vote, may at any time expel any participating company which in the opinion of the Board shall have violated any of the provisions of these Articles of Agreement or of the rules forming a part hereof as then constituted. Prior to any such action by the Board, the participating company shall have the opportunity to present any relevant evidence to the Board concerning any such alleged violation after notice of no less than ten (10) calendar days by the Board which specifies the alleged violation. If, after the participating company has presented

7

evidence to the Board, the Board determines that a violation has occurred, the Board shall send the participating company a notice of expulsion by mail, facsimile transmission, or delivery to such participating company at its latest home office address appearing on the records of the Administrator. If the violation is not cured within fifteen (15) calendar days following the mailing, transmission, or delivery of such notice, the expulsion shall become effective at a date to be determined by the Board but no later than December 31st of the current calendar year. No member of the Board of Governors may vote in a proceeding to expel a participating company by which it is employed or any of its affiliates.

Notice of an expulsion shall be given to the insurance regulator in each state where the expelled participating company was providing reinsurance pursuant to these Articles. The expelled participating company shall have the right to request a review of the Board of Governors' decision by the insurance regulator pursuant to the Dispute Resolution Procedures under the applicable Authorized Insurance Plans.

4. **Obligations After Termination.** Any participating company which terminates participation by withdrawal or by expulsion or has withdrawn from providing reinsurance in a certain state or states shall, nevertheless, with respect to risks subject to these Articles of Agreement prior to midnight of the effective date of such termination or withdrawal, continue to be governed by these Articles of Agreement, the Reinsurance Agreements, and the rules and procedures promulgated thereunder.

5. **Insolvency**

   (a) In the event any participating company shall become insolvent, as hereinafter defined, participation by such company under these Articles of Agreement and the Reinsurance Agreements shall be deemed terminated at the time such company becomes insolvent subject to the further provisions of Section 5(e). As used herein, "insolvent" means being the subject of receivership, conservatorship, rehabilitation, liquidation, or similar court proceedings, whether voluntary or involuntary, in any jurisdiction.

   (b) In the event a Servicing Carrier becomes insolvent, the Administrator, acting on behalf of each of the participating companies as directed by the Board of Governors, shall have the option to:

8

(i) pay to the receiver, conservator, rehabilitator, liquidator or other appropriate representative all losses and expenses for which such insolvent Servicing Carrier shall have come liable upon risks to which these Articles of Agreement apply; or

(ii) subject to the approval of the receiver, conservator, rehabilitator, liquidator or other representative, and subject to the approval of any court having jurisdiction over the proceedings, terminate the obligation of the participating companies to such insolvent Servicing Carrier to reinsure such insolvent Servicing Carrier for losses, costs and expenses for which the insolvent Servicing Carrier shall have become liable upon risks to which these Articles of Agreement apply. If this option is exercised, and where appropriate in the jurisdiction involved, the Administrator shall make arrangements to have all risks that have been assigned to and are being serviced by such insolvent Servicing Carrier reassigned to another Servicing Carrier or third party service provider for servicing. Such successor Servicing Carrier or third party service provider shall assume all the duties and obligations of the insolvent Servicing Carrier and shall be entitled to the reinsurance provided by the participating companies. Payment made on account of such risks, including expenses for the servicing thereof, shall be apportioned prorata among the remaining participating companies in accordance with the method provided for the apportioning of assessments.

(c) The outstanding liability to the participating companies of any insolvent participant, whether in its capacity as a Servicing Carrier or a participating company or both, and except for the portion unexpended of any amount of premium retained for servicing by such insolvent participating company (if a Servicing Carrier), shall, in event of such insolvency, and subject to any other or further provision with respect thereto which may be from time to time embodied in the rules and procedures adopted hereunder, be assumed by and apportioned among the remaining participating companies in the same manner in which liability for assessments is apportioned. No premium distributions or refunds shall be made to such insolvent participating company until all of its liabilities to the participating companies and all liabilities assumed by the participating companies by virtue of the provisions in this section shall have been fully settled and satisfied.

The participating companies shall have all the rights allowed by law against the estate or funds of such insolvent Servicing Carrier for recovery of funds disbursed (including the payment of losses, costs, expenses and unearned Servicing Carrier allowance) to insolvent Servicing

9

Carriers which have been absorbed by the participating companies as herein provided. The Administrator may assert and enforce such rights on behalf of the remaining participating companies, and is hereby appointed as their attorney-in-fact for this purpose, to assist and enforce such rights or any compromise on their behalf.

Upon the insolvency of a Servicing Carrier, all amounts due to such insolvent Servicing Carrier from the participating companies as a result of the reinsurance provided to such Servicing Carrier and all amounts due from the insolvent Servicing Carrier as a participating company to other Servicing Carriers it reinsures shall be merged into one account and deemed mutual debts and credits which solvent participating companies and Servicing Carriers may offset.

In the event of the insolvency of a participating company, any amounts owed to such insolvent participating company from any Servicing Carrier under any Reinsurance Agreement entered into pursuant to these Articles may be offset from any amounts owed (either due or to become due) by such insolvent participating company to any Servicing Carrier under the same Reinsurance Agreements. It is the intent of this provision that all amounts due to or from an insolvent participating company under this provision will be treated as mutual debts and credits for purposes of offset rights.

(d) The Board of Governors shall have the discretion to terminate participation of any or all affiliated companies of the insolvent participating company. The termination of an insolvent participating company or any or all companies described in this section shall not be deemed a violation of the requirement contained in Article III, Section 1 relating to all insurers in a group becoming participating companies. A decision to terminate an affiliate of an insolvent participating company is reviewable under the applicable Authorized Insurance Plans.

