IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL COUNCIL ON ) <br> COMPENSATION INSURANCE, INC., ) <br> solely as Attorney-In-Fact for the participating ) <br> companies of the National Workers Compensation ) <br> Reinsurance Pool, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> AMERICAN INTERNATIONAL GROUP, INC., ) <br> AIG CASUALTY COMPANY F/K/A ) <br> BIRMINGHAM FIRE INSURANCE COMPANY ) <br> OF PENNSYLVANIA, AIU INSURANCE ) <br> COMPANY, AMERICAN HOME ASSURANCE ) <br> COMPANY, AMERICAN INTERNATIONAL ) <br> PACIFIC INSURANCE COMPANY F/K/A ) <br> AMERICAN FIDELITY COMPANY, ) <br> AMERICAN INTERNATIONAL SOUTH ) <br> INSURANCE COMPANY F/K/A AMERICAN ) <br> GLOBAL INSURANCE COMPANY, ) <br> AMERICAN INTERNATIONAL SPECIALTY ) <br> LINES INSURANCE COMPANY F/K/A ) <br> ALASKA INSURANCE COMPANY, ) <br> COMMERCE AND INDUSTRY INSURANCE ) <br> COMPANY, INC., GRANITE STATE ) <br> INSURANCE COMPANY, ILLINOIS ) <br> NATIONAL INSURANCE COMPANY, ) <br> INSURANCE COMPANY OF THE STATE OF ) <br> PENNSYLVANIA, NATIONAL UNION FIRE ) <br> INSURANCE COMPANY OF PITTSBURGH, ) <br> NEW HAMPSHIRE INDEMNITY COMPANY, ) <br> and NEW HAMPSHIRE INSURANCE ) <br> COMPANY, ) <br> ) <br> Defendants. ) | No. 07 C 2898 <br><br> Judge Robert W. Gettleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiff National Council on Compensation Insurance, Inc. ("NCCI"), solely as attorney-in-fact for the participating companies of the National Workers Compensation Reinsurance Pool ("the Pool"),[1] has brought an eight-count complaint against defendants American International Group, Inc. ("AIG Inc.") and its affiliates and subsidiaries, AIG Casualty Company f/k/a Birmingham Fire Insurance Company of Pennsylvania, AIU Insurance Company, American Home Assurance Company, American International Pacific Insurance Company f/k/a American Fidelity Company, American International South Insurance Company f/k/a American Global Insurance Company, American International Specialty Lines Insurance Company f/k/a Alaska Insurance Company, Commerce and Industry Insurance Company, Inc., Granite State Insurance Company, Illinois National Insurance Company, Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, New Hampshire Indemnity Company, and New Hampshire Insurance Company (collectively "AIG").

The complaint alleges that AIG has committed a massive fraud against the Pool and its member workers compensation insurance companies, and asserts claims under the Racketeer Influenced and Corrupt Organization's Act ("RICO"), 18 U.S.C. § 1966 et seq., and other doctrines, seeking an accounting, damages, and other relief. In its answer to the complaint, AIG raised numerous defenses, all of which were either voluntarily withdrawn or dismissed by the

---

[1]On December 11, 2007, Magistrate Judge Schenkier, in the context of a discovery dispute, held that both NCCI and the Pool are plaintiffs in this case, although the individual members of the Pool are not. Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Group, Inc., 2007 WL 4365371 (N.D.Ill. Dec. 11, 2007). Although no party filed an objection to Judge Schenkier's order, the Pool has never sought to join this action as a plaintiff. This court does not regard Judge Schenkier's discovery order as binding on the parties or the court.

court in its February 23, 2009, Memorandum Opinion and Order. AIG also filed counterclaims for an equitable accounting and an action on an open, current, and mutual account, both of which survived NCCI's motion to dismiss. Additionally, AIG filed a twelve count third-party complaint against twenty-four named companies and numerous unnamed companies. Of the original third-party claims, only four remain.

AIG has filed the instant motion to dismiss for lack of subject matter jurisdiction pursuant to Rules 12(b)(1), 12(g)(2), and 12(h)(3). Because this court finds that NCCI does not have standing to pursue this action, AIG's motion is granted.

