# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., AIG CASUALTY COMPANY F/K/A, BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AMERICAN INTERNATIONAL PACIFIC INSURANCE COMPANY F/K/A AMERICAN FIDELITY COMPANY, AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY F/K/A AMERICAL GLOBAL INSURANCE COMPANY, AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY F/K/A ALASKA INSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE COMPANY, INC., GRANITE STATE INSURANCE COMPANY, ILLINOIS NATIONAL INSURANCE COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, NEW HAMPSHIRE INDEMNITY COMPANY, and NEW HAMPSHIRE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>ACE INA HOLDINGS, INC., ADVANTAGE WORKERS COMPENSATION INSURANCE COMPANY, ALASKA NATIONAL INSURANCE COMPANY, AMTRUST GROUP, BERKLEY RISK ADMINISTRATORS CO. LLC, CHUBB GROUP OF INSURANCE COMPANIES, CINCINNATI INSURANCE COMPANY, CIGNA GROUP INC., COMPANION PROPERTY & CASUALTY INSURANCE COMPANY, THE COVENANT GROUP, CRUM & FORSTER, GUARD INSURANCE COMPANY, GENERAL CASUALTY INSURANCE COMPANIES, HARLEYSVILLE INSURANCE GROUP, THE HARTFORD FINANCIAL SERVICES GROUP, INC., LIBERTY MUTUAL GROUP, INC., MEMIC INDEMNITY COMPANY, SAFECO CORPORATION, | Case No. 07 CV 2898<br><br>Judge Robert W. Gettleman<br><br>Magistrate Judge Sidney I. Schenkier<br><br><br><br><br><br><br><br><br>**CORRECTED FIRST**<br>**AMENDED COMPLAINT** |

TRAVELERS INSURANCE GROUP, SENTRY INSURANCE GROUP, TRUCK INSURANCE EXCHANGE, and UTICA NATIONAL INSURANCE CO.,

         Defendants.

LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORP., THE FIRST LIBERTY INSURANCE CORP., EMPLOYERS INSURANCE COMPANY OF WAUSAU, WAUSAU BUSINESS INSURANCE COMPANY, WAUSAU GENERAL INSURANCE COMPANY, and WAUSAU UNDERWRITERS INSURANCE COMPANY,

         Counter-Claimants,

    v.

AMERICAN INTERNATIONAL GROUP, INC., AIG CASUALTY COMPANY F/K/A, BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AMERICAN INTERNATIONAL PACIFIC INSURANCE COMPANY F/K/A AMERICAN FIDELITY COMPANY, AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY F/K/A AMERICAL GLOBAL INSURANCE COMPANY, AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY F/K/A ALASKA INSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE COMPANY, INC., GRANITE STATE INSURANCE COMPANY, ILLINOIS NATIONAL INSURANCE COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, NEW HAMPSHIRE INDEMNITY COMPANY, and NEW HAMPSHIRE INSURANCE COMPANY,

         Counter-Defendants.

         )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

|  |  |
|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY, individually, and on behalf of a class consisting of members of the National Workers Compensation Reinsurance Pool, | ) ) ) ) Case No. 09 CV 2026 ) ) Judge Robert W. Gettleman ) |
| Plaintiffs,<br><br>v. | ) Magistrate Judge Sidney I. Schenkier ) ) ) |
| AMERICAN INTERNATIONAL GROUP, INC., AIG CASUALTY COMPANY F/K/A, BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AMERICAN INTERNATIONAL PACIFIC INSURANCE COMPANY F/K/A AMERICAN FIDELITY COMPANY, AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY F/K/A AMERICAL GLOBAL INSURANCE COMPANY, AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY F/K/A ALASKA INSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE COMPANY, INC., GRANITE STATE INSURANCE COMPANY, ILLINOIS NATIONAL INSURANCE COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, NEW HAMPSHIRE INDEMNITY COMPANY, and NEW HAMPSHIRE INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

Plaintiff American International Group, Inc. and those additional plaintiffs identified in Paragraphs 15 – 27 (collectively, "AIG"), by their attorneys, Quinn Emanuel Urquhart Oliver & Hedges, LLP and Novack and Macey LLP, for their First Amended Complaint against Defendants who are identified in Paragraphs 29 – 48, allege as follows:

## NATURE OF THE ACTION

1.     This action is brought against:  (a) the National Workers Compensation Reinsurance Pool (the "Pool"); (b) the Pool's administrator, the National Council on Compensation Insurance, Inc. (the "NCCI"); (c) nineteen insurance companies (the "Pool Board Members") that have served on – and in the case of Liberty Mutual, Travelers, The Hartford, and ACE (the "Underreporting Pool Board Members") dominated – the Board of Governors of the Pool (the "Pool Board"); and (d) Sentry, an insurance company that participates in the Pool and that, like the Underreporting Pool Board Members, underreported its workers compensation premium to the Pool.

2.     In January 2006 — some nine months after an inquiry into its workers compensation premium reporting practices had begun — AIG entered into a settlement with the New York Attorney General and New York Department of Insurance (the "New York Authorities") pursuant to which it established a fund of over $300 million (the "Workers Compensation Fund" or "Fund") for the express and sole purpose of providing recompense to third parties allegedly injured as a consequence of AIG's alleged underreporting.  A team of respected regulatory consultants retained by the New York Authorities determined the amount of the Fund to be sufficient to fully compensate all of the third parties — including the Pool — that could have grounds to claim against it.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

3.      The Pool Board Members, however, have wrongfully spurned the Workers Compensation Fund as a means to redress any alleged injuries they and other insurance companies that participate in the Pool may have suffered. They took such action as part of a larger scheme – hatched in April 2005, soon after the Pool Board Members first learned of the New York Authorities' investigation of AIG – to exploit the regulatory inquiry into AIG's business practices for their own economic and competitive advantage. The malevolent motivation of the Pool Board Members was epitomized by Liberty Mutual's own Board representative who commented to a group of other Pool Board Members attending a Board Meeting that the allegations of AIG's underreporting had given Liberty and the other Board Members "an opportunity to get those bastards at AIG."

4.      This scheme has been led by a group of some of the largest and most sophisticated insurance companies in the nation – the Underreporting Pool Board Members – which at all relevant times have dominated and controlled the Pool Board and, therefore, the Pool itself. As detailed below, the Underreporting Pool Board Members engaged in the very same or similar underreporting practices that the New York Authorities alleged against AIG, a fact which further drives their wrongful conduct towards AIG.

5.      There were several aspects to the Pool Board Members' scheme wrongfully to exploit the New York Authorities' investigation of AIG, each of which was calculated to achieve one or both of two overlapping motives – to inflict competitive harm on AIG and to conceal the underreporting by any company other than AIG.

6.      *First*, as referenced above, the Pool Board Members collusively agreed not to participate in the Workers Compensation Fund and have affirmatively blocked any states from claiming against the Fund on the Pool's behalf and prevented the Pool itself from claiming

-5-

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

against the Fund. The Pool Board Members' intention in disabling the Fund has been to increase costs to AIG — including potentially requiring AIG to provide compensation multiple times for the same alleged conduct — while also hindering AIG's ability to resolve its historical alleged underreporting issues in hopes of maximizing the harm to AIG's reputation while also distracting AIG's management from the conduct of its business.

7.     *Second*, the Pool Board Members, acceding to the Underreporting Pool Board Members, have suppressed any investigation of underreporting by the Underreporting Pool Board Members (and, indeed, any company other than AIG), despite being aware of evidence described herein that warrants investigation. Indeed, even after AIG filed claims in this action based on specific allegations of underreporting by the Underreporting Pool Board Members and Sentry (together, the "Underreporting Participating Companies"), the Pool Board Members steadfastly refused to investigate those allegations or the misconduct of any insurance company other than AIG.

8.     *Third*, the Underreporting Pool Board Members have conspired to direct that NCCI issue the quarterly Pool statements despite the Underreporting Pool Board Members' knowledge that those statements are false, since the carrier participation rates contained therein are calculated on the basis of the inaccurate premium reporting that the Underreporting Pool Board Members have conspired to conceal. AIG has received such false statements and made payments in reliance thereon to its injury — as have other companies participating in the Pool (referred to herein as the "Participating Companies").

9.     *Fourth*, in order further to undermine AIG's ability to address its alleged historical underreporting, the Pool Board Members directed the administrator of the Pool, the NCCI, to abandon its standard administrative practices on behalf of the Pool, which would have

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

been automatically to recalculate AIG's residual market obligations based upon the revised premium that AIG reported in amended Annual Statement reports in connection with its settlement with the New York Authorities. Instead, the Underreporting Pool Board Members conspired to direct NCCI to deviate from those standard practices and ignore AIG's amended filings, in order to further disable the effectiveness of the Fund and prevent AIG from resolving allegations of its prior underreporting.

10. By the foregoing and other conspiratorial conduct described herein, the Underreporting Pool Board Members have both individually and collectively conducted the affairs of the Pool Board and the Pool through a pattern of racketeering activity and caused severe harm to AIG. The remaining Pool Board Members, by participating in and/or acceding to aspects of the Underreporting Pool Board Members' misconduct, breached fiduciary duties they owed AIG as Pool Board members.

11. Accordingly, on the basis of these allegations and others contained herein, AIG brings this action asserting claims against each of the Underreporting Pool Board Members for violations of the Racketeer Influence and Corrupt Organizations ("RICO"), fraud, breach of fiduciary duty, and civil conspiracy in furtherance of tortious conduct.

12. AIG also asserts claims against the each of the Pool Board Members for breach of fiduciary duty.

13. Finally, because the underreporting by the Underreporting Participating Companies impacted amounts that AIG and other companies participating in the Pool paid for losses associated with the residual workers compensation market, AIG also seeks relief against the Pool and its administrator, the NCCI, in the form of an accounting and an action on an open and mutual account.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

## THE PARTIES

14.    Plaintiff American International Group, Inc. ("AIG Holding Company") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  AIG Holding Company is a holding company for the AIG Insurers and does not write insurance policies.

