**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., *et al.* | ) ) ) | No.: 07 CV 2898 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| | ) ) | Magistrate Judge Sidney I. Schenkier |
| v. | ) ) | |
| ACE INA HOLDINGS, INC., *et al.* | ) ) | |
| Defendants. | ) ) | |
| —————————————— | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, *et al.*, | ) ) ) | |
| Counter-Claimants, | ) ) | |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., *et al.*, | ) ) ) | |
| Counter-Defendants. | ) ) | |
| —————————————————— | ) ) ) | |

| | | |
|---|---|---|
| SAFECO INSURANCE COMPANY OF AMERICA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 09 C 2026 |
| AMERICAN INTERNATIONAL GROUP, INC., *et al.*, | ) ) ) | Judge Robert W. Gettleman |
| Defendants. | ) ) ) | Magistrate Judge Sidney I. Schenkier |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ALL CLAIMS ASSERTED
AGAINST THE NATIONAL WORKERS COMPENSATION REINSURANCE POOL**

The National Workers Compensation Reinsurance Pool ("the Pool" or "NWCRP"), by its attorneys Schiff Hardin LLP, submits this Memorandum of Law in support of its motion to dismiss all claims asserted against the Pool.

## INTRODUCTION

This Court should dismiss Counts 9 and 10 of the Corrected First Amended Complaint ("AIG Complaint"), which are the only two claims asserted against the Pool by American International Group, Inc. ("AIG"), for four reasons:

First, the Pool is not an entity capable of being sued. It is not a corporation, a partnership, a joint venture, an unincorporated association, or any other type of organizational entity endowed with independent status. AIG has repeatedly argued before this Court that the Pool is "merely a collection of contracts." Under the doctrine of judicial estoppel, AIG should not *now* be allowed to insist that the Pool is anything more. The Pool is – as AIG itself admits and alleges in the AIG Complaint and elsewhere – a contractual "mechanism" for allocating reinsurance risk. To put it bluntly, AIG cannot sue a contract.

Second, AIG has not properly served process on the Pool. This is hardly surprising since, because the Pool is not an entity, there is no one to serve. The Pool has designated no agent for receiving service of process. Again, to put it bluntly, AIG cannot sue a contract.

Third, AIG cannot assert a claim for an equitable "accounting" against the Pool because the Pool – even if it were an "entity" – has no control over the accounting records of either AIG or any other participant in the Pool mechanism.

If the Pool contract (i.e., the NWCRP Articles of Agreement) has been breached,

AIG's remedy is with its fellow Pool participants, not by suing the contract that

those parties wrote to allocate the residual market risk.

Fourth, AIG's own unclean hands bar an action for an equitable

accounting. AIG admits that it has engaged in serious wrongdoing, to wit: the

underreporting of its workers compensation premiums in the voluntary market for

the purpose of avoiding, *inter alia*, its residual market reinsurance obligations to

other Pool participants. The law does not permit a confessed wrongdoer to invoke

the protection of equity in these circumstances.

## I.   <u>BACKGROUND FACTS</u>

This Court ruled on August 20, 2009, that the NCCI had no standing, as attorney–in–fact,

to assert claims against AIG in the NCCI Complaint on behalf of the participants in the Pool. In

so ruling, the Court expressly recognized that the Pool was not a party in this case (see Aug. 20,

2009 Order at 2, n.1), and rejected the prior ruling to the contrary by Magistrate Judge Schenkier

as non-binding. *(Id.)* This Court further noted that "no party has sought to join the Pool as a

plaintiff under Fed. R. Civ. P. 17(a), the caption naming NCCI as the single plaintiff has not been

changed, and no attempt to file an amended complaint naming the Pool as a plaintiff has been

made." (*Id.* at 6, n.4.)

In seeking the dismissal on standing grounds, AIG repeatedly acknowledged and

represented to this Court that the Pool is "merely a collection of contracts that comprise a

reinsurance mechanism." *(See, e.g.,* Defendants' Memorandum of Law in Support of Their

Motion to Dismiss for Lack of Subject Matter Jurisdiction, Docket Entry 409, at 10.) AIG

emphasized that the Pool was neither an "organization" nor an "association" that asserts its

members interests. *(Id.)* Despite these acknowledgements, AIG now attempts to sue the very same "collection of contracts" that it previously argued had no independent legal status. That should not be permitted. AIG cannot state claims for an accounting or an action on an account, both of which stem from a contractual relationship, against the contract itself rather than the parties with whom it actually contracted.[1]

## II.   ARGUMENT

### A.   AIG Cannot State a Claim Against a Contract.

In seeking to dismiss NCCI's complaint as attorney-in-fact, AIG insisted that the Pool had no independent legal status and was, "[a]t best, . . . a **bystander** in what is really a dispute among the Participating Companies." (Mem. of Law in Supp. of AIG's Mot. to Dismiss at 12 (emphasis supplied)). It insisted that the Pool as defined in the Articles of Agreement "is not an association designed to represent its members' interests, but instead is **merely a collection of reinsurance contracts** by and among hundreds of insurance companies." *(Id.* at 11 (emphasis supplied)). AIG championed these statements to the Court, expressly to support AIG's position that the Pool could not sue on behalf of the Participating Companies – because "[T]he Pool – **a reinsurance mechanism** – is simply **not the type of 'association' or 'organization' that represents its members' collective interests** and therefore may possess associational standing." *(Id.* at 2 (emphasis supplied)). The standing briefing is replete with these and other admissions by AIG that the Pool is merely a contractual reinsurance mechanism.[2] Having previously urged

---

[1] A claim based on an "open, current, and mutual" account is essentially an equitable accounting of the debits and credits between parties to a contract. *See, e.g., Chicago, Rock Island and Pac. R.R. Co. v. Atchison, Topeka and Santa Fe Ry. Co.,* 537 F.2d 906, 914 (7th Cir. 1976). For convenience, this Memorandum refers to both Counts Nine and Ten as "accounting claims."

[2] *See, e.g.,* Mem. of Law in Supp. of AIG's Mot. to Dismiss at 10 ("[T]he Pool is a contractual arrangement – a reinsurance mechanism – not an association designed to assert its members' collective interests."); Defendants' Reply Memorandum of Law in Further Support of Their

this Court that the Pool is simply a collection of reinsurance contracts, AIG cannot now maintain an action against the Pool.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (U.S. 2001). Here, AIG prevailed in its position that the Pool was merely a collection of reinsurance contracts, and the Court granted AIG's motion to dismiss the NCCI Complaint. (Aug. 20, 2009 Order at 17.) Yet AIG now asserts claims directly against the Pool – the very same "collection of contracts" that AIG previously argued had no independent legal status. The doctrine of judicial estoppel exists to prevent this very tactic, and the Court should employ it here to dismiss all claims against the Pool. *See New Hampshire,* 532 U.S. at 749; *Butler v. Vill. of Round Lake Police Dept.*, No. 08-3856, 2009 WL 3429100, at *2 (7th Cir. Oct. 27, 2009) ("This is just the kind of about-face judicial estoppel seeks to prevent."). Where a party advances a certain position in a legal proceeding, and succeeds in maintaining that position, "he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire*, 532 U.S. at 749. AIG cannot now claim that the Pool – which AIG acknowledged was merely a collection of reinsurance contracts and "[a]t best, . . . a bystander in what is really a dispute among the Participating Companies" – is a legal entity, both capable of being sued and properly sued for an accounting.

Though AIG seeks an "accounting" from the Pool, the AIG Complaint repeatedly acknowledges that the Pool is merely a "mechanism":

---

Motion to Dismiss for Lack of Subject Matter Jurisdiction, Docket Entry 444, at 7 ("The Pool, a mere 'reinsurance mechanism,' does not have associational standing.").

- The Pool is a **residual market mechanism** through which licensed workers compensation insurance companies reinsure certain workers compensation residual market policies. (AIG Complaint, ¶ 51, emphasis supplied.)

- NCCI administers the Pool on behalf of the Participating Companies and in such capacity provides various financial and accounting support services for the **reinsurance mechanism**. (AIG Complaint, ¶ 52, emphasis supplied.)

- The Pool is the largest residual market pool, **constituting a mechanism**, for the reinsurance for residual markets in a large number of states through apportioning those residual market reinsurance obligations among the Pool's members. (AIG Complaint, ¶ 57, emphasis supplied.)

