UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | Case No. 07 CV 2898 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, et al., | ) ) ) | |
| Counter-Claimants, | ) ) | |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | |
| Counter-Defendants. | ) ) | |
| SAFECO INSURANCE COMPANY OF AMERICA, et al., | ) ) ) ) | Case No. 09 CV 2026 |
| Plaintiffs, | ) ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| AMERICAN INTERNATIONAL GROUP, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION TO DISMISS THE LIBERTY PARTIES' COUNTERCLAIMS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

SUMMARY OF ARGUMENT .......................................................................................................1

STATEMENT OF FACTS ...............................................................................................................3

ARGUMENT ....................................................................................................................................6

I.   THE RICO CLAIMS SHOULD BE DISMISSED FOR
     FAILURE TO STATE A CLAIM ........................................................................................7

II.  THE LIBERTY PARTIES' STATE LAW CLAIMS, OTHER THAN CLAIMS
     AND REMEDIES FOR BREACH OF CONTRACT, SHOULD BE DISMISSED ...........7

     A.   The Articles of Agreement and Non-NWCRP Residual Market
          Agreements Bar the Liberty Parties' Quasi-Contract Claims ..................................9

          1.   Count Eight – The existence of express contracts precludes the
               Liberty Parties' promissory estoppel claim. ................................................9

          2.   Count Nine – The existence of express contracts precludes the
               Liberty Parties' unjust enrichment claim. ..................................................10

     B.   Count Three – Common Law Fraud Must Be Dismissed For Failure To
          Allege Reliance ......................................................................................................12

     C.   Count Four – MGL Section 93A Must Be Dismissed For Failure To
          Allege Misconduct "Primarily and Substantially" Within Massachusetts ............14

     D.   As a Matter of Law, Punitive Damages Are Not Available To the Liberty
          Parties .....................................................................................................................18

CONCLUSION ...............................................................................................................................20

**<u>TABLE OF AUTHORITIES</u>**

<u>Page</u>

<u>Cases</u>

*Am. Mgmt. Servs., Inc. v. George S. May Int'l Co.*,
933 F. Supp. 64 (D. Mass. 1996) ...............................................................15, 18

*Ashcroft v. Iqbal*,
--- U.S.---, 129 S. Ct. 1937 (2009)...............................................................6

*In re Bank of Boston Corp. Secs. Litig.*,
762 F. Supp. 1525 (D. Mass. 1991) ...............................................................12

*Beaupre v. Town of Douglas*,
No. 051049C, 2006 WL 1360814 (Mass. Super. April 4, 2006)...........................................11

*Bell Atl. Corp. v. Twombly*
550 U.S. 554 ...............................................................6, 20

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)...............................................................20

*Brewer v. Poole Constr. Co., No. CIV.A. 98-0924B*,
2001 WL 792783 (Mass. Super. May 3, 2001)...............................................................13

*Brockton Savs. Bank v. Peat, Marwick, Mitchell & Co.*,
577 F. Supp. 1281 (D. Mass. 1983) ...............................................................14

*Compagnie De Reassurance D'Ile de France v. New England Reins. Corp.*,
57 F.3d 56 (1st Cir. 1995)...............................................................13

*Conley v. Gibson*,
355 U.S. 41 (1957)...............................................................6

*Fillmore v. Leasecomm Corp.*,
Nos. 2004087H, 86778, 2004 WL 3091642 (Mass. Super. Nov. 15, 2004)...........................15

*Flesner v. Tech. Commc'ns Corp.*,
575 N.E.2d 1107 (Mass. 1991) ...............................................................18

*Frisone v. Bear Stearns & Co.*,
No. 82-1439-MA, 1983 WL 1313 . ...............................................................18

*Givon v. PPG Indust., Inc.*,
No. 99-3973, 2000 WL 1681081 (7th Cir. Nov. 7, 2000) ...............................................................10

*Haddad v. Wal-Mart Stores, Inc.*,
914 N.E.2d 59 (Mass. 2009) ...............................................................18

*Holman v. Ind.*,
211 F.3d 399 (7th Cir. 2000) ...............................................................14

*Homem v. Maple Vill., LLC*,
   No. ESCV200800455B, 2009 WL 3083339 (Mass. Super. July 16, 2009) ...........................14

*Int'l Fidelity Ins. Co. v. Wilson*,
   443 N.E.2d 1308 (Mass. 1983) ..........................................................................................18

*Kleinerman v. Hodge*,
   No. 952639B, 1996 WL 1186891 (Mass. Dist. Ct. June 21, 1996).......................................19

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
   781 N.E.2d 787 (Mass. 2003) ..........................................................................................16

*Limestone Dev. Corp. v. Village of Lemont*,
   520 F.3d 797 (7th Cir. 2008) .....................................................................................6, 8, 19

*Linear Retail Danvers #1, LLC v. Casatova, LLC*,
   No. 07-3147, 2008 WL 2415410 (Mass. Super. June 11, 2008) ...........................................11

*Lisciotti v. Lattanzio*,
   No. 042155, 2006 WL 2848674 (Mass. Super. Sept. 15, 2006)............................................12

*Moll Indus., Inc. v. Oral-B Labs., Inc.*,
   No. 011301BLS, 2001 WL 1194678 (Mass. Super. July 17, 2001) ......................................15

*Olson v. Energy N., Inc.*,
   No. 9800228, 1999 WL 1332362 (Mass.  Super. Jan. 14, 1999)...........................................18

*Purizer Corp. v. Battelle Mem'l Inst.*,
   No. 01 C 6360, 2002 WL 22014 (N.D. Ill. June 27, 2002) ..................................................11

*In re SmarTalk Teleservs., Inc. Sec. Litig.*,
   124 F. Supp. 2d 505 (S.D. Ohio 2000) ...............................................................................19

