# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., *et al.* | ) | No.: 07 CV 2898 |
| | ) | |
| Plaintiffs, | ) | Judge Robert W. Gettleman |
| | ) | |
| v. | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| ACE INA HOLDINGS, INC., *et al.* | ) | |
| Defendants. | ) | |
| | ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, *et al.*, | ) | |
| | ) | |
| Counter-Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN INTERNATIONAL GROUP, INC., *et al.*, | ) | |
| | ) | |
| Counter-Defendants. | ) | |
| | ) | |
| SAFECO INSURANCE COMPANY OF AMERICA, *et al.*, | ) | No. 09 C 2026 |
| | ) | |
| Plaintiffs, | ) | Judge Robert W. Gettleman |
| | ) | |
| v. | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| AMERICAN INTERNATIONAL GROUP, INC., *et al.*, | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ALL CLAIMS ASSERTED AGAINST THE NATIONAL WORKERS COMPENSATION REINSURANCE POOL

The National Workers Compensation Reinsurance Pool ("NWCRP" or "the Pool") respectfully submits this Reply Memorandum in support of its motion to dismiss all claims asserted against the Pool (Docket Entry 520).

# SUMMARY

For its response[1] to the Pool's motion to dismiss Counts 9 and 10 of the Corrected First Amended Complaint ("AIG Complaint"), AIG is forced to stake out positions with respect to the Pool that are squarely at odds not only with the actual allegations of the AIG Complaint, but also with the procedural history of this case, the positions AIG has previously asserted, this Court's prior rulings, and the NWCRP Articles of Agreement (the contractual mechanism that is "the Pool" but which AIG continues conveniently to ignore).

First, AIG repeatedly attributes past litigation positions and actions to "the Pool," despite the Court having expressly recognized that until very recently the Pool was not even a party in this case. (*See* Aug. 20. 2009 Order at 2, n. 1)  AIG adopts this tactic throughout its Response, whether to stretch its "law of the case" argument to the Pool, or simply to paint *the Pool* as the party that is changing positions.  The Pool can hardly be taking a "second bite" at any apple or changing any position.  Indeed, the pending motion is the Pool's first opportunity to present arguments about why, as a contract among the participating companies, it cannot be sued (nor served with process).

Second, AIG attempts to sidestep the Pool's main argument:  that AIG cannot sue a contract.  For the centerpiece of its Response, AIG lifts its assertion that the Pool is an "unincorporated association" from the same Memorandum Opinion and Order in which this Court made clear "the Pool" was not then even a party in the case.  Now that the Pool has appeared through counsel to address the

---

[1] AIG's Memorandum of Law in Opposition to the Non-Underreporting Pool Board Members', NCCI's, and the NWCRP's Motions to Dismiss AIG's Corrected First Amended Complaint (Docket Entry 537) (the "Response")

very issue whether the Pool is an "association" or "organization" that can be sued, AIG should not be allowed so easily to divorce itself from the allegations of its Complaint.   AIG's Complaint – consistent with the NWCRP Articles of Agreement and AIG's past arguments to this Court – could not be clearer that the Pool is nothing more than a contractual reinsurance **mechanism** among the participating companies.   We are aware of no authority in Illinois or elsewhere that automatically turns "mechanisms" (of the parties to that contract) into "unincorporated associations."

Third, AIG completely fails to address the gist of the Pool's argument about why it is an improper party for an accounting:  a contract cannot make an accounting.  Even if the Pool had some legal existence apart from the contract that is the Articles of Agreement, there still must be a contractual account relationship **between the parties** for there to be an accounting or an action on an open account.  Because AIG's contracts are with the participating companies (and *not* with the "the Pool" itself), there is no privity between AIG and the Pool, and the accounting claims against the Pool cannot proceed.

Fourth, in the remarkable circumstances of this case -- where AIG's long-concealed wrongdoing has not only been exposed but also admitted and alleged in its own Complaint -- AIG's unclean hands bar an action for an equitable accounting.

# ARGUMENT

## I.   "The Pool" Was Not Previously a Party

AIG accuses all the moving parties, *including the Pool*, of attempting to take a "second bite of the apple" in moving to dismiss the AIG Complaint.  (*See* Response at 1.)   AIG specifically states that "[o]n June 9, 2008, NCCI and the Pool moved to dismiss AIG's counterclaims . . . . The Court ruled on these motions on February 23, 2009. (Dkt. 422)." (*Id.* at 4.)   AIG argues that based on the "law of the case," the Pool should be foreclosed from moving to dismiss the current AIG Complaint.  (*See id.* at 9-10.)   AIG's argument misses wide of the mark.

The Pool cannot have moved to dismiss a previous version of AIG's claims, because the Pool was not even a party when the motion was filed or ruled upon.   When this Court ruled on August 20, 2009 that the NCCI had no standing to assert claims on behalf of the participants in the Pool, the Court expressly recognized that the Pool was not a party in this case (see Aug. 20, 2009 Order at 2, n.1).   The Pool was never served with process as a third-party defendant in 2008, never answered AIG's counterclaim, and – before moving to dismiss this most recent complaint – never caused a lawyer to file a formal appearance on behalf of the Pool as a party.[2] For this most basic of reasons, the Pool is not taking a second bite at anything.   The Pool's arguments are unique to it, and no party did or could raise these arguments on the Pool's behalf before the instant motion.

The illogic of AIG's argument *vis a vis* the Pool is laid bare by the one-sentence argument at Part I.C. of the Response.  (Response at 10.)   AIG, by adopting its arguments in

---

[2] Indeed, in the August 20 Order the Court noted that "no party has sought to join the Pool as a plaintiff under Fed. R. Civ. P. 17(a), the caption naming NCCI as the single plaintiff has not been changed, and no attempt to file an amended complaint naming the Pool as a plaintiff has been made." (*Id.* at 6, n.4.)

respect to NCCI as its arguments in respect to the Pool, completely blurs the distinction between the Pool on the one hand and NCCI as attorney-in-fact for participating companies on the other. As this Court has recognized, the Pool and NCCI are distinct, and NCCI in its role as attorney-in-fact for the participating companies was not advancing positions on behalf of the contract that is "the Pool."[3]   The arguments advanced by the Pool have not and could not have been previously addressed by this Court.   Those arguments warrant hearing, and they warrant dismissal of AIG's claims against the Pool.

## II.   "The Pool" Is a Contractual Mechanism, Not an Association

By reciting that the *capacity* to sue is determined "by the law of the state where the court is located" (Fed. R. Civ. P. 17(b)(2)), and by lifting language about the Pool being an association from the Court's August 20 Order – issued when the Pool was not even present to address whether it was a contract or an association – AIG sets up a straw man to knock down.   The distinctions among (1) NCCI, (2) the participating companies, and (3) the Pool (which is the contract among those participating companies) are critical to the instant motion, but AIG repeatedly glosses over those distinctions.

There is no dispute that Illinois law provides that "voluntary unincorporated association[s] may sue and be sued." 735 ILCS 5/2-209.1.  However, the NWCRP does not meet the statutory definition of "voluntary unincorporated association" because it is not an "organization."   It is clear the Pool has no separate legal existence as an "unincorporated association," for three reasons:  (1) AIG, to its benefit, has already taken the position in this litigation that "the Pool" is not an association or organization that asserts its members interests, (2) the AIG Complaint continues to makes clear that "the Pool" is merely a contractual

---

[3] AIG again blurs the facts at page 4 of the Response, where it alludes to NCCI as pursuing claims "on behalf of the NWCRP."

reinsurance mechanism, and (3) the participating companies' contract itself, the NWCRP Articles of Agreement (a copy of which is attached to the Pool's opening brief), makes clear it is in fact a contractual mechanism, not an association. *See* the Pool's Memorandum in Support of its Motion to Dismiss (Docket Entry 521 at 4-7).

In its Response, AIG argues that judicial estoppel should not apply to bar it from changing tactics and treating the Pool as an association. This tactic should not be countenanced. AIG won its motion to dismiss the NCCI as attorney-in-fact in August 2009 when it argued and *prevailed* on its twin arguments that NCCI had no standing to sue on behalf of the participating companies and that the Pool, even if it were joined as a party, was neither an "organization" nor an "association" that could assert its members' interests *(see, e.g.,* Defendants' Memorandum of Law in Support of Their Motion to Dismiss for Lack of Subject Matter Jurisdiction, Docket Entry 409, at 10-12).[4]  AIG would now like the Court to ignore the portions of its argument that allowed it to prevail. But the fact remains that AIG argued that the Pool was not an association which could assert its members interests, and the Court granted AIG's motion to dismiss the NCCI Complaint. (Aug. 20, 2009 Order at 17.)  Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (U.S. 2001) (citations omitted).

As a fallback position, AIG argues there is nothing contradictory about being both a "reinsurance mechanism" (how it describes the Pool throughout the AIG Complaint and earlier

---

[4] AIG insisted that the Pool had no independent legal status and was, "[a]t best, . . . a **bystander** in what is really a dispute among the Participating Companies." (Mem. of Law in Supp. of AIG's Mot. to Dismiss at 12 (emphasis supplied)).  It further insisted that the Pool as defined in the Articles of Agreement "is not an association designed to represent its members' interests, but instead is **merely a collection of reinsurance contracts** by and among hundreds of insurance companies." (*Id.* at 11 (emphasis supplied)).

pleadings) and an "unincorporated association" (how it describes the Pool for the first time in its Response).[5]   That is directly contrary to how AIG has juxtaposed the two terms in its prior pleadings, and it is belied by the fact that AIG's Complaint, while replete with references to the Pool as a "reinsurance mechanism," is deafeningly silent on the issue of the Pool as an association.  By alleging in the AIG Complaint that the Pool is merely a contractual mechanism, AIG has conclusively and fatally failed to demonstrate that the Pool is a natural person, a corporation, a receiver, a limited liability company, a partnership, or an unincorporated association capable of being sued under Fed. R. Civ. P. 17(b).  "A prime requisite to maintaining a proper lawsuit is that the parties, whether plaintiffs or defendants, be either a natural or an artificial person."  *Tyler v. J.C. Penney Co., Inc.*, 496 N.E.2d 323, 327 (Ill. App. Ct. 1986) (dismissing claims against "Market Place Shopping Center" because it was not a legal entity recognized by law).

Finally, AIG continues to ignore the NWCRP Articles of Agreement, which AIG signed and which define the Pool and must be the basis of any claim against it.[6]  Rather than address the

---

[5] For the proposition that "reinsurance mechanisms" and "unincorporated associations" are not mutually exclusive, AIG cites *IPF Recovery Co. v. Illinois Ins. Guar. Fund*, 826 N.E.2d 943, 945 (Ill. App. Ct. 2005).  That case, however, does not appear to have involved any allegations like the "reinsurance mechanism" allegations in AIG's Complaint.  Nor does there appear to have been any question as to the legal status of the entity being sued.  Indeed, the Guaranty Fund statute at issue in *IPF Recovery Co.* explicitly grants to the Guaranty Fund the power to sue or be sued.  215 ILCS 5/538.4.  No such legislative grant of power is made to the contract that is the Pool.

[6] Because the AIG Complaint refers to the Articles, that document is central to AIG's claims against the Pool.  A complete copy of the Articles was attached to the Pool's opening Memorandum in Support of Its Motion to Dismiss (Docket Entry 521).  *See Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (in ruling on motion to dismiss, district court appropriately considered treaties where the treaties were central to plaintiff's claims and were referenced in but not attached to the complaint); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431-32 (7th Cir. 1993) (district court appropriately considered documents not attached to the complaint, where they were central to the parties' contractual relationship and were referenced in the complaint).