(e) Anything in this Section to the contrary notwithstanding, the Board of Governors may, in the event such action is in its judgment feasible and desirable, and in a manner equitable to all participating companies, elect not to terminate the participation of such insolvent participating company, and permit such participating company to continue its participation under these Articles of Agreement upon such conditions as it may prescribe and subject in all respects to these Articles of Agreement and the rules and procedures hereunder as then constituted.

10

(f) No member of the Board of Governors that is either an insolvent participating company or affiliate thereof may vote in any proceeding under this Section.

6.    **Participating Company Obligations.**

(a) The Administrator is hereby authorized to establish a financial credit policy designed to protect the interests of all participating companies by making sure that each participating company, where appropriate, has adequate financial resources to meet its obligations under the Reinsurance Agreements. The financial credit policy may include, but need not be limited to, such things as: (i) financial reporting to the Administrator; (ii) minimum financial standards which must be met by each member; (iii) actions to be taken by the Administrator when such standards are not met; (iv) obligations of participating companies in respect to such financial credit policy; and (v) right of appeal. After soliciting individual input from various participating companies, the Administrator shall be responsible for the preparation and implementation of the financial credit policy and any subsequent amendments thereto.

(b) Notwithstanding Section 6. (a) above and in the absence of a good faith dispute as determined by the Administrator, any participating company that fails or has failed to make timely payment of its reinsurance obligations or any assessment made under these Articles of Agreement shall become immediately liable as of the earliest date on which such failure to pay occurs, for all current assessments and reinsurance obligations and an additional amount equal to the commuted value on such date of all outstanding reinsurance obligations that such participating company may have. For the purposes hereof, such commuted value shall total the amount of unearned premium reserves and incurred loss reserves then allocated to such participating company hereunder, as determined by the Administrator and approved by the Board of Governors. The liability of the participating company for such commuted value under this provision shall be deemed fixed, liquidated, and non-contingent as of the date of such failure to pay. The Administrator is hereby appointed the attorney-in-fact on behalf of all participating companies to assert and enforce such liability or any compromise thereof on their behalf.

(c) In addition to Sections 6. (a) and (b) above, if the Administrator determines that there is a substantial likelihood that a participating company's reserves are not adequate to meet its obligations under the Reinsurance Agreements, the Administrator shall have authority to order that all premium distributions or refunds due or that may become due to the participating company be paid into escrow or trust with the Administrator, or otherwise be withheld from

11

distribution to the participating company, to secure the participating company's obligations and that the participating company provide a letter of credit or such other form of security and in such amount approved by the Administrator to secure the participating company's future liabilities.

7.    **Authority to Commute.** The Board shall have the authority to direct the Administrator to enter into agreements on such terms as may be fair and reasonable for the following:

    (a) to commute with a servicing carrier all obligations owed by the participating companies to such servicing carrier under the Articles or the Reinsurance Agreements;

    (b) to commute any specific policy year or years of an individual participating company; or

    (c) to novate or reinsure policy years that have more than ten (10) years of experience.

When required under (a) or (c) above, such commutation or novation can only be effected with the agreement of the servicing carrier or carriers involved.

Any financial obligations arising under any agreement entered into under this Section 7 shall be binding upon the participating company or participating companies.



1.    **Regular Meetings.** The participating companies shall meet annually on the third Wednesday of June, or on such other date as the Board of Governors may determine, and at such place as the Board of Governors may determine.

2.    **Special Meetings.** Special meetings of the participating companies may be called at any time by the Chair of the Board of Governors and shall be called by the Chair upon the written request of three (3) non-affiliated participating companies.

3.    **Notice of Meetings.** Except as otherwise provided in Article VIII, notice of all annual and special meetings shall be given or caused to be given by the Chair, in writing, mailed or delivered to, or by

facsimile transmission or e-mail direct to, each participating company at the latest address appearing upon the records of the Administrator, or by telephone communication to any executive officer of such participating company. If notice is given by writing and mailed to the participating company, such notice shall be placed in the mail not less than ten (10) calendar days prior to the date of the meeting. If given by facsimile transmission, e-mail, or telephone communication, it shall be so given not less than five (5) calendar days prior to the meeting.

4.     **Quorum.** A quorum at any annual or special meeting shall consist of participating companies that write not less than 50.1% of the total net workers compensation premiums written by all participating companies during the latest calendar year for which information is available in all states where these Articles of Agreement are operative. For purposes of determining a quorum and any vote taken hereunder, the net workers compensation premium written for each participating company shall only include those states where such participating company is providing reinsurance under these Articles.

5.     **Powers.** The purpose of any special meeting shall be stated in the notice thereof; but at all such meetings and at annual meetings, participating companies may consider and act upon all matters brought before them, except where otherwise specifically provided in these Articles of Agreement.

6.     **Voting Rights.** Except where otherwise provided in these Articles of Agreement, at all meetings action may be taken only upon affirmative vote of a majority of the participating companies that write not less than 50.1% of the total net workers compensation premiums written by all participating companies during the latest calendar year for which information is available in all States where these Articles of Agreement are operative. If such meeting is limited to matters involving one State by the terms of the notice of meeting, no action may be taken unless there has been an affirmative vote of participating companies that write not less than 50.1% of the total net workers compensation premiums written by all participating companies providing reinsurance in such State during the latest calendar year for which information is available in such State. Action may also be taken without meeting by mail, facsimile transmission, e-mail, or telephone upon affirmative vote of participating companies which write not less than 50.1% of the total net workers compensation premiums written by all participating companies during the latest calendar year for which information is available in all States where these Articles of Agreement are operative provided that all participating companies are polled.