## **FACTS**[2]

All states require employers to provide workers compensation insurance for their employees. Most employers find insurers willing to provide them with coverage; these employers participate in what is known as the "voluntary market" for workers compensation insurance. Insurers that provide coverage to the voluntary market are also required to provide coverage to the "residual market" – the market for employers who cannot obtain coverage on the voluntary market – through a state's assigned risk plan. Under that plan, the amount of insurance an insurer is required to provide to the residual market is directly proportional to the amount of premiums it collects for the policies it writes for the voluntary market.

---

[2]For a more complete recitation of the facts, please see the court's opinions of Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Group, Inc., 2009 WL 466802 (N.D.Ill. Feb. 23, 2009); Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Group, Inc., (N.D.Ill. Dec. 26, 2007) (unpub.); Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Group, Inc., 2007 U.S. Dist. LEXIS 59707 (N.D. Ill. Aug. 6, 2007). For the purposes of a motion to dismiss, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

The National Workers Compensation Reinsurance Pool ("the Pool") is an unincorporated association active in more than forty states. Established in 1970, the Pool provides insurance companies with a means of complying with their residual market requirements. The Pool is organized and governed by the Articles of Agreement ("the Agreement"), a contract to which all participating insurers ("Participating Companies") have agreed and are signatories. The Agreement provides that NCCI, a statistical, research, and ratemaking not-for-profit corporation, is the administrator of the Pool, and is responsible for a variety of functions related to fulfilling the purpose of the Pool. As administrator, NCCI "executes the quota share reinsurance contracts on behalf of the participating companies . . . performs all accounting, actuarial, and administrative functions for those agreements including data collection and billing." It also administers bank accounts for the Pool and the Participating Companies, and functions as the attorney-in-fact for each Participating Company.[3]

NCCI's primary role is to calculate the "reinsurance participation rate" for each Participating Company using premium data from the annual certified financial reports filed by each company. These rates reflect each company's proportional share of the residual market on a a state-by-state and policy-year-by-policy-year basis. A company's annual reinsurance participation rate is the ratio of the amount of voluntary market workers compensation premiums billed by that company (numerator) to the total amount of workers compensation premiums billed in the voluntary market by all Participating Companies (denominator). Consequently, any

---

[3] The court incorrectly stated in its February 23, 2009, Memorandum Opinion and Order that NCCI functions as the attorney-in-fact for the Pool, rather than the Participating Companies.

company that underreports its premiums to NCCI decreases its reinsurance participation rate and the overall total used to calculate all the rates.

In 2005 a New York state investigation revealed that AIG had, over several decades, provided false reports of its workers compensation premiums to NCCI and state tax authorities to evade its residual market obligations. That investigation resulted in a formal report issued by AIG detailing its unlawful conduct and determining that the unreported workers compensation premiums totaled between $300 million and $400 million annually and gave AIG "an unlawful benefit in the range of $60-80 million or more annually." The report admitted that AIG's reporting practices were unlawful and exposed it to civil liability and potential criminal prosecution.

In 2006 AIG entered into settlement agreements with several enforcement authorities, including a $1.6 billion settlement with New York and federal authorities. The Participating Companies did not believe that the settlement agreements offered full and fair restitution. According to NCCI, total damages exceed $1 billion. For that reason, the Pool has refused to allow any state to tender a release on its behalf, which precludes those states from participating in the settlement fund.