15.    Plaintiff Granite State Insurance Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

16.    Plaintiff American Home Assurance Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

17.    Plaintiff The Insurance Company of the State of Pennsylvania is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

18.    Plaintiff New Hampshire Indemnity Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

19.    Plaintiff Commerce and Industry Insurance Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

20.    Plaintiff AIU Insurance Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

21. Plaintiff AIG Casualty Company (f/k/a Birmingham Fire Insurance Company) is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

22. Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

23. Plaintiff New Hampshire Insurance Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

24. Plaintiff American International Pacific Insurance Company is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in New York, New York.

25. Plaintiff Illinois National Insurance Co. is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in New York, New York.

26. Plaintiff American International South Insurance Company is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in New York, New York.

27. Plaintiff American International Specialty Lines Insurance Company is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in New York, New York.

28. Plaintiffs identified in paragraphs 14 through 27 are herein referred to collectively as "AIG."

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

29. Defendant ACE INA Holdings, Inc. ("ACE") is the United States-based operating division of ACE Group of Insurance Companies. ACE is the successor-in-interest to the international property and casualty business of CIGNA, which was acquired by ACE in July 1999. ACE is organized under the laws of Delaware with its principal place of business in Philadelphia, Pennsylvania.

30. Defendant Advantage Workers Compensation Insurance Company ("Advantage") is organized under the laws of Indiana with its principal place of business in Murray, Utah.

31. Defendant Alaska National Insurance Company ("Alaska") is organized under the laws of Alaska with its principal place of business in Anchorage, Alaska.

32. Defendant Amtrust Group ("Amtrust") is organized under the laws of Delaware with its principal place of business in New York, New York.

33. Defendant Berkley Risk Administrators Co. LLC ("Berkley") is organized under the laws of Minnesota with its principal place of business in Minneapolis, Minnesota.

34. Defendant Chubb Group of Insurance Companies ("Chubb") is organized under the laws of New Jersey with its principal place of business in Warren, New Jersey.

35. Defendant Cincinnati Insurance Company ("Cincinnati") is organized under the laws of Ohio with its principal place of business in Fairfield, Ohio.

36. Defendant Companion Property & Casualty Insurance Company ("Companion") is organized under the laws of South Carolina with its principal place of business in Columbia, South Carolina.

37. Defendant The Covenant Group ("Covenant") is organized under the laws of Georgia with its principal place of business in Atlanta, Georgia.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

38. Defendant Guard Insurance Company ("Guard") is organized under the laws of Delaware with its principal place of business in Wilkes-Barre, Pennsylvania.

39. Defendant General Casualty Insurance Companies ("General Casualty") is organized under the laws of Wisconsin with its principal place of business in Sun Prairie, Wisconsin. General Casualty was acquired by QBE Insurance Group Ltd which is an Australian company with its principal U.S. offices in New York, New York.

40. Defendant Harleysville Insurance Group ("Harleysville") is organized under the laws of Delaware with its principal place of business in Harleysville, Pennsylvania.

41. Defendant The Hartford Financial Services Group, Inc (together with its subsidiaries, "The Hartford") is organized under the laws of Delaware with it principal place of business in Hartford, Connecticut.

42. Defendant Liberty Mutual Group ("Liberty Mutual") is organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts.

43. Defendant Memic Indemnity Company ("Memic") is organized under the laws of New Hampshire with its principal place of business in Manchester, New Hampshire.

44. Defendant Safeco Corp ("Safeco") is organized under the laws of Washington with its principal place of business in Seattle, Washington.

45. Defendant Travelers Insurance Group ("Travelers") is organized under the laws of Minnesota with its principal place of business in St. Paul, Minnesota.

46. Defendant Truck Insurance Group ("Truck") is organized under the laws of South Carolina with its principal place of business in Linden, New Jersey.

47. Defendant Utica National Insurance Co. ("Utica") is organized under the laws of New York with its principal place of business in New Hartford, New York.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

48.     Defendant Sentry Insurance Group ("Sentry") is organized under the laws of Wisconsin with its principal place of business in Stevens Point, Wisconsin.

49.     Defendants ACE, The Hartford, Liberty Mutual, and Travelers have each served on the Board of Governors of the Pool between the period of 2005 and the present and are herein referred to as the "Underreporting Pool Board Members."

50.     All insurance carrier defendants other than Sentry are collectively referred to herein as the "Pool Board Members."

51.     The Pool is a residual market reinsurance mechanism through which licensed workers compensation insurance companies reinsure certain workers compensation residual market policies.

52.     NCCI is a not-for-profit corporation.  NCCI administers the Pool on behalf of the Participating Companies and in such capacity provides various financial and accounting support services for the reinsurance mechanism.

### JURISDICTION

53.     This Court has original jurisdiction over Counts 1 and 2 pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

54.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims asserted herein.

### BACKGROUND

### The Residual Market for Workers Compensation Insurance

55.     In many states, the market for workers compensation insurance is divided into two types of policy holders:  those who can obtain insurance and those who cannot.  The "voluntary" market is comprised of employers who are able to obtain insurance through the

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

ordinary means of application through an agent or a broker. In contrast, the "residual" market

consists of employers that are unable to procure workers compensation insurance through such

ordinary means in the voluntary market.

56.     Most states require that every employer have workers compensation insurance.

To ensure that coverage is available to employers in the residual market, certain states require all

workers compensation carriers licensed to write workers compensation insurance in the

voluntary market also to participate in the residual market. During some time periods, carriers

have been able to participate by taking direct assignment of a portion of the residual market

policies. More commonly, and during most of the time periods relevant here, carriers have

participated in the residual market by agreeing to participate in a mechanism called a "pool" that

reinsures residual market policies. Under the residual market pools, the amount of risk that the

carrier must reinsure is proportional to the amount of coverage that the carrier provides in the

voluntary market. For example, if an insurer writes 10% of the voluntary workers compensation

coverage in a state for a given year, that same insurer will be responsible for 10% of the

reinsurance of the residual market for that state for that year.

57.     The Pool is the largest residual market pool, constituting a mechanism for the

reinsurance for residual markets in a large number of states through apportioning those residual

market reinsurance obligations among the Pool's members. The Participating Companies

accomplish this by providing reinsurance to certain Participating Companies, known as

"servicing carriers," that are designated to issue workers compensation policies to employers

who obtain workers compensation insurance in the residual market.

58.     To participate in the Pool, each Participating Company is required to execute an

agreement to abide by the Pool's Articles of Agreement, which set forth the obligations of the

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

Pool and its members. Each of the Participating Companies executing the Articles of Agreement also enters into an Administration Agreement that sets forth the rights and obligations of NCCI, which acts as both the Pool's administrator and attorney-in-fact.

59.    In order to allocate properly residual market obligations, the Pool requires that each Participating Company submit reports to NCCI that list that carrier's net direct written workers compensation premium by year and by state.

60.    For each year, NCCI calculates a reinsurance participation rate for each Participating Company based on the ratio of the amount of voluntary market premium that the specific Participating Company reported to NCCI to the aggregate amount of premium that all Participating Companies reported to NCCI.

61.    Thus, in order for NCCI to calculate accurately a particular Participating Company's residual market participation, it must have two amounts: (a) that Participating Company's workers compensation premium written in the voluntary market in a particular state for a particular year; and (b) the aggregate workers compensation premium written in the voluntary market in that particular state and year by all licensed carriers. If either of those amounts is not accurate, then the participation rate calculated by NCCI will be incorrect.

62.    Furthermore, since every Participating Company's participation rate in the residual market is calculated with reference to the aggregate premium written in the state by all carriers, the failure of any Participating Company to accurately report its written premium impacts the calculation of the participation rate for every other Participating Company in the state.

63.    Each quarter, NCCI issues statements to each Participating Company showing that Participating Company's allocated share of residual market premium, losses, and expenses

-14-

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

for each state and each year in which that Participating Company participated in the Pool. Since the workers compensation losses can sometimes take many years to develop and be paid, these quarterly statements often reflect losses for policy years that date back decades. Upon receiving a quarterly statement, each Participating Company is responsible for remitting any cash balance that is owed to NCCI after balancing the premium, losses and expenses that NCCI has allocated to that Participating Company.

### The Widespread Underreporting of Workers Compensation Premium

64.    For a period stretching from the mid-1980s to the mid-1990s, the rates that were charged in the residual market, as mandated by state law, were too low to cover the substantial losses that those policies sustained. The substantial shortfall between the premium being collected and the losses being paid resulted in very significant residual market charges in certain years and states being passed to the Participating Companies. Indeed, in some states for certain years, the residual market losses actually exceeded the residual market premium and voluntary market premium combined, meaning that for each dollar in voluntary written workers compensation premium that a Participating Company reported to NCCI, it would eventually end up being obligated to pay out more than a dollar to cover its allocation of the losses in the residual market.

65.    In light of the substantial residual market obligations, certain Participating Companies — including the Underreporting Participating Companies — adopted practices that improperly decreased the amount of voluntary market workers compensation premium that was reported to the NCCI, which correspondingly decreased their residual market obligations.

66.    In a 1992 "Management Summary" report, NCCI observed: "The growing burden that the residual market places on the voluntary market has contributed substantially to

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

the decline of voluntary premium. The residual market's high operating losses and its burden on the voluntary market have forced premium out of the voluntary market ...." Since workers compensation coverage is required in most states and the aggregate amount of coverage written thus cannot vary much from year to year, NCCI's observation that premium were being "forced ... out of the voluntary market" by the "growing burden" of the residual market was a recognition that Participating Companies were finding ways to decrease their reporting of workers compensation premium for the purpose of avoiding residual market liabilities.