- As originally structured, it was expected that the states would receive distributions from the [Workers Compensation Fund] on behalf of both **public and private residual market mechanisms, such as the Pool**. (AIG Complaint, ¶ 75, emphasis supplied.)

- The Underreporting Pool Board Members, acting through, and under, the seemingly innocent guise of this **reinsurance mechanism**, have been able to engage in their racketeering activity, causing significant harm to AIG and other Participating Companies. (AIG Complaint, ¶ 145, emphasis supplied.)

- *First*, the Underreporting Pool Board Members use the seemingly innocent **reinsurance mechanism** of the Pool to engage in a pattern of racketeering activity to fraudulently obtain money and property from AIG and other Participating Companies by submitting false and materially misleading invoices, which AIG and the Participating Companies rely upon in paying their obligations to the Pool. (AIG Complaint, ¶ 157, emphasis supplied.)

- The object of the racketeering activity was for each of the Underreporting Pool Board Members to obtain substantial and unlawful economic benefits, and retain past substantial and unlawful economic benefits, by preventing the discovery of past frauds committed by each of the Underreporting Pool Board Members against AIG and other Participating Companies and to continue to defraud them under the guise of a seemingly innocent Board and **reinsurance mechanism**. (AIG Complaint, ¶ 179, emphasis supplied.)

By alleging in the AIG Complaint that the Pool is merely a "mechanism," AIG has excluded the possibility that the Pool is a natural person, a corporation, a receiver, a limited liability company, a partnership, or an unincorporated association capable of being sued under Fed. R. Civ. P. 17(b). "A prime requisite to maintaining a proper lawsuit is that the parties, whether plaintiff or defendants, be either a natural or artificial person." *Tyler v. J.C. Penney Co.,*

*Inc.*, 496 N.E.2d 323, 327 (Ill. App. Ct. 1986) (dismissing claims against "Market Place Shopping Center" because it was not a legal entity recognized by law). There is no basis under Illinois state law or otherwise for suing a "mechanism."[3]

AIG cannot state a claim against a party that has no legal existence, and AIG itself insists that the Pool is merely a mechanism or a collection of contracts. AIG's own pleading establishes that the Pool is incapable of being sued and renders the AIG Complaint subject to dismissal under Rule 12(b)(6). *See Fuller v. Woodland Racing*, No. 92-2317-GTV, 1994 WL 171408, at *2-3 (D. Kan. April 7, 1994) (dismissing claims against a building and the business name of a race track because they were not legal entities capable of being sued); *Roby v. Corporation of Lloyd's*, 796 F. Supp. 103, 104 (S.D.N.Y. 1992) (dismissing claims against insurance "syndicates" because they were not legal entities capable of being sued); *see generally Thompson v. Illinois Dept. of Prof'l Regulation*, 300 F.3d 750, 753-54 (7th Cir. 2002) (district court may take note of facts contained in the complaint which demonstrate that plaintiff is not entitled to relief); *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir. 1994) (district court properly noted that the allegations of the complaint negated the claim being asserted).

**B. AIG's Claims Against the Pool Must Be Dismissed Under Rule 12(b)(5) Because AIG Never Served The Pool With Its Pleadings**

The Seventh Circuit has recognized that a defendant has a "right to proper service of process." *Troxell v. Fedders of N. Am., Inc.*, 160 F.3d 381, 383 (7th Cir. 1998). AIG did not serve the Pool with a copy of a Summons and the First Amended Complaint, as required by Federal Rule 4. "When a defendant challenges the sufficiency of service, the burden is on the

---

[3] We are aware that the issue of the Pool's status has been raised in a handful of district court cases in other jurisdictions, but those cases are either distinguishable or led to a decision in the Pool's favor. In any event, both the doctrine of judicial estoppel, as well as AIG's own allegations in respect to the Pool being merely a collection of contracts (*see* pages 4 - 6, *supra*), render those cases inapposite.

Plaintiff to affirmatively demonstrate otherwise." *Chapman v. U.S. Marshal for the N. Dist. of Ill.*, 584 F. Supp. 2d 1083, 1090 (N.D. Ill. 2008). AIG cannot meet this burden.

Although AIG initially asserted purported counterclaims against the Pool in March 2008, this Court's ruling in August 2009 recognized that the Pool was never a plaintiff to this action. AIG has done nothing to bring the Pool into this case. As the Court's CM/ECF system reveals, the Pool was never served with process as a third-party defendant in 2008, never answered AIG's counterclaim, and – before now -- has never caused a lawyer to file a formal appearance on behalf of the Pool as a party. Because AIG has not served the AIG Complaint on the Pool, the Court should dismiss AIG's claims under Federal Rule 12(b)(5) for insufficient service of process.

**C.**     <u>**AIG's Claims Against the Pool Should Be Dismissed Because the Pool Has No Control Over the Participating Companies' Relevant Premium Accounts**</u>

AIG claims in Count 9 of the AIG Complaint that it is entitled to an accounting from each of twenty companies, as well as the NCCI and the Pool. Count 10 similarly alleges that AIG is entitled to bring an action on an open, current and mutual account against twenty companies, the NCCI and the Pool.

This Court should dismiss AIG's claims against the Pool because the AIG Complaint demands the wrong remedy from the wrong party. According to the AIG Complaint, AIG has been harmed by the conduct of twenty insurance companies, some of whom allegedly underreported premiums in the voluntary market, which in turn allegedly caused AIG's reinsurance obligations in the residual market to be unfairly high. In contrast, AIG alleges that the Pool is merely "a mechanism" for the "apportioning" of "residual market reinsurance obligations among the Pool's members." (AIG Complaint, ¶ 57.) AIG does not and cannot allege that the Pool has any premium to "report," is an insurer or reinsurer, or that the Pool bears

reinsurance risk. AIG does not and cannot allege that it has a reinsurance agreement with the Pool or that AIG is owed an obligation by the "mechanism" created by the Articles of Agreement, as opposed to the other signatories to the contract.

Rather, the preamble to the Pool's Articles of Agreement (attached hereto as Exhibit A)[4] clearly states that the "premiums, losses, costs and/or expenses" arising under policies of insurance issued by certain participating companies acting as servicing carriers in the residual market will be "equitably distributed among the participating companies." (Ex. A at 3.) The participating companies in the Pool agree with each other – rather than with the Pool itself – that each participating company will bear its own appropriate share of the *residual* market reinsurance obligations in proportion to the amount of insurance each of them writes in a particular *voluntary* market. (*Id.;* AIG Complaint, ¶ 56.) AIG and the other participating companies directly and severally assume their respective shares of the reinsurance of the residual market policies through the quota share reinsurance agreements with the servicing carriers who issue the residual market policies. (Ex. A at 3–5.) Thus, the Pool is not a counterparty to AIG's reinsurance obligations. As AIG itself has previously argued, the Pool is indeed a "bystander in what is really a dispute among the Participating Companies." (Mem. of Law in Supp. of AIG's Mot. to Dismiss at 12.).

---

[4] AIG's claim for an accounting must be based, if it is based in anything at all, on the NWCRP Articles of Agreement, but AIG fails to attach to the Complaint a copy of the document on which it relies. Because the AIG Complaint refers to the Articles and the document is central to AIG's claims and thus should be considered by the Court in evaluating those claims, the Pool attaches hereto a complete copy of the Articles. *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (in ruling on motion to dismiss, district court appropriately considered treaties that were not attached to the complaint, where the treaties were central to plaintiff's claims and were referenced in the complaint); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993) (district court appropriately considered documents not attached to the complaint, where they were central to the parties' contractual relationship and were referenced in the complaint).