*Spears v. Miller*,
   No. 16832006 WL 2808145 (Mass. Sept. 26, 2006) ............................................................11

*Tomei v. Corix Utils. (U.S.) Inc.*,
   No. 07-cv-11928-DPW, 2009 WL 2982775 (D. Mass. Sept. 10, 2009)................................11

*U.S. for Use & Benefit of L.E. Myers Co. v. George Hyman Constr. Co.*,
   Civ. A. No. 86-319-5, 1987 WL 13242 (D. Mass. June 19, 1987)..........................................9

*Van De Velde v. Coopers & Lybrand*,
   899 F. Supp. 731 (D. Mass. 1995) .....................................................................................12

*Weber v. Sanborn*,
   502 F. Supp. 2d 197 (D. Mass. 2007) .................................................................................15

*Wells v. Monarch Capital Corp.*,
   1991 WL 354938 (D. Mass. Aug. 23, 1991) .......................................................................12

*Wong v. Nieboer*,
   No. 1626, 2006 WL 1172191 (Mass. App. Div. Apr. 15, 2006) .............................................9

*Yankee Candle Co. v. Bridgewater Candle Co., LLC,*
   107 F. Supp. 2d 82 (D. Mass. 2000) .....................................................................................16

*Zircon Co., Inc. v. Graphik Dimensions, Inc., No. CA 945971,*
   1996 WL 1186866 (Mass. Super. July 26, 1996) ....................................................................9

### **Statutes**

Mass. Gen. Laws ch. 93A, § 9 .....................................................................................................15

Mass. Gen. Laws ch. 93A, § 11 .............................................................................................14, 15

Plaintiffs American International Group, Inc. ("AIG") and its subsidiary insurance companies named as plaintiffs herein (the "AIG Subsidiaries" and, together with AIG, "Plaintiffs") submit this memorandum of law in support of their motion to dismiss all but counts Five, Six and Seven of the Liberty Parties' Amended Counterclaims (the "Counterclaims").

## SUMMARY OF ARGUMENT

Plaintiffs and the Liberty Parties are all insurance companies that are parties to a reinsurance contract designed to spread losses incurred in the residual market for workers compensation insurance.  The Liberty Parties maintain that Plaintiffs breached their obligation to pay their contractual share of such losses and thereby caused the Liberty Parties to pay an inflated share.  They seek to make a federal case out of this reinsurance dispute – and recover treble damages – by alleging that Plaintiffs' alleged skirting of their reinsurance obligations rises to the level of a racketeering offense.  According to the Counterclaims, AIG operated a racketeering enterprise composed of the AIG subsidiaries and two related companies, and AIG engaged in a pattern of racketeering by mailing false reports to the Fund Administrators, its own agents, that failed to reflect accurately what its share of the residual market losses should be.

The Liberty Parties' RICO claims are defective and must be dismissed for at least three reasons.  *First*, the Liberty Parties fail adequately to plead the *sine qua non* of a racketeering claim, namely the existence of a RICO enterprise.  Although the Liberty Parties claim that AIG conducted an association-in-fact enterprise consisting of the AIG Subsidiaries and two other related companies, they fail to plead any facts in support of that claim.  The Liberty Parties do no more than plead that AIG controlled each of the supposed enterprise members and used them to perpetrate AIG's scheme.  They fail to plead any ongoing relationship or coordination among the supposed enterprise members themselves – whether in pursuit of the alleged scheme or anything else – that would evidence their being a "continuing unit," which is what the Supreme Court has defined an association-in-fact enterprise to be.

*Second*, the Liberty Parties fail adequately to plead that AIG engaged in racketeering activity.  They attempt to do so by alleging that AIG repeatedly committed mail fraud by sending reports and other documents to NCCI that falsely reported the amount of workers compensation premium written by the AIG Subsidiaries.  As the Counterclaims recognize, however, AIG's only obligation to submit accurate reports on that subject arose from the contract between the Liberty Parties (and other participating companies) and AIG.  The Liberty Parties' fraud claim, therefore, is in truth nothing more than an allegation that AIG breached a contractual obligation. The case law is clear that the Liberty Parties are not permitted to bootstrap a breach of contract claim into a RICO claim.

*Third*, the Liberty Parties' RICO claims also fail because they do not allege a sufficiently definite injury.  A RICO claim is not ripe until the existence and extent of an injury cognizable under RICO is definitely known.  Courts have held that this ripeness requirement is not satisfied unless and until a would-be RICO plaintiff pursues and exhausts all contract-based remedies that might redress its injury.  Here, the parties' reinsurance contract – and legal claims for breach thereof – is the mechanism for resolving disputes arising under their reinsurance relationship. The Liberty Parties could pursue their contract remedies and thereby recover damages that would fully compensate them for any underpayment by Plaintiffs.  If they are successful in such an effort, they will have no RICO injury.  Thus, to the extent the Liberty Parties are permitted at all to state a RICO claim based on breach of contract, they cannot do so until they have sought breach of contract remedies.

The Liberty Parties also assert a variety of quasi-contract and state-law tort claims, which fare no better than their RICO claim.  As detailed below, quasi-contract claims are precluded by the existence of the parties' contract.  The Liberty Parties' Chapter 93A claim fails because the alleged misconduct did not occur primarily and substantially within Massachusetts.  The Liberty Parties' fraud claim is also deficient because they fail adequately to allege the element of

reliance, as they did not receive the allegedly false reports made by Plaintiffs and thus cannot claim to have relied on them or changed their position because of them.  Finally, the Liberty Parties' demand for punitive damages fails because there is no statutory authority for any such award.