Articles of Agreement, AIG recites the definition of "voluntary unincorporated association" from Illinois law as if its use of the terms "association" and "organization" were self-applying definitions. It is the Articles of Agreement which determine in the first instance whether an "organization" or "association" **exists**, before any state's law as to capacity to sue or be sued can be applied. That is why the cases cited in the Pool's opening Memorandum at page 7 are so instructive. *See, e.g., Fuller v. Woodland Racing*, No. 92-2317-GTV, 1994 WL 171408, at *2-3 (D. Kan. April 7, 1994) (dismissing claims against a building and the business name of a race track because they were not legal entities capable of being sued); *Roby v. Corporation of Lloyd's*, 796 F. Supp. 103, 104 (S.D.N.Y. 1992) (dismissing claims against insurance "syndicates" because they were not legal entities capable of being sued). AIG cannot state a claim against a party that has no separate legal existence or personality. Not only does AIG's Complaint insist that the Pool is merely a mechanism or a collection of contracts, but AIG drew that idea from an important source: the Articles of Agreement. The preamble to the Pool's Articles of Agreement clearly states that

> the participating companies desire to form a **mechanism** to allow for the efficient and cost-effective provision of reinsurance to the Servicing Carriers selected under Authorized Insurance Plans, where such **mechanism** would provide efficient, centralized administration, including accounting, statistical and actuarial services, among other appropriate activities related to such reinsurance and the spreading of risk;

Articles of Agreement, at 2. There is no basis under Illinois state law or otherwise for suing a contractual "mechanism."

## III.   AIG Has No Account with "the Pool"

AIG does not address the argument that the Pool is, in any event, an improper target for AIG's accounting claims. Even if the Court were to deem the Pool to be an "unincorporated association," AIG does not and cannot allege that it has a reinsurance agreement with the Pool

(as opposed to the other participating companies) or that AIG is owed an obligation by the "mechanism" created by the Articles of Agreement, as opposed to the other signatories to the contract. The Pool is not a counterparty to AIG's reinsurance obligations. As the cases cited in the Pool's opening Memorandum demonstrate and as AIG concedes by its silence, the defining characteristic of both an accounting claim <u>and</u> an action on an open account is the existence of a contractual account relationship between the parties, *i.e.,* privity. Here, there is no privity between AIG and the Pool, and the accounting claims against the Pool therefore cannot proceed.

## IV.   AIG's Unclean Hands Bar an Action Against "the Pool"

The Pool's opening Memorandum already cites authority for the proposition that although unclean hands is an affirmative defense, it may be raised by a 12(b)(6) motion where the grounds for the defense are apparent on the face of the complaint. *See Cunningham v. EquiCredit Corp.,* 256 F. Supp. 2d 785, 797 n.12 (N.D. Ill. 2003) ("Although unclean hands is an affirmative defense, the Court may consider affirmative defenses on a motion to dismiss if, as herein, the facts giving rise to the defense are apparent on the face of the complaint.") The mere fact those grounds were not present in other cases cited by AIG is irrelevant. AIG does not and cannot deny that it has engaged in serious wrongdoing, to wit: the underreporting of its workers compensation premiums in the voluntary market for the purpose of avoiding, *inter alia*, its residual market reinsurance obligations to other Pool participants (*see, e.g.,* AIG Complaint, ¶74). That is in fact what AIG itself concedes in its Complaint:

- In January 2006 — some nine months after an inquiry into its workers compensation premium reporting practices had begun — AIG entered into a settlement with the New York Attorney General and New York Department of Insurance (the "New York Authorities") pursuant to which it established a fund of over $300 million (the "Workers Compensation Fund" or "Fund") ***for the express and sole purpose of providing recompense to third parties allegedly injured as a consequence of AIG's alleged underreporting.*** (AIG Complaint, ¶ 2) (emphasis added).

- In addition to establishing the Workers Compensation Fund, *AIG also filed with each state insurance department amended statutory Annual Statements for 1987 to 2005, which included amended exhibits of premium and losses ... reflecting the revised written workers compensation premium that had been agreed upon with the New York Authorities* and that were used for purposes of calculating the Fund." (AIG Complaint, ¶77) (emphasis added).

Serious admissions can be made in the space of two paragraphs.  In light of AIG's allegation that it filed Amended Annual Statements as part of its settlement with the New York Authorities, AIG cannot possibly deny that for *almost two decades* its original Annual Statements contained false and misleading premium figures.  Instead, AIG resorts to arguing that nothing in the AIG Complaint demonstrates that any wrongdoing on its part was *intentional*, or *directed at the Pool*. (Response at 28.)  Neither argument can save AIG's Complaint from dismissal for unclean hands.  AIG acted in bad faith by allowing false and misleading premium figures to remain on file for almost two decades and by not taking corrective action until the investigation by the NYAG and NYDOI forced it to address the situation.

Even without taking judicial notice of the facts surrounding AIG's admissions (though such notice could properly be taken, *see* Fed. R. Evid. 201(b)), the scope of the allegations of AIG's Complaint as to its own underreporting places AIG's bad faith beyond any reasonable doubt.  If there were any doubt on that score, AIG's Complaint would have alleged its own innocent intent.  In its Settlement Agreement with the NY Attorney General, referenced in AIG's complaint and therefore properly considered in ruling on this motion to dismiss, *see* note 5 *supra*, AIG acknowledged that it had created a fund to try to compensate participants in residual market mechanisms including those in the Pool, for injuries AIG caused as a result of underreporting workers compensation premiums for over a decade.  *See* Settlement Agreement (attached hereto as Exhibit A) at ¶¶4, 10.  That Settlement Agreement also obligated AIG to engage in a series of business reforms including mandatory training for its senior officers and

lawyers to address steps they should take in the future "upon learning of improper, illegal or potentially illegal acts . . . ." *Id.* at ¶ 49(c).  As part of the Settlement Agreement and attached to it as Exhibit 1, AIG issued the following apology:

> AIG regrets and apologizes for the conduct that led to the action brought by the New York Attorney General and the New York Superintendent of Insurance and to today's settlement. **Providing incorrect information to the investing public and to regulators was wrong** and is against the values of our current leadership and employees.
>
> In response to these events, and to the guilty pleas of our own employees and others, as part of today's settlement, we have and are continuing to aggressively implement business reforms to prevent this conduct from recurring . . . .

*Id.* at Exhibit 1 (emphasis added).  Nowhere, has AIG ever suggested that nearly two decades of its admitted wrongful conduct was somehow "inadvertent."

Likewise, AIG cannot simultaneously seek to maintain an action for an accounting against the Pool, and be heard to argue (as it does) that its misconduct was not directed at the Pool but rather at participating companies.  (Response at 28.)  AIG cannot have its cake and eat it too.  Either the Pool is not the proper target for AIG's accounting claims, or the Pool has and will suffer harm from AIG's admitted wrongdoing and should not in equity be subjected to litigation whose genesis is AIG's own unclean hands.  Because AIG is guilty of the very misconduct that forms the basis for the equitable relief it seeks, its accounting claims must be dismissed.

## CONCLUSION

For all of the foregoing reasons and those stated in the Pool's opening Memorandum (Docket Entry 521), all claims asserted in AIG's Corrected First Amended Complaint against the National Workers Compensation Reinsurance Pool should be dismissed.

Dated:  December 30, 2009

Respectfully submitted,

National Workers Compensation Reinsurance Pool

By:___/s/ William M. Hannay_____
      William M. Hannay
      Marci A. Eisenstein
      SCHIFF HARDIN LLP
      233 S. Wacker Drive
      Chicago IL 60606

Exhibit A

**Agreement Between the Attorney General of the State of New York and
American International Group, Inc. and its subsidiaries
(collectively "AIG") dated January 18, 2006**

WHEREAS, the New York Attorney General (the "Attorney General") and the

Superintendent of Insurance of the State of New York (the "Superintendent") commenced an

action against AIG pursuant to Executive Law § 63 (12), the Martin Act (Gen. Bus. Law § 352-

c), Insurance Law §§ 201, 327 and the common law of the State of New York dated May 26,

2005 (the "Complaint");

WHEREAS, the Attorney General has conducted an investigation related to AIG's

practices in the marketing, sale, renewal, placement or servicing of insurance for its

policyholders and its accounting and public reporting practices, including those relating to

nontraditional and finite insurance (the "Attorney General's Investigation") and the

Superintendent, pursuant to Insurance Law § 310, has conducted an examination of AIG (the

"Superintendent's Examination");

WHEREAS, the Attorney General and the Superintendent have alleged the

following facts with respect to AIG's participation in schemes relating to the rigging of bids for

excess casualty insurance business and the use of contingent commission agreements or

placement service agreements to steer business:

a. Since at least the mid-1990s AIG and other insurers have paid hundreds of

millions of dollars in so-called "contingent commissions" to the world's largest

insurance brokers, including Marsh & McLennan Companies, Inc. or Marsh Inc.

(collectively "Marsh"), Aon Corporation ("Aon"), Willis Group Holding Ltd.

1

("Willis") and Arthur J. Gallagher & Co. ("Gallagher"), as well as tens of

thousands of smaller brokers and independent agents.

b.    AIG entered into a number of contingent commission agreements (also known as

"override" agreements) to pay compensation to Producers,[1] such as Marsh, Aon,

Willis and Gallagher as a result of which they steered insurance policies to AIG to

increase the volume of policies written by AIG, to keep retention levels of

existing AIG policies above certain benchmarks, and to direct the most profitable

policies to AIG.  In most cases, steering took the form of Producers purporting to

offer unbiased recommendations to their clients about the selection of insurers

when in fact, in many cases, the Producers' recommendations were biased in favor

of insurers who paid contingent commissions.

c.    Under these agreements, when Marsh, for example, helped AIG retain its existing

business at renewal time, AIG paid Marsh higher contingent commissions.  Thus,

in the 2002 placement service agreement between the two companies relating to

excess casualty, AIG agreed to pay Marsh an aggregate percentage of gross

written premium that varied from a minimum of 10% for one dollar of premium,

to 15% for four hundred million dollars, to 15.75% of one billion dollars.

d.    Further, when Willis steered business to AIG's Hartford Steam Boiler subsidiary,

AIG, in turn, paid Willis higher contingent commissions.  When Gallagher gave

---

[1] For purposes of this Agreement, "Producer" shall mean any insurance broker as that term is defined in § 2101(c) of the Insurance Law of the State of New York or any independent insurance agent as that term is defined in § 2101(b) of the Insurance Law of the State of New York and who offers insurance for a specific product or line from more than one insurer or affiliated group of insurers.