13

7.   **Proxies and Mail Votes.** Participating companies may be represented at any meeting by proxy. Every proxy shall be in writing and signed by an authorized officer of the participating company. No proxy shall be valid after the expiration of six (6) months after the date thereof. Every proxy shall be revocable at the pleasure of the participating company executing it. Before any proxy can be voted, it shall first be filed with the Chair of the Board of Governors or the Chair's designee not later than one (1) full business day in advance of the meeting. Participating companies may record their votes by mail, facsimile transmission, or e-mail on written propositions, and such votes shall have the same standing as if cast by such participating companies in person or by proxy.

8.   **Procedure / Minutes of Meetings.** Minutes of all meetings of the participating companies and of the Board of Governors shall be recorded and be available to all participating companies. Except as otherwise specifically provided in these Articles of Agreement, all annual and special meetings shall be conducted in accordance with the rules of parliamentary procedure established in the most current edition of *Robert's Rules of Order.*

█████████████

█████████████████████

1.   **Number and Term of Office.** Except for those powers specifically granted to the Administrator or an administrator under any Authorized Insurance Plan, these Articles of Agreement and the Administrative Agreement, the operation, business and affairs of all matters arising under these Articles of Agreement shall be managed and controlled by a Board of Governors composed of twelve (12) non-affiliated participating companies.

The Board shall be elected by the participating companies at the annual meeting of the participating companies. Board elections shall be made for staggered terms, with such terms effective immediately upon adjournment of the annual meeting of the participating companies.

Four (4) participating companies shall be elected annually for a term of three (3) years. No participating company serving on the Board for a full term shall succeed itself, except where a sufficient number of non-succeeding participating companies cannot be induced to serve on the Board.

14

No more than five (5) of the twelve (12) participating companies of the Board of Governors shall be Servicing Carriers.

All participating companies elected to the Board shall designate a knowledgeable representative of suitable senior standing and shall select two (2) alternates of similar standing to attend Board meetings and vote on matters brought before the Board.

To facilitate voting for members of the Board of Governors at annual meetings, at least sixty (60) days prior to each annual meeting the Board shall appoint a Nominating Committee consisting of four (4) participating companies and to include both stock and non-stock representation. The Nominating Committee shall make nominations for the terms that are expiring at the next annual meeting. The Nominating Committee recommendations shall be reported to all participating companies at least one (1) week prior to the annual meeting. Any participating company can make additional nominations at the annual meeting.

2.   **Vacancies.** If a vacancy occurs in the Board of Governors, the Board shall appoint a replacement which will serve until an election can be held at the next annual or special meeting of the participating companies to fill the unexpired term.

3.   **Place of Meetings.** All meetings of the Board shall be held at a place designated by the Chair.

4.   **Quorum and Voting Rights.** A majority of the Board of Governors shall constitute a quorum. Each Governor shall be entitled to one vote. A Governor's vote may be cast only by its representative, or in his or her absence, by its alternate. Proxy voting shall not be permitted. Any Board action requires an affirmative vote of a majority of the Board present for the meeting. If such votes are not cast, the matter fails adoption except as provided for elsewhere in these Articles of Agreement. In the absence of a quorum, the Board, subject, however, to the provisions of Section 2 of this Article V relative to filling vacancies on the Board, shall have no power except that a majority of the Board of Governors in attendance may adjourn the meeting from time to time until a quorum shall attend.

5.   **Meetings.** The Board shall meet within thirty (30) calendar days next following the annual election of the Board for the purpose of electing officers to serve for the next ensuing year and for the

15

transaction of all other business within the powers of the Board. Other regular meetings of the Board of Governors shall be held at such places and on such dates as the Board may from time to time determine. Special meetings of the Board may be called at any time by the Chair, or by the Chair upon written request of three (3) non-affiliated Board members. Such notice of regular and special meetings of the Board shall be given as may be determined by the Board or, in the event the period or method of notice shall not have been prescribed, as the Chair shall deem reasonable. Board members may participate in meetings of the Board by means of a conference telephone, video conference, or similar communications method by which all persons participating in the meeting can hear each other at the same time, and participation by such means shall constitute presence in person at such meeting.

6.    **Action Without Meeting.** Any action of the Board of Governors may be taken without a meeting if a consent in writing setting forth the action so taken is signed by all of the Board members then in office and is filed with the minutes of the Board of Governors. Such unanimous written consent shall have the same effect as a unanimous vote of the Board.

7.    **Authorization.** These Articles of Agreement shall not apply to any Insurance Plan unless the incorporation of these Articles of Agreement into such Insurance Plan is first authorized by the Board of Governors, or the Board approves their application upon some other form of approval by the insurance regulator. The Board has the power, through such vote, to take necessary and appropriate steps to incorporate the Articles of Agreement into such Insurance Plans through filings with the appropriate regulators for consideration and approval, or to otherwise obtain approval from appropriate regulators. In the event that amendments to these Articles of Agreement are not approved by the insurance regulator in a particular state, the most recently approved version of the Articles of Agreement shall continue to apply to risks written through the Insurance Plan in that state.

8.    **Plan Changes.** The Board shall monitor and review any change in any Authorized Insurance Plan and any changes in the identity of the Plan Administrator for any such Plan. The Board shall assess the effect of any such changes on the interests of the participating companies and policyholders insured under any Authorized Insurance Plan and shall approve all such changes unless the Board finds that such changes would be inconsistent with the purposes of these Articles of Agreement. If the Board does not approve such a change, the Board may elect to terminate reinsurance in accordance with the termination provisions of the applicable Reinsurance Agreement. Any decision

16

by the Board to elect to terminate reinsurance shall be subject to the approval of the participating companies at any regular or special meeting thereof. At any time, the Board of Governors may develop and present proposed amendments, changes, or revisions to, or complete replacements for, an existing Authorized Insurance Plan or proposed Insurance Plan where the Board believes its proposal would be in the overall interest of the participating companies in a given state.