On May 24, 2007, NCCI filed the instant suit based on injury caused to the Participating Companies as a result of AIG's alleged underreporting of its premium data. The caption of the complaint lists only NCCI, "solely as Attorney-In-Fact for the participating companies of the National Workers Compensation Reinsurance Pool," as plaintiff. As noted in footnote 1 above, on December 11, 2007, Magistrate Judge Schenkier, in the context of a discovery dispute, held that both NCCI and the Pool are plaintiffs in this case, although the individual members of the

5

Pool are not. This court adopted that holding in its February 23, 2009, Memorandum Opinion and Order, because the issue was not briefed for the motions pending at that time. The court now revisits this issue on the merits because it is central to the instant motion.[4]

## **DISCUSSION**

*Standard of Review*

The threshold requirement for bringing a suit in federal court is that the plaintiff present a case or controversy between him- or itself and the defendant within the meaning of Article III of the U.S. Constitution. See Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975). A central element in the case-or-controversy requirement is that the plaintiff have standing to bring the suit. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992). To possess standing, a plaintiff must show three things: (1) that it personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) that the injury fairly can be traced to the challenged action; and (3) that the injury is likely to be redressed by a favorable decision in the suit. Lujan, 504 U.S. at 560-61; see Valley Forge Christian College v. Americans United For Separation of Church and State, Inc., 454 U.S. 464, 472, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982); see also Northeastern

---

[4]Although NCCI complains that AIG's instant motion is untimely, the court notes that no party has sought to join the Pool as a plaintiff under Fed. R. Civ. P. 17(a), the caption naming NCCI as the single plaintiff has not been changed, and no attempt to file an amended complaint naming the Pool as a plaintiff has been made. In any event, the burden remains on a plaintiff to establish (or at least sufficiently allege) its standing, a jurisdictional matter that may be raised at any time. Fed. R. Civ. P. 12(h)(3); Lujan, 504 U.S. at 561.

Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663-64, 124 L. Ed. 2d 586, 113 S. Ct. 2297 (1993).

In ruling on a motion to dismiss for lack of standing, the material allegations of the complaint must be accepted as true, and the complaint is to be liberally construed in favor of the plaintiff. See Warth, 422 U.S. at 501; see also Jenkins v. McKeithen, 395 U.S. 411, 421, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969). The complaint should not be dismissed unless it appears that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. See Jenkins, 395 U.S. at 422.

AIG argues that the instant action should be dismissed for lack of subject matter jurisdiction because NCCI, the sole plaintiff identified in the complaint, does not have standing to sue AIG for injuries alleged to have been suffered only by the Participating Companies. AIG raises two core arguments in support of its motion. First, it contends that NCCI does not have Article III standing to pursue those claims because it does not have legal title to or a property interest in the Participating Companies' claims. Second, AIG argues that standing would fail even if the Pool were joined as a party plaintiff because, (1) the complaint is bereft of allegations that the Pool was injured by AIG's alleged underreporting, and (2) the Pool cannot rely on associational standing.

*First Party Standing*

*1. Attorney-in-Fact Standing*

The Supreme Court recently held in Sprint Communications Co. v. APCC Services, Inc., 128 S. Ct. 2531 (2008), that a plaintiff must have legal title to, or a property interest in, a legal claim to have Article III standing to pursue that claim. Thus, merely assigning a case to an

attorney to prosecute the claim does not confer standing on the attorney. The Second Circuit affirmed this view in W.R. Huff Asset Management Co. v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008), holding that absent legal title or ownership of a legal claim, grant of "a mere power-of-attorney – i.e., an instrument that authorizes the grantee to act as an agent or an attorney-in-fact for the grantor . . . does not confer standing to sue in the holder's own right because a power-of-attorney does not confer an ownership interest in the claim." Id. at 108.

Here, AIG argues and NCCI concedes, that although the Participating Companies gave NCCI the authority to prosecute their claims arising under breach of the Agreement, the Participating Companies did not transfer legal title of their claims to NCCI.

Article V § 12 of the Agreement provides:

Upon direction by the Board of Governors, the Administrator [NCCI] is empowered to act as attorney-in-fact for each participating company to prosecute, to defend, to submit to arbitration, to settle, and to propose or to accept a compromise with respect to, any claim existing in favor of, or against, such participating company based on or involving any matter relating to this Agreement or to intervene in any action or proceeding related thereto.