67.     The Underreporting Participating Companies implemented fraudulent schemes and practices that had the purpose and effect of understating their true written workers compensation premium. Examples of such underreporting schemes include:

a) <u>Reporting Workers Compensation Premium Under Different Lines:</u> Some Participating Companies improperly reported workers compensation premium as premium relating to a different line of business, typically miscoding premium that rightfully should have been treated as workers compensation premium under a policy for a "nonsubject" line of business, such as general liability or inland marine. Among others, **Liberty Mutual** and **Travelers** engaged in this form of underreporting.

b) <u>Failing To Account for Residual Market Expenses as Premium:</u> Another underreporting practice routinely engaged in by many Participating Companies was to pass through residual market charges to insureds in the voluntary market, but to either not record it as premium at all or to code it as "nonsubject" premium for another line of business, such as general liability. Among others, **Liberty Mutual, Travelers** and **ACE** (as successor in interest to **CIGNA**) engaged in this

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

practice.

c) Masking Workers Compensation Premium as Negative Dividend Payments:

Still other Participating Companies inaccurately reported their premium to NCCI

through the use of so-called "dividend retention plan" agreements, under which

negative dividends were not reported to NCCI as premium. Among others,

**Sentry** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ engaged in this

form of underreporting.[1]

68.     Moreover, the fact that there was significant misreporting of premium to NCCI

was well known, even if the particular companies that were engaged in it may not have been

known. For example, NCCI discussed such misreporting of premium in its 1986 annual

"Management Summary" sent to all Participating Companies. There, in describing the results of

routine audits that NCCI conducted of the Pool servicing carriers — the carriers that issue and

administer the actual workers compensation policies in the residual market — NCCI reported

that one of the "major areas" in which it regularly found deficiencies was "incorrect premium

reporting" by those carriers. These audit findings are highly suggestive that these same carriers

— which also wrote policies in the voluntary market and were thus Participating Companies in

the Pool — were similarly misreporting their voluntary market premium that NCCI used to

calculate residual market participation rates. Indeed, in discussing the servicing carrier audit

results, NCCI specifically noted that, since servicing carriers use the same data reporting systems

for their voluntary market business as they do for their residual market servicing business, the

deficiencies that NCCI had identified in its audits would equally "affect the processing of

---

[1]     Pursuant to a previously-entered protective order, Plaintiffs have redacted portions of the publicly-filed version of this First Amended Complaint that reveal or are derived from documents or testimony that a Defendant herein has claimed is "confidential" and, therefore, that Defendant has requested be shielded from public disclosure.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

voluntary writings." While NCCI did not identify the specific servicing carriers for which it had uncovered "incorrect premium reporting," several of the Underreporting Pool Board Members — Liberty Mutual, Travelers, and The Hartford — were among the Pool's top servicing carriers by volume of servicing carrier business at the time.

69.     These types of premium misreporting issues were echoed in a highly critical 2001 examination report of NCCI conducted by a team of experts retained by a consortium of 13 states to test the accuracy of NCCI's data and systems. As part of that multi-state examination, the experts downloaded data from NCCI's system that had been reported to NCCI by six unidentified national carriers for ratemaking purposes. The experts then took a sample of the data related to 181 specific workers compensation policies and compared it to the source policy files obtained from the six carriers to test whether the data had been properly reported by the carriers and recorded by NCCI. The report states that the examiners anticipated an error rate of 2% — meaning that they expected to find discrepancies between the policy documents and the data reported to NCCI on only 3 to 4 of the 181 sampled policies. However, the examiners actually found discrepancies between the NCCI data and the carriers' records on an astounding 120 of the 181 policies — reflecting an error rate that was above 60% and more than *30 times* higher than the examiners had anticipated.

70.     Moreover, of the specific types of reporting errors the examiners discovered, misreported premium was the most prevalent. In fact, from the 181 policies sampled, the report notes that the examiners identified a full "eighty-one instances in which the premium per the [examiners'] premium audit did not agree to the premium reported to NCCI."

71.     These findings by the multi-state examiners, while not conclusive, were nonetheless again highly suggestive of misreporting with respect to premium data reported to

-18-

NCCI for the purpose of calculating Pool residual market participation rates. While NCCI did not calculate those participation rates from the type of ratemaking data reports that were the subject of the examiners' audit, it did calculate the participation rates on the basis of data reported from the same carriers for which the examiners had found data reporting deficiencies. Moreover, there is reason to believe that the ratemaking data reported by these carriers was, if anything, likely to be more accurate than the data that they had reported for purposes of calculating Pool residual market participation rates. Both the incentive and opportunity for misreporting with respect to residual market reporting is greater than with ratemaking data since residual market reporting is done on an aggregate basis, and it has a direct impact on Pool liabilities rather than the indirect impact of ratemaking data on filed rates.

### The New York Authorities' Investigation and the Workers Compensation Fund

72.    In 2005, AIG became subject to an investigation conducted by the Office of the New York Attorney General (the "NYAG") and the New York Department of Insurance (together, the "New York Authorities"). While that investigation focused on other areas as well, one of the issues that the New York Authorities reviewed was AIG's historical reporting of workers compensation premium. The New York Authorities alleged that AIG had engaged in certain historical practices that resulted in AIG underreporting its workers compensation premium to NCCI. The AIG practices alleged by the New York Authorities were similar in effect to the practices that AIG here alleges against the Underreporting Participating Companies, such as those described in paragraph 67 above.

73.    In order to determine the impact of AIG's alleged underreporting on third parties, a professional team of regulatory consultants, under the close supervision of the New York Authorities, was retained to review AIG's data and to work with AIG to prepare a model to

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

estimate the impact. On the basis of that analysis, AIG and the New York Authorities, *in parens patriae*, reached a settlement with respect AIG's alleged underreporting in January 2006.

74.     As part of that settlement, AIG agreed to establish the "Workers Compensation Fund" with $301,216,234, which was the amount that the consultants, with the New York Authorities' approval, had concluded would fully compensate third parties impacted by AIG's alleged underreporting — including the Participating Companies in the Pool.

75.     The Workers Compensation Fund was structured so as to allow for a period of time in which only governmental entities could receive distributions from the Fund. That period runs through December 31, 2009. As originally structured, it was expected that the states would receive distributions from the Fund on behalf of both public and private residual market mechanisms, such as the Pool. Indeed, the settlement agreement with the New York Authorities included a specific release agreement approved by the New York Authorities through which each participating state could release claims on behalf of that state's "Workers Compensation Residual Market Pool(s)" in exchange for the state's collecting from the Fund on the behalf of those pools.

76.     Following the period in which only governmental entities can receive distributions from the Fund, to the extent that there are private third-party residual market mechanisms that were not compensated through claims asserted on their behalf by governmental entities, they are permitted to receive distributions from the Fund in settlement of any claims they may have. To the extent any amounts remain in the Fund after February 29, 2012, they are to be distributed pro rata among the states that participated in the Fund, with no monies reverting to AIG.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

77.     In addition to establishing the Workers Compensation Fund, AIG also filed with each state insurance department amended statutory Annual Statements for 1987 to 2005, which included amended exhibits of premium and losses (sometimes referred to as "Statutory Page 14s") reflecting the revised written workers compensation premium that had been agreed upon with the New York Authorities and that were used for purposes of the calculating the Fund. Those amended Annual Statements were also sent to NCCI on May 1, 2007.

**The Pool Board and its Committees**

78.     Pursuant to its Articles of Agreement, the Pool is supposed to be controlled and managed by a Board of Governors, comprised of twelve non-affiliated Participating Companies who owe fiduciary obligations to the Pool's members.

79.     Participating Companies are nominated for Pool Board representation by the Nominating Committee, comprised of four Pool Board Members, and elected by the Participating Companies at the annual meeting for staggered terms of three years, with terms running from June to June. After a Pool Board Member has completed its three-year term, the Articles of Agreement requires the particular Pool Board Member to wait at least one year before re-submitting itself for nomination and election to the Pool Board unless there is insufficient interest in Pool Board membership. Notwithstanding this requirement, Liberty Mutual has sought to serve – and is serving – two consecutive terms on the Pool Board, with the first term beginning in June 2005 and the second term to conclude in June 2011.

80.     There are two named positions on the Pool Board: chairman and vice chairman. Under the Articles, the chairman serves as "chief executive officer" with "overall control of and responsibility for all activities" of the Pool Board. In the chairman's absence, the vice chairman inherits the chairman's executive powers and duties. The vice chairman is appointed by the Pool

-21-

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

Board, with the understanding that the vice chair will accede to the chairman position in the subsequent term.

### The Underreporting Pool Board Members Establish Control over the Pool Board in Order To Harm AIG and Conceal Their Own Misconduct

81.     In recent years, some of the most powerful and largest writers of workers compensation premium in the country — the Underreporting Pool Board Members — have, through their positions on the Pool Board and its committees, as well as through their marketplace power, dominated and controlled the Pool Board and its decision-making processes.

82.     Since at least June 1986, at least two of the four Underreporting Pool Board Members have served on the Pool Board at all times. From a point shortly after the New York Authorities announced their investigation of AIG's historical workers compensation business, the Underreporting Pool Board Members have ensured that at least three of them are on the Pool Board at all times.

83.     The Underreporting Pool Board Members assumed even greater control of the Pool Board in June 2006, when Liberty Mutual became the Pool Board's vice chairman. The Underreporting Pool Board Members' power grab on the Pool Board continued when Liberty Mutual became the chairman in June 2007 and The Hartford became the vice chairman.

84.     At the conclusion of the June 2007 – June 2008 term, The Hartford and Liberty simply swapped positions, with The Hartford becoming the chairman of the Pool Board and Liberty Mutual becoming the vice chairman.

85.     Even when an Underreporting Pool Board Member was not on the Pool Board, the other members ensured that they were kept apprised of the progress of the scheme against AIG. For example, even though Travelers did not serve on the Pool Board for the 2006-07 term, it remained closely connected to the Pool Board's activities with regard to the AIG dispute.

-22-

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

86.    Among other things, Travelers received 

87.    Attendance during Executive Sessions is limited to Pool Board members, counsel, and certain NCCI staff. Nonetheless, the Pool Board deviated from its standard practice of excluding non-Pool Board Participating Companies from the executive sessions of Board Meetings in order to allow Travelers to participate in the conduct of the conspiracy. Topics discussed during these Executive Sessions improperly attended by Travelers include

88.    In fact, Travelers was permitted to attend these meetings as a Participating Company even though it was itself the subject of a subpoena from the New York Attorney General's office related to its workers compensation reporting practices.