Because AIG's contracts are with the participating companies (and *not* with the Pool), the Pool is not a proper party from which to seek an accounting. "An equitable accounting is 'an adjustment of the accounts of the parties and a rendering of the balance ascertained to be due'." *Drake Enter., Inc. v. Colloid Envtl. Tech. Co.*, No. 08 C 6753, 2009 WL 1789355, at *2 (N.D. Ill. June 24, 2009) *(quoting Blythe Holdings, Inc. v. Flawless Fin. Corp.*, 2009 WL 103196, at *14 (N.D. Ill. Jan. 15, 2009)). Similarly an action on a open, current and mutual account similarly requires the existence of an account *between the parties*:

> [T]here must be a mutual, or as sometimes expressed, an alternate, course of dealing, giving rise to cross demands upon which the parties might respectively maintain actions. Where payments are made on account by one party for which credit is given by the other, it is an account without reciprocity, and only on one side. There must be a mutual credit, founded on a subsisting debt on the other side, or an express or implied agreement for a set-off of mutual debts. But in addition, the "main ground" on which rests the rule that items within the period of limitation draw after them items beyond the period, is a determination that every new item and credit in an account given by one party to the other is an admission that there are some unsettled accounts between them.

*In re Mortgage Escrow Deposit Litig.*, 1994 U.S. Dist. LEXIS 12746, at *12 (N.D. Ill. Sept. 9. 1994) (citations omitted). The purpose of an open mutual account claim is to reassess debits and credits between parties that share an open account relationship. *See Chicago, Rock Island and Pac. R.R. Co. v. Atchison, Topeka and Santa Fe Ry. Co.*, 537 F.2d 906, 914 (7th Cir. 1976). Thus, the defining characteristic of both an accounting claim and an action on an open account is the existence of a contractual, account relationship between the parties, *i.e.*, privity. Here, there is no privity between AIG and the Pool, and the accounting claims against the Pool therefore cannot proceed.

AIG demands an accounting because other Pool participants allegedly "underreported" their voluntary market premiums to NCCI, the Pool administrator.[5] Thus, AIG is suing over what various *other* insurance companies allegedly *should have reported* with respect to their voluntary market premiums, not what they actually reported to NCCI. Even if the Pool is deemed to be more than what AIG has alleged (a collection of reinsurance contracts), it would still lack any of the necessary information from which an "accounting" of the correct amounts of voluntary market premium could be performed. Even if the Pool mechanism had employees, an office or even a filing cabinet, the Pool does not have possession or control of the records from which to ascertain the true and actual amount of voluntary market premiums that any of the alleged underreporting companies *should have reported*. See *In re Nat'l Audit Def. Network*, 332 B.R. 896, 919 (D. Nev. 2005) ("under traditional principles, no accounting is available" when the complaining party does not have "technical legal title to any property *in the defendant's possession*") (emphasis added) (citations omitted). Indeed, the Pool does not have any more access to the voluntary market accounting and business records of AIG and other Pool participants than AIG itself has.

Though AIG seeks to press an accounting claim against NCCI and the Pool, the AIG Complaint makes clear that it takes issue only with the alleged conduct of certain other Pool participating companies.[6] Conclusory references such as "the parties' accounts with NCCI" (AIG Complaint, ¶219) and an "open, current and mutual account with the Pool" (AIG

---

[5] AIG claims that: "[a]s a result of inaccurate reporting to NCCI by the Underreporting Participating Companies of their workers compensation premium, the calculations performed by NCCI were incorrect." (AIG Complaint, ¶218.)

[6] For example, AIG claims that it "lacks an adequate remedy at law to determine the amounts *due to and/or from the Underreporting Participating Companies.*" (AIG Complaint, ¶222, emphasis added.)

Complaint, ¶226) do not satisfy AIG's pleading burden. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) ("we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"). AIG's Complaint, the Articles of Agreement and this Court's August 20, 2009 Order make it very clear that the reinsurance obligations that form the "account" at issue run exclusively between insurance companies. The parties that allegedly caused harm to the admitted wrongdoer, AIG, are insurance companies. To the extent AIG claims that it has been harmed by its fellow workers compensation insurance companies, AIG cannot properly look to the Pool for redress.

## III. PLAINTIFFS' UNCLEAN HANDS BAR AN ACTION FOR AN ACCOUNTING

"It is one of the very first principles of equity that he who asks for equity must do equity; that a party coming into a court of equity must come in with clean hands, free from wrong himself in relation to the matter in which they ask equitable relief." *Beermart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409, 413 (7th Cir. 1986) (citation omitted). The relief sought by AIG against the Pool – an accounting and an action on an open current, and mutual account – is equitable in nature, and as such may be barred by the doctrine of unclean hands. *See* 1 Am Jur 2d Accounts and Accounting § 65. "Traditionally, the doctrine of unclean hands is invoked when one seeking relief in equity has violated conscience, good faith or other equitable principles in his prior conduct." *Murphy v. Justus*, 1995 U.S. App. LEXIS 7917, at *8 (7th Cir. Apr. 6, 1995) (citation omitted). AIG's accounting claims must fail against the Pool because the accounting sought by AIG is allegedly necessitated by AIG's own admitted fraudulent conduct.

As is apparent from the face of the AIG Complaint, AIG has engaged in serious wrongdoing – the underreporting of its workers compensation premiums for the purpose of avoiding, inter alia, residual market reinsurance obligations (*see, e.g.,* AIG Complaint, ¶74), which necessitated AIG filing Amended Annual Statements with state insurance departments to

reflect that AIG had underreported workers' compensation premiums for almost two decades. The premise of AIG's accounting claims is that its underreporting has impacted the accounts administered by NCCI. AIG, however, claims that because other companies – in addition to itself – are alleged to have engaged in misconduct, this somehow entitles AIG to an accounting. Because the relief AIG seeks is equitable, however, AIG must itself do equity, and its misconduct bars it from obtaining the relief it seeks. As the Supreme Court long ago observed:

> Those who come into a court of equity, seeking equity, must come with pure hands and a pure conscience. If they claim relief against the frauds of others, they must themselves be free from the imputation. ... An exclusive privilege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character.

*Manhattan Med. Co. v. Wood,* 108 U.S. 218, 227 (1883) (citations omitted). The fact that other participating companies may have engaged in underreporting is irrelevant to the issue of whether AIG may recover in equity; the doctrine applies "to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Packers Trading Co. v. Commodity Futures Trading Comm'n,* 972 F.2d 144, 148 (7th Cir. 1992).

Although unclean hands is an affirmative defense, it may be raised by a 12(b)(6) motion where the grounds for the defense are apparent on the face of the complaint. *See Cunningham v. Equicredit Corp.,* 256 F. Supp. 2d 785, 797 n.12 (N.D. Ill. 2003) ("Although unclean hands is an affirmative defense, the Court may consider affirmative defenses on a motion to dismiss if, as herein, the facts giving rise to the defense are apparent on the face of the complaint.") The AIG Complaint amply demonstrates not only that AIG has engaged in misconduct but that this misconduct – and the regulatory settlement resulting therefrom – are the basis of AIG's present claims:

- In January 2006 — some nine months after an inquiry into its workers compensation premium reporting practices had begun — AIG entered into a settlement with the New York Attorney General and New York Department of Insurance (the "New York Authorities") pursuant to which it established a fund of over $300 million (the "Workers Compensation Fund" or "Fund") *for the express and sole purpose of providing recompense to third parties allegedly injured as a consequence of AIG's alleged underreporting.* (AIG Complaint, ¶ 2) (emphasis added).

- In addition to establishing the Workers Compensation Fund, *AIG also filed with each state insurance department amended statutory Annual Statements for 1987 to 2005, which included amended exhibits of premium and losses ... reflecting the revised written workers compensation premium that had been agreed upon with the New York Authorities* and that were used for purposes of calculating the Fund." (AIG Complaint, ¶77) (emphasis added).

"In what may have been the earliest application of the principle of unclean hands, a highwayman was refused an accounting against his partner in crime." *Shondel v. McDermott,* 775 F.2d 859, 868 (7th Cir. 1985). The present situation is no different. AIG has admitted to wrongdoing and now seeks relief based upon the allegedly identical conduct of others. Equity will not countenance such a result. Because AIG is guilty of the very misconduct that forms the basis for the equitable relief it seeks, its accounting claims must be dismissed.

## CONCLUSION

For all of the foregoing reasons, all claims asserted in AIG's Corrected First Amended Complaint against the National Workers Compensation Reinsurance Pool should be dismissed.