At bottom, this is a contract dispute that presents the question of whether Plaintiffs (and certain Defendants) breached their obligation to pay their contractually-mandated share of residual market losses and, if so, by how much.  Plaintiffs have not moved to dismiss the Liberty Parties' contract and accounting claims because they acknowledge that such claims (which Plaintiffs assert too) are the appropriate vehicles to resolve this dispute.  The Liberty Parties' remaining claims, however, are legal window-dressing, designed to reap windfalls through the imposition of unwarranted treble and punitive damages, and they should be dismissed.

## STATEMENT OF FACTS

These Counterclaims are asserted by Liberty Mutual and certain of its subsidiaries, which, along with Plaintiffs, are participating companies in the National Workers Compensation Reinsurance Pool (the "NWCRP").  The Liberty Parties do not include Safeco Insurance Company of America and Ohio Casualty Insurance Company, the two Liberty Mutual affiliates that are the Plaintiffs in the related putative class action.  Through presiding over the referenced class action and the now-dismissed related action filed by the National Council on Compensation Insurance, Inc. (the "NCCI"), the Court is well familiar with the underlying factual background, which we summarize here only briefly.

Generally speaking, insurance companies that voluntarily write workers compensation policies within a state in a given year are also obligated to participate in the state's assigned risk plan, which provides workers compensation insurance to employers that cannot otherwise obtain it.  (Countercl. ¶ 56.)  Risks insured through an assigned risk plan are assigned to a particular carrier in the plan, which writes the necessary policy.  The other carriers participating in the plan

agree to reinsure such policies, and the losses sustained on them are thus allocated among all the plan participants.  Insurance companies are generally required to participate in a state's assigned risk plan in direct proportion to the premium they receive in the state's voluntary workers compensation market, which means that each carrier's percentage share of losses on assigned risks equals its percentage share of premiums written by all participants in the corresponding voluntary market.  (Countercl. ¶ 57.)

 The carriers that participate in most of the states' assigned risk plans provide the required reinsurance to each other by contracting among themselves to "pool" their risks in reinsurance pools such as the NWCRP.  (Countercl. ¶ 2.)  The NWCRP's participating companies, including the AIG Subsidiaries, are all party to a contract known as the Articles of Agreement that requires them to report to the NCCI (as administrator for the NWCRP) their net direct written workers compensation premiums by year by state, so that the NCCI can calculate each participating company's share of residual market losses and related expenses.  (*See* NWCRP Articles of Agreement, Countercl. Ex. B at 11 (the "Articles"); Countercl. ¶ 172.)  It is that contract that creates the obligation of a participating company to report accurately its net direct written premium.  A failure accurately to report net direct written premium is a breach of the Articles of Agreement, as is a failure by a participating company to pay its full share of any residual market losses.  To the extent one participating company underreports its premium and thereby causes the others to bear an improperly increased share of residual market losses and expenses, the overpaying participating companies may have a claim for having their payments corrected and trued up to reflect what they otherwise would have paid.  (Countercl. ¶ 83.)

 According to the Counterclaims, the AIG Subsidiaries, acting under the direction and control of AIG, deliberately breached their obligation to provide accurate reports of net direct written premium to the NCCI, thereby reducing their share of reinsurance owed in the residual market for workers compensation and increasing the reinsurance liabilities of the NWCRP's

4

other participating companies.  (Countercl. ¶¶ 68-70.)  The Counterclaims allege that this conduct occurred for decades.  (Countercl. ¶ 68.)  The Counterclaims further allege that executives at the AIG Subsidiaries were corrupted and motivated to engage in this alleged premium underreporting scheme by compensation that was paid to them through C.V. Starr & Co., Inc. ("CVSCO") and Starr International Company, Inc. ("SICO" and, together with CVSCO, the "Starr Entities").  (Countercl. ¶ 122.)  The Starr Entities, though not legal subsidiaries of AIG, were founded by AIG's founder, Cornelius Van der Starr.  (Countercl. ¶¶ 52, 53.)  At all times relevant to the Counterclaims, the business activities of the Starr Entities were conducted by officers of AIG.  (Countercl. ¶¶ 52, 53.)

The Liberty Parties seek to make a RICO case of this reinsurance dispute by alleging that AIG, acting as a "RICO person," conducted the affairs of an association-in-fact enterprise consisting of the AIG Subsidiaries and the Starr Entities (but excluding AIG itself), through a pattern of racketeering activity consisting of acts of supposed mail fraud that occurred when AIG caused the AIG Subsidiaries to mail inaccurate reports of workers compensation premium to the NCCI.  (Countercl. ¶¶ 117, 118, 124.)  The alleged purpose of the association-in-fact enterprise was to corrupt the employees and agents of the AIG Subsidiaries who carried out the alleged premium underreporting scheme in order to facilitate the scheme and thereby enrich AIG.  (Countercl. ¶ 122.)  The Counterclaims further allege a RICO conspiracy claim against AIG on the theory that AIG conspired with the Starr Entities (but not, apparently, the AIG Subsidiaries), to commit at least two acts of mail fraud to further the purpose of the alleged association-in-fact enterprise.  (Countercl. ¶ 139, 140.)  Finally, the Counterclaims allege a series of state law, fraud, contract, quasi-contract and equitable claims against all Plaintiffs, all stemming from the alleged underreporting of premium.  (Countercl. ¶¶ 143-153, 168-185.)

## ARGUMENT

Before March 2007, the oft-quoted standard for evaluating a 12(b)(6) motion to dismiss came from *Conley v. Gibson*: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957). In *Bell Atl. Corp. v. Twombly*, however, the Supreme Court retired that standard, 550 U.S. 554, 563, adopting instead a standard that a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557 (brackets omitted). The Court has recently explained that *Twombly* developed a two-pronged approach to pleadings where:

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009). In *Iqbal*, the Court confirmed that *Twombly*'s standard applies to all pleadings, not just those in the antitrust context. *Id.* at 1953.