2

AIG first rights of refusal and made sure AIG got its fair share of business, AIG reimbursed Gallagher for some of its employees' salaries, another way to pay Gallagher higher fees.

e. In some cases AIG did not enter into formal contingent commission agreements with Producers, but agreed instead to subsidize certain of the Producers' expenses. For example, AIG rewarded Gallagher with "hiring subsidies" of $2 million in 2002 and $2.5 million in 2003, to pay for the salaries of certain Gallagher employees. In return, Gallagher agreed to give AIG an exclusive "first right of refusal" for prospective insurance business and to make sure that AIG was successful on a fair share of this business.

f. In the area of excess casualty insurance, which covers losses above the limits provided by policyholders' primary casualty insurance policies, and in which AIG is a major provider, Marsh, AIG and other insurers rigged the process of bidding for insurance policies and actively deceived clients. AIG underwrote the vast majority of umbrella excess casualty business that was placed through Marsh's Global Broking Excess Casualty Group, and was thus the "incumbent" on most business that came up for renewal. The bid manipulation that AIG and Marsh engaged in generally sought to protect AIG's incumbency and gave AIG an unfair competitive advantage, to the detriment of the insured, whose best interests Marsh was supposed to be serving.

g. When AIG was the incumbent carrier, or was otherwise chosen by Marsh to win a

3

client's business, Marsh set a target for AIG which included proposed premium and policy terms for AIG's bid as a part of the renewal process. If AIG met this target, or even if it provided a much less favorable bid from the client point of view, Marsh generally arranged for AIG to win the business, regardless of whether AIG, or any other insurance company, could have quoted better terms for the client.

h.    In order to ensure that AIG won business it wanted, Marsh instructed other insurance companies to provide intentionally losing bids that were inferior to those provided by AIG. These losers were known, among other things, as "fake," "backup," "supportive," or "protective quotes." They were also known as "B Quotes" or simply "B's." Once it had secured such quotes, Marsh would present them to clients as bids obtained through a competitive process. This pretense of competition was intended to, and did, give clients the impression that AIG's bid was the best available. It also had the effect of throwing business to AIG, not at terms best for the client, but rather at terms advantageous to AIG. Certain employees of AIG were aware of this arrangement and of the "B Quotes" supplied by other insurers. Set forth below are specific examples:

i.    In March 2002, Marsh set a target price of $690,000 to provide AIG the renewal business for AIG's insured, "Client A." The Marsh employee coordinating the renewal instructed colleagues that "B Quotes" be obtained from Munich and St. Paul insurance companies to ensure that

4

AIG would win this "[g]ood account."  Despite the target price

established, toward the end of the month AIG quoted the account at a price

of $825,000, or approximately 20% higher than the price at which Marsh

had intended AIG to obtain the business.  Nonetheless, once AIG quoted

higher than the target price, thereby rendering its bid far less attractive and

more vulnerable to competition, the Marsh employee sought greater

protection for AIG.  On March 25, the Marsh employee circulated an email

seeking intentionally losing "B quotes" from two additional insurance

companies, Zurich and Liberty.  With "competitors" submitting losing

quotes that made AIG's increased price seem competitive, AIG obtained

the client's business at exactly the price AIG quoted.

ii.   AIG's client, "Client B," had its insurance up for renewal in October 2002.

Marsh's broking plan, prepared in August 2002 without specifying any

target price, called for AIG to win the business and for other insurance

companies to submit intentionally losing quotes in support of AIG's quote.

After the plan was issued, AIG quoted $475,000, a 111% increase in price

over the previous year's premium.  The Marsh employee overseeing the

placement noted to his Marsh colleagues on September 18, 2003 that

"[t]he client is not happy with this price and we have asked AIG for

consideration on the premium due to the long term relationship."  Despite

the client's dissatisfaction, on the very same day the Marsh employee

instructed one Marsh colleague that "[w]e need Zurich to quote . . . for

something higher."   On September 23, 2003, the Marsh employee further

directed another Marsh colleague to "have ACE send an email stating they

would quote . . . for $500,000 or higher with a professional liability

exclusion and an aircraft products and grounding exclusion." These

exclusions were not included in the AIG quote.  Just a day later,

increasingly concerned about AIG's high bid and the client's unhappiness,

the Marsh employee sent an email to colleagues soliciting intentionally

losing quotes from two additional insurers to further support AIG's price

increase:

> Guys,
>
> AIG quoted [the layer] for $475,000.  Premium
> increase is 111% due to 3MM auto loss AIG paid
> on this account recently.  This is going to be a tough
> sale so I need some help.  Emails would be fine.
>
> St. Paul . . . $525,000
> Liberty Decline Lead
> ACE . . . $500,000
>
> All of these options should have the following
> exclusions:
>
> aircraft products and grounding
> failure to supply
> professional responsibility

AIG thereafter received the protection of these fake quotes and bound the

business at its chosen price, terms and conditions.

6

iii.    For the October 2002 policy renewal of "Client C," AIG submitted a bid

65% higher than what it had charged the previous year. A Marsh

employee then informed colleagues that "AIG quoted . . . for $1,300,000

which is in line with the client's expectations," and instructed them "[w]e

need email indications as follows: Zurich – 20 x 5 $1,500,000[;] ACE – 5

x 5 $1,100,000." In the same month, when AIG raised its quote by 65%

for a different policy, the Marsh employee in charge of getting a

purportedly competitive quote from Zurich wrote "AIG has quoted the

lead on ["Client D"] @ $320,000 (I am shocked it's only a 65% premium

increase), we need Zurich to quote a supportive lead at $365,000. I will

fax you our quote confirmation." And also in the same month, a Marsh

underwriter sent the following message to a purported competitor of AIG

regarding the ["Client E"] account:

> AIG has quoted:
>
> 25 x p=$525,000
> 50 x p=$675,000
> GL attachments 2/4/4
> AL attachments 2mm
>
> Please over price your indications for 25 [x p] or 50
> [x p] or both if you can. **This is a fake quote both
> of them are fake.**

(Emphasis added).

iv.    On December 17, 2002, an ACE assistant vice president of underwriting

sent Marsh a fax quoting an annual premium of $990,000 for an excess

casualty insurance policy for one of AIG's insureds, "Client F."   Later that day, ACE revised its bid upward to $1,100,000.  On the fax cover sheet with the revised bid, ACE's assistant vice president wrote: "Per our conversation attached is revised confirmation.  All terms & conditions remain unchanged."  An email the next day from the ACE assistant vice president to a superior explained the revision as follows: "Original quote $990,000 . . . .  We were more competitive than AIG in price and terms. Marsh requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business. . . ."

v.   When the time came for "Client G" to renew its excess casualty insurance in April 2003, Marsh set a target price of $470,000 for a particular layer. The target also included the provision that AIG's proposed policy would "maintain silence" on whether its insurance would cover claims for injury resulting from EMF, or electromagnetic fields.   AIG chose to provide a less attractive bid from the insured's point of view: not only did it quote $550,000 for the policy, approximately 20% higher than the target at which it was the designated winner, but AIG's quote also included an EMF exclusion.  To support AIG's quote, the Marsh employee coordinating the placement nevertheless instructed a colleague, on March 26, 2003, to (1) "get a B quote from Zurich for [Client G] with the EMF exclusion" and (2) "have Zurich provide an e-mail indication in the area of

8

$650,000." With this supportive bid rigging, AIG obtained the business.

vi.    For one account, "Client H," with a May 2003 renewal, a Marsh employee instructed the underwriter at one of AIG's purported competitors: "Can you email me a protective indication on this. It is an AIG renewal and AIG already quoted it so just give me a bad price with higher per occ. attachment and then we can be done with this."

i.    In some situations where another carrier was the incumbent, or was chosen by Marsh to win a client's business, AIG provided Marsh with intentionally losing bids to present to the clients. For example, in October 2003, an underwriter at AIG described one such intentionally losing bid that AIG provided as follows: "This was not a real opportunity. Incumbent Zurich did what they needed to do at renewal. We were just there in case they defaulted. Broker . . . said Zurich came in around $750K & wanted us to quote around $900K."

WHEREAS, based on these allegations and those contained in the Complaint, the Attorney General and the Superintendent allege that AIG unlawfully deceived its policyholders, regulators and other authorities and shareholders by: (a) participating in schemes to steer business; (b) participating in rigging of bids for excess casualty insurance through Marsh; (c) underreporting to state insurance departments, taxing authorities and other entities the amount of workers compensation premium it collected; (d) providing false and misleading information and responses to regulators, including misrepresentations concerning certain reinsurance

9

arrangements; and (e) using fraudulent insurance transactions and "topside" accounting adjustments to bolster the quality, quantity and stability of its earnings;

WHEREAS, AIG has been and is continuing to cooperate with the Attorney General's Investigation and the Superintendent's Examination;

WHEREAS, in the wake of the Complaint, the Attorney General's Investigation and the Superintendent's Examination, AIG has adopted and under this Agreement (the "Agreement") will continue to implement a number of business reforms;

WHEREAS, the Attorney General and AIG wish to enter into this Agreement to resolve all issues related to AIG in the Complaint and the Attorney General's Investigation (with the exceptions of any conduct or activity relating to the Variable Annuity Life Insurance Company and any other AIG subsidiary which sells variable annuities, and any conduct or activity relating to the marketing, purchase, sale or negotiation of life settlements, including AIG's dealings with life settlement brokers, agents, sellers and investors; notwithstanding the above, this Agreement resolves the allegations relating to the Coventry Life Settlement Trust contained in paragraphs 81-91 of the Complaint);

WHEREAS, nothing herein shall be construed to apply to any business or operations involving group and individual: (1) fixed and variable life insurance, (2) fixed and variable, immediate and deferred annuities, (3) accidental death and dismemberment insurance, (4) short and long term disability insurance, (5) long term care insurance, (6) accident and health insurance, including vision and dental insurance, (7) credit insurance, (8) involuntary unemployment insurance, (9) guaranteed investment contracts, and (10) funding agreements

(collectively "AIG's Life Insurance Operations");

WHEREAS, the Superintendent and AIG simultaneously wish to enter into a Stipulation to resolve all issues related to AIG in the Complaint and the Superintendent's Examination (with the exception of any pending or future examination of American International Group, Inc. and its insurer subsidiaries) ("the Stipulation");

WHEREAS, AIG is entering into an agreement with the United States Securities and Exchange Commission ("SEC") to provide a fund to compensate investors for alleged injuries related to AIG's accounting and public reporting practices;

WHEREAS, the Attorney General finds the relief and agreements contained in this Agreement appropriate and in the public interest, and is willing to accept this Agreement as a settlement of the Complaint, and the Attorney General's Investigation (with the exceptions noted above);

WHEREAS, this Agreement is entered into solely for the purpose of resolving the Complaint and the Attorney General's Investigation (with the exceptions noted above) and is not intended to be used for any other purpose; and

WHEREAS, AIG neither admits nor denies the above allegations or the allegations contained in the Complaint;

NOW THEREFORE, AIG and the Attorney General hereby enter into this Agreement with a statement of apology attached as Exhibit 1, and agree as follows:

11

## MONETARY RELIEF

**A.**   **Workers Compensation**

1.      AIG shall pay a total of $343.5 million for alleged injury caused by its underpayment of workers compensation premium taxes and all other related fees and assessments including workers compensation residual market assessments for and including tax years 1985 to 1996 but not including workers compensation guaranty fund assessments and any monies owed relating to large deductible policies and related taxes.  The $343.5 million will be apportioned as detailed in paragraphs 2, 3 and 4, below.  The State of New York shall not consider any portion of this amount to be a fine or penalty.

2.      On or before March 1, 2006, AIG shall pay $87,801 to the State of New York by wire transfer for alleged injury caused by AIG's underpayment of workers compensation premium taxes and all other related fees and assessments including workers compensation residual market assessments and guaranty fund assessments for and including tax years 1985 to 1996.

3.      On or before March 1, 2006, AIG shall pay to each of the other forty-nine states and the District of Columbia ("State," or collectively "States") the total listed for that State on Schedule WC-A to this Agreement for alleged injury caused by AIG's underpayment of workers compensation premium taxes and all other related fees and assessments for and including tax years 1985 to 1996 but not including workers compensation residual market assessments and guaranty fund assessments.  The total amount to be paid to the States pursuant to this paragraph shall be $42,280,740.