9.  **Organization and Procedure.** The members of the Board of Governors annually shall elect a Chair and a Vice-Chair. The Chair, or in his or her absence the Vice-Chair, or in the absence of both, a Chair pro tem elected by the Governors present, shall act as a Chair of every meeting of the Board; and the Chair shall appoint a person to act as secretary of the meeting, who shall keep a record of the Board's proceedings. The order of business at all meetings of the Board shall be determined by the Chair. If any Governor is absent from the meeting of the Board, such absent Governor, or the participating company that such Governor represents, may designate in writing any other Governor of the Board to act, but not to vote, in the place and stead of such absent Governor at such meeting. Except as otherwise specifically provided in these Articles of Agreement, all meetings of the Board shall be conducted in accordance with the rules of parliamentary procedure established in the most current edition of *Robert's Rules of Order.*

10. **Disputes and Appeals.** In addition to the powers elsewhere conferred upon it by these Articles of Agreement, the Board of Governors shall constitute a committee with full authority to pass upon all disputes arising with respect to these Articles of Agreement, including without limitation any questions as to the application, scope, and effect of these Articles of Agreement. The ruling of a majority of the Board as then constituted on any such dispute or question following reasonable notice and an opportunity for a hearing shall be final. All disputes reviewed by the Board of Governors and appeals therefrom shall be subject to and in accord with the Dispute Resolution Procedures provided for in the various Authorized Insurance Plans.

11. **Rules and Procedures.** The Board of Governors shall have the right to promulgate and adopt rules and procedures for the purpose of implementing the terms of these Articles of Agreement and may also delegate their power to promulgate and adopt rules and procedures to the Administrator, subject to repeal by the Board.

12. **Authority of Administrator.** The Administrator is authorized to enter into agreements on behalf of the participating companies to carry out the purposes of these Articles of Agreement, including but

17

not limited to the Reinsurance Agreements. Upon direction by the Board of Governors, the Administrator is empowered to act as attorney-in-fact for each participating company to prosecute, to defend, to submit to arbitration, to settle, and to propose or to accept a compromise with respect to, any claim existing in favor of, or against, such participating company based on or involving any matter relating to this Agreement or to intervene in any action or proceeding related thereto. The Administrator or an officer thereof is authorized to certify these Articles of Agreement, acts taken by the Board or the participating companies, the tenure of, signatures, identity and acts of officers or other officials, or other official acts; and such certificates may be relied upon by any person to whom the same shall be given, until receipt of notice to the contrary.

13. **Chair.** The Chair shall be chief executive officer under these Articles, and shall have overall control of and responsibility for all activities subject to this agreement and other powers which are incidental thereto. The Chair shall serve for a term of one year and any participating company serving as Chair for such term or any portion thereof may succeed itself, provided further that the Chair shall be limited to two (2) consecutive one-year terms, unless otherwise approved by the Board of Governors. The Chair shall not vote in any matter requiring action by the Board of Governors under these Articles of Agreement, except in the event of a tie vote among those Board members voting on any particular matter.

14. **Vice-Chair.** The Vice-Chair shall have immediate charge, subject to the direction and control of the Chair, of such matters as may be assigned to him or her. In the Chair's absence or inability for any reason to act as the Chair, his or her executive duties and powers under these Articles of Agreement may, with like effect, be performed and exercised by the Vice-Chair or, if the latter also be absent or unable to act, by a Chair pro tem elected by the Governors present.

15. **Committees.** The Chair may from time to time appoint such committees, (which may include representatives from participating companies that are not represented on the Board), with such duties and subject to such rules or conditions, not inconsistent herewith, as the Chair may deem desirable. The Chair shall appoint a Chair of each committee, who shall have the same powers and duties with respect to the committee so chaired as the Chair of the Board of Governors has with respect to the Board as a whole. Committee meetings shall be convened and conducted, and action may be taken by each committee, in the same manner as is provided herein for meetings and action of the Board of Governors.

18

1. **Fiscal Year.** The fiscal year for the purpose of administering this Agreement shall be the calendar year unless otherwise established by the Board of Governors.

2. **Accounts.** Funds held temporarily for the benefit of participating companies, including funds withheld pursuant to Article III, Section 6, shall be held by the Administrator and kept on deposit in such banks, trust companies or other depositories as may from time to time be designated and prescribed by resolution of the Board of Governors. The Administrator shall have full authority to deposit, withdraw, and invest such funds in order to carry out the purposes of these Articles of Agreement. The Administrator shall keep accurate records to identify such deposits, withdrawals, and investments which shall be available for review by the Board at any time.

3. **Investment Income.** All income on the funds held for the benefit of the participating companies shall, upon receipt thereof, become subject to all the appropriate provisions of this agreement, except for funds held pursuant to Article III, Section 6 in which case interest will be for the benefit of the participating company that has provided the security required.

1. **Indemnification.** Any person or insurer made, or threatened to be made, a party to any action, suit or proceeding, because such person or insurer was a participating company, or served as a member or representative of a member of the Board of Governors or other committee, or was an officer or employee as provided in this agreement or of the Administrator acting on behalf of the participating companies shall be indemnified against all judgments, fines, amounts paid in settlement, reasonable costs and expenses including attorney's fees, and any other liabilities that may be incurred as a result of such action, suit or proceeding, or threatened action, suit or proceeding, except in relation to matters as to which he, she or it shall be adjudged in such action, suit or proceeding to be liable by reason of willful misconduct in the performance of his, her or its duties or obligations to the

19

participating companies and, with respect to any criminal actions or proceedings, except when such person or insurer had reasonable cause to believe that his, her or its conduct was unlawful. Such indemnification shall be provided whether or not such person or insurer is a participating company, or is holding office, or is employed at the time of such action, suit or proceeding, and whether or not any such liability is incurred prior to the adoption of this Article. Such indemnification shall not be exclusive of other rights such person or insurer may have, and shall pass to the successors, heirs, executors or administrators of such person or insurer. The termination of any such civil or criminal action, suit or proceeding by judgment, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not in itself create a presumption that any such person or insurer was liable by reason of willful misconduct, or that he, she or it had reasonable cause to believe that his, her or its conduct was unlawful. If any such action, suit or proceeding is compromised, it must be with the approval of the Board of Governors; provided, however, the Board of Governors may delegate to the Administrator the authority to approve any such compromise of financial liability.