As explained in this court's February 23, 2009, Memorandum Opinion and Order, "nothing in the text [of the Agreement] suggests an explicit or implicit assignment of sole authority from Participating Companies to the Pool Board to bring legal claims arising from the Agreement. . . . This language does not evidence an intention by the signers to assign all their legal rights to the Pool Board." Therefore, because NCCI does not hold title to the Participating Companies' legal claims against AIG, it lacks Article III standing, suing solely as attorney-in-fact for the Participating Companies, to pursue the instant case.

2. *Direct Injury*

NCCI argues in the alternative that both NCCI, in its capacity as administrator of the Pool, and the Pool itself have independent standing because each suffered direct injury as a result of AIG's underreporting. NCCI claims that it suffered direct injury because it relied on AIG's misleading data in calculating and allocating the premium, losses, and expenses of the residual market. Further, the Pool was allegedly injured by AIG's conduct because AIG's actions undermined the "integrity of the allocation mechanism," causing it to fail and compromising the purpose of the Pool. AIG counters that NCCI did not include specific allegations in the complaint that either the Pool or NCCI, in its capacity as administrator, suffered any harm as a direct and proximate result of AIG's underreporting.

The complaint alleges that NCCI, as administrator of the Pool, relied upon AIG's false reports and representations in carrying out its duties. It does not, however, allege that either NCCI or the Pool were harmed as a direct and proximate result of AIG's actions. Rather, the complaint alleges only that the Participating Companies suffered harm from AIG's underreporting. This defect in the complaint is not a mere technicality, but compromises the underlying premise of NCCI's theory of the case. While it may be possible to plead and prove a claim that NCCI and the Pool suffered harm as a consequence of AIG's underreporting, that is not the claim presently before the court. Therefore, based on the pleadings, neither NCCI, as administrator of the Pool, nor the Pool itself have Article III standing stemming from a direct injury.

3. *Bailee Standing*

NCCI's theory of bailee standing is similarly unavailing. NCCI controlled pass-through bank accounts created in the Pool's name and administered by NCCI to "safeguard reinsurance premiums and loss payments." As administrator of the accounts NCCI had the right to receive, (1) accurate premium data from each Participating Company, and (2) payment from each Participating Company in satisfaction of its obligation to the Pool. Because AIG allegedly compromised these rights when it underreported its premium data, NCCI claims that it has standing to bring suit on its own behalf.

A bailment is defined as "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be." Monroe Sys. for Bus., Inc. v. Intertrans Corp., 650 So. 2d 72, 75-76 (Fla. Dist. Ct. App. 1994) (quoting Dunham v. State, 192 So. 324, 326 (Fla. 1939)).[5] "As a general rule, delivery of the item to the bailee must give him or her the right to exclusive use and possession of the item for the period of the bailment." Meeks ex rel Estate of Meeks v. Fla. Power & Light Co., 816 So. 2d 1125, 1129 (Fla. Dist. Ct. App. 2002). Bailees have standing to assert claims arising out of wrongful treatment of the bailed property in their possession. See Via Mat Int'l S. Am. Ltd. v. U.S., 446 F.3d 1258, 1262 (11th Cir. 2006); see also C.F. Harms Co. v. Erie R.Co., 167 F.2d 562, 565 (2d Cir. 1948).

---

[5] The purportedly bailed property – the pass-through bank accounts – were created pursuant to the Agreement and NCCI's Administration Agreement, the latter of which contains a Florida choice-of-law provision. Therefore, Florida law governs the issue of whether NCCI was serving as a bailee.

Here, the documents governing the pass-through accounts did not create a bailor-bailee relationship. The documents not only refer to NCCI as the agent through whom the funds shall be transmitted to all parties, but also state that NCCI holds the funds for the Participating Companies' benefit, and specify that NCCI shares control over the accounts with the Pool Board members. Nowhere in the agreements does it specify that NCCI has exclusive possession or control of the pass-through accounts. This arrangement is more accurately described as a principal-agent relationship. See Monroe Sys., 650 So. 2d at 75 (quoting RESTATEMENT (SECOND) OF AGENCY § 1 (1958) (defining principal-agent relationship as "'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'")). Consequently, NCCI does not have constitutional standing as a bailee.