89.    Despite the fact that the Pool Board has a standing Litigation Management Committee (the "LMC"), the sole function of which is to manage any litigations in which the Pool is involved, the litigation between the Pool and AIG is being controlled by a special "AIG Ad Hoc Committee." Specifically, in the late summer of 2006, the Pool Board delegated to the AIG Ad Hoc Committee all responsibility for the dispute between the Pool and AIG concerning AIG's alleged underreporting of workers compensation premium, including the instant litigation, notwithstanding the existence the LMC.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

90.    The initial composition of the AIG Ad Hoc Committee, which includes at least two Underreporting Pool Board Members – Liberty Mutual and The Hartford – makes clear that the Underreporting Pool Board Members used this committee as a vehicle for controlling the Pool Board's actions with regard to AIG in order to further the scheme to harm AIG and conceal their own wrongdoing.

91.    In 2007, Travelers was reelected to the Pool Board. Liberty Mutual, which was then serving both on the AIG Ad Hoc Committee and as the Pool Board chairman, ██████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████

92.    Despite the fact that the Articles of Agreement mandate that all Pool Board meeting minutes "shall be recorded and available to all participating companies" and that "[c]ommittee meetings shall be . . . conducted . . . in the same manner as . . . meetings and actions of the Board," ██████████████████████████████████████████ ████████████████████████████████

93.    ███████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████

**The Pool Board Members' Conspiracy Against AIG**

94.    The Underreporting Pool Board Members conspired to use their control over the Pool Board opportunistically to seize on the New York Authorities' investigation and AIG's settlement of that investigation as a chance to weaken AIG – one of their primary competitors.

-24-

The true motivation of the Pool Board Members was epitomized by the Liberty Pool Board

representative who commented to a group of other Pool Board Members attending a Board

Meeting that the allegations of AIG's underreporting had given Liberty and the other Board

Members "an opportunity to get those bastards at AIG."

95.     In so doing, these Underreporting Pool Board Members have abused their

positions of trust, conspired in violation of federal and state law, breached their fiduciary duties

to AIG as a member of the Pool, and caused the non-underreporting Pool Board Members to do

the same. This conspiracy has taken shape in multiple ways.

96.     *First*, the Underreporting Pool Board Members have conspired to disable the $300

million Workers Compensation Fund that was established under the auspices of the New York

Authorities. The Underreporting Pool Board Members first sought to undermine the effect of the

Fund by affirmatively blocking any states from receiving distributions from the Fund for injuries

to the Participating Companies and the Pool, despite the fact that this was how the New York

Authorities had envisioned the Fund would be distributed. Indeed, immediately upon learning

that several states were considering issuing releases on behalf of the Pool in order to collect from

the Fund, the Underreporting Pool Board Members directed their legal counsel — the same

counsel representing them here — to issue stern written warnings to state regulators that:

> [T]he [Pool] Board has not authorized any State Attorney General or State Insurance
> Commissioner to execute a release on its behalf. ... The Board has advised AIG that it
> cannot rely upon any release that purports to release claims belonging to the NWCRP, its
> administrator, and its participating companies until AIG receives written confirmation of
> such authority from the Board of the NWCRP.

97.     Individual Underreporting Pool Board Members strengthened those warnings to

state regulators by sending out warnings of their own. ████████████████████████

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -



98.    Through these actions, the Underreporting Pool Board Members have effectively

shut down the Fund, and they have made clear that they intend to continue these efforts by

refusing to assert any claims for payment from the Fund on behalf of the Participating

Companies. The Underreporting Pool Board Members have thereby prevented any of the

Participating Companies from receiving benefits from the Fund. This conduct has the intended

effect of preventing AIG from dispensing amounts from the Fund and thereby prolonging and

exacerbating the impact on its employees, management and customers of the unresolved

allegations regarding AIG's alleged historical underreporting. Moreover, because the Fund is

not permitted to revert to AIG, there is a risk that this action will result in an unfair benefit to its

claimants and the potential for a double recovery against AIG.

99.    *Second*, while pushing the Pool to pursue claims against AIG, the Underreporting

Pool Board Members conspired to refrain selectively from investigating or asserting claims

against each other, or other Underreporting Participating Companies, for their own

underreporting of workers compensation premium. As described earlier and detailed further

below, the Pool Board is aware that other Participating Companies incorrectly reported premium

but has rejected all efforts to investigate or otherwise pursue this misconduct.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

100.    Indeed, NCCI, the Pool's own agent and administrator, admitted that "incorrect premium reporting" was one of the "major areas" of deficiency that it regularly encountered in carrier audits.  And, as recently as 2001, a regulatory examination of NCCI found misreporting of premium to be the most prevalent error encountered in carriers' reports to NCCI.  Moreover, as discussed further below, the largest and most influential Pool Board Members — Liberty Mutual, ACE, Travelers and The Hartford — have themselves engaged in improper premium reporting practices.  The Underreporting Pool Board Members have conspired not to act on any of this information about underreporting that is well within their knowledge.  At the same time, the Underreporting Pool Board Members have, through the Pool Board, made false and misleading statements to regulators regarding AIG's conduct with intent of increasing harm to AIG while also diverting attention from their own conduct.

101.    The Underreporting Pool Board Members have steadfastly refused to conduct an investigation into the possibility of underreporting by any other Participating Company, including, of course, themselves.

102.    For example, during a Pool Board meeting held before the Pool filed its action against AIG, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

103. The Hartford representative to the Board 

104. Yet The Hartford and Travelers publicly disclosed that they were subpoenaed by the NYAG for issues relating to their reporting of workers compensation premium, and the Pool Board has failed to investigate potential claims that the Pool might have against these two Underreporting Pool Board Members.

105. The Hartford ultimately entered into a settlement with the NYAG, which related in part to its reporting of workers compensation premium. Despite this public disclosure, the Pool Board Members still refused to investigate the possibility of underreporting of workers compensation premium by other Participating Companies.

106. At a 2008 meeting of the Litigation Management Committee,

107. The Pool Board – under the dominant influence of the Underreporting Pool Board Members – persisted it its ostrich-like refusal to examine underreporting by other Participating Companies even after AIG filed claims in this action in which it identified not only specific companies (the Underreporting Participating Companies) that had engaged in underreporting but

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

specific practices they had used to do it. AIG filed those claims in March 2008 but the Pool

Board, in derogation of its contractual and fiduciary duties, has done nothing to investigate them

108. The Underreporting Pool Board Members have further conspired to refrain from

directing NCCI to investigate or pursue any claims of premium underreporting by the

Underreporting Pool Board Members or other Underreporting Participating Companies, placing

NCCI in violation of its contractual obligations to AIG. NCCI's contractual obligations under

the Administration Agreement run between NCCI and each of the Participating Companies,

including AIG, and include the accurate "preparation and distribution of the Pool participants'

quarterly assessment/distribution." As described above, NCCI was aware of premium

underreporting by other Participating Companies. NCCI additionally has access to non-public

audit files from which it can identify specific Participating Companies that have engaged in

historical premium misreporting practices. By failing to direct that NCCI investigate the

underreporting practices of which it is aware, the Underreporting Pool Board Members have

placed NCCI in violation of its contractual obligation to prepare and distribute accurate quarterly

assessments/distributions to all of the Pool participants.

109. *Third*, the Underreporting Pool Board Members have conspired to direct and

allow the distribution of multiple false statements and invoices to AIG, as well as other

Participating Companies. Under the auspices and direction of the Underreporting Pool Board

Members through the Pool Board, NCCI issues quarterly statements to each of the Participating

Companies in the Pool. These statements include a calculation of each Participating Company's

liability for the losses that were paid in connection with particular years and states based on

NCCI's calculation of that Participating Company's participation rate for the relevant year and

state which, in turn, is based on the reported premium for all Participating Companies. The

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

Underreporting Pool Board Members have, through the Pool, directed that NCCI prepare and distribute statements to AIG (and other Participating Companies) that the Underreporting Pool Board Members know to be false because they are based on inflated participation rates that were calculated on the basis of underreported premium by Underreporting Participating Companies that the Underreporting Pool Board Members have conspired to conceal and not correct. As a result of this conspiracy, AIG and other Participating Companies have paid inflated assessments to the Pool. While other Participating Companies have received their own false statements, AIG's inflated payments have been on the basis of the following statements, among others:

| Invoice Number | Invoice Date | Invoice Amount |
|---|---|---|
| 99123325 | 12/12/2005 | $290,673.39 |
| 99123313 | 12/12/2005 | $8,014.27 |
| 99123415 | 12/12/2005 | $3,700.08 |
| 991233597 | 12/12/2005 | $3,931.11 |
| 99124736 | 3/14/2006 | $296,649.46 |
| 99124339 | 3/14/2006 | $9,437.02 |
| 99124269 | 3/14/2006 | $3,219.43 |
| 99124840 | 3/14/2006 | $1,925.14 |
| 99125768 | 6/28/2006 | $1,709,021.29 |
| 99125763 | 6/28/2006 | $168,549.07 |
| 99125556 | 6/28/2006 | $8,171.60 |
| 99125540 | 6/28/2006 | $4,179.24 |
| 99125700 | 6/28/2006 | $1,809.01 |
| 99126950 | 9/11/2006 | $303,941.43 |
| 99126994 | 9/11/2006 | $16,319.93 |
| 99127006 | 9/11/2006 | $6,318.94 |
| 99127128 | 9/11/2006 | $3,208.33 |
| 99127932 | 12/12/2006 | $255,470.44 |