Dated: October 30, 2009

Respectfully submitted,

National Workers Compensation Reinsurance Pool


By:___/s/ William M. Hannay_____
     William M. Hannay
     Marci A. Eisenstein
     SCHIFF HARDIN LLP
     233 S. Wacker Drive
     Chicago IL 60606

# EXHIBIT A

**NWCRP ARTICLES OF AGREEMENT**

Adopted January 1, 1970
Amended May 20, 1970
Amended May 19, 1971
Amended March 2, 1972
Amended May 18, 1973
Amended March 7, 1974
Amended May 15, 1974
Amended May 21, 1975
Amended March 29, 1977
Amended May 20, 1981
Amended May 19, 1982
Amended June 15, 1983
Amended June 20, 1984
Amended June 19, 1985
Amended January 1, 1991
Amended July 1, 1992
Amended January 1, 1993
Amended March 5, 1997
Amended January 1, 1999
Amended January 1, 2002

Reprinted ____, _____

1

### NWCRP Articles of Agreement

**Effective January 1, 2002**

Whereas, the undersigned parties hereto (hereinafter referred to as "participating companies" or "participants") are engaged in the business of insuring against liability under workers compensation acts of the United States of America, of the various states, territories thereof and of the District of Columbia (hereinafter referred to generally as State or States, as the context may require); and

Whereas, in addition to being participating companies they also may be members of Workers Compensation Insurance Plans or other assigned risk workers compensation insurance plans (hereinafter referred to as "Insurance Plans") that are in effect in various states and which generally provide for the issuance of workers compensation policies to employers who are in good faith entitled to workers compensation insurance as defined in the Insurance Plans but are unable to procure such insurance in a regular manner; and

Whereas the participating companies desire to adopt these Articles of Agreement to assist in providing efficient, cost-effective insurance to policyholders who qualify for insurance protection under Authorized Insurance Plans and, further, for the benefit of the participating companies, in order to facilitate their fulfillment of their obligations under an Insurance Plan provided that the Plan's design, structure, and administration is acceptable to the Board of Governors and the participating companies; and

Whereas, the participating companies desire that the premiums, losses, costs and/or expenses arising under certain policies issued pursuant to Authorized Insurance Plans, whether as separate or combined components, be equitably distributed among the participating companies by reinsuring such policies under these Articles of Agreement on a quota share or aggregate excess of loss basis, or other reasonable and equitable basis approved by the Board of Governors, thereby mitigating the risk of undue loss to any one of the participating companies on account of any such policy and permitting the underwriting results, expenses and administration to be accounted for in a cost-effective and consistent manner; and

Whereas, the participating companies desire to form a mechanism to allow for the efficient and cost-effective provision of reinsurance to the Servicing Carriers selected under Authorized Insurance Plans, where such mechanism would provide efficient, centralized administration, including accounting, statistical and actuarial services, among other appropriate activities related to such reinsurance and the spreading of risk; and

Whereas, the participating companies desire that employers needing multistate coverage and who are in good faith entitled to workers compensation insurance as defined in the Authorized Insurance Plans be able to obtain efficient, cost-effective coverage under Authorized Insurance Plans through a single Servicing Carrier and under a multistate policy, where appropriate, thereby helping to reduce the cost of such insurance; and

Whereas, the participating companies have a direct financial interest in, and wish to be assured that, the reinsured Servicing Carriers under Authorized Insurance Plans provide efficient, cost-effective policyholder services, including claims handling and loss prevention services, and further, that Servicing Carriers diligently collect premium due under policies issued by the Authorized Insurance Plans; and

Whereas, the participating companies must be able to rely upon the integrity and dependability of the administrators of the Authorized Insurance Plans, and the selected Servicing Carriers, to achieve the purposes of these Articles of Agreement; and

Whereas, the administration of Authorized Insurance Plans, including but not limited to the efficient and effective performance by the Plan Administrator of its duty to appropriately supervise the reinsured Servicing Carriers, is of substantial interest to the participating companies; and

Whereas, the participating companies may wish to propose new, amended, or revised Insurance Plans, where such changes are appropriate to allow participating companies to be assured that the benefits of these Articles of Agreement shall remain available in the most efficient, cost-effective and reasonable manner.

Now, therefore, for the purpose of reinsuring policies issued pursuant to Authorized Insurance Plans, for the protection of each participating company from the extraordinary hazards incident to the issuance of such policies, and to achieve the other purposes described above or elsewhere in these Articles of Agreement, the undersigned participating companies hereby subscribe to, become parties to, and adopt these Articles of Agreement.

**ARTICLE I**

**Definitions—Rules of Construction**

Unless otherwise provided herein, all terms defined in any Authorized Insurance Plan shall have the same meaning in these Articles of Agreement.

The terms "net premiums written," "net workers compensation insurance premiums written," "workers compensation premiums written" and "workers compensation insurance premiums," wherever used in these Articles of Agreement, shall mean the gross direct premiums charged less all premiums (except dividends and savings refunded under participating policies) returned to policyholders for all Workers Compensation and Occupational Disease Insurance, exclusive of premiums for risks subject to these Articles of Agreement, and for risks written under National Defense Projects Rating Plan and under excess policies. (An excess workers compensation insurance policy is a policy issued to provide coverage for amounts above a self-insured retention.)

"Authorized Insurance Plan" wherever used herein shall mean an Insurance Plan (i) approved by the insurance regulator in any state that provides workers compensation insurance to employers who are in good faith entitled to such insurance but are unable to procure such insurance in a regular manner and (ii) which has been authorized by the Board of Governors under Article V, Section 7.

The term "Workers Compensation" and the word "Workers" wherever used within these Articles of Agreement mean Workers or Workmen's as applicable.

The term "Reinsurance Agreements" shall mean those reinsurance agreements entered into among the Servicing Carriers and the participating companies pursuant to these Articles of Agreement. These Reinsurance Agreements reinsure the direct insurance obligations of the Servicing Carriers, who issue insurance policies in their own names directly to policyholders under the Authorized Insurance Plans.

The term "Administrator" shall mean the entity designated by the Board of Governors to provide the necessary administrative services as are required to achieve the purposes of these Articles of Agreement.

The term "Servicing Carrier(s)" shall mean those licensed insurers who (i) have been selected pursuant to the Authorized Insurance Plans to issue to employers who are eligible for such coverage direct workers

4

compensation insurance policies, as defined in those Plans, such policies being issued in the insurer's own name; and (ii) with respect to such policies, have ceded reinsurance pursuant to the Reinsurance Agreements provided for in these Articles of Agreement.

### ARTICLE II

### Purpose and Limitations

1.  **Purpose.** The purpose of this Agreement is to provide participating companies with an option for complying with Authorized Insurance Plan requirements by permitting the participating companies to share in the experience of certain assigned risks through reinsurance, thereby reducing both administrative costs and the annual fluctuation in the liability of participating companies arising from Authorized Insurance Plan participation. Under the Insurance Plans, an employer who qualifies for coverage is assigned to a carrier to issue and service the policy of insurance issued to such employer. For those participating companies that elect to subscribe to these Articles of Agreement, assignments are made to Servicing Carriers that are appointed pursuant to the Authorized Insurance Plans to write and service the policies issued to employers, which policies are then reinsured by the participating companies. The service provided by the Servicing Carriers is the provision of direct insurance, which includes underwriting and issuing the policy, auditing and collection of premiums, paying all premium and loss based taxes and assessments, providing loss control, and defending and paying claims.

    All participating companies must enter into Reinsurance Agreements with Servicing Carriers ("Reinsurance Agreements") for the purpose of sharing through reinsurance, whether as separate or combined components, the premiums, losses, costs and/or expenses of the policies assigned to the Servicing Carriers. These Reinsurance Agreements distribute premiums, losses, costs and/or expenses and define the obligations among the Servicing Carriers and the participating companies. These Articles of Agreement are intended to: (1) facilitate the reinsurance by establishing uniform rules and procedures; (2) provide a framework which permits the participating companies to agree upon such rules and procedures in the future; and (3) provide a mechanism for resolving disputes arising under the Reinsurance Agreements and these Articles of Agreement.

The relationship between the Servicing Carriers and the participating companies shall be administered by such organization as provided for in a separate administration agreement (herein "Administration Agreement"). The Administrator's duties and obligations with respect to such administration are established by: (i) the Authorized Insurance Plans; (ii) these Articles of Agreement; and (iii) Administration Agreement. The Administrator is also designated as an agent for the participating companies to enter into contracts on their behalf to carry out the purposes of these Articles including but not limited to the Reinsurance Agreements.