Prior to *Iqbal*, the Seventh Circuit had already held that *Twombly*'s pleading standard applied to RICO actions. *See Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). Under the Seventh Circuit's reading of *Twombly*, "the pleader must show through his allegations that it is plausible, rather than merely speculative, that he is entitled to relief." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin.*, 536 F.3d 663, 668 (7th Cir. 2008) (quotations and citations omitted). A complaint must do more than merely "avoid foreclosing possible bases for relief." *Id.* (quotation omitted). It "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Id.* Moreover, "[i]n a complex antitrust or RICO case a fuller set of factual allegations than found in the sample complaint in the civil rules' Appendix of Forms may be necessary to show

6

that the plaintiff's claim is not 'largely groundless.'" *Limestone*, 520 F.3d at 803. *Twombly* "teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." *Id.* at 802-03. A "rote recitation of the legal requirements of a RICO claim fail[s] to satisfy pleading requirement post-[*Twombly*]." *Vulcan Golf, LLC v. Google Inc.*, No. 07 C 3371, 2008 WL 2959951, at *3 (N.D. Ill. July 31, 2008).

## I.  THE RICO CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

For the reasons set forth in Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Class Action Complaint, which is incorporated by reference herein, AIG respectfully submits that the Court should dismiss the RICO Counts alleged by the Liberty Parties in the Counterclaim.

## II.  THE LIBERTY PARTIES' STATE LAW CLAIMS, OTHER THAN CLAIMS AND REMEDIES FOR BREACH OF CONTRACT, SHOULD BE DISMISSED.

At the heart of this dispute is a reinsurance mechanism – governed by valid and enforceable contracts, the Articles and the non-NWCRP states' residual market agreements – that creates and imposes the parties' legal duties to one another. These agreements created the obligations that AIG allegedly breached, including the obligation to report premium to the Fund Administrators and the obligation to make payments to the NWCRP and non-NWCRP states.

As discussed above, the Counterclaims concede that "[t]he Liberty Parties and the AIG Companies have at all times material to this action been parties to the NWCRP Articles of Agreement . . . as well as beneficiaries of various non-NWCRP states' assigned risk agreements." (Countercl. ¶ 169.) Moreover, the Counterclaims confirm that the participating companies' reporting and payment obligations are dictated by these agreements. (*See, e.g.*, *id.* ¶ 170 ("Under these agreements, the AIG Companies have a duty to submit accurate premium data, so that the Fund Administrators, as agent for the Liberty Parties, may equitably apportion

the premium, losses, and expenses of the residual market for workers compensation insurance in NWCRP states.").)

Those same agreements provide the only proper legal theory of recovery for disputes between the parties in the event of alleged breaches of those obligations.  Here, that principle means that the Liberty Parties should be limited to claims for breach of contract, and the remedies associated with such claims; and the Liberty Parties' quasi-contract claims and claim for punitive damages should be dismissed.

Moreover, the Liberty Parties' state law claim for fraud must be dismissed because the Liberty Parties have failed to plead reliance.  Specifically, the Liberty Parties do not allege that they were ever privy to the alleged false misrepresentations, which were sent to only to the Fund Administrators, making direct reliance on such statements an impossibility.

Independently, the Liberty Parties' Chapter 93A claim should be dismissed for their failure to plead the fundamental requirement regarding the location of the alleged misconduct. Specifically, the Liberty Parties fail to allege that any alleged misconduct by Plaintiffs occurred within the Commonwealth of Massachusetts, let alone that such misconduct occurred primarily and substantially within that state.

Last, AIG moves to dismiss the Liberty Parties' claims for punitive damages.  Such exemplary damages are not available to the Liberty Parties as a matter of the state law giving rise to their causes of action.

**A.     The Articles of Agreement and Non-NWCRP Residual Market Agreements Bar the Liberty Parties' Quasi-Contract Claims.**

1.      Count Eight – The existence of express contracts precludes the Liberty Parties' promissory estoppel claim.

Where the parties' relationship, including their resulting obligations to one another, is based on an express contract between them, recovery under quasi-contract theories such as promissory estoppel is precluded.[1]  *U.S. for Use & Benefit of L.E. Myers Co. v. George Hyman Constr. Co.*, Civ. A. No. 86-319-5, 1987 WL 13242, at *3 (D. Mass. June 19, 1987) (on summary judgment, holding that the "promissory estoppel argument is precluded by the mere existence of the contract itself"); *cf. Wong v. Nieboer*, No. 1626, 2006 WL 1172191, at *4 (Mass. App. Div. Apr. 15, 2006) (reversing trial judge's ruling in favor of plaintiff on its promissory estoppel claim "[d]ue to the fact that there was a contract between the two parties" because promissory estoppel is an equitable doctrine "used by the court only in instance where there is 'the absence of an express contract'") (quoting *Northrup v. Bringham*, 826 N.E.2d 239 (Mass. 2005); *Zircon Co., Inc. v. Graphik Dimensions, Inc.*, No. CA 945971, 1996 WL 1186866, at *3 (Mass. Super. July 26, 1996) (granting summary judgment dismissing plaintiff's promissory estoppel claim because "given the undisputed fact that the parties had a contract[,]" the claim seemed "duplicative of the contract and misrepresentation claims").