12

4.      On or before March 1, 2006, AIG shall pay $301,216,234 into a fund created by AIG for the settlement of claims with the States and workers compensation residual market pools, including monopolistic or exclusive State funds, competitive State funds, independent State assigned risk plans, the National Workers' Compensation Reinsurance Pool administered by the National Council on Compensation Insurance, Inc. ("NCCI"), State assigned risk plans administered by the NCCI or another third-party administrator, or other workers compensation residual market mechanisms in which one or more of the States participates, for alleged injury caused by AIG's underpayment of workers compensation residual market assessments for and including tax years 1985 to 1996, and additional amounts arising out of any claim for injury described in paragraph 1, but not set forth in paragraphs 2 and 3 of this Agreement (the "Workers Compensation Fund").  A calculation by State of such underpayments and the interest thereon is attached as Schedule WC-B to this Agreement.  In no event shall any of the money in the Workers Compensation Fund be paid directly to an insurance company.

5.      On or before March 1, 2006, AIG shall send a notice to the Attorney General and Insurance Commissioner of each State (the "Workers Compensation Notice").  The Workers Compensation Notice shall be accompanied by:  (a) payment owing, if any, pursuant to paragraph 3 above; (b) a copy of this Agreement, its Exhibits and Schedules (including Schedules WC-A and WC-B); (c) a copy of the Stipulation and exhibits; and (d) a cover letter stating that the Workers Compensation Fund described in paragraph 4 above has been created for the settlement of claims arising from AIG's underpayment of workers compensation residual market assessments for and including tax years 1985 to 1996 and setting forth the amount apportioned to

13

the noticed State on Schedule WC-B.

6.      The form of the Workers Compensation Notice described in paragraph 5 above shall be subject to the prior approval of the Attorney General and the Superintendent.

7.      The Workers Compensation Fund shall be held by AIG and invested in a designated money market fund subject to the prior approval of the Attorney General and the Superintendent.

8.      Each State which receives a Workers Compensation Notice and which elects to receive a distribution from the Workers Compensation Fund in the amount apportioned to it on Schedule WC-B (a "Participating State," or collectively the "Participating States") shall tender a release in the form attached to this Agreement as Exhibit WC-1 (the "Release") on or before March 1, 2007.

9.      For each Participating State that has tendered a Release pursuant to the preceding paragraph, AIG shall pay the Participating State an amount equal to the amount apportioned to the State on Schedule WC-B plus all investment or interest income earned thereon, within ten business days of receiving the Release.

10.     In the event that any State elects not to participate and does not tender a Release as provided in paragraph 8 above, AIG may use the money remaining in the Workers Compensation Fund as of but not before March 2, 2007 to satisfy any claim for injury caused by AIG's underpayment of workers compensation residual market assessments or workers compensation premium taxes or any other related fees or assessments by a State, a monopolistic or exclusive State fund, a competitive State fund, an independent State assigned risk plan, the

14

National Workers' Compensation Reinsurance Pool administered by the NCCI, a State assigned risk plan administered by the NCCI or other third-party administrator, or other workers compensation residual market mechanism in which one or more of the States participates. In no event shall any money in the Workers Compensation Fund be used to settle other claims before all Participating States have been paid their full distribution from the Fund pursuant to paragraph 9. In no event shall any of the money in the Workers Compensation Fund be paid directly to an insurance company.

11.    If any money remains in the Workers Compensation Fund as of December 31, 2008, it shall be distributed on or before January 31, 2009 on a pro rata basis to the Participating States pursuant to the Participating States' apportioned shares on Schedule WC-B.

12.    The Attorney General shall not seek to impose on AIG any other financial obligation or liability related to any injury caused by AIG's underpayment of workers compensation premium taxes and all other related fees and assessments including residual market assessments for and including tax years 1985 to 1996, but not including any monies owed relating to large deductible policies and related taxes.

13.    In no event shall any of the money in the Workers Compensation Fund, or the investment or interest income earned thereon be used to pay or considered in the calculation of attorneys fees.

14.    In no event shall any of the money in the Workers Compensation Fund, or the investment or interest income earned thereon, be used to pay or considered in the calculation of commissions, administrative or other fees to AIG.

15

15.     On or before March 20, 2007, AIG shall file an interim report with the Attorney
General and the Superintendent, certified by an officer of AIG, listing all amounts paid from the
Workers Compensation Fund to date.

16.     On or before March 1, 2009, AIG shall file a report with the Attorney General and
the Superintendent, certified by an officer of AIG, listing all amounts paid from the Workers
Compensation Fund including any amounts paid pursuant to paragraph 11.

**B.     Bid Rigging – Excess Casualty Policyholders**

17.     On or before March 1, 2006, AIG shall pay $375 Million into a fund (the "Excess
Casualty Fund") created and held by AIG to be paid to AIG's policyholders who purchased or
renewed AIG Excess Casualty policies, excluding Excess Workers Compensation policies)
through Marsh during the period from January 1, 2000 through September 30, 2004 (the
"Eligible Policyholders").  All of the money paid into the Excess Casualty Fund and any
investment or interest income earned thereon shall be paid to Eligible Policyholders pursuant to
this Agreement.  No portion of the Excess Casualty Fund shall be considered a fine or a penalty.

18.     The Excess Casualty Fund shall be invested in a designated money market fund
subject to the prior approval of the Attorney General and the Superintendent.

19.     AIG shall (a) by May 1, 2006 calculate the amount of money each of the Eligible
Policyholders paid for excess casualty insurance placed through Marsh with inception or renewal
dates during the period from January 1, 2000 through September 30, 2004 (the "Eligible
Policies"); (b) within ten days of completing these calculations, file a report with the Attorney
General and the Superintendent, certified by an officer of AIG, setting forth:  (i) each Eligible

16

Policyholder's name and address; (ii) the Eligible Policyholder's Eligible Policy(ies) purchased

or renewed and policy number(s); (iii) the amount the Eligible Policyholder paid in premiums for

each such policy; and (iv) the amount each policyholder is eligible to receive which shall equal

each policyholder's pro rata share of the Excess Casualty Fund as calculated by multiplying the

amount in the Excess Casualty Fund by the ratio of the policyholder's gross written premium for

Eligible Policies for the period from January 1, 2000 through September 30, 2004, divided by the

total gross written premium for all Eligible Policies; and (c) by May 22, 2006, send a notice to

each Eligible Policyholder, setting forth items (ii) through (iv), above, and stating that the

amount paid may increase if there is less than full participation by Eligible Policyholders in the

Excess Casualty Fund (the "Excess Notice").  The form of the Excess Notice shall be subject to

the prior approval of the Attorney General and Superintendent.

      20.     Eligible Policyholders who receive an Excess Notice and who voluntarily elect to

receive a cash distribution (the "Participating Policyholders") shall tender a release in the form

attached hereto as Exhibit 2 on or before October 23, 2006.

      21.     On or before November 30, 2006, AIG shall pay each Participating

Policyholder the amount that that Participating Policyholder is eligible to receive from the Excess

Casualty Fund as set forth in paragraph 19(b)(iv) above, and any interest or investment income

earned thereon.

      22.     On or before December 27, 2006, AIG shall file an interim report with the

Attorney General and the Superintendent, certified by an officer of AIG, listing all amounts paid

from the Excess Casualty Fund.

23.    In the event that any Eligible Policyholder elects not to participate or otherwise does not respond to the Excess Notice (the "Non-Participating Policyholders"), the amount that such policyholder was eligible to receive from the Excess Casualty Fund as set forth in paragraph 19(b)(iv) may be used by AIG to satisfy any pending or other claims asserted by policyholders relating to the excess casualty bid rigging or excess casualty steering allegations set forth in this Agreement, provided that in no event shall a distribution be made from the Excess Casualty Fund to any other policyholder until all Participating Policyholders have been paid the full aggregate amount set forth in paragraph 19(b)(iv) above, and any interest or investment income earned thereon; nor shall the total payments from the Excess Casualty Fund to any Non-Participating Policyholder exceed 80% of the amount that Non-Participating Policyholder was originally eligible to receive as set forth in paragraph 19(b)(iv).

24.    If any money remains in the Excess Casualty Fund as of October 1, 2007, any such funds shall be distributed by November 1, 2007 on a pro rata basis to the Participating Policyholders.

25.    In no event shall any of the money in the Excess Casualty Fund or the investment or interest income earned thereon be used to pay or considered in the calculation of attorneys fees.

26.    In no event shall any of the money in the Excess Casualty Fund or the investment or interest income earned thereon be used to pay or considered in the calculation of commissions, administrative or other fees to AIG.

27.    On or before November 15, 2007, AIG shall file a report with the Attorney

18

General and the Superintendent, certified by an officer of AIG, listing all amounts paid from the

Excess Casualty Fund, including any payments subsequent to the payments described in

paragraph 22.

**C.**   **Fine**

28.   On or before March 1, 2006, AIG shall pay $100 million as a fine, by wire transfer

to the State of New York.

## BUSINESS REFORMS

29.   Within 60 days of the date of this Agreement, AIG shall undertake the following

business reforms.  AIG will not undertake any transaction for the purpose of circumventing the

prohibitions contained in this Agreement.

30.   For purposes of this Agreement, Compensation shall mean anything of material

value given to a Producer including, but not limited to, money, credits, loans, forgiveness of

principal or interest, vacations, prizes, gifts or the payment of employee salaries or expenses,

provided that Compensation shall not mean customary, non-excessive meals and entertainment

expenses.  AIG shall develop and implement policies for its employees explaining the provisions

of this paragraph as part of the Company-wide written standards described in paragraph 42

below.  Prior to June 30, 2006, AIG shall submit to the New York Attorney General and the

Superintendent a draft of the intended policies.

31.   For purposes of this Agreement, Contingent Compensation is any Compensation

contingent upon any Producer: (a) placing a particular number of policies or dollar value of

premium with AIG; (b) achieving a particular level of growth in the number of policies placed or

19

dollar value of premium with AIG; (c) meeting a particular rate of retention or renewal of

policies in force with AIG; (d) placing or keeping sufficient insurance business with AIG to

achieve a particular loss ratio or any other measure of profitability; (e) providing preferential

treatment to AIG in the placement process, including but not limited to giving AIG last looks,

first looks, rights of first refusal, or limiting the number of quotes sought from insurers for

insurance placements; or (f) obtaining anything else of material value for AIG. This definition

does not include Compensation paid to employees of AIG or to AIG's Producers that are captive

or are exclusive to AIG with respect to a specific line or product that is clearly and conspicuously

identified in marketing materials as AIG's line or product.

32. **Compensation Disclosure.** Beginning six months from the date of this

Agreement, AIG offices, situated and issuing insurance policies in the United States, shall send a

notice accompanying the insured's policy, stating that the insured can review and obtain

information relating to AIG's practices and policies regarding Compensation on either a website

or from a toll-free telephone number. The information on the website or available through the

toll-free number shall be sufficient to inform insureds of the nature and range of Compensation,

by insurance product, paid by AIG. No later than four months from the date of this Agreement,

AIG shall submit to the Attorney General the proposed format and content of the notice, website

and the information available via the toll-free telephone number described in this paragraph. The

form and content of the notice, website and information available via the toll-free telephone

number shall be subject to the prior approval of the Attorney General. AIG shall commence

posting the website and operation of the toll-free telephone number no later than six months after

20

the date of this Agreement.