2.    In each instance in which a question of indemnification arises, entitlement thereto, pursuant to the conditions set forth in Section 1 of this Article, shall be determined by the Board of Governors which shall also determine the time and manner of payment of such indemnification; provided, however, that a person or insurer who or which has been wholly successful, on the merits or otherwise, in the defense of a civil or criminal action, suit or proceeding of the character described in Section 1 of this Article shall be entitled to indemnification as authorized in such section. The Board of Governors may delegate to the Administrator the authority to determine, in a manner consistent with this Article, entitlement to indemnification, and the time and manner of payment of such indemnification, for any indemnification requiring payment which is less than an amount as may be fixed from time to time by the Board of Governors. Nothing herein shall be deemed to bind a person or insurer who or which the Board of Governors has determined not to be entitled to indemnification, or to preclude such person or insurer from asserting the right to such indemnification by legal proceedings. Such indemnification as is herein provided shall be apportioned among all participating companies, including any named in any such action, suit or proceeding pursuant to Article X. To the extent that the action, suit or proceeding that gave rise to the indemnification concerns matters in one or more identifiable states in which the reinsurance is provided to an Authorized Insurance Plan under these Articles of Agreement and to particular policy years of such reinsurance, the expenses of indemnification shall be ratably apportioned to the participating companies for those states and policy years in question. The Board has the

20

authority to review and determine whether the legal fees or related expenses incurred by the indemnified person or entity were excessive and unreasonable under the circumstances, and if so, pay the indemnified person or entity only the reasonable amount of any such fees and expenses. All disputes in this regard shall be resolved under the procedure provided in Article V, Section 10, as the exclusive remedy of the person or entity being indemnified.



**Amendments to Articles of Agreement.** Any and all provisions of these Articles of Agreement and any amendments hereto shall be subject to amendment, alteration, repeal, or re-enactment at any annual meeting of the participating companies, or at any special meeting called for the purpose, by the affirmative vote of two-thirds (2/3) of the participating companies voting in person or by proxy and such two-thirds (2/3) of said participating companies shall write not less than 50.1% of the total net workers compensation premiums written by all members during the latest available calendar year for which information is in all states where these Articles are operative. For purposes of this determination, the net workers compensation premium written for each participating company shall only include those states where such participating company is providing reinsurance under these Articles. Not less than fifteen (15) calendar days' written notice of any such meeting shall be given, or caused to be given, by the Chair, in which notice the action proposed to be taken shall be fully set forth. Any amendments to these Articles of Agreement approved by the participating companies shall be binding on the participating companies for all outstanding policy years, but shall only be effective in those states where the amendments have been filed and approved by the insurance regulator as part of the Authorized Insurance Plans in effect in such states, or as otherwise approved by the regulator.

**Effective Date.** These Articles of Agreement and any amendments thereto, as approved under the provisions of Article VIII, shall become effective and binding on those insurers that become signatories hereto as of the date of execution by an authorized representative of any such insurer. Notwithstanding the

21

foregoing, if pursuant to the terms of any statute, regulation, or Authorized Insurance Plan, any insurer was under a legal duty to participate in the reinsurance provided under these Articles but failed or refused to execute these Articles as required, the execution of these Articles by such company at any time shall relate back to the policy year when the participating company first became obligated to execute these Articles.



1.  **Expenses and Payments.** Expenses incurred by the Administrator in the administration of the affairs subject to these Articles of Agreement, shall be a proper charge against, and shall be an obligation of the participating companies. A record shall be kept of all such expenses, and the amount thereof shall be apportioned to the participating companies in the ratio of their interest under the various Reinsurance Agreements. Such expenses may be paid out of funds held by the Administrator or shall be assessed against the participating companies.

2.  **Transactions, Accounts, and Financial Statements.** Separate accounts shall be maintained by the Administrator covering transactions for each policy year in each state based on the information provided to the Administrator by the Servicing Carriers pursuant to the Reinsurance Agreements. The Administrator shall prepare and deliver to each participating company a statement showing the apportionment of only that company's obligations under the Reinsurance Agreements, including the expenses of administration provided for herein and the condition of each account. The Administrator shall distribute premium and collect reinsurance recoverables as provided for in the Reinsurance Agreements. The Board shall select independent auditors for engagement by the Administrator to examine an annual special-purpose financial statement prepared by the Administrator. The preparation and examination of such special-purpose financial statement shall be performed pursuant to accounting policies and standards that may be adopted from time to time by the Board. As part of this process, the auditors shall make such actuarial determinations as are necessary and appropriate, including the validation of appropriate reserves for each policy year. Upon Board approval of the special-purpose financial statement examination report, the Administrator shall make a copy of such examination report available upon request to any participating company.

22

3.  **Actuarial Opinion.** A statement of actuarial opinion for the reserves on policies issued pursuant to Authorized Insurance Plans and reinsured under approved Articles of Agreement shall be prepared and certified by an actuary of the Administrator who meets the qualification standards of the American Academy of Actuaries and the Casualty Actuarial Society, upon the conclusion of each fiscal year. The Administrator shall make a copy of such statement of actuarial opinion available upon request to any participating company.



1.  **Titles.** The titles to the various articles and sections hereof are for reference purposes only and shall not be used in the construction or interpretation of these Articles of Agreement.