*Trustee Standing*

NCCI also argues that NCCI and the Pool have trustee standing to bring suit on behalf of the Participating Companies. Trustees have Article III standing to assert claims arising out of damage to trust property. Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 462 (1980). NCCI argues that upon signing the Agreement, each Participating Company gave plenary authority over its Pool-centered claims in trust, to be held and controlled by the Pool Board, acting through the Pool and NCCI, as trustees, for the benefit of the Participating Companies as a whole. To support this argument, NCCI stresses that the power to prosecute, settle, release, and compromise these claims is absolute – "nothing is left with the settlor" – and that the trustees do not function as agents, but rather act independently, as fiduciaries to all the Participating Companies collectively.

11

This argument is readily disposed of for the same reason NCCI's attorney-in-fact argument failed, namely; the Agreement failed to transfer title to the Participating Companies' legal claims to NCCI.

A trust is defined as "a fiduciary relationship with respect to property, arising from a manifestation of intent to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee." RESTATEMENT (THIRD) OF TRUSTS § 2 (2003). Here, the complaint and the Agreement are both silent about the creation of a trust. As NCCI notes, however, this silence is not fatal so long as NCCI can demonstrate an intent to create a trust. See RESTATEMENT (THIRD) OF TRUSTS § 4, Comment a (2003) (manifestation of intention by the settlor to create a trust is required, either through words or conduct). However, "'[t]here must be a particular intent to confer benefits through the medium or a trust, and not through some related or similar device'" Eychaner v. Gross, 202 Ill. 2d 228, 255 (Ill. 2002) (quoting G. Bogert, Trusts & Trustees § 46, at 489-91 (rev. 2d ed. 1984)).

NCCI has not sufficiently demonstrated that in signing the Agreement the Participating Companies intended to create a trust and not some other device by transferring title to their legal claims arising from their participation in the Pool to either NCCI or the Pool. Article V § 12 of the Agreement, quoted in its entirety earlier in this opinion, on its face appoints NCCI as the Participating Companies' attorney-in-fact, creating an agent-principal relationship. See RESTATEMENT (SECOND) OF TRUSTS § 2 (1959) ("A trustee has title to the trust property; an agent as such does not have title to the property of his principal, although he may have powers with respect to it."). It also states that NCCI may "intervene in any action" related to the

Agreement, implying that the Participating Companies retain the right to prosecute their own claims arising from their participation in the Pool.

That the plain language of the Agreement may be at odds with the true intention of the Participating Companies is not a conclusion this court is willing to reach. A legally sophisticated signatory, which each of the hundreds of Participating Companies surely is, would expect a legal document to incorporate all the terms of the agreement at the time it is signed. See Eychaner, 202 Ill. 2d at 255 ("'In most cases, and particularly where the intention is manifested in an instrument drawn by a competent lawyer, there is no difficulty in determining whether the owner of property has manifested an intention to create a trust.'" quoting 1 W. Fratcher, Scott on Trusts § 23, at 249-50 (4th ed. 1987)). The failure to transfer title to the legal claims here is dispositive, and therefore, NCCI cannot proceed on the basis of trustee standing.

*Associational Standing*

NCCI's final alternative argument is based on the theory that the Pool, if joined as a plaintiff, would have associational standing to bring suit on behalf of the Participating Companies. An organization has associational standing, and may bring suit on behalf of its members, when it meets all three prongs of the Hunt test: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). AIG argues that NCCI fails to meet the standard of associational standing for two main reasons. First, it argues that the Pool is a contractual arrangement and not an association designed to assert its members' collective

interests. Second, it argues that associational standing is not available here because the complaint seeks money damages.

There is no dispute that the Pool's members – the Participating Companies – have standing to bring claims separately against AIG. The disagreement arises from the second and third prongs of the Hunt test.

Regarding the second prong, the Pool is as an unincorporated association of insurance companies that have voluntarily agreed to participate in an arrangement that equitably apportions the risk arising from the residual workers compensation insurance market. The primary purpose of the Pool is to provide a mechanism and a methodology for Participating Companies to meet their regulatory obligations and pay their fair share of the residual market. Thus, the Participating Companies' interests in adjusting their assigned risk in light of AIG's alleged underreporting would seem to be germane to the Pool's purpose.