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

| | | |
|---|---|---|
| 99128054 | 12/12/2006 | $10,846.63 |
| 99128066 | 12/12/2006 | $3,877.23 |
| 99128194 | 12/12/2006 | $5,206.93 |
| 99128952 | 3/13/2007 | $284,276.40 |
| 99129159 | 3/13/2007 | $10,442.66 |
| 99129138 | 3/13/2007 | $3,676.15 |
| 99129265 | 3/13/2007 | $3,617.01 |
| 99130813 | 6/28/2007 | $292,768.29 |
| 99130694 | 6/28/2007 | $6,086.23 |
| 99130713 | 6/28/2007 | $2,613.44 |
| 99130471 | 6/28/2007 | $1,018.27 |
| 99130487 | 6/28/2007 | $5,302.46 |
| 99131597 | 9/11/2007 | $286,157.39 |
| 99132153 | 9/11/2007 | $11,372.79 |
| 99131555 | 9/11/2007 | $6,798.66 |
| 99131453 | 9/11/2007 | $3,351.72 |
| 99131702 | 9/11/2007 | $3,145.38 |
| 99132706 | 12/11/2007 | $456,142.99 |
| 99132726 | 12/11/2007 | $271,923.01 |
| 99132453 | 12/11/2007 | $9,946.70 |
| 99132939 | 12/11/2007 | $8,439.72 |
| 99132520 | 12/11/2007 | $4,136.43 |
| 99133215 | 12/11/2007 | $2,444.89 |
| 99134431 | 3/11/2008 | $2,567,908.89 |
| 99134435 | 3/11/2008 | $256,0573.64 |
| 99133540 | 3/11/2008 | $9,114.85 |
| 99133552 | 3/11/2008 | $3,780.21 |
| 99133763 | 3/11/2008 | $4,864.72 |

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

| | | |
|---|---|---|
| 99134011 | 3/11/2008 | $4,645.08 |
| 99135078 | 6/24/2008 | $5,350,064.21 |
| 99135079 | 6/24/2008 | $271,433.39 |
| 99135390 | 6/24/2008 | $19,934.15 |
| 99135130 | 6/24/2008 | $14,797.38 |
| 99135142 | 6/24/2008 | $3,901.24 |
| 99135242 | 6/24/2008 | $10,327.67 |
| 99136258 | 9/11/2008 | $4,458,362.92 |
| 99136262 | 9/11/2008 | $218,680.96 |
| 99136318 | 9/11/2008 | $6,635.16 |
| 99136606 | 9/11/2008 | $4,754.27 |
| 99136330 | 9/11/2008 | $3,268.06 |
| 99136444 | 9/11/2008 | $2,410.10 |
| 99137497 | 12/11/2008 | $5,935,389.12 |
| 99137501 | 12/11/2008 | $309,802.62 |
| 99137856 | 12/11/2008 | $7,873.35 |
| 99137562 | 12/11/2008 | $7,499.69 |
| 99137574 | 12/11/2008 | $3,090.91 |
| 99137692 | 12/11/2008 | $2,678.20 |
| 99138757 | 3/17/2009 | $6,375,613.99 |
| 99138761 | 3/17/2009 | $282,529.92 |
| 99138820 | 3/17/2009 | $8,815.02 |
| 99139105 | 3/17/2009 | $6,304.92 |
| 99138832 | 3/17/2009 | $3,215.58 |
| 99138945 | 3/17/2009 | $4,294.20 |
| 99140334 | 6/25/2009 | $6,555.15 |
| 99140006 | 6/25/2009 | $12,567,180.35 |
| 99140010 | 6/25/2009 | $302,510.81 |

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

| 99140068 | 6/25/2009 | $5,339.98 |
| 99140080 | 6/25/2009 | $2,432.31 |
| 99140187 | 6/25/2009 | $1,312.99 |
| 99141212 | 9/15/2009 | $7,742,142.48 |
| 99141216 | 9/15/2009 | $257,613.50 |
| 99141574 | 9/15/2009 | $6,973.17 |
| 99141279 | 9/15/2009 | $4,396.38 |
| 99141291 | 9/15/2009 | $2,528.36 |
| 99141408 | 9/15/2009 | $1,165.21 |

110.     *Fourth*, in order to undermine further AIG's ability to address its alleged historical underreporting, the Underreporting Pool Board Members also have conspired to prevent NCCI from following its standard administrative practice of automatically adjusting Participating Company assessments whenever a company amends its Annual Statement premium reports.  Indeed, in an August 18, 2006 letter to Indiana regulators, NCCI's own Director of Reinsurance described how NCCI was to apply this standard practice in the case of AIG:

> [I]t needs to be understood that the basis for determining each Indiana insurer's (including AIG) proportionate share of the Indiana residual market is each insurer's workers compensation insurance Direct Premium Written as reported on the company's Exhibit of Premiums and Losses (Statutory Page 14) of its Annual Statements as filed with the Department of Insurance in each state in which the company is licensed…. *[I]f these Annual Statement exhibits had been amended by and re-filed by AIG with the Indiana Insurance Department, the proportionate share of each Indiana insurer in the residual market would have been systematically recalculated [by NCCI] and related assessments adjusted and reallocated.*

111.     When AIG amended and re-filed its Annual Statements (including its Statutory Page 14 exhibits), NCCI was directed by the Underreporting Pool Board Members through the Pool Board to suspend its "systematic" process of recalculating residual market shares and adjusting related assessments.  NCCI was directed by the Underreporting Pool Board Members

-33-

-- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

through the Pool Board to deviate from that standard practice and ignore AIG's amended filings in order to ensure that AIG was unable to address its alleged historical underreporting and also to manufacture an excuse for the Underreporting Pool Board Members to lodge unnecessary public legal claims against AIG.

112. By conspiring to reject the Workers Compensation Fund (and effectively precluding others from accepting proceeds from it), turning a blind eye to each other's underreporting conduct, and directing NCCI to engage in conduct that was inconsistent with its standard practices and contractual obligations and that resulted in the distribution of false account statements, all the while directing the prosecution of meritless racketeering claims against AIG and making false and misleading statements to regulators to increase pressure upon, and ultimately the impact to, AIG, the Underreporting Pool Board Members have abdicated their duties for the purpose and with the effect of inflicting harm on AIG in violation of state and federal laws.

### The Underreporting Participating Companies' Underreporting Schemes

113. The Pool Board Members, including the Underreporting Pool Board Members, have breached their duties to perform a fair and evenhanded investigation of and pursue claims against all of the Participating Companies for which they have evidence of underreporting, including:

#### *Liberty Mutual*

114. A January 31, 1992 internal memorandum authored by an executive at Wausau, now a subsidiary of Liberty Mutual, set forth its procedure for masking residual market costs as miscellaneous income. That memorandum stated: "Wausau has recently developed a program where they bill the policyholder to receive a certain percentage of the policy amount to pay for

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

these residual market charges. The charge is not associated with the policy and is not, therefore, posted to the premium account. Instead, Wausau applies the amount received to offset the assumed loss account which is incurred due to losses the company must assume from the states." This practice resulted in the underreporting of workers compensation premium and thus reduced Wausau's share of the residual market.

115.    In another internal memorandum, a Wausau executive responded to a request to identify and employ any "creative way" in which other companies were handling residual market costs. That Wausau executive described the range of "creative" ways that its competitors were passing along workers compensation residual market expenses:

> It appears that most of our competitors are well aware of the cost of workers compensation residual markets and try to pass those costs on to their policy holders. ... Some carriers are making special nonsubject premium charges via endorsements for covering anticipated residual market costs. Travelers is said to be a carrier that makes a separate charge, generally through the voluntary compensation or the foreign coverage endorsements. ... Many carriers (i.e., Liberty) are loading the basic or the tax multiplier to incorporate residual market costs. Some carriers are said to be writing nonfiled retrospective rating plans where the basic include residual market costs. One broker source in Los Angeles indicated 9 out of 10 carriers are placing residual market costs in the tax multiplier and/or basics.

Many of the practices identified by this Wausau executive — such as reflecting residual market expenses as "nonsubject premium" — failed to account for these expenses as workers compensation premium and therefore resulted in underreporting to NCCI.

116.    A former Wausau executive testified in October 2000 that (i) Wausau collected negative dividends; (ii) that negative dividends were the equivalent of generating premium; and (iii) that Wausau never reported the negative dividends it collected to NCCI, insurance regulators, or other insurance companies. NCCI's director of reinsurance at NCCI, who administers the Pool, testified that, assuming these facts were true, he would be obligated to bring it to the attention of the Pool Board. The Wausau executive further testified that Wausau

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

charged its insureds a "residual market charge pass-through" based on a side agreement with the insured that was booked as a reinsurance transaction rather than as workers compensation premium.

117.    In other instances, Liberty Mutual has underreported its workers compensation premium by miscoding workers compensation premium as attributable to non-regulated lines of business.

118.    Liberty Mutual has also ████████████████████████████████████
██████████████████████████████████████████████████

119.    Liberty Mutual has also been subject to multiple state examinations related to its workers compensation reporting practices. In 1997, the Colorado Department of Regulatory Agencies Division issued a market conduct examination report finding that Liberty Mutual had reported incorrect data to NCCI. The Division cited Liberty Mutual for failing to report deductible reimbursements to NCCI, as well as failing to follow NCCI's reporting requirements, including those regarding experience modification factors, classification codes, credits, and premium discounts. Liberty Mutual was directed to bring its practices in line with NCCI's requirements.

120.    In a subsequent market conduct examination conducted by the State of Florida Department of Insurance for the period January 1997 to December 1999, Liberty Mutual was again cited for violating regulatory obligations. That examination resulted in the issuance of a consent order that concluded that Liberty Mutual's workers compensation practices violated the Florida administrative code by failing to follow filed rate, rating schedule, rating rule, or underwriting guidelines. The consent order noted specific violations that resulted in premium undercharges.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

121.    In yet another regulatory inquiry, Liberty Mutual's Wausau subsidiary was cited by the Colorado Department of Regulatory Agencies Division of Insurance in September 2000 for failing to use experience modifiers and rating methodology promulgated by NCCI. The company was directed to provide written procedures to the Colorado Division of Insurance to ensure that all workers compensation policies written in Colorado contain the experience modification factors promulgated by NCCI.

122.    Through these and other practices to be shown at trial, Liberty Mutual underreported its actual written workers compensation premium to NCCI. Liberty Mutual's purpose in failing to make the requisite disclosures and concealing its practices of understating workers compensation premium was to avoid its financial obligations to the Pool, while at the same time injuring AIG and other Participating Companies.