2.    **Limitations.** No Insurance Plan for any state shall be brought within the scope of these Articles of Agreement and the rules and procedures adopted hereunder unless these Articles of Agreement have been authorized for and incorporated as part of the Insurance Plan that has been filed with the insurance regulator in such state and approved, or the Articles of Agreement are otherwise approved by the insurance regulator.

These Articles of Agreement shall apply to policies issued to employers whose risks have been assigned to and accepted by Servicing Carriers in accordance with any Authorized Insurance Plan and the terms herein.

Commencing on January 1, 1999, these Articles of Agreement shall be applicable to each Authorized Insurance Plan for terms of three (3) calendar years, unless action is taken pursuant to Article V, Section 8. At the end of each such term, these Articles shall automatically renew for an additional three (3) year term unless the Board of Governors shall recommend to the participating companies that no such renewal should be extended to that Authorized Insurance Plan. Any such recommendation by the Board shall be presented to the participating companies no later than the regular meeting of participating companies to be held during June of the third year of any such term for a specific Authorized Insurance Plan. Any such recommendation is subject to ratification by the affirmative vote, in person or by proxy, of participating companies writing at least $66^2/_3\%$ of the total net workers compensation premium written by all participating companies in such state during the latest available calendar year.

**ARTICLE III**

**Participation**

1.  **Participation.** Any company licensed to write workers compensation insurance in any state that
    has an approved Authorized Insurance Plan may become a participating company by subscribing to
    these Articles of Agreement. Any State Workers Compensation Insurance Fund established by law
    also may become a participant by subscribing to these Articles of Agreement. The Board of
    Governors may permit participation at its sole discretion to any group, organization, association or
    other entity it deems appropriate, subject to such entity subscribing to these Articles of Agreement.

    A company that elects to become a participating company need not participate in the reinsurance in
    all states where the Articles of Agreement apply. If, however, a participating company is part of a
    group or affiliation, its election as to which states it will participate in the reinsurance pursuant to
    these Articles of Agreement must be the same for all companies affiliated in the group. At the time
    a company becomes a participant, it must identify all affiliated companies and notify the
    Administrator which states it will participate in the reinsurance provided under these Articles of
    Agreement. Thereafter, any participating company may withdraw from providing reinsurance in
    any state by giving notice as required in paragraph 2 below subject to the withdrawal of all
    affiliated companies from such state or states.

2.  **Withdrawal.** Any participating company may withdraw as a participating company with respect to
    the reinsurance in a given state or states only on December 31 of any year and must give ninety
    (90) calendar days' advance written notice to the Administrator. Any withdrawal must be made by
    all companies affiliated within a group.

3.  **Expulsion.** The Board of Governors, by affirmative vote of at least nine (9) members then holding
    office and eligible to vote, may at any time expel any participating company which in the opinion
    of the Board shall have violated any of the provisions of these Articles of Agreement or of the
    rules forming a part hereof as then constituted. Prior to any such action by the Board, the
    participating company shall have the opportunity to present any relevant evidence to the Board
    concerning any such alleged violation after notice of no less than ten (10) calendar days by the
    Board which specifies the alleged violation. If, after the participating company has presented

7

evidence to the Board, the Board determines that a violation has occurred, the Board shall send the participating company a notice of expulsion by mail, facsimile transmission, or delivery to such participating company at its latest home office address appearing on the records of the Administrator. If the violation is not cured within fifteen (15) calendar days following the mailing, transmission, or delivery of such notice, the expulsion shall become effective at a date to be determined by the Board but no later than December 31st of the current calendar year. No member of the Board of Governors may vote in a proceeding to expel a participating company by which it is employed or any of its affiliates.

Notice of an expulsion shall be given to the insurance regulator in each state where the expelled participating company was providing reinsurance pursuant to these Articles. The expelled participating company shall have the right to request a review of the Board of Governors' decision by the insurance regulator pursuant to the Dispute Resolution Procedures under the applicable Authorized Insurance Plans.

4. **Obligations After Termination.** Any participating company which terminates participation by withdrawal or by expulsion or has withdrawn from providing reinsurance in a certain state or states shall, nevertheless, with respect to risks subject to these Articles of Agreement prior to midnight of the effective date of such termination or withdrawal, continue to be governed by these Articles of Agreement, the Reinsurance Agreements, and the rules and procedures promulgated thereunder.

5. **Insolvency**

    (a) In the event any participating company shall become insolvent, as hereinafter defined, participation by such company under these Articles of Agreement and the Reinsurance Agreements shall be deemed terminated at the time such company becomes insolvent subject to the further provisions of Section 5(e). As used herein, "insolvent" means being the subject of receivership, conservatorship, rehabilitation, liquidation, or similar court proceedings, whether voluntary or involuntary, in any jurisdiction.

    (b) In the event a Servicing Carrier becomes insolvent, the Administrator, acting on behalf of each of the participating companies as directed by the Board of Governors, shall have the option to:

(i) pay to the receiver, conservator, rehabilitator, liquidator or other appropriate representative all losses and expenses for which such insolvent Servicing Carrier shall have come liable upon risks to which these Articles of Agreement apply; or

(ii) subject to the approval of the receiver, conservator, rehabilitator, liquidator or other representative, and subject to the approval of any court having jurisdiction over the proceedings, terminate the obligation of the participating companies to such insolvent Servicing Carrier to reinsure such insolvent Servicing Carrier for losses, costs and expenses for which the insolvent Servicing Carrier shall have become liable upon risks to which these Articles of Agreement apply. If this option is exercised, and where appropriate in the jurisdiction involved, the Administrator shall make arrangements to have all risks that have been assigned to and are being serviced by such insolvent Servicing Carrier reassigned to another Servicing Carrier or third party service provider for servicing. Such successor Servicing Carrier or third party service provider shall assume all the duties and obligations of the insolvent Servicing Carrier and shall be entitled to the reinsurance provided by the participating companies. Payment made on account of such risks, including expenses for the servicing thereof, shall be apportioned prorata among the remaining participating companies in accordance with the method provided for the apportioning of assessments.

(c) The outstanding liability to the participating companies of any insolvent participant, whether in its capacity as a Servicing Carrier or a participating company or both, and except for the portion unexpended of any amount of premium retained for servicing by such insolvent participating company (if a Servicing Carrier), shall, in event of such insolvency, and subject to any other or further provision with respect thereto which may be from time to time embodied in the rules and procedures adopted hereunder, be assumed by and apportioned among the remaining participating companies in the same manner in which liability for assessments is apportioned. No premium distributions or refunds shall be made to such insolvent participating company until all of its liabilities to the participating companies and all liabilities assumed by the participating companies by virtue of the provisions in this section shall have been fully settled and satisfied.

The participating companies shall have all the rights allowed by law against the estate or funds of such insolvent Servicing Carrier for recovery of funds disbursed (including the payment of losses, costs, expenses and unearned Servicing Carrier allowance) to insolvent Servicing

Carriers which have been absorbed by the participating companies as herein provided. The Administrator may assert and enforce such rights on behalf of the remaining participating companies, and is hereby appointed as their attorney-in-fact for this purpose, to assist and enforce such rights or any compromise on their behalf.

Upon the insolvency of a Servicing Carrier, all amounts due to such insolvent Servicing Carrier from the participating companies as a result of the reinsurance provided to such Servicing Carrier and all amounts due from the insolvent Servicing Carrier as a participating company to other Servicing Carriers it reinsures shall be merged into one account and deemed mutual debts and credits which solvent participating companies and Servicing Carriers may offset.

In the event of the insolvency of a participating company, any amounts owed to such insolvent participating company from any Servicing Carrier under any Reinsurance Agreement entered into pursuant to these Articles may be offset from any amounts owed (either due or to become due) by such insolvent participating company to any Servicing Carrier under the same Reinsurance Agreements. It is the intent of this provision that all amounts due to or from an insolvent participating company under this provision will be treated as mutual debts and credits for purposes of offset rights.

(d) The Board of Governors shall have the discretion to terminate participation of any or all affiliated companies of the insolvent participating company. The termination of an insolvent participating company or any or all companies described in this section shall not be deemed a violation of the requirement contained in Article III, Section 1 relating to all insurers in a group becoming participating companies. A decision to terminate an affiliate of an insolvent participating company is reviewable under the applicable Authorized Insurance Plans.