As the court in *L.E. Myers* explained, "the purpose of the doctrine [of promissory estoppel] is to protect parties in contract-type situation, *in which there is no valid contract which would serve to protect the parties' rights*."  1987 WL 13242, at *3 (emphasis added).  Here, these is no dispute that both AIG and the Liberty Parties are parties to the Articles and that AIG's obligations are clearly defined therein.  While plaintiffs are permitted to plead promissory estoppel and breach of contract in the alternative, the Liberty Parties have not done so here, as

---

[1]  For the purposes of this motion, AIG assumes that the Liberty Parties bring their state law claims under Massachusetts law given the Liberty Parties' claim for violation of the Massachusetts Regulation of Business Practice and Consumer Protection Act, M.G.L. § 93A (Count IV). (Countercl. ¶¶ 150-153.)

they do not allege that the Articles or the non-NWCRP states' assigned risk agreements are void or are otherwise unenforceable.  *See Givon v. PPG Indust., Inc.*, No. 99-3973, 2000 WL 1681081, at *3 (7th Cir. Nov. 7, 2000) (affirming dismissal of promissory estoppel claim where plaintiff alleged existence of express oral contract, because "'[p]romissory estoppel is not a doctrine designed to give a party . . . a second bite at the apple in the event it fails to prove a breach of contract'") (citation omitted).  Similarly, the Liberty Parties allege that they are third-party beneficiaries to the non-NWCRP states' assigned risk agreements, which agreements likewise define AIG's obligations to the non-NWCRP residual markets and participants. (Countercl. ¶¶ 169-70.)  These agreements serve to bar the Liberty Parties' claim for promissory estoppel.

A comparison of the Liberty Parties' promissory estoppel and breach of contract claims makes clear that the former arises out of the same subject matter as, and is no more than a duplicate of, the latter.  (*Compare* Countercl. ¶ 170 ("Under these agreements, the AIG Companies have a duty to submit accurate premium data . . . .") *and id.* ¶ 171 ("The AIG Companies repeatedly breached their contractual obligations by submitting false and inaccurate premium data to the Fund Administrators."), *with id.* ¶ 175 ("The AIG Companies made clear and unambiguous promises to the Liberty Parties to fairly and accurately report their workers compensation premium to the Fund Administrators.").)  Indeed, the Liberty Parties do not identify a duty owed or a promise given by AIG that is independent of the duties and imposed by the Articles and the non-NWCRP states' assigned risk agreements.

        2.     <u>Count Nine – The existence of express contracts precludes the Liberty Parties' unjust enrichment claim.</u>

As with the Liberty Parties' promissory estoppel claim, the undisputed existence of the Articles and the non-NWCRP states' assigned risk agreements precludes the Liberty Parties'

unjust enrichment claim.[2]  "Quantum Meruit is a common-law claim based on an underlying premise of one party's unjust enrichment.  To recover under quantum meruit there can be no enforceable express contract, only an implied or quasi-contract.  Massachusetts courts have consistently held that recovery in quantum meruit *requires at least that no actual contract exist regarding the subject matter being disputed*."  *Beaupre v. Town of Douglas*, No. 051049C, 2006 WL 1360814, at *2 (Mass. Super. April 4, 2006) (citations omitted) (emphasis added) (granting motion to dismiss quantum meruit claim because of existence of express contract related to same subject matter); *accord Linear Retail Danvers #1, LLC v. Casatova, LLC*, No. 07-3147, 2008 WL 2415410, at *4 (Mass. Super. June 11, 2008) (granting motion to dismiss quantum meruit because "[i]t is well settled . . . quantum meruit relief may not lie where an express contract governing the subject matter exists").

   The same is true when, as here, the party asserting the claim has an adequate legal remedy as the third-party beneficiary of a contract.  *See Tomei v. Corix Utils. (U.S.) Inc.*, No. 07-cv-11928-DPW, 2009 WL 2982775, at *21 (D. Mass. Sept. 10, 2009) (triable breach of contract claim under theory that plaintiff was a third-party beneficiary of contract "obviat[ed] the need for a claim in quantum meruit or unjust enrichment"); *cf. Spears v. Miller*, No. 16832006 WL 2808145, at *3 (Mass. Sept. 26, 2006) (granting motion to dismiss unjust enrichment claim because "adequate remedy at law exists" through breach of contract claim).

   As described above in point II.A.1, the Liberty Parties acknowledge throughout the Counterclaims that the Articles and the non-NWCRP states' assigned risk agreements govern the parties' relationship and duties to one another, including AIG's duty to "submit accurate premium data to the NCCI."  Countercl. ¶ 170; *see also id.* ¶ 181 (realleging and reincorporating

_____

   [2] Again, although a plaintiff may plead unjust enrichment and breach of contract as alternate claims, the Liberty Parties have not done so properly here, as there are no allegations that any of the admitted agreements are void or otherwise unenforceable.  *See Purizer Corp. v. Battelle Mem'l Inst.*, No. 01 C 6360, 2002 WL 22014, at *15 (N.D. Ill. June 27, 2002) (recognizing that, in the Northern District of Illinois, if a plaintiff intends to plead its unjust enrichment claim in the alternative to a breach of contract claim, it must be sufficiently clear that it is doing so).

by reference all prior paragraphs of the Counterclaims).  The Liberty Parties' unjust enrichment claim thus is covered by the subject matter of these agreements, and is likewise inextricably linked to their breach of contract claim.  The Liberty Parties' unjust enrichment claim is therefore precluded by the undisputed existence of the Articles and the non-NWCRP states' assigned risk agreements and should be dismissed.

> **B.     Count Three – Common Law Fraud Must Be Dismissed For Failure To Allege Reliance.**

To prove fraud under Massachusetts law, the party asserting it "'must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'"  *Lisciotti v. Lattanzio*, No. 042155, 2006 WL 2848674, at *6 (Mass. Super. Sept. 15, 2006).