33.     **Prohibition on Contingent Compensation for Excess Casualty.**  During the period of 2006 through and including 2008, AIG offices situated and issuing policies in the United States shall not pay any Producer Contingent Compensation relating to the placement of any excess casualty insurance policy.  In addition, AIG offices situated and issuing policies outside the United States shall not pay any Producer Contingent Compensation relating to the placement of any excess casualty insurance policy issued or renewed to any insured domiciled in the United States, which policy is principally associated with covering property or operations situated in the United States.  Subsequent to 2008, excess casualty insurance shall be subject to the provisions of paragraph 39.

34.     AIG shall undertake the business reforms set forth in paragraphs 35-41 for AIG's offices situated and issuing policies in the United States.

35.     Except as set forth in paragraphs 39-41 below, in connection with its issuance, renewal or servicing of insurance policies through a Producer, AIG shall pay as Compensation only a specific dollar amount or percentage commission on the premium set at the time of each purchase, renewal, placement or servicing of a particular insurance policy.

36.     **Prohibition on Pay-to-Play.**  AIG shall not offer to pay or pay, directly or indirectly, any Producer any Compensation in connection with the Producer's solicitation of bids for the Producer's clients.

37.     **Prohibition on Bid Rigging.**  AIG shall not directly or indirectly knowingly offer or provide to any Producer any false, fictitious, artificial, 'B' or "throw away" quote or

21

indication.  Nothing herein shall preclude AIG from offering to provide or providing any bona

fide quote or indication.

38.     **Prohibition on Leveraging.**  AIG shall not make any promise or commitment to

use any Producer's brokerage, agency, producing or consulting services, including reinsurance

brokerage, agency or producing services, contingent upon any of the factors listed in paragraph

31 (a) - (f) above.

39.     **Additional Limitations on Contingent Compensation.**  Within 30 days of

receipt of a notice from the Attorney General that the Attorney General has made a

determination, based on market share information available from the National Association of

Insurance Commissioners ("NAIC") or A.M. Best Company (or another agreed upon third-party

source of market share data if such data is not available from NAIC or A.M. Best for a given

insurance line (or product/segment)), that (a) insurers who do not pay Contingent Compensation

in a given insurance line (or product/segment) including but not limited to direct writers and

insurers that employ only captive agents in the given insurance line (or product/segment) and (b)

insurers who have signed agreements with the Attorney General containing this paragraph as

applied to them, together represent more than 65% of the national gross written premiums in the

given insurance line (or product/segment) in the calendar year for which market share data is

most recently available (the "Notice"), AIG shall stop paying Contingent Compensation for such

insurance line (or product/segment) beginning on January 1 of the next calendar year following

the date of the Notice.  If, in any given calendar year after the date of the Notice described above,

the market share used in the Notice falls below 60%, AIG shall notify the Attorney General of

the change.  If, within 60 days, the Attorney General does not object to AIG's determination that

the market share used in the Notice is below 60%, any prohibition on Contingent Compensation

described in the Notice shall cease.  If the Attorney General does object to AIG's determination,

the Attorney General shall set forth the reasons for such objections in a written notice to AIG

within 60 days of AIG's notification to the Attorney General.  Resort to court action to resolve a

dispute related to the determination of market share or the determination that a given insurer does

not pay Contingent Compensation under this paragraph shall not be deemed a violation of this

Agreement.

     40.     Except as provided in paragraph 33, in any insurance line or product in which

AIG paid Contingent Compensation for the 2004 calendar year or any part thereof, AIG may

continue to pay Contingent Compensation until the receipt of a Notice from the Attorney General

that the conditions described in paragraph 39 above have been met.  Following receipt of a

Notice, AIG may continue to pay any Contingent Compensation accrued or accruing until the end

of the calendar year.  In no event shall any provisions in paragraphs 39, 40 and 41 be construed to

require AIG to take any action that would cause AIG to be in breach of an agreement that is in

force as of the date of this Agreement.

     41.     AIG agrees not to commence the paying of Contingent Compensation in any

insurance line (or product/segment) in which it did not pay Contingent Compensation for the

2004 calendar year or any part thereof and where the Attorney General has sent a Notice pursuant

to paragraph 39 above.  In the event that AIG intends to enter into any agreement potentially

obligating it to make Contingent Compensation payments for any insurance line (or

product/segment) in which it did not pay Contingent Compensation for the 2004 calendar or any

23

part thereof, AIG agrees to give the Attorney General written notice and a copy of the intended agreement at least 60 days prior to the execution of any such agreement.

42.    **Standards of Conduct and Training.**  AIG shall implement Company-wide written standards of conduct regarding Compensation paid to Producers, consistent with the terms of this Agreement, subject to approval of the Attorney General and Superintendent, which implementation shall include, *inter alia*, appropriate training of relevant employees, including but not limited to training in business ethics, professional obligations, conflicts of interest, anti-trust and trade practices compliance, and record keeping.

43.    AIG agrees to support legislation and regulations to abolish Contingent Compensation for insurance products or lines.  AIG further agrees to support legislation and regulations requiring greater disclosure of Compensation.

44.    AIG shall not engage or attempt to engage in violations of Executive Law § 63 (12), the Donnelly Act (Gen. Bus. Law § 340 et seq.), the Martin Act (Gen. Bus. Law § 352-c) and New York Insurance Law.

45.    This Agreement is contingent upon AIG reaching agreement with the SEC to resolve the SEC's investigation of AIG's accounting and public reporting practices.  This Agreement will not be binding and will not go into effect unless and until AIG reaches such agreement with the SEC.  In any event, if AIG does not reach such agreement with the SEC by February 24, 2006, this Agreement will be null and void.

46.    **Retention of a Consultant**.  Pursuant to the agreement with the SEC, American International Group, Inc. will retain, pay for, and enter into an agreement with a consultant, not

24

unacceptable to the SEC, in consultation with the Attorney General and Superintendent, to conduct a comprehensive examination and review of the areas specified below and to make recommendations to the Board of Directors of American International Group, Inc., SEC, Attorney General and Superintendent (the "Consultant").  The Consultant's compensation and expenses shall be borne exclusively by American International Group, Inc.  The agreement shall provide that the Consultant examine:

    a.    American International Group, Inc.'s internal controls over financial reporting (the Consultant may, if appropriate, rely on American International Group, Inc.'s independent accountant's attestation and report on management's assessment of the effectiveness of American International Group, Inc.'s internal control structure and procedures pursuant to Section 404 of the Sarbanes-Oxley Act);

    b.    The organization and reporting structure of American International Group, Inc.'s internal audit department and American International Group, Inc.'s disclosure committee (which is described in Exhibit A to American International Group, Inc.'s Consent and Undertakings to be entered with the SEC);

    c.    The policies, procedures and effectiveness of American International Group, Inc.'s regulatory, compliance and legal functions, including the operations of any committees established to review and approve transactions or for the purpose of preventing the recording of transactions or financial reporting results in a manner inconsistent with Generally

25

Accepted Accounting Principles ("GAAP") and Statements of Statutory

Accounting Principles ("SSAP");

d.     American International Group, Inc.'s records management and retention

policies and procedures;

e.     The adequacy of whistleblower procedures designed to allow employees

and others to report confidentially matters that may have bearing on the

company's financial reporting obligations;

f.     American International Group, Inc.'s training and education program

described below;

g.     The reforms that American International Group, Inc. has implemented that

are set forth in Exhibit A to American International Group, Inc.'s Consent

to be entered into with the SEC; and

h.     The adequacy and effectiveness of the remediation plan described below.

47.     **Consultant's Reporting Obligations.**  The Consultant shall issue a report to the

SEC, Attorney General, Superintendent and American International Group, Inc.'s Board of

Directors within three months of appointment, provided, however, that the Consultant may seek

to extend the period of review for one or more additional three-month terms by requesting such

an extension from the SEC.  The SEC shall have discretion, after consultation with the Attorney

General and Superintendent, to grant such extensions as it deems reasonable and warranted.

a.     The Consultant's report shall set forth the Consultant's recommendations

regarding best practices in the areas specified in paragraph 46 (a) - (h)

26

above, including the Consultant's recommendations for any changes in or improvements to American International Group, Inc.'s policies and procedures that the Consultant reasonably deems necessary to conform to the law and best practices, and a procedure for implementing the recommended changes in or improvements to American International Group, Inc.'s policies and procedures.

b.  American International Group, Inc. shall adopt all recommendations contained in the report of the Consultant, referred to in paragraph 47(a) above, provided, however, that within forty-five days of receipt of the report, American International Group, Inc. shall in writing advise the Consultant, the SEC, the Attorney General and Superintendent of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that American International Group, Inc. considers unnecessary or inappropriate, American International Group, Inc. need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

c.  As to any recommendation with respect to American International Group, Inc.'s policies and procedures on which American International Group, Inc. and the Consultant do not agree, such parties shall attempt in good faith to reach an agreement within ninety days of the issuance of the Consultant's report. In the event American International Group, Inc. and

27

the Consultant are unable to agree on an alternative proposal acceptable to the SEC, after consultation with the Attorney General and Superintendent, American International Group, Inc. will abide by the determinations of the Consultant.

d.    American International Group, Inc. shall retain the Consultant for a period of three years from the date of appointment in accordance with the provisions of paragraph 48 below.  Once the Consultant's recommendations become final, the Consultant shall oversee the implementation of such recommendations and provide a report to the SEC, Attorney General and Superintendent and to American International Group, Inc.'s Board of Directors every three months concerning the progress of such implementation.  If, at the conclusion of this three-year period, less than all recommended reforms have been substantially implemented for at least two successive quarters, the SEC may, in its discretion, after consultation with the Attorney General and Superintendent, direct American International Group, Inc. to extend the Consultant's term of appointment until such time as all recommended reforms have been substantially implemented for at least two successive quarters.

48.    **Terms of Retention.**  American International Group, Inc. will submit to the SEC a proposal setting forth the identity, qualifications, and proposed terms of retention of the

Consultant.  The SEC, within thirty days of such notice will either (1) deem American

International Group, Inc.'s choice of Consultant and proposed terms of retention acceptable or

(2) require American International Group, Inc. to propose an alternative Consultant and/or

revised proposed terms of retention within fifteen days.  This process will continue, as necessary,

until American International Group, Inc. has selected a Consultant and retention terms that are

not unacceptable to the SEC.  American International Group, Inc. shall enter into an agreement

with the Consultant that shall contain the following terms:

a.    The Consultant shall provide the SEC, Attorney General, Superintendent

and American International Group, Inc.'s Board of Directors with such

documents or other information concerning the areas identified in

paragraph 46 above, as any of them may request during the pendency or at

the conclusion of the review.

b.    The Consultant shall have reasonable access to all of the books and

records of American International Group, Inc. and its subsidiaries and the

ability to meet privately with personnel of American International Group,

Inc. and its subsidiaries.  American International Group, Inc. may not

assert the attorney-client privilege, the protection of the work-product

doctrine, or any privilege as a ground for not providing the Consultant

with contemporaneous documents or other information related to the

matters that are the subject of the review.  American International Group,

Inc. shall instruct and otherwise encourage its officers, directors, and

employees to cooperate fully with the review conducted by the Consultant,

29

and inform its officers, directors, and employees that failure to cooperate with the review will be grounds for dismissal, other disciplinary actions, or other appropriate actions.

c.  The Consultant shall have the right, as reasonable and necessary in his or her judgment, to retain, at American International Group, Inc.'s expense, attorneys, accountants, and other persons or firms, other than officers, directors, or employees of American International Group, Inc., to assist in the discharge of his or her obligations under the undertakings.  American International Group, Inc. shall pay all reasonable fees and expenses of any persons or firms retained by the Consultant.  To the extent the Consultant seeks to retain an accounting firm, he or she shall choose an accounting firm in consultation with the SEC.

d.  The Consultant shall make and keep notes of interviews conducted, and keep a copy of documents gathered, in connection with the performance of his or her responsibilities, and require all persons and firms retained to assist the Consultant to do so as well.

e.  The Consultant's relationship with American International Group, Inc. shall not be treated as one between an attorney and client.  The Consultant will not assert the attorney-client privilege, the protection of the work-product doctrine, or any privilege as a ground for not providing any information obtained in the review sought by the SEC, Attorney General or Superintendent.