2.  **Severability.** In the event any term or provision of these Articles of Agreement shall to any extent be held to be illegal, invalid, unenforceable, or nonoperative as a matter of law, the remaining terms and provisions hereof shall not be affected thereby, and each such term and provision shall be valid and shall remain in full force and effect.

## *SIGNATURE PAGE TO FOLLOW*

THE ARTICLES OF AGREEMENT may be simultaneously executed by the participating companies in any number of counterparts, written or printed or both, and each counterpart so executed shall be deemed to be an original and all such counterparts shall constitute one and the same document.

IN WITNESS WHEREOF, the undersigned have respectively caused their corporate names to be hereunto subscribed by the President or a Vice-President and a corporate seal to be hereto affixed, attested by a duly authorized officer or notary public.

Company

By: _____
President/Vice President Signature

_____
President/Vice President Printed Name

Title: _____

Attest: _____
Officer's or Notary's Signature

SEAL

.

Date Subscribed: _____

# EXHIBIT B

PRIVATE AND CONFIDENTIAL

(This memorandum is based on personal interviews with AIG employees
and assumes the accuracy of their comments).

TO: M.R. Greenberg                     DATE: January 31, 1992

FROM: ▮▮▮▮▮▮▮

RE: AIGRM and AI Global Operations
    Summary of Attached Memorandum

### ILLEGAL CONDUCT

The conduct of AIG in connection with the domestic workers
compensation ("WC"), general liability ("GL") and auto liability
("AL") business written by Division 55, Division 50 and AI Global
involves various kinds of intentional violations of State and
Federal law. Such conduct would also be a violation of the new
Federal insurance fraud law if it is enacted in early 1992 as
expected. Under the U.S. Sentencing Commission Guidelines which
became law on November 1, 1991, the illegal activities are such
that a Federal criminal conviction would expose AIG to fines and
penalties in the hundreds of millions of dollars and would
jeopardize the careers of numerous long-time employees. The major
elements of illegality include false reporting of WC premiums as GL
premiums, exceeding maximum legal WC premiums, avoiding residual
market and other WC-related assessments and expenses, avoiding
premium taxes, overcharging clients for residual market assessments
and premium taxes, booking fictitious premiums and assets, SEC
reporting violations, illegal rebates to insureds and intentional
use of unfiled, unapproved WC contracts which would not qualify for
regulatory approval in most states.

### CORRECTIVE ACTIONS

1. Cessation Of Illegal Conduct. Instructions should be
given immediately to all relevant parties that all false reporting
of WC premiums as GL premiums and related illegal conduct described
in the attached memorandum must cease immediately.

2. Housecleaning. In order for AIG to meet the requirements
of the U.S. Sentencing Commission Guidelines concerning an
effective Compliance Program, all employees who were aware of the
illegal conduct over the years and who participated in, or had
supervisory authority over those who committed the illegal acts,
will have to be terminated or removed from positions of
"substantial discretionary authority". Employees affected include
J. Smetana, ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮, ▮▮
▮▮▮▮, ▮▮▮▮▮▮▮ and numerous others.

3. Restitution. The amount of monetary damages to insureds,
State tax authorities and other insurers caused by AIG's employees
must be calculated and a method of restitution must be devised.

4. Compliance Program. Pursuant to the U.S. Sentencing
Commission Guidelines, a monitoring and compliance program must be
instituted to assure cessation of the illegal conduct and to detect
and prevent any future illegal conduct.

CONFIDENTIAL                                      AIG-D 0023434

**PRIVATE AND CONFIDENTIAL**

(This memorandum is based on personal interviews with AIG employees and assumes the accuracy of their comments).

TO:    M.R. Greenberg                    DATE:  January 31, 1992

FROM:  

RE:    AIGRM and AI Global Operations

        I have now completed some preliminary informal information gathering and following are the results:

        The conduct of AIG in connection with the domestic workers compensation ("WC"), general liability ("GL") and auto liability ("AL") business written by Division 55, Division 50 and AI Global* is permeated with illegality. The result is that AIG makes millions of dollars illegally each year. The conduct currently involves intentional violations of State and Federal law and assuming that, as expected, the Federal insurance fraud law is enacted early in 1992, this conduct will be a violation of the new insurance fraud law. Under the U.S. Sentencing Commission Guidelines which took effect on November 1, 1991, the level of management involvement and culpability, the amount of money involved and the widespread nature of the illegal activities are such that a Federal conviction would expose AIG to fines and penalties in the hundreds of millions of dollars and would cause the loss of jobs and careers of numerous long-time employees of AIG. The situation is so serious that it could threaten the continued existence of senior management in its current form. There are 13 primary elements of illegality involved, as follows:

        (1) GENERAL REPORTING AND FILING VIOLATIONS. By various methods, AIGRM and AI Global ("AIGRM/Global") falsely report a substantial portion

----

*I understand that AI Global is being renamed and that its domestic WC, GL and AL business is being transferred to Division 55 and Division 50.

**CONFIDENTIAL**                              **AIG-D 0023435**

-2-

of their WC premiums as GL premiums. This is a violation of State statutes and regulations which require that premiums be reported by line of business. In addition, in many cases, guaranteed cost WC policy forms are filed and are the only forms approved for use by AIG in the particular States. However, the approved guaranteed cost forms are intentionally ignored by AIG employees, who write the business on Indemnity Agreement forms which have not been filed or approved and which would not qualify for approval in most States.

(2) 18 MONTH CLOSEOUT PROGRAM. Under this program, AIGRM purports to terminate the WC policy at the first adjustment point 18 months after inception, calculates the refund of WC premium due to the insured and records the refund on its books as having been paid to the insured. Simultaneously, AIGRM records on its books that an amount equal to the WC refund was paid to AIG as a "Stop-Gap Liability Policy" premium, which premium is reported as GL premium. These are book entries only; no cash refund is paid. In addition, any further premiums generated at later adjustment points by the WC business for which the policy was terminated are also booked by AIGRM as GL premiums. This constitutes one of the methods by which AIGRM falsely reports WC premiums as GL premiums.