Notwithstanding this fact, the second prong of the Hunt test has not been satisfied here because the complaint creates a serious conflict of interest among the Pool's members. Intra-organizational conflicts of interest are fatal to associational standing when they are "profound." Builders Ass'n of Greater Chicago v. City of Chicago, 170 F.R.D. 435, 439 (N.D. Ill. 1996) (citing Retired Chicago Police Ass'n v. City of Chicago, 76 F.3d 856, 864 (7th Cir. 1996). The Seventh Circuit has held that profound conflict exists where, (1) an association "seeks standing to directly sue some of its members, " or (2) a successful suit brought by an association was not properly authorized and would be directly detrimental to the interests of some association members. Retired Chicago Police Ass'n, 76 F.3d at 864.

In the instant case, although the Participating Companies have explicitly authorized NCCI (upon the direction of the Pool Board) to pursue intra-Pool claims, there remains a profound conflict among the Participating Companies if this suit by NCCI were allowed to proceed because NCCI would be suing a number of members on behalf of other members. See Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1381 (7th Cir. 1987) (holding that an association of realtors does not have associational standing to sue a sub-set of its members on behalf of other members because the remedy sought may result in both actual and potential conflicts among the organization's members). The conflict here is further complicated because AIG is not simply one entity, but rather fourteen related companies all of which are members of the Pool.

Although NCCI's failure to satisfy the second prong of the Hunt test is dispositive on the issue of associational standing and obviates the need to consider the third and final prong, the court notes that NCCI has also failed to satisfy the third prong of the Hunt test. In the usual course, associational standing is extended to an organization seeking declaratory, injunctive, or some other form of prospective relief on behalf of its membership. Warth v. Seldin, 422 U.S. 490, 515 (1975); See Sanner v. Board of Trade, 62 F.3d 918 (7th Cir. 1995) (noting that "no federal court has allowed an association standing to seek monetary relief on behalf of its members." (internal citations omitted)). If the association seeks damages where the injury suffered is "peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," there can be no associational standing. Id. at 515-16.

AIG argues that associational standing is not available here because the complaint seeks damages, and individual participation of the Participating Companies is required. This argument

15

is misleading because while the NCCI does seek damages on behalf of the Participating Companies, the main thrust of the complaint is equitable (an accounting) and declaratory rather than monetary relief.  Even so, were NCCI to be successful in establishing AIG's liability, any equitable relief or damages computation would require each individual company to proffer its premium data for each year and state.  While it is true, as NCCI asserts, that NCCI already has data for all of the Participating Companies and is in a singularly advantaged position to calculate each company's percentage of losses incurred, the ultimate resolution of this case may require a full mutual accounting conducted by a neutral party.

Therefore, because individualized participation of the Participating Companies is likely anticipated, the third prong of the Hunt test has not been satisfied.  Coupled with the failure of the second prong of the Hunt test, NCCI has not sufficiently established associational standing.

## **CONCLUSION**

As discussed above, NCCI has failed to establish standing by any of its multiple theories requiring dismissal of the current complaint.  This may not be the end of this litigation, however.

On April 14, 2009, Safeco Insurance Company of America v. AIG, No. 09 C 2026, was reassigned to this court for relatedness in accordance with the provisions of Local Rule 40.4.  This action was filed individually and on behalf of a class consisting of members of the Pool, and was stayed pending resolution of AIG's instant motion to dismiss.  The court will examine the viability of proceeding as a class action in due course.

For the reasons explained, AIG's motion to dismiss for lack of subject matter jurisdiction is granted. This complaint is dismissed without prejudice. The parties are directed to appear on September 4, 2009, at 9:30 a.m. for a status hearing on this matter to determine the course of the Safeco case, the jurisdictional basis for AIG's counterclaims and third party complaint, and other related matters.

**ENTER:**     **August 20, 2009**

**Robert W. Gettleman**
**United States District Judge**