*Travelers*

123.    Travelers has regularly underreported its workers compensation premium through, among other things, the use of non-regulated policies. A former Travelers executive – Richard Palczynski ("Palczynski") – who spent 28 years with the company, including as head of the actuarial division of its national accounts department, testified under oath as to how this was accomplished. According to Palczynski, in both the 1980s and 1990s, Travelers had a practice of including a non-regulated "open policy" in its large multi-line contracts to which it would book workers compensation premium beyond what was permitted under a rating plan. As Palczynski explained, Travelers would "charge an extra price on a[n open] policy that had the flexibility to do so that wasn't governed by the rating plans." The workers compensation premium booked to "open policies" was thereby concealed from NCCI and not included in NCCI's calculation of Traveler's residual market participation rates.

-37-

124. Travelers facilitated its underreporting scheme by including "inland marine" policies under its multi-line loss-sensitive insurance contracts that also included workers compensation coverage, even when no inland marine coverage was required by the insured. Travelers would then improperly record premium collected from the insured as premium attributable to the inland marine coverage by closing out the workers compensation policy before all of the workers compensation claims had been closed. None of the workers compensation premium that Travelers recorded as premium under its inland marine policies was reported to NCCI.



125. Travelers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

126. Travelers' ▮▮▮▮▮▮▮▮▮▮▮▮

127. Travelers' ▮▮▮▮▮▮▮▮▮▮

128. To avoid regulatory scrutiny of these impermissible practices and the fraudulent underreporting of workers compensation premium, Travelers ▮▮▮▮▮▮▮▮▮▮▮▮

129. Travelers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -



130. Travelers

131. Travelers' premium underreporting was not limited to retrospectively rated

policies.

132.

133. Furthermore, this conduct by Travelers was and is known to the Pool Board

through its counsel. In the litigation in which the now-former Travelers executive, Palczynski,

testified under oath as to these underreporting schemes, Travelers was represented by the same

law firm, Lord Bissell & Brook (now Locke Lord Bissell & Liddell) — and, indeed, the very

same individual attorneys — that represents the Pool in this very case. At least one of the Pool

Board's primary attorneys in this action was present for Palczynski's deposition at which he

testified to Travelers' underreporting scheme. Nevertheless, the Pool Board Members chose to

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

ignore Travelers' underreporting rather than naming Travelers as an additional defendant or investigating its practices.

134.     Also, a Travelers subsidiary was subject to a consent order issued by the Florida Department of Insurance in conjunction with a market conduct examination relating to the period of January 1999 through May 2001. That consent order concluded that Travelers had committed numerous violations of the Florida administrative code with regard to its workers compensation business, including failing to follow filed rates, rating schedules, rating rules, or underwriting guidelines. Travelers was also cited for having failed to properly retain records.

135.     Travelers also was subpoenaed by the NYAG in 2005 with respect to its workers compensation practices. Travelers has not disclosed whether that investigation has been concluded or what changes it has made to its business as a result of the inquiry, and the Pool Board Members have not asked that it do so.

136.     Through these and other practices to be shown at trial, Travelers underreported its actual written workers compensation premium to NCCI. Travelers' purpose in failing to make the requisite disclosures and concealing its practices of understating workers compensation premium was to avoid its financial obligations to the Pool, while at the same time injuring AIG and the other Participating Companies.

### *The Hartford*

137.     Following an approximately two-year investigation, in July 2007, The Hartford disclosed that it had entered in a settlement with the NYAG under which it agreed to pay $115 million to resolve matters related to, among other things, The Hartford's "reporting of workers compensation premiums." In January 2006 — during and as result of that investigation — a spokesman from The Hartford revealed in a press report that the company had changed the

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

method it was using to report written workers compensation premium. The Hartford failed to disclose the changes it had made to its workers compensation reporting or the impact that its now-abandoned historical reporting practices had on the premium that it had reported to NCCI for the purpose of calculating The Hartford's residual market assessments.

138. Through these and other practices to be shown at trial, The Hartford underreported its actual written workers compensation premium to NCCI. The Hartford's purpose in failing to make the requisite disclosures and conceal its practices of understating workers compensation premium was to avoid its financial obligations to the Pool, while at the same time injuring AIG and the other Participating Companies.

### *CIGNA/ACE*

139. CIGNA regularly employed schemes to underreport the residual market expenses collected from its insureds by, among other things, characterizing them as something other than workers compensation premium. A former CIGNA assistant vice president – Jennifer Crowley – who had responsibility for underwriting in the Special Risks Facilities Casualty Division, admitted that CIGNA had boilerplate side agreements that it entered into with insureds during the 1980s and 1990s, under which the insureds were charged for residual market expenses. This same former executive conceded that, at least for certain periods, CIGNA treated residual market expenses as "non-subject expenses" that were therefore not reported as premium as was required.

140. ACE is successor in interest to CIGNA's property and casualty business, which it acquired in July 1999.

141. Through these and other practices to be shown at trial, CIGNA/ ACE underreported their actual written workers compensation premium to NCCI. CIGNA/ACE's purpose in failing to make the requisite disclosures and concealing their practices of understating

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

workers compensation premium was to avoid their financial obligations to the Pool, while at the same time injuring AIG and the other Participating Companies.

### *Sentry*

142. Sentry inaccurately reported its workers compensation premium to NCCI through, among other practices, the use of so-called "dividend retention plan" agreements. According to a Sentry National Accounts Chief Underwriter – Marilyn Rogers – Sentry created separate dividend retention plan agreements which included charges for residual market expenses. Rogers acknowledged that Sentry did not treat any negative dividends generated by those agreements or any payment of residual market charges as premium reportable to NCCI.

143. Through these and other practices to be shown at trial, Sentry underreported its actual written workers compensation premium to NCCI. Sentry's purpose in failing to make the requisite disclosures and concealing its practices of understating workers compensation premium was to avoid its financial obligations to the Pool, while at the same time injuring AIG and the other Participating Companies.

### COUNT ONE

**(Civil Racketeering against Underreporting Pool Board Members in violation of 18 U.S.C. § 1962(c))**

144. AIG realleges and incorporates by reference Paragraphs 1- 143 of this First Amended Complaint as if fully set forth herein.

145. Since 2005, the Underreporting Pool Board Members have conducted the affairs of the Pool Board and, therefore, the Pool through a pattern of racketeering activity, the purpose of which was and is to injure AIG and others through depriving AIG and other Participating Companies of money and property. The Underreporting Pool Board Members, acting through, and under, the seemingly innocent guise of this reinsurance mechanism, have been able to

-42-

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

engage in their racketeering activity, causing significant harm to AIG and other Participating Companies.

146.    The Underreporting Pool Board Members have effectuated their purpose of depriving AIG and the other Participating Companies of their money and property in at least two separate and distinct ways. *First*, the Underreporting Pool Board Members have been using the Pool to issue false and materially misleading invoices to AIG and the other Participating Companies through the mail and wires, which have been paid, and therefore have deprived AIG and the Participating Companies of their money and property. *Second*, the Underreporting Pool Board Members have made false and materially misleading statements to AIG and the other Participating Companies, in addition to engaging in conduct that deprived AIG and the other Participating Companies of their right to honest services, for the purpose of retaining the benefits of past conduct whereby the Underreporting Pool Board Members defrauded AIG and the other Participating Companies.

147.    Each Underreporting Pool Board Member is a corporation and, therefore, a person within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

148.    The Pool is composed of the Participating Companies. The Pool has continuously remained in existence since its inception in 1970, despite the introduction of new members, departure of other members, and the fact that certain Participating Companies have gone into run off or liquidation. The Pool is organized and governed by a contract called the Articles of Agreement, to which all Participating Companies have agreed and are signatories. The Participating Companies have the common purpose of reinsuring certain workers compensation insurance policies. The Pool is an enterprise within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(4).

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

149.   The Pool Board manages the operation, business, and affairs of the Pool. The Pool Board is created and governed by the Articles of Agreement and has a process for filling vacancies that may occur.

150.   The Pool Board and the Pool are composed of insurance carriers throughout the country that write workers compensation insurance in multiple states in the country. Therefore, the Pool and the Pool Board are engaged in interstate commerce or engaged in activities which affect interstate commerce.

151.   The Pool and the Pool Board are separate and distinct from each Underreporting Pool Board Member.

152.   Each Underreporting Pool Board Member is a Participating Company and directly or indirectly participates in the conduct of the Pool by providing reinsurance for certain workers compensation policies.

153.   The Underreporting Pool Board Members directly or indirectly participate in the conduct of the Pool Board by, among other things:

(a)   Having the right to elect a chairman and executive vice chairman;

(b)   Serving as chairman or vice chairman of the Pool Board, with full control of and authority to govern the activities of the Pool Board, and through it, the Pool;

(c)   Serving on Pool Board committees such as the AIG Ad Hoc Committee and/or the Litigation Management Committee, with authority on all matters relating to the AIG dispute and the present litigation; and

(d)   Having the right to promulgate and adopt rules and procedures for the purpose of implementing the terms of the Articles of Agreement.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

154.  Since 2005, and through the present, the Underreporting Pool Board Members have been conducting or participating in, directly or indirectly, the conduct of the affairs of the Pool and the Pool Board through a pattern of racketeering activity that was not only designed to, but in fact did, cause the fraudulent and wrongful conversion of money from AIG and other Participating Companies for the improper and illegal use and benefit of the Pool Board and the Underreporting Pool Board Members.

155.  The Underreporting Pool Board Members participated in the conduct and operation of the enterprise by managing and controlling the operation, business and affairs of the Pool and the Pool Board, including:

(a)  Dominating and controlling the Pool Board and maintaining a hold on its executive positions;

(b)  Permitting and directing NCCI to issue invoices to AIG and other Participating Companies that were false and materially misleading;

(c)  Permitting and directing NCCI to accept funds paid by AIG and other Participating Companies in reliance on those false and materially misleading invoices;

(d)  Failing to direct NCCI to conduct any investigation of underreporting of workers compensation premium by the Underreporting Pool Board Members and others, despite the existence of red flags that such underreporting was occurring;

(e)  Failing to direct the Pool to file lawsuits against any of the Underreporting Pool Board Members or others that engaged in the underreporting of workers compensation premium; and

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

(f)     Blocking the Pool from participating in the Workers Compensation Fund, so as to cause financial harm to all Participating Companies and also reputational harm to AIG.