(e) Anything in this Section to the contrary notwithstanding, the Board of Governors may, in the event such action is in its judgment feasible and desirable, and in a manner equitable to all participating companies, elect not to terminate the participation of such insolvent participating company, and permit such participating company to continue its participation under these Articles of Agreement upon such conditions as it may prescribe and subject in all respects to these Articles of Agreement and the rules and procedures hereunder as then constituted.

10

(f) No member of the Board of Governors that is either an insolvent participating company or affiliate thereof may vote in any proceeding under this Section.

6. **Participating Company Obligations.**

(a) The Administrator is hereby authorized to establish a financial credit policy designed to protect the interests of all participating companies by making sure that each participating company, where appropriate, has adequate financial resources to meet its obligations under the Reinsurance Agreements. The financial credit policy may include, but need not be limited to, such things as: (i) financial reporting to the Administrator; (ii) minimum financial standards which must be met by each member; (iii) actions to be taken by the Administrator when such standards are not met; (iv) obligations of participating companies in respect to such financial credit policy; and (v) right of appeal. After soliciting individual input from various participating companies, the Administrator shall be responsible for the preparation and implementation of the financial credit policy and any subsequent amendments thereto.

(b) Notwithstanding Section 6. (a) above and in the absence of a good faith dispute as determined by the Administrator, any participating company that fails or has failed to make timely payment of its reinsurance obligations or any assessment made under these Articles of Agreement shall become immediately liable as of the earliest date on which such failure to pay occurs, for all current assessments and reinsurance obligations and an additional amount equal to the commuted value on such date of all outstanding reinsurance obligations that such participating company may have. For the purposes hereof, such commuted value shall total the amount of unearned premium reserves and incurred loss reserves then allocated to such participating company hereunder, as determined by the Administrator and approved by the Board of Governors. The liability of the participating company for such commuted value under this provision shall be deemed fixed, liquidated, and non-contingent as of the date of such failure to pay. The Administrator is hereby appointed the attorney-in-fact on behalf of all participating companies to assert and enforce such liability or any compromise thereof on their behalf.

(c) In addition to Sections 6. (a) and (b) above, if the Administrator determines that there is a substantial likelihood that a participating company's reserves are not adequate to meet its obligations under the Reinsurance Agreements, the Administrator shall have authority to order that all premium distributions or refunds due or that may become due to the participating company be paid into escrow or trust with the Administrator, or otherwise be withheld from

11

distribution to the participating company, to secure the participating company's obligations and that the participating company provide a letter of credit or such other form of security and in such amount approved by the Administrator to secure the participating company's future liabilities.

7.    **Authority to Commute.**  The Board shall have the authority to direct the Administrator to enter into agreements on such terms as may be fair and reasonable for the following:

(a)  to commute with a servicing carrier all obligations owed by the participating companies to such servicing carrier under the Articles or the Reinsurance Agreements;

(b)  to commute any specific policy year or years of an individual participating company; or

(c)  to novate or reinsure policy years that have more than ten (10) years of experience.

When required under (a) or (c) above, such commutation or novation can only be effected with the agreement of the servicing carrier or carriers involved.

Any financial obligations arising under any agreement entered into under this Section 7 shall be binding upon the participating company or participating companies.

## ARTICLE IV

## Meetings and Voting Rights

1.    **Regular Meetings.** The participating companies shall meet annually on the third Wednesday of June, or on such other date as the Board of Governors may determine, and at such place as the Board of Governors may determine.

2.    **Special Meetings.** Special meetings of the participating companies may be called at any time by the Chair of the Board of Governors and shall be called by the Chair upon the written request of three (3) non-affiliated participating companies.

3.    **Notice of Meetings.** Except as otherwise provided in Article VIII, notice of all annual and special meetings shall be given or caused to be given by the Chair, in writing, mailed or delivered to, or by

12

facsimile transmission or e-mail direct to, each participating company at the latest address appearing upon the records of the Administrator, or by telephone communication to any executive officer of such participating company. If notice is given by writing and mailed to the participating company, such notice shall be placed in the mail not less than ten (10) calendar days prior to the date of the meeting. If given by facsimile transmission, e-mail, or telephone communication, it shall be so given not less than five (5) calendar days prior to the meeting.

4.     **Quorum.** A quorum at any annual or special meeting shall consist of participating companies that write not less than 50.1% of the total net workers compensation premiums written by all participating companies during the latest calendar year for which information is available in all states where these Articles of Agreement are operative. For purposes of determining a quorum and any vote taken hereunder, the net workers compensation premium written for each participating company shall only include those states where such participating company is providing reinsurance under these Articles.

5.     **Powers.** The purpose of any special meeting shall be stated in the notice thereof; but at all such meetings and at annual meetings, participating companies may consider and act upon all matters brought before them, except where otherwise specifically provided in these Articles of Agreement.

6.     **Voting Rights.** Except where otherwise provided in these Articles of Agreement, at all meetings action may be taken only upon affirmative vote of a majority of the participating companies that write not less than 50.1% of the total net workers compensation premiums written by all participating companies during the latest calendar year for which information is available in all States where these Articles of Agreement are operative. If such meeting is limited to matters involving one State by the terms of the notice of meeting, no action may be taken unless there has been an affirmative vote of participating companies that write not less than 50.1% of the total net workers compensation premiums written by all participating companies providing reinsurance in such State during the latest calendar year for which information is available in such State. Action may also be taken without meeting by mail, facsimile transmission, e-mail, or telephone upon affirmative vote of participating companies which write not less than 50.1% of the total net workers compensation premiums written by all participating companies during the latest calendar year for which information is available in all States where these Articles of Agreement are operative provided that all participating companies are polled.

13

7.  **Proxies and Mail Votes.** Participating companies may be represented at any meeting by proxy. Every proxy shall be in writing and signed by an authorized officer of the participating company. No proxy shall be valid after the expiration of six (6) months after the date thereof. Every proxy shall be revocable at the pleasure of the participating company executing it. Before any proxy can be voted, it shall first be filed with the Chair of the Board of Governors or the Chair's designee not later than one (1) full business day in advance of the meeting. Participating companies may record their votes by mail, facsimile transmission, or e-mail on written propositions, and such votes shall have the same standing as if cast by such participating companies in person or by proxy.

8.  **Procedure / Minutes of Meetings.** Minutes of all meetings of the participating companies and of the Board of Governors shall be recorded and be available to all participating companies. Except as otherwise specifically provided in these Articles of Agreement, all annual and special meetings shall be conducted in accordance with the rules of parliamentary procedure established in the most current edition of *Robert's Rules of Order*.

## ARTICLE V

## Board of Governors

1.  **Number and Term of Office.** Except for those powers specifically granted to the Administrator or an administrator under any Authorized Insurance Plan, these Articles of Agreement and the Administrative Agreement, the operation, business and affairs of all matters arising under these Articles of Agreement shall be managed and controlled by a Board of Governors composed of twelve (12) non-affiliated participating companies.

    The Board shall be elected by the participating companies at the annual meeting of the participating companies. Board elections shall be made for staggered terms, with such terms effective immediately upon adjournment of the annual meeting of the participating companies.

    Four (4) participating companies shall be elected annually for a term of three (3) years. No participating company serving on the Board for a full term shall succeed itself, except where a sufficient number of non-succeeding participating companies cannot be induced to serve on the Board.

14

No more than five (5) of the twelve (12) participating companies of the Board of Governors shall be Servicing Carriers.

All participating companies elected to the Board shall designate a knowledgeable representative of suitable senior standing and shall select two (2) alternates of similar standing to attend Board meetings and vote on matters brought before the Board.

To facilitate voting for members of the Board of Governors at annual meetings, at least sixty (60) days prior to each annual meeting the Board shall appoint a Nominating Committee consisting of four (4) participating companies and to include both stock and non-stock representation. The Nominating Committee shall make nominations for the terms that are expiring at the next annual meeting. The Nominating Committee recommendations shall be reported to all participating companies at least one (1) week prior to the annual meeting. Any participating company can make additional nominations at the annual meeting.

2.      **Vacancies.** If a vacancy occurs in the Board of Governors, the Board shall appoint a replacement which will serve until an election can be held at the next annual or special meeting of the participating companies to fill the unexpired term.