Reliance is a critical element of a fraud claim, which must be pled with particularity under Federal Rule of Civil Procedure 9(b).  *See Van De Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 738 (D. Mass. 1995) (dismissing fraud claim where plaintiff did not plead "actual reliance by the named plaintiffs"); *Wells v. Monarch Capital Corp.*, 1991 WL 354938, at *12 (D. Mass. Aug. 23, 1991) (dismissing fraud claim where plaintiff "does not state that he read any of the allegedly false documents"); *In re Bank of Boston Corp. Secs. Litig.*, 762 F. Supp. 1525, 1536 (D. Mass. 1991) (Under Massachusetts common law "a claim of fraud requires direct or individualized reliance."); *Lisciotti*, 2006 WL 2848674, at *6 (dismissing fraud claim where misrepresentation was not made to claimant and claimant did not rely on such misrepresentation).

Here, the Liberty Parties allege only that AIG made false and misleading statements in its submissions to the Fund Administrators.  (Countercl. ¶¶ 16, 58, 144-48.)  The Liberty Parties *do not* allege, however, that AIG made any false or misleading statements to them directly.  Nor could the Liberty Parties make such allegations, as they admit that individual participating

12

companies do not have access to the reports submitted to the Fund Administrators in which AIG allegedly submitted false data.  (Countercl. ¶ 61 ("By virtue of this confidential reporting and invoicing mechanism, individual participating companies are unable to independently verify the reliability of the reporting of other participating companies.").)  Instead, the Counterclaims merely offer the perfunctory allegation that "[a]s a direct and proximate result of [the Liberty Parties'] reliance on the false reports and misrepresentations made by AIG Defendants, the Liberty Parties have suffered substantial financial harm in an amount to be proven at trial." (Countercl. ¶ 149.)

In *Compagnie De Reassurance D'Ile de France v. New England Reins. Corp.,* 57 F.3d 56 (1st Cir. 1995), the First Circuit reversed the district court's finding under Massachusetts common law that the plaintiff had relied on materials without presenting any direct or circumstantial evidence of reliance necessary for fraud:  "[D]elivery of the [] materials [containing alleged misrepresentations] to a plaintiff is not the same as proof that the recipient looked at and relied upon them.  Nor is the fact that certain other plaintiffs read and relied upon the [] materials evidence that all plaintiffs did so.  Several of the plaintiffs were unable to produce copies of the [materials] from their own files, and many were unable to present the testimony of anyone who could say that the [materials were] seen and relied upon in making the decision."  *Id*. at 86; *see also Brewer v. Poole Constr. Co*., No. CIV.A. 98-0924B, 2001 WL 792783, at * 6 (Mass. Super. May 3, 2001) (holding insufficient fraud claim based on defendants' statements to third-party that "were made to secure from that body the permission necessary to further the defendants' business goals.  It would thus be illogical to impute to these statements an intention to improperly influence anyone other than the Board itself.").  There is no question that the Counterclaims lack any allegation that the Liberty Parties ever received any misrepresentation from AIG and, therefore, the Liberty Parties are unable to allege actual reliance on any alleged misstatements.

13

Although a misrepresentation to third parties may be actionable under Massachusetts law in certain circumstances, the terms of the alleged misrepresentation must be repeated or its substance communicated to the complaining party. *See Brockton Savs. Bank v. Peat, Marwick, Mitchell & Co.*, 577 F. Supp. 1281, 1287 (D. Mass. 1983) (While "'reliance may be indirect as well as direct,' the 'terms' of the alleged misrepresentation must 'be repeated' or its 'substance communicated' to the complaining party in order for an action to lie.") (quoting Restatement of Torts (Second), § 553 (1977)) (citations omitted).  The Liberty Parties' Counterclaims, however, concede that they cannot make any such allegation.

The Counterclaims admit that the allegedly fraudulent statements made to the Fund Administrators could not be in fact repeated to them, as the reporting and invoicing mechanism is confidential, such that individual participating companies are unable to independently verify the submissions of other companies.  (Countercl. ¶¶ 61, 64-67.)  Nor can the Liberty Parties maintain any allegation that the substance of the alleged fraudulent statements were somehow communicated to the Liberty Parties because any such allegation is inconsistent with their allegation that each participating company receives only its allocated share of residual market premiums, losses, and expenses.  (Countercl. ¶ 70.)

### C.    Count Four – MGL Section 93A Must Be Dismissed For Failure To Allege Misconduct "Primarily and Substantially" Within Massachusetts.

It is a foundational requirement of Massachusetts General Law Chapter 93A, Section 11[3] that the conduct complained of *must have occurred "primarily and substantially" within Massachusetts.*  MASS. GEN. LAWS ch. 93A, § 11.  In fact, Chapter 93A "specifically prohibits

---

[3] The Liberty Parties fail to specify the section of Chapter 93A pursuant to which they purport to state a claim.  For purposes of this motion, AIG assumes the Liberty Parties intend to rely on Section 11, which applies to persons who "engage[] in the conduct of any trade or commerce."  MASS. GEN. LAWS ch. 93A, § 11.  Any attempt by the Liberty Parties to rely on Section 9 would fail as a matter of law, because they have failed to allege that they first issued a written demand for relief at least thirty days prior to the filing of an action, which creates an incurable jurisdictional defect.  MASS. GEN. LAWS ch. 93A, § 9; *Homem v. Maple Vill., LLC*, No. ESCV200800455B, 2009 WL 3083339, at *1 (Mass. Super. July 16, 2009) ("Because the plaintiffs did not send demand letters before bringing the 93A claim, this claim . . . must be dismissed.  The demand letter is a jurisdictional requirement.").