30

f.   If the Consultant determines that he or she has a conflict with respect to one or more of the areas described in paragraph 46 or otherwise, he or she shall delegate his or her responsibilities with respect to that subject to a person who is chosen by the Consultant and who is not unacceptable to the SEC.

g.   For the period of engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consulting, attorney-client, auditing or other professional relationship with American International Group, Inc., or any of its present or former subsidiaries or affiliates, directors, officers, employees, or agents acting in their capacity as such; and shall require that any firm with which the Consultant is affiliated or of which the Consultant is a member, or any person engaged to assist the Consultant in performance of the Consultant's duties, without prior written consent of the SEC, not enter into any employment, consulting, attorney-client, auditing or other professional relationship with American International Group, Inc., or any of its present or former subsidiaries or affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.  For the purposes of this section, representation of a person or firm insured by American International Group, Inc. shall not be deemed a professional relationship with American International Group, Inc.

31

h.     American International Group, Inc., including the Board of Directors and committees of the Board of Directors of American International Group, Inc., shall not assert, or permit its subsidiaries to assert, the attorney-client privilege, the protection of the work-product doctrine, or any privilege as a ground for not providing to the Consultant any documents, information, or testimony that American International Group, Inc. provided to the SEC, Attorney General or Superintendent which the Consultant has deemed necessary for his or her review.

i.     The Consultant shall treat and maintain information of American International Group, Inc. and its subsidiaries as strictly confidential and shall not disclose such information other than to the SEC, Attorney General, and Superintendent and to the Consultant's personnel, agents or representatives who need to know such information for the purpose of the review contemplated herein, or as otherwise required by law.

j.     At the conclusion of the Consultant's engagement, subject to the approval of the SEC, after consultation with the Attorney General and Superintendent, the Consultant shall return to American International Group, Inc. all documents reflecting or referring to non-public business and financial information of American International Group, Inc. and its subsidiaries.

32

49.    **Additional Undertakings.**

a.       American International Group, Inc. will draft a remediation plan consisting of (i) steps to address and correct the causes of the material weaknesses in internal controls over financial reporting as identified in the 2004 Form 10-K; (ii) a program to test the operational effectiveness of new or enhanced controls; and (iii) completion of management's testing of the relevant significant controls.

b.       American International Group, Inc. agrees that it will establish and maintain a training and education program, completion of which will be required for (i) officers, executives, and employees of American International Group, Inc. and its subsidiaries who are involved in the oversight of accounting and financial reporting functions; (ii) all employees in American International Group, Inc.'s legal division with responsibility for or oversight of American International Group, Inc.'s accounting, financial reporting or disclosure obligations; and (iii) other senior officers and executives of American International Group, Inc. and its subsidiaries, as proposed by American International Group, Inc. and approved by the Consultant (collectively, the "Mandatory Participants").

c.       The structure and operation of the training and education program shall be reviewed and approved by the Consultant.  The training and education program shall be designed to cover, at a minimum, the following: (i) the

33

obligations imposed on American International Group, Inc. by federal and

state securities law, including American International Group, Inc.'s

financial reporting and disclosure obligations; (ii) the financial reporting

and disclosure obligations imposed on American International Group, Inc.

and its subsidiaries by New York state insurance law; (iii) proper internal

accounting controls and procedures; (iv) discovering and recognizing

accounting practices that do not conform to GAAP or SSAP or that are

otherwise improper; and (v) the obligations assumed by, and responses

expected of the Mandatory Participants upon learning of improper, illegal

or potentially illegal acts relating to American International Group, Inc.'s

accounting and financial reporting. The Board of Directors shall

communicate to Mandatory Participants, in writing or by video, its

endorsement of the training and education program.

50.     To the extent that any of the provisions of the SEC agreement described in

paragraph 45 conflict with the provisions in paragraphs 46 through 49 of this Agreement, the

provisions of the SEC agreement will replace such provisions in paragraphs 46 through 49 of this

Agreement.

## REINSURANCE REPORTING OBLIGATIONS

51.     For a period of five years beginning May 1, 2006, AIG will provide annually by

May 1 of each year to the Superintendent a report, in a format approved by the Superintendent,

that includes:

a.      A review of ceded and assumed reinsurance of AIG's property/casualty

34

insurers required to file statutory financial statements on the NAIC blanks (the "Property/Casualty Insurers") verifying that all contracts comply with SSAP 62 and 75 and the new NAIC disclosure and attestation requirements including the attestation that with respect to all reinsurance contracts for which the reporting entity is taking credit on its current financial statements, to the best of AIG's knowledge and belief, after diligent inquiry and unless noted as an exception under the attestation requirement:

i.    Consistent with SSAP 62, there are no separate written or oral agreements between the reporting entity (or its affiliates or companies it controls) and the assuming reinsurer that would under any circumstances, reduce, limit, mitigate or otherwise affect any actual or potential loss to the parties under the reinsurance contract, other than inuring contracts that are explicitly defined in the reinsurance contract except as disclosed;

ii.   For each such reinsurance contract entered into, renewed or amended on or after January 1, 1994, for which risk transfer is not reasonably considered to be self-evident, documentation concerning the economic intent of the transaction and the risk transfer analysis evidencing the proper accounting treatment, as required by SSAP 62 and 75, is available for review;

iii.  The reporting entity complies with all the requirements set forth in

35

SSAP 62 and 75, and any supporting documentation is available for review;

iv. The reporting entity has appropriate controls in place to monitor the use of reinsurance and adhere to the provisions of SSAP 62 and 75.

b. A list of all its affiliated insurers, categorized by domicile, whether controlled through ownership or otherwise under the Insurance Law.  The list shall include the percentage of ownership or other means by which AIG controls the affiliated insurer.

c. A list of its ownership of five percent or more of the voting shares of any non-affiliated insurer entities.

d. A list of non-affiliated insurers to whom AIG's Property/Casualty Insurers have ceded business during the preceding calendar year either directly, or through retrocession agreements if known, excluding those captive reinsurance entities that do not accept third party business, where the business ceded represents fifty percent or more of the entire direct and assumed premium written by the insurer, based upon such insurer's most recent publicly available financial statements.

e. A list disclosing any letter of credit for which an AIG insurer is the beneficiary and AIG or an AIG subsidiary is directly or indirectly guaranteeing or providing collateral for the letter of credit or incurring the cost, except for parental letters of credit in accordance with New York

36

State Insurance Department ("Department") Regulation 20.

Such report shall be certified by the Chief Reinsurance Officer and the Chief Executive Officer of American International Group, Inc. and a copy of such report shall be submitted to the Audit Committee of AIG.

52.    The Chief Reinsurance Officer will maintain approved lists of reinsurers.  AIG will not cede insurance to any reinsurer not set forth on those lists.  Such lists will be available to the Superintendent upon examination.  All approved reinsurance relationships will be reviewed by the Chief Reinsurance Officer and such review will include a written determination of whether the reinsurance entity is affiliated or controlled (by ownership, by contract or otherwise) by AIG.

53.    AIG agrees not to enter into any arrangement, transaction or relationship with a reinsurer that has characteristics similar to those of Coral Re, Union Excess or Richmond.

## COOPERATION WITH THE SUPERINTENDENT

54.    AIG will maintain and provide to the Superintendent, upon the Superintendent's request, complete underwriting files, including correspondence and e-mails, and risk transfer analysis to the extent required by SSAP 62 relating to all reinsurance ceded or assumed by AIG. AIG will authorize its independent auditors and direct its internal auditors to make available to the Superintendent upon request all workpapers of its auditors, including but not limited to all Schedules of Unadjusted Differences.

55.    AIG will file all holding company transactions in a timely manner in compliance with Article 15 of the New York Insurance Law and Department Regulation 52.  The

37

Superintendent and AIG will agree upon a filing methodology that will recognize efficiencies in such compliance.

56.    The Chairs of the Audit Committee and the Regulatory, Compliance and Legal Committee of the Board will meet with the Superintendent and/or a designated official of the Department on an annual basis or more frequently as deemed necessary by the Department.  The Chair of the Regulatory Compliance and Legal Committee will serve as the Department's contact for all AIG examinations and such meetings.

57.    AIG will cooperate fully on all examinations and on all other regulatory requests and will respond to all Department inquiries in a prompt, timely and complete manner.  AIG will provide appropriate staff during examinations in order to provide timely responses.  Failure to respond to the Department in a timely manner will constitute violations of this Agreement and the Insurance Law.  Any issues that relate to the timeliness of the responses shall be reported to the Chief Financial Officer.

58.    AIG will provide the Superintendent with all copies of its remediation plans and regular progress reports relating to its remediation plans to address significant deficiencies in internal controls over financial reporting.

59.    AIG has taken appropriate remedial actions with respect to certain employees in management and in the underwriting, accounting, auditing, actuarial and financial reporting functions who were involved in the allegations of the Complaint and has reviewed such actions with the Superintendent.

## COOPERATION WITH THE ATTORNEY GENERAL

60.    AIG shall fully and promptly cooperate with the Attorney General with regard to

his Investigation, and related proceedings and actions, of any other person, corporation or entity,

including but not limited to AIG's current and former employees, concerning the insurance

industry.  AIG shall use its best efforts to ensure that all its officers, directors, employees, and

agents also fully and promptly cooperate with the Attorney General in this Investigation and

related proceedings and actions. Cooperation shall include without limitation: (a) production

voluntarily and without service of subpoena of any information and all documents or other

tangible evidence reasonably requested by the Attorney General, and any compilations or

summaries of information or data that the Attorney General reasonably requests be prepared; (b)

without the necessity of a subpoena, having AIG's officers, directors, employees and agents

attend any proceedings at which the presence of any such persons is requested by the Attorney

General and having such persons answer any and all inquiries that may be put by the Attorney

General (or any of the Attorney General's deputies, assistants or agents) to any of them at any

proceedings or otherwise ("proceedings" include but are not limited to any meetings, interviews,

depositions, hearings, grand jury hearing, trial or other proceedings); (c) fully, fairly and

truthfully disclosing all information and producing all records and other evidence in its

possession relevant to all inquiries reasonably made by the Attorney General concerning any

fraudulent or criminal conduct whatsoever about which it has any knowledge or information; (d)

in the event any document is withheld or redacted on grounds of privilege, work-product or other

legal doctrine, a statement shall be submitted in writing by AIG indicating: (i) the type of

document; (ii) the date of the document; (iii) the author and recipient of the document; (iv) the

general subject matter of the document; (v) the reason for withholding the document; and (vi) the

Bates number or range of the withheld document. The Attorney General may challenge such

claim in any forum of its choice and may, without limitation, rely on all documents or

communications theretofore produced or the contents of which have been described by AIG, its

officers, directors, employees, or agents; and (e) AIG shall not jeopardize the safety of any

investigator or the confidentiality of any aspect of the Attorney General's Investigation, including

sharing or disclosing evidence, documents, or other information with others during the course of

the investigation, without the consent of the Attorney General. Nothing herein shall prevent AIG

from providing such evidence to other regulators, or as otherwise required by law.