(3) EXCEEDING MAXIMUM LEGAL PREMIUMS. AIGRM/Global's false reporting of WC premiums as GL premiums enables them to collect WC premium in excess of the maximum amount permitted by law for a particular policy and to avoid reporting such collections.

(4) AVOIDING RESIDUAL MARKET ASSESSMENTS. AIGRM/Global's false reporting of WC premiums as GL premiums enables them to report a much lower volume of WC premiums than they actually write. Since WC residual market assessments against AIG are based on its reported WC premium volume, this results in a substantial reduction of such assessments against AIG. Rough estimates are that the amount of WC premiums not being reported is in the range of $300-$400 million or more annually at current levels of business, and that this results in an unlawful benefit to AIG in the range of $60-$80 million or more annually. The amount of residual market assessments which AIG avoids by this technique is, of necessity, paid as additional assessments by the other insurance companies subject to WC residual market assessments.

(5) OVERCHARGING CLIENTS FOR RESIDUAL MARKET ASSESSMENTS. Concerning Division 50's "50% Pay-In Program", AIGRM, with respect to the uncollected portion of the standard premium, does not pass along to the insured the benefit of the reduced residual market assessments described in paragraph (4) above. Instead, AIGRM charges the insured a residual market loading ("RML") equal to the amount the RML would have been if AIGRM had not falsely under-reported its WC premium volume and had collected and reported 100%

CONFIDENTIAL

AIG-D 0023436

-3-

of the standard premium instead of a lesser portion. The result is that AIGRM is charging its insureds for residual market assessments on the uncollected portion of the standard premium which are not made against AIG and which AIG does not pay.

(6) AVOIDING STATE PREMIUM TAXES. Since AIG's State WC premium tax obligations are based on its reported WC premium volume and since the GL premium tax rate is generally somewhat lower than the WC tax rate, AIGRM/Global's false reporting of WC premiums as GL premiums enables AIG to pay lower premium taxes than it is legally obligated to pay. In addition, State laws require that WC premiums be reported and paid to every State where an insured's employees are located, while GL premiums are required only to be reported and paid to a single State, usually the domiciliary of the named insured. The result is that, not only is AIG paying less taxes than it is legally obligated to pay, but individual States are losing substantial tax revenues to which they are legally entitled.

(7) OVERCHARGING CLIENTS FOR STATE PREMIUM TAXES. Concerning Division 50's "50% Pay-In Program", AIGRM, with respect to the uncollected portion of the standard premium, does not pass along to the insured the benefit of the reduced premium tax payments described in paragraph (6) above. Instead, AIGRM charges the insured a premium tax loading equal to the amount the premium tax would have been if AIGRM had not falsely under-reported its WC premium volume and had collected and reported 100% of the standard premium instead of a lesser portion. The result is that AIGRM is charging its insureds for premium taxes on the uncollected portion of the standard premium which AIG does not report and does not pay.

(8) AVOIDING GUARANTY FUND AND SPECIAL PURPOSE FUND ASSESSMENTS. Most States have Guaranty Funds and Special Purpose Funds that levy assessments against insurers based on their reported WC premium volume. In these States, AIGRM/Global's false reporting of WC premiums as GL premiums enables AIG to pay substantially lower assessments for Guaranty Funds and Special Purpose Funds than it is legally obligated to pay. The amount of such assessments which AIG avoids is, of necessity, paid as additional assessments by the other insurance companies subject to Guaranty Fund and Special Purpose Fund assessments.

(9) AVOIDING REINSURANCE PREMIUMS DUE MINNESOTA REINSURANCE FACILITY. Minnesota requires all WC insurers to purchase a mandatory WC reinsurance cover for a designated excess layer of coverage. The reinsurance premium paid by each WC direct writer is based on its reported WC premium volume in Minnesota. AIGRM/Global's false reporting of WC premiums as GL premiums enables AIG to pay lower reinsurance premiums to the Minnesota facility than it is legally obligated to pay.

CONFIDENTIAL

AIG-D 0023437

-4-

(10) <u>BOOKING FICTITIOUS PREMIUMS AND ASSETS</u>. In Division 50's "50% Pay-In Program", only 50% of the designated maximum premium is collected at the inception of the policy. However, an amount equal to the uncollected portion of the premium is recorded by AIGRM at the inception of the policy as a reinsurance assumed premium and as an asset. These constitute fictitious premiums and assets on the books of AIG, as there are no reinsurance contracts and these are not reinsurance premiums.

(11) <u>BOOKING FICTITIOUS PREMIUMS AND ASSETS</u>. A study has been performed which estimates the amount of retrospective WC premiums expected to be collected on the subject business during the next decade. A practice has been instituted of taking down $25 million each quarter of the expected WC retro premiums and recording it as premium income on an accrual basis. This premium income is booked as reinsurance assumed premiums instead of WC premiums. This violates State statutes and regulations which require that premiums be reported by line of business. Also, such premiums and assets constitute fictitious income and assets on the books of AIG since there are no reinsurance contracts and these are not reinsurance premiums. In addition, this method avoids the payment of State premium taxes, residual market assessments and other fees and assessments that apply to written direct WC premiums but don't apply to reinsurance premiums. The annual unlawful benefit to AIG could be in the range of $15-$20 million.