156.    The pattern of racketeering activity consisted of separate and distinct violations of the federal mail fraud statute (18 U.S.C. § 1341), and the federal wire fraud statute (18 U.S.C. § 1343) that occurred each quarter between 2005 and the present. Unless stopped through this action, these violations are likely to continue in each quarter in the future.

157.    The purpose of the schemes is twofold. *First*, the Underreporting Pool Board Members use the seemingly innocent reinsurance mechanism of the Pool to engage in a pattern of racketeering activity to fraudulently obtain money and property from AIG and other Participating Companies by submitting false and materially misleading invoices, which AIG and the Participating Companies rely upon in paying their obligations to the Pool. *Second*, the Underreporting Pool Board Members also use the Pool as a means to retain money and property that are the fruits of earlier frauds committed by the Underreporting Pool Board Members.

158.    In fact, the Underreporting Pool Board Members are accomplishing their objectives by engaging in several distinct schemes:

(a)     their scheme to engage in anti-competitive conduct targeted at AIG;

(b)     their scheme to protect themselves and hide their own underreporting by preventing the Pool from investigating their underreporting and suing them;

(c)     their scheme to conceal their failure properly to report workers compensation premium;

(d)     their scheme to pass along their costs to other members of the Pool; and

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

(e)     their scheme to collect money from AIG and other Participating Companies in
excess of their actual obligations.

159.    These schemes to defraud AIG (and other Participating Companies) have relied
on the mail and wires. On numerous occasions, between 2005 through the present, the
Underreporting Pool Board Members, acting through the Pool and the Pool Board under the
guise of conducting the Pool's and Pool Board's affairs in the regular way of conducting an
ongoing legitimate business, knowingly and with intent to defraud AIG and other Participating
Companies, caused the Pool's agent (NCCI) to issue false and materially misleading invoices
every quarter to AIG and other Participating Companies. Each of the Underreporting Pool Board
Members knew these invoices were false because each was aware of its own underreporting and
also was aware of the underreporting by the other Underreporting Pool Board Members.

160.    These invoices were issued by NCCI from its offices in Florida and were sent to
AIG's offices in New York and/or New Jersey (in addition to similar invoices that were sent to
the offices of other Participating Companies located in various states throughout the country), via
the mails and the Internet. In addition, the Underreporting Pool Board Members permitted NCCI
to accept payment from AIG and other Participating Companies on those false and materially
misleading invoices. Each invoice sent to (and corresponding payment by) AIG and the other
Participating Companies constitutes a separate and independent violation of the mail or wire
fraud statutes.

161.    The Underreporting Pool Board Members have violated 18 U.S.C. §§ 1341 and
1343 by committing mail and wire fraud through the false invoices they have caused to be
submitted to AIG and other Participating Companies.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

162. These invoices were false and materially misleading as a result of the conduct alleged in paragraphs 113 to 143, which resulted in AIG and other Participating Companies being invoiced, and paying, for higher amounts than they should have.

163. The invoices listed in paragraph 109, which is incorporated herein by reference as if set forth in full, include some of the false and materially misleading invoices that have been sent to AIG (and its subsidiaries) by NCCI, under the auspices and direction of the Underreporting Pool Board Members. Other false and materially misleading invoices have been sent to other Participating Companies.

164. In addition to these invoices, there are hundreds of Participating Companies in the Pool that have received false quarterly invoices over the course of the Pool's existence. Each of these mailings constitutes a separate and distinct predicate act and each causes a separate and distinct injury.

165. These invoices (and others) were sent to AIG (and other Participating Companies) via email and the Internet, and continue to be sent, and be available, through NCCI's website: www.ncci.com.

166. If the conduct of the Underreporting Pool Board Members is not stopped, the Pool will continue to distribute false invoices in violation of the mail and wire fraud statutes.

167. Each successful mail or wire fraud was related to the twin purposes of defrauding AIG (or another Participating Company) and concealing the Underreporting Pool Board Members' prior frauds.

168. In addition to the predicate acts set forth above arising under the mail and wire fraud statutes, the Underreporting Pool Board Members engaged in separate and additional predicate acts through violations of 18 U.S.C. § 1346.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

169.    The Pool Board Members owe the members of the Pool, including AIG, a fiduciary duty.

170.    By electing the Pool Board Members to serve on the Pool Board, AIG and other Participating Companies had a justified expectation that the Pool Board Members would provide honest services.

171.    As alleged in detail above, the Underreporting Pool Board Members have:

(a)    Blocked the Pool from conducting any investigation of underreporting of workers compensation premium by the Underreporting Pool Board Members and others;

(b)    Blocked the Pool from taking action against any of the Underreporting Pool Board Members for underreporting of workers compensation premium; and

(c)    Blocked the Pool from participating in the Workers Compensation Fund, so as to cause financial and reputational harm to AIG.

172.    Through the foregoing conduct and other conduct described herein, the Underreporting Pool Board Members have deprived, and have caused the Pool Board and NCCI to deprive, AIG (and the other Participating Companies) of its intangible right to honest services in the conduct of the Pool's affairs.

173.    This conduct has caused financial harm to the Participating Companies, including AIG, by depriving them of an opportunity to recover the substantial funds owed by the Underreporting Pool Board Members as a result of their malfeasance. This conduct has also caused financial harm to AIG and other Participating Companies by creating the possibility that the Workers Compensation Fund will not be put to its intended purpose and that AIG will be subject to a "double payment" as a result of the Underreporting Pool Board Members' refusal to participate in the Workers Compensation Fund.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

174.    As a direct and proximate result of the Underreporting Pool Board Members' racketeering activity and violations of 18 U.S.C. § 1962(c), AIG and the other Participating Companies have been injured in their business and property.

175.    Each of the racketeering acts of mail or wire fraud set forth in this complaint by the Underreporting Pool Board Members was related, had the same or similar purpose of executing these schemes and unlawful conduct alleged herein, involved the same or similar participants and method of commission, had similar results, multiple victims and directly impacted AIG and/or other Participating Companies.

## COUNT TWO
**(Civil Racketeering against Underreporting Pool Board Members
in violation of 18 U.S.C. § 1962(d))**

176.    AIG realleges and incorporates by reference Paragraphs 1- 175 and 180 - 190 of this First Amended Complaint as if fully set forth herein.

177.    Each of the Underreporting Pool Board Members agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, each of the Underreporting Pool Board Members intentionally conspired and agreed to direct and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

178.    Each of the Underreporting Pool Board Members agreed that at least two of the predicate acts of mail or wire fraud would be committed in furtherance of the common purpose of the enterprise.

179.    The object of the racketeering activity was for each of the Underreporting Pool Board Members to obtain substantial and unlawful economic benefits, and retain past substantial and unlawful economic benefits, by preventing the discovery of past frauds committed by each of the Underreporting Pool Board Members against AIG and other Participating Companies and

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

to continue to defraud them under the guise of a seemingly innocent Board and reinsurance mechanism.

## COUNT THREE
### (Civil Conspiracy against Underreporting Pool Board Members)

180.    AIG realleges and incorporates by reference Paragraphs 1- 179 of this First Amended Complaint as if fully set forth herein.

181.    The Underreporting Pool Board Members, between and among themselves and with the aid of the Pool Board, NCCI, and counsel, entered into a contract, combination, or conspiracy.

182.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among the Underreporting Pool Board Members in furtherance of which the Underreporting Pool Board Members and the Pool Board and NCCI have effectively boycotted the Workers Compensation Fund on behalf of the Participating Companies, agreed not to investigate or make claims against each other or other Underreporting Participating Companies related to the underreporting of workers compensation premium, and submitted false invoices to AIG and other Participating Companies.

183.    The contract, combination, or conspiracy between and among the Underreporting Pool Board Members and the Pool Board and NCCI was for the purpose of engaging in tortious conduct including, but not limited to:  (a) defrauding AIG; (b) breaching fiduciary duties of care and loyalty by the Underreporting Pool Board Members to AIG; (c) inducing other Pool Board Members to breach duties of care and loyalty to AIG; (d) participating in a fraud by themselves and other Underreporting Participating Companies by assisting in the concealment of that fraud; (e) engaging in unfair business practices by deliberately and maliciously imposing unwarranted

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

financial and reputational harm on AIG; and (f) engaging in a prima facie tort by imposing financial and reputational harm on AIG without reasonable justification.

184. The Underreporting Pool Board Members have engaged in overt acts to further this contract, combination, or conspiracy, including but not limited to: (a) causing false financial statements to be issued to AIG and other Participating Companies; (b) refusing to participate in the Workers Compensation Fund; (c) refusing to investigate fraud by themselves and other Underreporting Participating Companies; (d) assisting in the concealment of the fraud by themselves and other Underreporting Participating Companies; and (e) making false, misleading, and defamatory remarks, either directly or through the Pool's outside counsel, to third parties and regulators concerning AIG.

185. AIG has suffered injury in the form of increased costs and lost business as a proximate result of the Underreporting Pool Board Members' conspiracy to commit tortious conduct.

186. The Underreporting Pool Board Members, through the Pool and NCCI, have made materially false statements – in the form of quarterly invoices which fail to account for workers compensation premium underreporting by themselves and other Underreporting Participating Companies – to AIG and other Participating Companies, on which AIG and other Participating Companies have relied, causing injury.

187. The Underreporting Pool Board Members owe AIG and other Participating Companies a fiduciary duty and have breached that fiduciary duty by, among other things, failing to investigate and assert claims for their own fraudulent conduct and that of other Participating Companies and assisting to conceal that conduct.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

188.    The Underreporting Pool Board Members induced other Pool Board Members to breach the fiduciary duties that they owe to AIG and other Participating Companies by, among other things, influencing them in such a way so as to result in a failure to investigate their own fraudulent conduct and that of other Participating Companies and assisting to conceal that conduct.