3.      **Place of Meetings.** All meetings of the Board shall be held at a place designated by the Chair.

4.      **Quorum and Voting Rights.** A majority of the Board of Governors shall constitute a quorum. Each Governor shall be entitled to one vote. A Governor's vote may be cast only by its representative, or in his or her absence, by its alternate. Proxy voting shall not be permitted. Any Board action requires an affirmative vote of a majority of the Board present for the meeting. If such votes are not cast, the matter fails adoption except as provided for elsewhere in these Articles of Agreement. In the absence of a quorum, the Board, subject, however, to the provisions of Section 2 of this Article V relative to filling vacancies on the Board, shall have no power except that a majority of the Board of Governors in attendance may adjourn the meeting from time to time until a quorum shall attend.

5.      **Meetings.** The Board shall meet within thirty (30) calendar days next following the annual election of the Board for the purpose of electing officers to serve for the next ensuing year and for the

transaction of all other business within the powers of the Board. Other regular meetings of the Board of Governors shall be held at such places and on such dates as the Board may from time to time determine. Special meetings of the Board may be called at any time by the Chair, or by the Chair upon written request of three (3) non-affiliated Board members. Such notice of regular and special meetings of the Board shall be given as may be determined by the Board or, in the event the period or method of notice shall not have been prescribed, as the Chair shall deem reasonable. Board members may participate in meetings of the Board by means of a conference telephone, video conference, or similar communications method by which all persons participating in the meeting can hear each other at the same time, and participation by such means shall constitute presence in person at such meeting.

6. **Action Without Meeting.** Any action of the Board of Governors may be taken without a meeting if a consent in writing setting forth the action so taken is signed by all of the Board members then in office and is filed with the minutes of the Board of Governors. Such unanimous written consent shall have the same effect as a unanimous vote of the Board.

7. **Authorization.** These Articles of Agreement shall not apply to any Insurance Plan unless the incorporation of these Articles of Agreement into such Insurance Plan is first authorized by the Board of Governors, or the Board approves their application upon some other form of approval by the insurance regulator. The Board has the power, through such vote, to take necessary and appropriate steps to incorporate the Articles of Agreement into such Insurance Plans through filings with the appropriate regulators for consideration and approval, or to otherwise obtain approval from appropriate regulators. In the event that amendments to these Articles of Agreement are not approved by the insurance regulator in a particular state, the most recently approved version of the Articles of Agreement shall continue to apply to risks written through the Insurance Plan in that state.

8. **Plan Changes.** The Board shall monitor and review any change in any Authorized Insurance Plan and any changes in the identity of the Plan Administrator for any such Plan. The Board shall assess the effect of any such changes on the interests of the participating companies and policyholders insured under any Authorized Insurance Plan and shall approve all such changes unless the Board finds that such changes would be inconsistent with the purposes of these Articles of Agreement. If the Board does not approve such a change, the Board may elect to terminate reinsurance in accordance with the termination provisions of the applicable Reinsurance Agreement. Any decision

16

by the Board to elect to terminate reinsurance shall be subject to the approval of the participating companies at any regular or special meeting thereof. At any time, the Board of Governors may develop and present proposed amendments, changes, or revisions to, or complete replacements for, an existing Authorized Insurance Plan or proposed Insurance Plan where the Board believes its proposal would be in the overall interest of the participating companies in a given state.

9.     **Organization and Procedure.** The members of the Board of Governors annually shall elect a Chair and a Vice-Chair. The Chair, or in his or her absence the Vice-Chair, or in the absence of both, a Chair pro tem elected by the Governors present, shall act as a Chair of every meeting of the Board; and the Chair shall appoint a person to act as secretary of the meeting, who shall keep a record of the Board's proceedings. The order of business at all meetings of the Board shall be determined by the Chair. If any Governor is absent from the meeting of the Board, such absent Governor, or the participating company that such Governor represents, may designate in writing any other Governor of the Board to act, but not to vote, in the place and stead of such absent Governor at such meeting. Except as otherwise specifically provided in these Articles of Agreement, all meetings of the Board shall be conducted in accordance with the rules of parliamentary procedure established in the most current edition of *Robert's Rules of Order.*

10.    **Disputes and Appeals.** In addition to the powers elsewhere conferred upon it by these Articles of Agreement, the Board of Governors shall constitute a committee with full authority to pass upon all disputes arising with respect to these Articles of Agreement, including without limitation any questions as to the application, scope, and effect of these Articles of Agreement. The ruling of a majority of the Board as then constituted on any such dispute or question following reasonable notice and an opportunity for a hearing shall be final. All disputes reviewed by the Board of Governors and appeals therefrom shall be subject to and in accord with the Dispute Resolution Procedures provided for in the various Authorized Insurance Plans.

11.    **Rules and Procedures.** The Board of Governors shall have the right to promulgate and adopt rules and procedures for the purpose of implementing the terms of these Articles of Agreement and may also delegate their power to promulgate and adopt rules and procedures to the Administrator, subject to repeal by the Board.

12.    **Authority of Administrator.** The Administrator is authorized to enter into agreements on behalf of the participating companies to carry out the purposes of these Articles of Agreement, including but

not limited to the Reinsurance Agreements. Upon direction by the Board of Governors, the Administrator is empowered to act as attorney-in-fact for each participating company to prosecute, to defend, to submit to arbitration, to settle, and to propose or to accept a compromise with respect to, any claim existing in favor of, or against, such participating company based on or involving any matter relating to this Agreement or to intervene in any action or proceeding related thereto. The Administrator or an officer thereof is authorized to certify these Articles of Agreement, acts taken by the Board or the participating companies, the tenure of, signatures, identity and acts of officers or other officials, or other official acts; and such certificates may be relied upon by any person to whom the same shall be given, until receipt of notice to the contrary.

13. **Chair.** The Chair shall be chief executive officer under these Articles, and shall have overall control of and responsibility for all activities subject to this agreement and other powers which are incidental thereto. The Chair shall serve for a term of one year and any participating company serving as Chair for such term or any portion thereof may succeed itself, provided further that the Chair shall be limited to two (2) consecutive one-year terms, unless otherwise approved by the Board of Governors. The Chair shall not vote in any matter requiring action by the Board of Governors under these Articles of Agreement, except in the event of a tie vote among those Board members voting on any particular matter.

14. **Vice-Chair.** The Vice-Chair shall have immediate charge, subject to the direction and control of the Chair, of such matters as may be assigned to him or her. In the Chair's absence or inability for any reason to act as the Chair, his or her executive duties and powers under these Articles of Agreement may, with like effect, be performed and exercised by the Vice-Chair or, if the latter also be absent or unable to act, by a Chair pro tem elected by the Governors present.

15. **Committees.** The Chair may from time to time appoint such committees, (which may include representatives from participating companies that are not represented on the Board), with such duties and subject to such rules or conditions, not inconsistent herewith, as the Chair may deem desirable. The Chair shall appoint a Chair of each committee, who shall have the same powers and duties with respect to the committee so chaired as the Chair of the Board of Governors has with respect to the Board as a whole. Committee meetings shall be convened and conducted, and action may be taken by each committee, in the same manner as is provided herein for meetings and action of the Board of Governors.

## ARTICLE VI

### Fiscal Matters

1. **Fiscal Year.** The fiscal year for the purpose of administering this Agreement shall be the calendar year unless otherwise established by the Board of Governors.

2. **Accounts.** Funds held temporarily for the benefit of participating companies, including funds withheld pursuant to Article III, Section 6, shall be held by the Administrator and kept on deposit in such banks, trust companies or other depositories as may from time to time be designated and prescribed by resolution of the Board of Governors. The Administrator shall have full authority to deposit, withdraw, and invest such funds in order to carry out the purposes of these Articles of Agreement. The Administrator shall keep accurate records to identify such deposits, withdrawals, and investments which shall be available for review by the Board at any time.

3. **Investment Income.** All income on the funds held for the benefit of the participating companies shall, upon receipt thereof, become subject to all the appropriate provisions of this agreement, except for funds held pursuant to Article III, Section 6 in which case interest will be for the benefit of the participating company that has provided the security required.