the bringing of an action thereunder 'unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.'"   *Moll Indus., Inc. v. Oral-B Labs., Inc.*, No. 011301BLS, 2001 WL 1194678, at *11 (Mass. Super. July 17, 2001) (quoting Section 11). Where such allegations are lacking, the claim cannot be sustained.  *See Am. Mgmt. Servs., Inc. v. George S. May Int'l Co.*, 933 F. Supp. 64, 68 (D. Mass. 1996) (dismissing 93A claim where, *inter alia*, "nowhere in the complaint is there any allegation that defendants acted in Massachusetts" and the "word 'Massachusetts' never appears in the factual recitation except to identify the domicile of the plaintiff"); *Fillmore v. Leasecomm Corp.*, Nos. 2004087H, 86778, 2004 WL 3091642, at *5-6 (Mass. Super. Nov. 15, 2004) (where only connection to state was that product was sold to a Massachusetts company, connection was too attenuated to subject defendant to a 93A claim, and claim was dismissed); *Moll Indus.*, 2001 WL 1194678, at *11 (dismissing complain where "the overwhelming conclusion to be drawn . . . is that the actions in issue did not occur 'primarily and substantially' within the Commonwealth.  Indeed, they occurred here hardly at all.").

Although the Supreme Judicial Court of Massachusetts has noted that the question of whether the conduct complained of occurred primarily and substantially within the commonwealth "is not a determination that can be reduced to any precise formula," *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 798 (Mass. 2003), lower courts addressing this question have made clear that the allegations connecting the alleged conduct to Massachusetts must be rigorously analyzed.

For example, the court in *Weber v. Sanborn*, 502 F. Supp. 2d 197 (D. Mass. 2007), held that Chapter 93A requires that "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the commonwealth."  *Id.* at 199 (quoting *Kuwaiti*).  In *Weber*, the court dismissed Section 93A claims with prejudice.  Emphasizing that the key inquiry

15

is "[t]he location of the events, and to some extent, the location of the harm," the court dismissed claim under Section 93A where the only nexus to Massachusetts was that defendant was incorporated in Massachusetts. *Id.* at 198.

Here, the Counterclaims are devoid of any allegation that the alleged misconduct occurred within Massachusetts, let alone primarily and substantially within the state. To the contrary, to the extent that the Counterclaims even address the location of the alleged conduct, it is clearly New York-centric. (*See, e.g.*, Countercl. ¶ 99 (stating that AIG became the subject of investigations by New York regulatory agencies); *id.* ¶ 101-102 (settlement was reached with those agencies in New York; the Workers Compensation Fund was established in New York pursuant to those settlements).) This acknowledgment is only logical, given that none of the AIG parties is incorporated in, or alleged to have a principal place of business, in Massachusetts. (Countercl. ¶¶ 33-46 (alleging New York, Pennsylvania, Colorado and Illinois as the states of incorporation and that all parties have a principal places of business in New York).)

Nor can it be said that the alleged injury, for purposes of a Section 93A claim, occurred primarily and substantially within Massachusetts. The Liberty Parties admit that they were not the direct recipients of AIG's allegedly fraudulent statements; rather, those statements were submitted directly to and relied upon by third parties – the Fund Administrators. (*See, e.g.*, Countercl. ¶¶ 16, 58.) The court in *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 107 F. Supp. 2d 82 (D. Mass. 2000), was faced with a similar problem on a motion for summary judgment. There, plaintiff alleged that the alleged misrepresentations had been received by third parties – its customers – and not by it directly. In evaluating where the plaintiff had received and acted upon the deceptive acts, the court recognized that this factor had been characterized as "the locus of the *recipient* of the deception at the time of the reliance" which "may or may not be the same place as the place where the *plaintiffs* received the deception." *Id.* at 88 (emphasis added). Applying this analysis to the third-party recipients, it was clear that the "vast majority of the

16

recipients of the deception charged in the complaint . . . were undeniably outside Massachusetts when they were targeted for [defendant's] alleged misconduct." *Id.* (dismissing Chapter 93A claim on summary judgment).

The same analysis applies here:  The injury occurred where the direct recipients – the Fund Administrators – received the alleged deception.  However, as the Liberty Parties allege in the opening statement of the Counterclaims, the alleged misrepresentations were received primarily ***outside*** of Massachusetts, as the misrepresentations were made directly to the NCCI, non-NCCI Residual Market Pools, Guaranty Funds and Special Assessments Pool in which AIG participated, most of which are not alleged to operate within the commonwealth.  (Countercl. ¶ 1; *id.* ¶ 3 (the NCCI is a Delaware corporation); *id.* ¶ 6 (listing the non-NWCRP Residual Market Pool states as Indiana, Massachusetts, Michigan, Missouri, Mississippi, New Jersey, North Carolina, New Mexico, Tennessee, Texas and Wisconsin); *id.* ¶ 64 (listing the Guaranty Funds as operating in Alabama, Colorado, Connecticut, District of Columbia, Florida, Indiana, Maryland, Michigan, Missouri, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas and Vermont); *id.* ¶ 65 (listing Special Purpose Funds as operating in Kentucky, Tennessee and Virginia).)

In fact, the only allegations in the Counterclaims that could plausibly lead to an inference of a connection to Massachusetts is that four of the eight Liberty Parties have their principal place of business in the state, and that AIG "engage[s] in trade or commerce in Massachusetts and throughout the United States."  (Countercl. ¶¶ 24-32; 151.)  Notwithstanding that the other half of the Liberty Parties are non-Massachusetts domiciliaries (with incorporation and principal places of business in Wisconsin), the domicile of the Massachusetts half of the Liberty Parties' does not rescue this claim, as "[s]omething more than a Massachusetts plaintiff is required to invoke the provisions of Chapter 93A."  *Am. Mgmt. Servs.,* 933 F. Supp. at 68 (dismissing claim because "that 'something' is absent here").  Because AIG's alleged misconduct did not occur

17

primarily and substantially in Massachusetts, the Liberty Parties' Chapter 93A claim should be dismissed.