61.     AIG shall comply fully with the terms of this Agreement. If AIG violates the

terms of paragraph 60 in any material respect, as determined solely by the Attorney General: (a)

the Attorney General may pursue any action, criminal or civil, against any entity for any crime it

has committed, as authorized by law, without limitation; (b) as to any criminal prosecution

brought by the Attorney General for violation of law committed within six years prior to the date

of this Agreement or for any violation committed on or after the date of this Agreement, AIG

shall waive any claim that such prosecution is time barred on grounds of speedy trial or speedy

arraignment or the statute of limitations.

### OTHER PROVISIONS

62.     AIG, the Board of Directors of AIG, and the Audit Committee will review its

relationship with AIG's independent outside auditors on a yearly basis and will conduct a

Request For Proposal procedure for its independent auditors in connection with its 2008 fiscal

year.  Such review shall be made available to the Superintendent.

63.     AIG will review its holding company structure with the goal to reducing and

simplifying the structure.  A report detailing this review and its conclusions shall be provided to

the Superintendent by June 1, 2006.

64.     AIG has agreed to restate its 2004 statutory financial statements to properly account for the Union Excess and Richmond transactions identified in the Complaint as well as additional transactions pursuant to its agreement with the Superintendent and other state insurance regulators.

65.     AIG agrees to review all of its communications with state insurance regulators to ensure full and complete disclosure.

66.     AIG shall not seek or accept, directly or indirectly, indemnification pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to this Agreement.

67.     None of the provisions of this Agreement shall apply to AIG's Life Insurance Operations.

68.     None of the provisions of this Agreement shall apply to 21st Century Insurance Group or Transatlantic Holdings Inc.  AIG shall not enter into any transaction with either of these entities, or engage in any conduct by virtue of its ownership interests therein for the purpose of circumventing any provision of this Agreement.

69.     The Attorney General will promptly file a Stipulation Discontinuing Action with Prejudice, in the form attached hereto as Exhibit 3, voluntarily dismissing the Complaint with prejudice as to American International Group, Inc., and will not initiate a new case against AIG related to the matters set forth in the Complaint and this Agreement or uncovered to date by the Attorney General's Investigation, provided, however, that this Paragraph shall not be construed to include any conduct or activity relating to the Variable Annuity Life Insurance Company and

41

any other AIG subsidiary which sells variable annuities and any conduct or activity relating to the marketing, purchase, sale or negotiation of life settlements, including AIG's dealings with life settlement brokers, agents, sellers and investors or any conduct or activity relating to AIG's Life Insurance Operations. Notwithstanding the above, this Agreement resolves the allegations relating to the Coventry Life Settlement Trust contained in paragraphs 81-91 of the Complaint. The Attorney General shall not seek to impose on AIG any other financial obligation or liability related to the allegations of excess casualty bid rigging or steering contained in this Agreement.

70.    The Attorney General agrees that any prior approval required under the terms of this Agreement shall not be unreasonably withheld.

71.    This Agreement is not intended to disqualify AIG, or any current employees of AIG, from engaging in any business in New York or in any other jurisdiction. Nothing in this Agreement shall relieve AIG's obligations imposed by any applicable state insurance law or regulations or other applicable law.

72.    This Agreement shall not confer any rights upon any persons or entities besides the Attorney General and AIG.

73.    AIG shall maintain custody of, or make arrangements to have maintained, all documents and records of AIG related to this matter for a period of not less than six years.

74.    The Attorney General of the State of New York may make such application as appropriate to enforce or interpret the provisions of this Agreement, or in the alternative, maintain any action, either civil or criminal, for such other and further relief as the Attorney General may determine is proper and necessary for the enforcement of this Agreement. If compliance with any aspect of this Agreement proves impracticable, AIG reserves the right to

42

request that the parties modify the Agreement accordingly.

75.     In any application or in any such action, facsimile transmission of a copy of any

papers to current counsel for AIG shall be good and sufficient service on AIG unless AIG

designates, in a writing to the Attorney General, another person to receive service by facsimile

transmission.

76.     Facsimile transmission of a copy of this Agreement to counsel for AIG shall be

good and sufficient service on AIG.

77.     This Agreement shall be governed by the laws of the State of New York without

regard to conflict of laws principles.

78.     This Agreement may be executed in counterparts.

WHEREFORE, the following signatures are affixed hereto on this 18th day of January,

2006.

ELIOT SPITZER
Attorney General of the State of New York

_____
Office of the New York State Attorney General
120 Broadway, 25th Floor
New York, New York 10271

AMERICAN INTERNATIONAL GROUP, INC.

By: _____
Martin J. Sullivan
President and Chief Executive Officer
American International Group, Inc.
70 Pine Street
New York, New York 10270

43

request that the parties modify the Agreement accordingly.

75.   In any application or in any such action, facsimile transmission of a copy of any

papers to current counsel for AIG shall be good and sufficient service on AIG unless AIG

designates, in a writing to the Attorney General, another person to receive service by facsimile

transmission.

76.   Facsimile transmission of a copy of this Agreement to counsel for AIG shall be

good and sufficient service on AIG.

77.   This Agreement shall be governed by the laws of the State of New York without

regard to conflict of laws principles.

78.   This Agreement may be executed in counterparts.

WHEREFORE, the following signatures are affixed hereto on this 18th day of January,

2006.

ELIOT SPITZER
Attorney General of the State of New York

_____
Office of the New York State Attorney General
120 Broadway, 25th Floor
New York, New York 10271

AMERICAN INTERNATIONAL GROUP, INC.

By: _____
Martin J. Sullivan
President and Chief Executive Officer
American International Group, Inc.
70 Pine Street
New York, New York 10270

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _Martin Flumenbaum_

Martin Flumenbaum
1285 Avenue of the Americas
New York, NY 10019
Attorneys for AIG

44

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Martin Flumenbaum
1285 Avenue of the Americas
New York, NY 10019
Attorneys for AIG

EXHIBIT 1

"AIG regrets and apologizes for the conduct that led to the action brought by the New York Attorney General and the New York Superintendent of Insurance and to today's settlement.  Providing incorrect information to the investing public and to regulators was wrong and is against the values of our current leadership and employees.

In response to these events, and to the guilty pleas of our own employees and others, as part of today's settlement, we have and are continuing to aggressively implement business reforms to prevent this conduct from recurring.  We are committed to business practices that provide transparency and fairness in the insurance markets.  As part of our commitment, among other things, we have agreed not to pay contingent commissions for excess casualty insurance and will support legislation to eliminate contingent commission payments."

**EXHIBIT WC-1**

**RELEASE**

        For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, [the undersigned] for [State], and on behalf of [Workers Compensation Residual Market Pool(s)] and administrators thereof ("Releasors"), hereby releases and discharges American International Group, Inc. ("AIG") and its subsidiaries, agents, representatives, officers, predecessors and each of its present and former officers, directors, and employees, and attorneys, except for those individuals named as defendants in THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, Attorney General of the State of New York, and HOWARD MILLS, Superintendent of Insurance of the State of New York v. American International Group, Inc. et al., Index No. 05-401720 ("Releasees") from and against any claims, liabilities, actions, causes of action whether asserted or unasserted, suits, debts, dues, sums of money, accounting, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, damages, judgments, penalties, claims and demands of any and every character, kind and nature whatsoever in law, admiralty, or equity, whether known or unknown, pending or not pending, and whether or not concealed or hidden which against the Releasees the Releasors ever had, now have, or hereafter can, shall, or may have with respect to:

        (1)      Alleged injury caused by AIG's underpayment of workers compensation premium taxes and all other related fees and assessments including workers compensation residual market assessments for and including tax years 1985 to 1996 but not including workers compensation guaranty fund assessments and any monies owed relating to large deductible policies and related taxes;

        (2)      Any breach or violation of any provision of any agreement, including any reinsurance agreement, entered into between AIG and [Workers Compensation Residual Market Pool(s)] or the administrators thereof, relating to paragraph (1) above; and

        (3)      Any other claim relating to Releasee's participation in [Workers Compensation Residual Market Pool(s)] relating to paragraph (1) above.

        [The undersigned] hereby represents and warrants that s/he has all requisite authority to execute this Release on behalf of [State] and [Workers Compensation Residual Market Pool(s)] and the administrators thereof, and that [Workers Compensation Residual Market Pool(s)] shall be deemed to have given the release provided for herein to the same extent as if it was a signatory to this agreement.

Dated:_____

RELEASOR:_____

By:_____

Print Name:_____

Title:_____

**SCHEDULE WC-A**

**WORKERS COMPENSATION PREMIUM TAX**

| State | Under (Over) payment | Interest[1] | State Total |
|---|---|---|---|
| Alabama | ($962,800) | $0 | $0 |
| Alaska | ($17,595) | $0 | $0 |
| Arizona | $976,663 | $1,603,986 | $2,580,649 |
| Arkansas | $262,797 | $457,323 | $720,120 |
| California | $3,084,036 | $4,784,811 | $7,868,847 |
| Colorado | $430,211 | $758,146 | $1,188,357 |
| Connecticut | ($135,790) | $0 | $0 |
| Delaware | $63,223 | $81,734 | $144,957 |
| District of Columbia | ($17,971) | $0 | $0 |
| Florida | $1,722,927 | $3,234,446 | $4,957,373 |
| Georgia | $632,367 | $1,271,093 | $1,903,460 |
| Hawaii | $99,176 | $272,458 | $371,634 |
| Idaho | $13,911 | $86,693 | $100,604 |
| Illinois | ($394,200) | $0 | $0 |
| Indiana | ($399,366) | $0 | $0 |
| Iowa | $18,869 | $31,767 | $50,636 |
| Kansas | $143,304 | $267,294 | $410,598 |
| Kentucky | ($5,386) | $19,104[2] | $13,718 |
| Louisiana | $357,044 | $732,476 | $1,089,520 |
| Maine | $42,823 | $93,828 | $136,651 |
| Maryland | $617,300 | $1,162,300 | $1,779,600 |
| Massachusetts | $283,678 | $572,275 | $855,953 |
| Michigan | $1,854,325 | $3,425,159 | $5,279,484 |
| Minnesota | $201,118 | $401,773 | $602,891 |
| Mississippi | $33,196 | $61,917 | $95,113 |
| Missouri | ($1,500) | $21,635[2] | $20,135 |
| Montana | $9,318 | $18,741 | $28,059 |

| | | | |
|---|---|---|---|
| Nebraska | $72,748 | $115,655 | $188,403 |
| Nevada | ($50,476) | $0 | $0 |
| New Hampshire | $65,374 | $120,117 | $185,491 |
| New Jersey | ($262,559) | $0 | $0 |
| New Mexico | ($61,215) | $0 | $0 |
| New York | $20,219 | $67,582 | $87,801 |
| North Carolina | $119,537 | $336,764 | $456,301 |
| North Dakota | ($5,541) | $0 | $0 |
| Ohio | ($730,792) | $0 | $0 |
| Oklahoma | $379,230 | $535,686 | $914,916 |
| Oregon | $100,050 | $261,851 | $361,901 |
| Pennsylvania | $700,445 | $1,113,168 | $1,813,613 |
| Rhode Island | $1,013,556 | $1,950,194 | $2,963,750 |
| South Carolina | $47,750 | $96,067 | $143,817 |
| South Dakota | ($63,019) | $0 | $0 |
| Tennessee | ($58,574) | $0 | $0 |
| Texas | $1,399,131 | $2,135,832 | $3,534,963 |
| US | ($5,520,088) | $0 | $0 |
| Utah | $327,625 | $628,903 | $956,528 |
| Vermont | $188,176 | $332,375 | $520,551 |
| Virginia | ($877,159) | $0 | $0 |
| Washington | ($18,573) | $0 | $0 |
| West Virginia | $12,191 | $14,335 | $26,526 |
| Wisconsin | $5,334 | $10,287 | $15,621 |
| Wyoming | ($15,773) | $0 | $0 |
| | | TOTAL: | $42,368,541 |

[1]    Interest applied at the average of the historical 30-Year Treasury Note, 10-Year Treasury Note and Prime rates; interest begins 18 months after the first-year mid-point and was compounded.