(12) <u>SEC REPORTING VIOLATIONS</u>. The reporting of fictitious premiums and assets referred to in items (10) and (11) above exists in the Form 10-K and Form 10-Q filings which AIG makes to the SEC. Assuming the amounts involved and the related circumstances constitute "material facts", this would trigger Section 78ff of the U.S.C.A., the penalty provision for false reports to the SEC. Section 78ff prescribes a penalty of up to $1 million and a jail term of up to 10 years for each person who willfully and knowingly makes or causes to be made a false report. It is possible that, for purposes of this provision, each quarterly and annual report would constitute a separate false report.

(13) <u>ILLEGAL REBATES</u>. In AIGRM's "Cash Collateral" program, AIGRM, with respect to some of the business, has dispensed with the Notes for which cash was previously held as collateral, and just accepts the cash which is booked as premium income. If Notes are used, the Notes can be booked as premium income, the cash deposits are collateral for the Notes, and interest can legally be paid to the insureds on the cash deposits collateralizing the Notes. However, when the Notes are eliminated and the cash is booked as premium income, as is the current practice for some of the business, it is illegal to pay interest on the cash because

CONFIDENTIAL

AIG-D 0023438

-5-

such interest constitutes a rebate to the insureds. Most, if not all, States have laws prohibiting insurers from paying rebates to their insureds.

A jury could find that the above conduct constitutes various kinds of State and Federal civil and criminal violations, including common law fraud, mail fraud, Securities Act violations, RICO violations, State statutory and regulatory violations, State tax fraud and breach of contract. In addition, this conduct would be a violation of the proposed new Federal insurance fraud statute if it becomes law in early 1992 as expected. The RICO statute, in addition to stringent criminal penalties, provides a treble damages civil action to private plaintiffs. Potential plaintiffs who could take advantage of this and the other causes of action are the other insurance companies who have to pick up AIG's share of residual market assessments and other assessments, the States who lose premium tax payments to which they are legally entitled and AIG's insureds who pay for residual market assessments and premium taxes that AIG does not report or pay. Also possible are class actions by such plaintiffs seeking bad faith and punitive damages. If successful, such class actions would result in astronomical damages awards against AIG.

CONFIDENTIAL

AIG-D 0023439

-6-

## CORRECTIVE ACTIONS

Compliance with State and Federal laws, as well as fulfillment of the fiduciary duties of senior management, require that the following corrective actions be taken immediately.

1. **Cessation of Illegal Conduct.** Instructions should be given immediately to all relevant parties that all illegal conduct must cease immediately. The instructions should specifically state that:

1) All WC premiums must be booked and reported as WC premiums and no WC premiums will be booked and reported as GL or any other line of premiums.

2) All additional premiums paid at the adjustment points under the Retrospective and Indemnity Agreements which are generated by WC business must be booked and reported as WC premiums and not GL or AL premiums.

3) The "18-month Closeout Program" under which the WC policy is purported to be terminated and the WC refund plus all additional WC premiums are booked and reported as Stop Gap Liability Policy premiums must be halted immediately.

4) The practice of booking a reinsurance assumed premium in the amount of the uncollected portion of the WC premium in Division 50's "50% Pay-In Program" must be halted immediately.

5) The practice of booking reinsurance assumed premiums in the amount of $25 million per quarter in connection with the accrual of future WC retro premiums must be halted immediately.

6) No premiums for a particular policy should be collected in excess of the maximum permitted by applicable law.

7) All residual market and other WC-related assessments, premium taxes, and any other applicable fees and expenses must be paid on the basis of full and accurate booking and reporting as WC premiums of all premiums generated by the WC business, including adjustment premiums paid under Retrospective or Indemnity Agreements.

**CONFIDENTIAL**

**AIG-D 0023440**

-7-

2. <u>Housecleaning</u>. Whenever illegal acts by its employees are discovered by a corporation, corrective actions include disciplinary action against the employees involved in or responsible for the misconduct. Ordinarily, this would mean termination of those employees directly involved. In addition, in order to meet the requirements of the U.S. Sentencing Commission Guidelines (which became law on November 1, 1991) concerning an effective Compliance Program, AIG must not delegate substantial discretionary authority to individuals "with a propensity to engage in illegal activities". To comply, AIG will have to remove from positions of substantial discretionary authority all employees who were aware of the illegal conduct over the years and who participated in or had supervisory authority over those who committed the illegal acts. Employees who would be affected by such compliance include ████████████████████ ████████████████████████████████ as well as numerous others. Since there is no statutory or case law yet which defines precisely what is meant by "with a propensity to engage in illegal activities", it is possible that any others in the AIG chain of command above Messrs. Smetana and ██████ who had knowledge of the illegal conduct and approved or condoned it would also be affected.

If senior management fails to implement a Compliance Program meeting the above requirements, and such failure results in a substantially higher fine for a future conviction than would otherwise have been imposed, senior management and the AIG Board of Directors will be exposed to derivative suits and class action suits by AIG shareholders for intentional misconduct, breach of fiduciary duty and negligence.

3. <u>Restitution</u>. Whenever illegal acts by its employees are discovered by a corporation, corrective actions include restitution for any harm caused by the employee misconduct. This would require AIG to calculate the amount of monetary damages that the acts of its employees have caused to other insurers subject to residual market assessments, States which have lost premium taxes, insureds who have been charged for residual market assessments and premium taxes which AIG did not pay, State Guaranty Funds, and any others who have been harmed by AIG's conduct. A fair method of restitution to injured parties must be devised.

4. <u>Compliance Program</u>. Whenever illegal acts by its employees are discovered by a corporation, corrective actions include instituting a monitoring and compliance program to prevent any recurrence of the illegal activity. This means a system must be set up to independently monitor the activities which have been the subject of illegality to assure prevention and detection of any additional illegal conduct in the future. An audit team of employees from units other than those in which the illegal conduct occurred, or from an outside firm, will be necessary for this function.

CONFIDENTIAL

AIG-D 0023441