189.    The Underreporting Pool Board Members, both directly and indirectly through the Pool and NCCI, have engaged in fraudulent conduct and misleading representations by assisting in the concealment of their own and other Participating Companies' conduct. AIG has relied on these representations and has been harmed as a result.

190.    The Underreporting Pool Board Members have acted toward AIG with malevolence in refusing to participate in the Workers Compensation Fund, in refusing to investigate the conduct of themselves and other Participating Companies, and the other actions set forth above.

## COUNT FOUR
### (Breach of Fiduciary Duty against Pool Board Members)

191.    AIG realleges and incorporates by reference Paragraphs 1- 190 of this First Amended Complaint as if fully set forth herein.

192.    Each Pool Board Member owes a fiduciary duty to AIG, as a member of the Pool, as well as to all other Participating Companies.

193.    The Pool Board Members breached their fiduciary duty to AIG by, among other things: (a) conspiring to undermine and disable the Workers Compensation Fund; (b) conspiring to prevent NCCI from following its standard practices with respect to calculating AIG's residual market assessments and directing NCCI to engage in conduct inconsistent with its contractual obligations, including through disseminating false account statements; and (c) failing to

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

investigate and assert claims for the fraudulent conduct of the Underreporting Participating

Companies and assisting in the concealment of that conduct.

194.    AIG has suffered damages, including through paying higher residual market

assessments, as a result of the Pool Board Members' breaches of their fiduciary duties.

<u>COUNT FIVE</u>
**(Fraud against Underreporting Participating Companies — Premium Underreporting)**

195.    AIG realleges and incorporates by reference Paragraphs 1- 194 of this First

Amended Complaint as if fully set forth herein.

196.    Each of the Underreporting Participating Companies made statements to NCCI

with respect to the amount of their workers compensation premium that they knew to be false

when made.

197.    Each of the Underreporting Participating Companies made these false statements

to NCCI with the expectation that NCCI and the Pool would rely upon those statements in

allocating residual market liabilities and that the other Participating Companies, including AIG,

would rely upon those statements in paying for residual market liabilities on the basis of those

allocations.

198.    The false statements by the Underreporting Participating Companies were

material to the calculation of the participation rates for AIG in the Pool.

199.    AIG made payments to NCCI, as administrator for the Pool, in reliance on

participation rates that were calculated based on the false statements made by the Underreporting

Participating Companies, and was thus damaged thereby.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

## COUNT SIX
**(Fraud against Underreporting Participating Companies — Workers Compensation Fund)**

200.    AIG realleges and incorporates by reference Paragraphs 1- 199 of this First Amended Complaint as if fully set forth herein.

201.    Each of the Underreporting Participating Companies made reports of their written workers compensation premium to NCCI and state regulators that they knew to be false when made.

202.    AIG created the Workers Compensation Fund to make restitution for any financial harm allegedly caused by any inaccurate reporting of its workers compensation premium.

203.    The Workers Compensation Fund was calculated based on its reporting of revised workers compensation amounts.

204.    In calculating the Workers Compensation Fund, AIG and the New York Authorities relied on the accuracy of the workers compensation premium that had been reported by the Underreporting Participating Companies.

205.    As a result of the Underreporting Participating Companies' intentional underreporting of workers compensation premium, the Workers Compensation Fund was calculated as a larger amount than it would have been had it been calculated on the basis of accurate premium reporting by the Underreporting Participating Companies.

206.    AIG has been injured in that it is unable to recover any amounts from the Workers Compensation Fund even if such amounts are ultimately not necessary to make full restitution for any financial harm allegedly caused by any inaccurate reporting of its workers compensation premium.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

## COUNT SEVEN
### (Breach of Contract against Underreporting Participating Companies)

207.   AIG realleges and incorporates by reference Paragraphs 1- 206 of this First Amended Complaint as if fully set forth herein.

208.   AIG and the Underreporting Participating Companies have at all times material to this action been parties to Articles of Agreement.

209.   Under the Articles of Agreement, the Participating Companies have a duty to submit accurate premium information data.

210.   The Underreporting Participating Companies breached their contractual obligations by submitting false and inaccurate premium data to NCCI.

211.   AIG has performed or been excused from performing its material obligations under the Articles of Agreement.

212.   As a direct and proximate result of the Underreporting Participating Companies' breaches of their contract, AIG has been damaged in an amount to be proved at trial.

## COUNT EIGHT
### (Unjust Enrichment against Underreporting Participating Companies)

213.   AIG realleges and incorporates by reference Paragraphs 1- 212 of this First Amended Complaint as if fully set forth herein.

214.   The Underreporting Participating Companies have unjustly retained substantial benefits from their underreporting of workers compensation premium to the financial harm and other detriment of AIG.

215.   The retention of the benefits arising from the Underreporting Participating Companies' underreporting of workers compensation premium violates the fundamental principles of justice, equity and good conscience.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

216.     The amount by which the Underreporting Participating Companies have been unjustly enriched will be proven at trial.

**COUNT NINE**
**(Equitable Accounting against Underreporting**
**Participating Companies, the Pool, and NCCI)**

217.     AIG realleges and incorporates by reference Paragraphs 1-216 of this First Amended Complaint as if fully set forth herein.

218.     As a result of inaccurate reporting to NCCI by the Underreporting Participating Companies of their workers compensation premium, the calculations performed by NCCI were incorrect and the residual market obligations of AIG and other Participating Companies were incorrectly determined.

219.     Due to the complex nature of the parties' accounts with NCCI, the equally complex calculations necessary to determine the amount of the parties' rights and obligations to each other, and the Underreporting Participating Companies' fraudulent concealment of the true and accurate premium of the Participating Companies, AIG does not have an adequate remedy at law.

220.     The Underreporting Participating Companies have refused and continue to refuse to account to AIG for amounts by which they have underreported their workers compensation premium.

221.     The Pool, NCCI, and the Underreporting Participating Companies are currently in possession of the books, records and other documentation that accounts for what the Underreporting Participating Companies have reported as their workers compensation premium.

222.     AIG lacks an adequate remedy at law to determine the amounts due to and/or from the Underreporting Participating Companies, and can do so only through an accounting.

-57-

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

223. AIG has a compelling need for access to the information possessed by Defendants so it can understand the scope and the consequences of the premium underreporting by the Underreporting Participating Companies and the impact of the foregoing on the residual market obligations of the other Participating Companies, including AIG.

224. Defendants owe fiduciary duties of fair dealing and loyalty to the Participating Companies, including AIG, and they have breached their fiduciary duties by, among other things, causing AIG (and other Participating Companies) to pay more than it was properly required to the Pool, while being complicit in the Underreporting Participating Companies' scheme to underreport their workers compensation premium.

225. The Participating Companies, including AIG, have been defrauded by each of the Underreporting Participating Companies and, therefore, the equitable remedy of an accounting is necessary to understand the scope and the consequences of the fraudulent underreporting.

226. Each of the Participating Companies has an open, current and mutual account with the Pool that is highly complex. Consequently, AIG needs the equitable remedy of an accounting to understand the scope of the fraudulent underreporting by the Underreporting Participating Companies and the impact of that underreporting on AIG.

227. AIG respectfully requests that an equitable accounting be made of all workers compensation premium made by all of the Underreporting Participating Companies to determine the parties' rights and liabilities.

## COUNT TEN
### (Action on an Open, Mutual, and Current Account against Underreporting Participating Companies, the Pool, and NCCI)

228. AIG realleges and incorporates by reference Paragraphs 1- 227 of this First Amended Complaint as if fully set forth herein.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

229.     AIG, along with the other Participating Companies, has a highly complex account arising from its participation in the Pool that is administered by the NCCI.

230.     This account is open to current and future adjustments as a result of changes in premium, losses, costs and expenses.

231.     This account is current as a result of the fact that adjustments have been made to it within the last 12 months.

232.     This account is mutual as a result of the fact that adjustments can be favorable or unfavorable to AIG and/or the other members of the Pool.

233.     As a direct and proximate result of the conduct alleged herein, the open, current and mutual account between AIG and other Participating Companies has been improperly computed, offset and balanced in an amount to be proven at trial.

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

## PRAYER FOR RELIEF

WHEREFORE, AIG respectfully requests the entry of judgment against

Defendants as follows:

(a)    an award of treble damages with respect to the amount by which AIG has been injured as a proximate result of the Underreporting Pool Board Members' violations of RICO;

(b)    an award of compensatory and punitive damages in respect of the amount by which AIG has been injured as a proximate result of the Underreporting Pool Board Members' fraudulent conduct, breaches of fiduciary duty, and conspiracy to commit tortious activity;

(c)    an award of compensatory and punitive damages in respect of the amount by which AIG has been injured as a proximate result of the Pool Board Members' breaches of fiduciary duty;

(d)    an award in the amount by which the Underreporting Participating Companies have been unjustly enriched by their underreporting of workers compensation premium at AIG's expense;

(e)    an equitable accounting of each of the Underreporting Participating Companies' obligations to AIG resulting from their underreporting of workers compensation premium;

(f)    ordering a proper computation of AIG's account with NCCI;

(g)    an award of compensatory and punitive damages in respect of the injury that AIG has sustained as a result of the underreporting of workers

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

compensation premium by the Underreporting Participating Companies; and

(h)    an award of interest, attorneys' fees, and such other and further relief as may be just and proper.

DATED:    Chicago, Illinois
October 16, 2009

AMERICAN INTERNATIONAL GROUP, INC., *et al.*,

By: /s/ Stephen Novack
One of Their Attorneys

Stephen Novack
P. Andrew Fleming
John F. Shonkwiler
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900

Michael B. Carlinsky
Kevin S. Reed
Jennifer J. Barrett
Brendan N. Snodgrass
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

- This document has been redacted to remove material designated as Confidential pursuant to Protective Order -

## CERTIFICATE OF SERVICE

Andrew D. Campbell, an attorney, hereby certifies that he served a copy of the foregoing **Corrected First Amended Complaint** upon the parties by causing a true and correct copy thereof to be delivered by electronically filing the document with the Clerk of Court using the ECF system on this 16th day of October, 2009.

_____ /s/ Andrew D. Campbell _____