## ARTICLE VII

### Indemnification

1. **Indemnification.** Any person or insurer made, or threatened to be made, a party to any action, suit or proceeding, because such person or insurer was a participating company, or served as a member or representative of a member of the Board of Governors or other committee, or was an officer or employee as provided in this agreement or of the Administrator acting on behalf of the participating companies shall be indemnified against all judgments, fines, amounts paid in settlement, reasonable costs and expenses including attorney's fees, and any other liabilities that may be incurred as a result of such action, suit or proceeding, or threatened action, suit or proceeding, except in relation to matters as to which he, she or it shall be adjudged in such action, suit or proceeding to be liable by reason of willful misconduct in the performance of his, her or its duties or obligations to the

participating companies and, with respect to any criminal actions or proceedings, except when such person or insurer had reasonable cause to believe that his, her or its conduct was unlawful. Such indemnification shall be provided whether or not such person or insurer is a participating company, or is holding office, or is employed at the time of such action, suit or proceeding, and whether or not any such liability is incurred prior to the adoption of this Article. Such indemnification shall not be exclusive of other rights such person or insurer may have, and shall pass to the successors, heirs, executors or administrators of such person or insurer. The termination of any such civil or criminal action, suit or proceeding by judgment, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not in itself create a presumption that any such person or insurer was liable by reason of willful misconduct, or that he, she or it had reasonable cause to believe that his, her or its conduct was unlawful. If any such action, suit or proceeding is compromised, it must be with the approval of the Board of Governors; provided, however, the Board of Governors may delegate to the Administrator the authority to approve any such compromise of financial liability.

2.  In each instance in which a question of indemnification arises, entitlement thereto, pursuant to the conditions set forth in Section 1 of this Article, shall be determined by the Board of Governors which shall also determine the time and manner of payment of such indemnification; provided, however, that a person or insurer who or which has been wholly successful, on the merits or otherwise, in the defense of a civil or criminal action, suit or proceeding of the character described in Section 1 of this Article shall be entitled to indemnification as authorized in such section. The Board of Governors may delegate to the Administrator the authority to determine, in a manner consistent with this Article, entitlement to indemnification, and the time and manner of payment of such indemnification, for any indemnification requiring payment which is less than an amount as may be fixed from time to time by the Board of Governors. Nothing herein shall be deemed to bind a person or insurer who or which the Board of Governors has determined not to be entitled to indemnification, or to preclude such person or insurer from asserting the right to such indemnification by legal proceedings. Such indemnification as is herein provided shall be apportioned among all participating companies, including any named in any such action, suit or proceeding pursuant to Article X. To the extent that the action, suit or proceeding that gave rise to the indemnification concerns matters in one or more identifiable states in which the reinsurance is provided to an Authorized Insurance Plan under these Articles of Agreement and to particular policy years of such reinsurance, the expenses of indemnification shall be ratably apportioned to the participating companies for those states and policy years in question. The Board has the

authority to review and determine whether the legal fees or related expenses incurred by the indemnified person or entity were excessive and unreasonable under the circumstances, and if so, pay the indemnified person or entity only the reasonable amount of any such fees and expenses. All disputes in this regard shall be resolved under the procedure provided in Article V, Section 10, as the exclusive remedy of the person or entity being indemnified.

## ARTICLE VIII

### Amendments to Articles of Agreement

**Amendments to Articles of Agreement.** Any and all provisions of these Articles of Agreement and any amendments hereto shall be subject to amendment, alteration, repeal, or re-enactment at any annual meeting of the participating companies, or at any special meeting called for the purpose, by the affirmative vote of two-thirds (2/3) of the participating companies voting in person or by proxy and such two-thirds (2/3) of said participating companies shall write not less than 50.1% of the total net workers compensation premiums written by all members during the latest available calendar year for which information is in all states where these Articles are operative. For purposes of this determination, the net workers compensation premium written for each participating company shall only include those states where such participating company is providing reinsurance under these Articles. Not less than fifteen (15) calendar days' written notice of any such meeting shall be given, or caused to be given, by the Chair, in which notice the action proposed to be taken shall be fully set forth. Any amendments to these Articles of Agreement approved by the participating companies shall be binding on the participating companies for all outstanding policy years, but shall only be effective in those states where the amendments have been filed and approved by the insurance regulator as part of the Authorized Insurance Plans in effect in such states, or as otherwise approved by the regulator.

## ARTICLE IX

### Effective Date

**Effective Date.** These Articles of Agreement and any amendments thereto, as approved under the provisions of Article VIII, shall become effective and binding on those insurers that become signatories hereto as of the date of execution by an authorized representative of any such insurer. Notwithstanding the

foregoing, if pursuant to the terms of any statute, regulation, or Authorized Insurance Plan, any insurer was under a legal duty to participate in the reinsurance provided under these Articles but failed or refused to execute these Articles as required, the execution of these Articles by such company at any time shall relate back to the policy year when the participating company first became obligated to execute these Articles.

## ARTICLE X

### Assessments and Expenses

1.  **Expenses and Payments.** Expenses incurred by the Administrator in the administration of the affairs subject to these Articles of Agreement, shall be a proper charge against, and shall be an obligation of the participating companies. A record shall be kept of all such expenses, and the amount thereof shall be apportioned to the participating companies in the ratio of their interest under the various Reinsurance Agreements. Such expenses may be paid out of funds held by the Administrator or shall be assessed against the participating companies.

2.  **Transactions, Accounts, and Financial Statements.** Separate accounts shall be maintained by the Administrator covering transactions for each policy year in each state based on the information provided to the Administrator by the Servicing Carriers pursuant to the Reinsurance Agreements. The Administrator shall prepare and deliver to each participating company a statement showing the apportionment of only that company's obligations under the Reinsurance Agreements, including the expenses of administration provided for herein and the condition of each account. The Administrator shall distribute premium and collect reinsurance recoverables as provided for in the Reinsurance Agreements. The Board shall select independent auditors for engagement by the Administrator to examine an annual special-purpose financial statement prepared by the Administrator. The preparation and examination of such special-purpose financial statement shall be performed pursuant to accounting policies and standards that may be adopted from time to time by the Board. As part of this process, the auditors shall make such actuarial determinations as are necessary and appropriate, including the validation of appropriate reserves for each policy year. Upon Board approval of the special-purpose financial statement examination report, the Administrator shall make a copy of such examination report available upon request to any participating company.

3. **Actuarial Opinion.** A statement of actuarial opinion for the reserves on policies issued pursuant to Authorized Insurance Plans and reinsured under approved Articles of Agreement shall be prepared and certified by an actuary of the Administrator who meets the qualification standards of the American Academy of Actuaries and the Casualty Actuarial Society, upon the conclusion of each fiscal year. The Administrator shall make a copy of such statement of actuarial opinion available upon request to any participating company.

## ARTICLE XI

### Miscellaneous Provisions

1. **Titles.** The titles to the various articles and sections hereof are for reference purposes only and shall not be used in the construction or interpretation of these Articles of Agreement.

2. **Severability.** In the event any term or provision of these Articles of Agreement shall to any extent be held to be illegal, invalid, unenforceable, or nonoperative as a matter of law, the remaining terms and provisions hereof shall not be affected thereby, and each such term and provision shall be valid and shall remain in full force and effect.

## *SIGNATURE PAGE TO FOLLOW*

**ARTICLE XII**

**Acceptance of Articles of Agreement** THE ARTICLES OF AGREEMENT may be simultaneously executed by the participating companies in any number of counterparts, written or printed or both, and each counterpart so executed shall be deemed to be an original and all such counterparts shall constitute one and the same document.

IN WITNESS WHEREOF, the undersigned have respectively caused their corporate names to be hereunto subscribed by the President or a Vice-President and a corporate seal to be hereto affixed, attested by a duly authorized officer or notary public.

Company _____

By: _____
President/Vice President Signature

_____
President/Vice President Printed Name

Title: _____

Attest: _____
Officer's or Notary's Signature

SEAL

Date Subscribed: _____

## <u>CERTIFICATE OF SERVICE</u>

I, William M. Hannay, an attorney, hereby certify that I caused true and correct copies of the foregoing **Memorandum in Support of Motion to Dismiss All Claims Asserted Against the National Workers Compensation Reinsurance Pool** to be sent by the U.S. District Court CM/ECF e-filing system on this, the 30th day of October, 2009.

_____ /s/ William M. Hannay_____