### D.    As a Matter of Law, Punitive Damages Are Not Available To the Liberty Parties.

The law in Massachusetts regarding the award of punitive damages is simple: they can only be awarded where there is explicit statutory authorization.  In fact, less than four weeks ago, the Supreme Judicial Court of Massachusetts, the state's highest court, reaffirmed this well-settled rule in *Haddad v. Wal-Mart Stores, Inc.*, 914 N.E.2d 59, 75 (Mass. 2009) ("We impose punitive damages only when authorized by statute."); *see Flesner v. Tech. Commc'ns Corp.*, 575 N.E.2d 1107, 1112 (Mass. 1991) ("Punitive damages are not allowed in this Commonwealth unless expressly authorized by state.  Because no such legislative authorization applies to [plaintiff's claims for emotional distress and mental anguish, plaintiff's] claim for punitive damages cannot stand."); *Int'l Fidelity Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1317 n.20 (Mass. 1983) ("Under Massachusetts law, punitive damages may be awarded only by statute.").

Here, the sole count as to which the Liberty Parties seek punitive damages is in connection with their common law fraud claim – Count Three.[4]  (Countercl. ¶ 149.)  Under Massachusetts law, however, there is no statutory authority for awarding damages to claims for common law fraud.  *Olson v. Energy N., Inc.*, No. 9800228, 1999 WL 1332362, at *8 (Mass. Super. Jan. 14, 1999) (addressing claims alleging fraud and deceit and explaining that "neither treble damages, nor punitive damages, nor attorneys fees may be awarded on a common law claim"); *Frisone v. Bear Stearns & Co.*, No. 82-1439-MA, 1983 WL 1313, at *5 (D. Mass. Apr.

---

[4] AIG recognizes that Count Four of the Counterclaims seeks treble damages under the Massachusetts Regulation of Business Practice and Consumer Protection Act.  The Liberty Parties' claim for multiple damages will, however, be subject to dismissal based on the reasonable settlement offer that AIG has already made (and will timely reiterate in its answer) in the form of the WCF and that the Liberty Parties have repeatedly rejected.  MGL § 93 ("The respondent may tender with his answer in any such action a written offer of settlement for single damages.  If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.").

27, 1983) (granting motion to dismiss plaintiff's claim for punitive damages under Massachusetts common law because "'under Massachusetts law, punitive damages may be awarded only by statute'") (citation omitted); *Kleinerman v. Hodge*, No. 952639B, 1996 WL 1186891, at *5 (Mass. Dist. Ct. June 21, 1996) (striking punitive damages with misrepresentation claim where not authorized by statute); *accord In re SmarTalk Teleservs., Inc. Sec. Litig.*, 124 F. Supp. 2d 505, 526 (S.D. Ohio 2000) (holding that "[n]o Massachusetts statute authorizes the recovery for punitive damages for common law fraud claims" and dismissing plaintiffs' claim for punitive damages).

In light of the unequivocal Massachusetts policy against awarding punitive damages on common law fraud claims, even if this Court should determine that the Liberty Parties have stated valid claims under state law – which they have not – there is no question that the Court should dismiss the Liberty Parties' demand for punitive damages.  The court's analysis in *In re SmarTalk*  is instructive in this regard.  There, the court was presented with a motion to dismiss claims of common law fraud and a demand for punitive damages.  124 F. Supp. 2d at 526.  Applying Massachusetts law, the court granted the motion to dismiss the fraud claim in only in part, but went on to explain that "[n]o Massachusetts statute authorizes the recovery for punitive damages for common law fraud claims."  *Id.*  This unequivocal law compelled the court to dismiss plaintiffs' claims for punitive damages.  *Id.*  The result here should be the same, and the Liberty Parties' punitive damage claims should be dismissed.

In addition to the clear legal mandate under Massachusetts law to address the legal viability of claims for punitive damages on a motion to dismiss, the Seventh Circuit has recognized that claims for punitive damages – especially in large, complex litigation that will entail extensive and expensive discovery – have *in terrorem* effects on the course of the litigation.  *See, e.g., Limestone*, 520 F.3d at 803 ("[T]he complaint in a potentially complex litigation, or one that by reason of the potential cost of a judgment to the defendant creates the

'in terrorem' effect against which *Blue Chip* warned, must have some degree of plausibility to survive dismissal.") (citing *Twombly*, 550 U.S. at 544, and *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)).  Addressing such issues at the motion to dismiss phase, therefore, places the parties in a position whereby they can focus their litigation efforts on the matters that may ultimately be presented to the trier of fact, without regard to collateral considerations.

## <u>CONCLUSION</u>

For the foregoing reasons, AIG's motion to dismiss the Liberty Parties' RICO, common law fraud, Chapter 93A, promissory estoppel, unjust enrichment, and punitive damages claims should be granted.

Respectfully submitted,

PLAINTIFFS AMERICAN INTERNATIONAL GROUP, INC., et al.,

By:____/s/ Andrew D. Campbell_____
        One of Their Attorneys

Stephen Novack
P. Andrew Fleming
John F. Shonkwiler
Andrew D. Campbell
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900

Michael B. Carlinsky
Kevin S. Reed
Jennifer J. Barrett
Brendan N. Snodgrass
QUINN EMANUEL URQUHART OLIVER
  & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

## CERTIFICATE OF SERVICE

I, Andrew D. Campbell, an attorney, hereby certify that I caused true and correct copies of the foregoing **Memorandum of Law in Support of Plaintiff's Motion to Dismiss the Liberty Parties' Counterclaims** to be sent by the U.S. District Court CM/ECF e-filing system on this, the 30th day of October, 2009.

/s/ Andrew D. Campbell