[2]    Overall, AIG overpaid premium taxes in this State for the relevant period. However, interest on earlier underpayments is greater than the overpayment.

48

**SCHEDULE WC-B**

**WORKERS COMPENSATION RESIDUAL MARKET ASSESSMENTS**

| State | Under (Over) payment | Interest[1] | State Total |
|---|---|---|---|
| Alabama | $4,001,141 | $7,375,728 | $11,376,869 |
| Alaska | $86,828 | $136,648 | $223,476 |
| Arizona | $387,245 | $810,904 | $1,198,149 |
| Arkansas | $70,642 | $103,275 | $173,917 |
| California | $427,511 | $866,356 | $1,293,867 |
| Colorado | $4,912 | $21,703 | $26,615 |
| Connecticut | $925,405 | $1,833,038 | $2,758,443 |
| Delaware | $112,621 | $200,426 | $313,047 |
| District of Columbia | $39,313 | $79,683 | $118,996 |
| Florida | $17,772,164 | $35,067,156 | $52,839,320 |
| Georgia | $1,641,480 | $3,192,461 | $4,833,941 |
| Hawaii | $126,836 | $354,919 | $481,755 |
| Idaho | $45,319 | $99,698 | $145,017 |
| Illinois | $632,228 | $1,255,314 | $1,887,542 |
| Indiana | $268,868 | $508,904 | $777,772 |
| Iowa | $136,591 | $261,937 | $398,528 |
| Kansas | $1,006,145 | $1,883,683 | $2,889,828 |
| Kentucky | $1,651,591 | $3,050,282 | $4,701,873 |
| Louisiana | $10,623,535 | $23,210,037 | $33,833,572 |
| Maine | $2,642,572 | $5,829,104 | $8,471,676 |
| Maryland | $175,903 | $354,474 | $530,377 |
| Massachusetts | $10,841,027 | $22,749,474 | $33,590,501 |
| Michigan | $824,755 | $1,796,118 | $2,620,873 |
| Minnesota | $228,707 | $410,218 | $638,925 |
| Mississippi | $577,545 | $1,164,253 | $1,741,798 |
| Missouri | $754,892 | $1,463,353 | $2,218,245 |
| Montana | $180 | $614 | $794 |

49

| | | | |
|---|---|---|---|
| Nebraska | $234,816 | $420,273 | $655,089 |
| Nevada | $29,332 | $66,812 | $96,144 |
| New Hampshire | $600,781 | $1,138,476 | $1,739,257 |
| New Jersey | $4,201,737 | $7,809,105 | $12,010,842 |
| New Mexico | $295,156 | $705,331 | $1,000,487 |
| New York | ($225,250) | $0 | $0 |
| North Carolina | $1,502,567 | $2,687,353 | $4,189,920 |
| North Dakota | $535 | $1,013 | $1,548 |
| Ohio | ($66,801) | $0 | $0 |
| Oklahoma | $13,699 | $24,008 | $37,707 |
| Oregon | $98,575 | $184,569 | $283,144 |
| Pennsylvania | $532,452 | $1,056,135 | $1,588,587 |
| Rhode Island | $33,718,852 | $63,992,772 | $97,711,624 |
| South Carolina | $241,465 | $485,009 | $726,474 |
| South Dakota | $21,159 | $48,000 | $69,159 |
| Tennessee | $2,114,618 | $3,589,079 | $5,703,697 |
| Texas | ($393,790) | $0 | $0 |
| US | $467,709 | $656,462 | $1,124,171 |
| Utah | $13,917 | $33,769 | $47,686 |
| Vermont | $1,453,174 | $2,599,420 | $4,052,594 |
| Virginia | ($1,719,903) | $0 | $0 |
| Washington | $18,125 | $45,429 | $63,554 |
| West Virginia | $9,991 | $13,924 | $23,915 |
| Wisconsin | ($4,095) | $0 | $0 |
| Wyoming | $1,564 | $3,355 | $4,919 |
| | | **TOTAL:** | **$301,216,234** |

[1]     Interest applied at the average of the historical 30-Year Treasury Note, 10-Year Treasury Note and Prime rates; interest begins 18 months after the first-year mid-point and was compounded.

## EXHIBIT 2

## RELEASE

This RELEASE (the "Release") is executed this ___ day of _____, 2006 by RELEASOR (defined below) in favor of RELEASEE (defined below).

## DEFINITIONS

"RELEASOR" refers to [fill in name _____] and any of its affiliates, subsidiaries, associates, general or limited partners or partnerships, predecessors, successors, or assigns, including, without limitation, any of their respective present or former officers, directors, trustees, employees, agents, attorneys, representatives and shareholders, affiliates, associates, general or limited partners or partnerships, heirs, executors, administrators, predecessors, successors, assigns or insurers acting on behalf of RELEASOR.

"RELEASEE" refers to American International Group, Inc. and any of its subsidiaries, associates, general or limited partners or partnerships, predecessors, successors, or assigns, including, without limitation, any of their respective present or former officers, directors, trustees, employees, agents, attorneys, representatives and shareholders, affiliates, associates, general or limited partners or partnerships, heirs, executors, administrators, predecessors, successors, assigns or insurers (collectively, "AIG").

"AGREEMENT" refers to a certain agreement between AIG and the Attorney General of the State of New York ("NYAG") dated January 18, 2006 and an accompanying stipulation between AIG and the Superintendent of Insurance of the State of New York ("NYSI") dated January 18, 2006, relating to (i) an action commenced against AIG by the NYAG and NYSI dated May 26, 2005, captioned The People of the State of New York v. American International Group, Inc., Maurice R. Greenberg and Howard I. Smith, Index No. 401720/2005, and an investigation by the NYAG and NYSI relating to same (the "COMPLAINT"), (ii) an investigation by the NYAG and NYSI related to AIG's alleged use of contingent commission agreements or placement service agreements to steer business; and (iii) an investigation by the NYAG and NYSI related to AIG's alleged participation in bid rigging schemes.

## RELEASE

1.      In consideration for the total payment of $_____ in accordance with the terms of the AGREEMENT, RELEASOR does hereby fully release, waive and forever discharge RELEASEE from any and all claims, demands, debts, rights, causes of action or liabilities whatsoever, including known and unknown claims, now existing or hereafter arising, in law, equity or otherwise, whether under state, federal or foreign statutory or common law, and whether possessed or asserted directly, indirectly, derivatively, representatively or in

51

any other capacity (collectively, "claims"), to the extent any such claims are based upon, arise out of or relate to, in whole or in part, (i) any of the allegations, acts, omissions, transactions, events, types of conduct or matters that are the subject of the COMPLAINT, described in the AGREEMENT, or were subject to investigation by NYAG and NYSI as referenced in the AGREEMENT;(ii) any allegations, acts, omissions, transactions, events, types of conduct or matters that are the subject of In re Insurance Brokerage Antitrust Litigation, MDL No. 1663, or the actions pending in the United States District Court for the District of New Jersey captioned In re: Insurance Brokerage Antitrust Litigation, Civ. No. 04-5184 (FSH), and In re Employee Benefit Insurance Brokerage Antitrust Litigation, Civ. No. 05-1079 (FSH) or any related actions filed or transferred to the United States District Court for the District of New Jersey that are consolidated into either of the preceding Civil Action dockets; or (iii) any allegations of bid-rigging or of the use of contingent commission agreements or placement service agreements to steer business; provided, however, that RELEASOR does not hereby release, waive, or discharge RELEASEE from any claims that are based upon, arise out of or relate to (a) the purchase or sale of AIG securities; and (b) AIG's Life Insurance Operations (as defined by the Agreement to which this Release is an exhibit).

2.    In the event that the total payment referred to in paragraph 1 is not made for any reason, then this RELEASE shall be deemed null and void, provided that any payments received by RELEASOR shall be credited to AIG in connection with any claims that RELEASOR may assert against AIG, or that are asserted on behalf of RELEASOR or by a class of which RELEASOR is a member, against AIG.

3.    This RELEASE may not be changed orally and shall be governed by and interpreted in accordance with the internal laws of the State of New York, without giving effect to choice of law principles, except to the extent that federal law requires that federal law governs. Any disputes arising out of or related to this RELEASE shall be subject to the exclusive jurisdiction of the Supreme Court of the State of New York or, to the extent federal jurisdiction exists, the United States District Court for the Southern District of New York.

4.    Releasor represents and warrants that the claims have not been sold, assigned or hypothecated in whole or in part.

Dated:__

RELEASOR:____

By:____

Print Name:_____

Title:

**EXHIBIT 3**

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

THE PEOPLE OF THE STATE OF NEW YORK by
ELIOT SPITZER, Attorney General of the State of
New York, and HOWARD MILLS, Superintendent of
Insurance of the State of New York,

                           Plaintiffs,

                            v.

AMERICAN INTERNATIONAL GROUP, INC.,
MAURICE R. GREENBERG and HOWARD I.
SMITH,

                           Defendants.

Index No. 401720/05
(Ramos, J.)

STIPULATION DISCONTINUING ACTION
WITH PREJUDICE

          IT IS HEREBY STIPULATED AND AGREED, by and between plaintiffs

and defendant American International Group, Inc. that, pursuant to CPLR § 3217(a) and the

agreement annexed hereto, this action is hereby discontinued with prejudice as to American

International Group, Inc., as of this date without costs to either party against the other.

Dated:  New York, New York
          January __, 2006

                            ELIOT SPITZER,
                            Attorney General of the State of New
                            York
                            By:_____
                            David D. Brown, IV
                            Assistant Attorney General
                            120 Broadway
                            New York, NY 10271

(212) 416-8198
*Attorney for Plaintiffs*

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP


By: _____
Martin Flumenbaum
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
*Attorneys for American International
Group, Inc.*

54

## CERTIFICATE OF SERVICE

I, William M. Hannay, an attorney, hereby certify that I caused true and correct copies of the foregoing **Reply Memorandum in Support of Motion to Dismiss All Claims Asserted Against the National Workers Compensation Reinsurance Pool** to be sent by the U.S. District Court CM/ECF e-filing system on this, the 30th day of December, 2009.

_____/s/ William M. Hannay_____

CH2\8225048.1

13