# Exhibit 1

 LexisNexis®

FOCUS - 1 of 1 DOCUMENT

**BATH PETROLEUM STORAGE, INC., Plaintiff-Appellant, -v.- MARKET HUB PARTNERS, L.P., MARKET HUB PARTNERS, INC., TPC CORPORATION, and COALITION FOR RESOURCES AND ENVIRONMENT IN THE SOUTHERN TIER, INC., Defendants-Appellees.**

00-7302

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2000 U.S. App. LEXIS 25440; 2000-2 Trade Cas. (CCH) P73,061*

**October 11, 2000, Decided**

**NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 29246.* Certiorari Denied May 21, 2001, Reported at: *2001 U.S. App. LEXIS 3851.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of New York. (Siragusa, J.).

**DISPOSITION:** Judgment of the district court AFFIRMED.

**LexisNexis(R) Headnotes**

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > General Overview*
[HN1] The Noerr-Pennington Doctrine protects under the *U.S. Const. amend. I* efforts to influence governmental action through litigation, lobbying, and the like. Such activities are immunized from antitrust liability, provided the activities are more than a mere sham.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > General Overview*

[HN2] Noerr-Pennington immunity is applicable to Racketeer Influenced and Corrupt Organizations Act actions and to state-law claims such as fraud and tortious interference.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > General Overview*
[HN3] In order to demonstrate a sham under the Noerr-Pennington Doctrine, a litigant must first prove that the behavior was objectively baseless in the sense that no reasonable person could realistically expect success on the merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN4] In considering a motion to dismiss, a trial court may rely upon public documents of which the plaintiff had notice that are integral to the plaintiff's claim.

**COUNSEL:** APPEARING FOR APPELLANT: Jerry William Boykin, McLean, Virginia, The Jefferson Law Firm, PLC.

APPEARING FOR APPELLEES: John B. Wyss, Washington, D.C. Wiley, Rein & Fielding (Market Hub Partners, L.P. & Market Hub Partners, Inc.). David M. Connors, Salt Lake City, Utah. LeBoeuf, Lamb, Green & MacRae, LLP (TPC Corporation). Alan J. Knauf, Rochester, New York. Knauf Koegel & Shaw, LLP (Coalition

for Resources and Environment in the Southern Tier, Inc.).

**JUDGES:** PRESENT: HON. DENNIS JACOBS, HON. CHESTER J. STRAUB, HON. ROBERT D. SACK, Circuit Judges.

**OPINION**

*SUMMARY ORDER* UPON DUE CONSIDERA-TION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court be **AFFIRMED**.

Bath Petroleum Storage, Inc. ("Bath") appeals from the judgment of the United States District Court for the Western District of New York (Siragusa, *J.*) dismissing [*2] its suit against Market Hub Partners, L.P., Market Hub Partners, Inc., TPC Corporation, and Coalition for Resources and Environment in the Southern Tier, Inc. (collectively "Appellees") pursuant to *Rule 12(b)(6), Federal Rules of Civil Procedure.*

A detailed factual record is set out by the district court; familiarity with the record is assumed. *See Bath Petroleum Storage v. Market Hub Partners, L.P., 2000 U.S. Dist. LEXIS 3180*, No. 98-CV-6138 CJS, 2000 WL 1279160, at *2-12 (W.D.N.Y. Feb. 25, 2000). Briefly, the action arises out of Bath's attempt to enter the natural gas storage market. Bath claims that Appellees made false statements before various administrative bodies regulating the industry (specifically, regulating Bath's entry into the industry). Bath claims these false statements led to delays, and that these delays caused its partner (CNG Transmission Corp.) to breach a lease agreement it had with Bath.

The district court's dismissal of the suit was entirely appropriate. In order to succeed, Bath must first surmount the significant hurdles imposed by the "Noerr-Pennington" Doctrine, established by the United States Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961)*, [*3] and *United Mine Workers of America v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965)*. Essentially, [HN1] the Doctrine protects under the *First Amendment* efforts to influence governmental action through litigation, lobby-

ing, and the like. Such activities are immunized from antitrust liability, provided the activities are more than a mere "sham." *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 56-57, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993)*. [HN2] **Noerr-Pennington immunity is applicable to RICO actions and to state-law claims** such as fraud and tortious interference. *See Int'l Bhd. of Teamsters, Local 734 Health Workers and Welfare Trust v. Philip Morris, 196 F.3d 818, 826 (7th Cir. 1999)* (RICO suits); *Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 128-29 (3d Cir. 1999)* (tortious interference and unfair competition); *cf. Hirschfeld v. Spanakos, 104 F.3d 16 (2d Cir. 1997)* (applying Noerr-Pennington to § 1983 action).

[HN3] In order to demonstrate that the Appellees' conduct was a sham, Bath must first prove that the behavior was "objectively baseless in the [*4] sense that no reasonable [person] could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc., 508 U.S. at 51* (referring to litigants and lawsuits, but with application to the broad scope of activities covered by the Noerr-Pennington Doctrine). The district court's decision reviews each of the administrative processes at which Bath alleges Appellees committed fraud and finds that in each instance, the Appellees' behavior cannot be said to be "objectively baseless." *See Bath, 2000 U.S. Dist. LEXIS 3180, 2000 WL 1279160*, at *15-17. We agree with the district court for substantially the same reasons.

Bath also argues that the district court impermissibly relied upon evidence outside the record--namely, documents related to the proceedings before the various agencies that regulate Bath's entry into the natural gas storage market. This Court has consistently held that, [HN4] in considering a motion to dismiss, a trial court may rely upon public documents of which the plaintiff had notice that are integral to the plaintiff's claim. *See, e.g., Cortec Indus. v. SUM Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)*; *Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991)*. [*5] Accordingly, the district court committed no error in this regard.

For the reasons set forth above, the judgment of the district court is hereby **AFFIRMED**.

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

C

United States District Court,
N.D. Illinois, Eastern Division.
THE BOARD OF TRUSTEES OF THE IRON-
WORKERS LOCAL NO. 498 PENSION FUND,
The Board of Trustees of the Ironworkers Local 498
Defined Contribution Retirement Fund, and the
Board of Trustees of the Sheet Metal Workers Local
218S Pension Fund, Plaintiffs,
v.
NATIONWIDE LIFE INSURANCE COMPANY,
Nationwide Financial Services, Inc., Nationwide
Trust Company, FSB, Nationwide Financial Institu-
tion Distributors Agency, Inc., and Nationwide In-
vestment Services Corp., Defendants.
**No. 04 C 821.**

March 28, 2005.

Pasquale Angelo Fioretto, Beverly Pazon Alfon,
Brian C. Hlavin, Catherine Marie Chapman, Patrick
Nolan Ryan, Baum, Sigman, Auerbach, Pierson,
Neuman & Katsaros, Ltd., Chicago, IL, for Plaintiffs.

James H. Mutchnik, Andrew Paul Bautista, Petra
Renee Wicklund, Thomas L. Campbell, Kirkland &
Ellis LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

GUZMÁN, J.

*1 The Board of Trustees of the Ironworkers Local
No. 498 Pension Fund ("498 DB Fund"), the Board
of Trustees of the Ironworkers Local No. 498 De-
fined Contribution Fund ("498 DC Fund"), and the
Board of Trustees of the Sheet Metal Workers Local
218S Pension ("218S Fund") have sued Nationwide
Life Insurance Co. ("NLIC"), Nationwide Financial
Services, Inc. ("NFS"), Nationwide Trust Co.
("NTC"), and Nationwide Financial Institution Dis-
tributors Agency, Inc. ("NFIDA") for violation of the
Racketeering Influence and Corrupt Organizations
Act ("RICO"), 18 U.S.C. § 1961 et seq. and rescis-
sion of contracts with NLIC. Before this Court is
Defendants' motion to dismiss the complaint for fail-
ure to state a claim upon which relief can be granted

pursuant to Federal Rule of Civil Procedure ("Rule")
12(b)(6). In the alternative, Defendants move to stay
the action pending the resolution of related criminal
proceedings. For the reasons provided in this Memo-
randum Opinion and Order, the Court grants in part
and denies in part the motion to dismiss and denies
the motion to stay.

*FACTS*

Plaintiffs had alleged contracts with NLIC to invest
money with Defendants. (Compl.¶ 8.) Plaintiffs al-
lege that Defendants acted to deprive them of money,
which should have been invested on their behalf,
through a scheme in which Defendants deducted
money from fund assets and paid fees, kickbacks, and
commissions to third-party administrators, Michael
G. Linder, Liz/Mar ("Liz/Mar") and Associates, Inc.,
and/or Joseph/Anthony and Associates, Inc. ("Joseph/
Anthony"), in return for Linder's recommendation
that the Plaintiffs invest their assets with Defendants.
(*Id.* ¶ 13.) Plaintiffs also allege that the contracts with
the Defendants were entered into without Plaintiffs'
knowledge that Linder had an undisclosed broker
relationship with Defendants and that the fees which
Defendants took from the individual participant ac-
counts were used by Defendants to pay themselves
for whatever services they claimed to be performing,
with the additional fees used to pay commissions,
kickbacks and fees to Linder, Joseph/Anthony, and/or
Liz/Mar. (*Id.* ¶¶ 23, 55.) Furthermore, the Funds al-
lege that the signature on the contracts were unau-
thorized and unauthentic. (*Id.* ¶¶ 30, 62, 76.)

One of the alleged contracts required Defendants to
pay commissions to Linder. (*Id.* ¶ 31.) However, the
other contracts required Defendants to pay commis-
sions to Joseph/Anthony or Liz/Mar, either of which
then passed the funds to Linder. (*Id.* ¶¶ 32, 63.) De-
fendants, in order to assist Linder in hiding the
scheme, agreed to Linder's requests that all documen-
tation regarding his compensation be directed solely
to him without any information sent to the Fund
Trustees. (*Id.* ¶ 32.) Eventually, the Funds requested
an accounting from Linder, which revealed that
Linder had collected total fees exceeding the *bona
fide* compensation which the Fund Trustees agreed
that Linder, Joseph/Anthony, and Liz/Mar were enti-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

tled to receive. (*Id.* ¶¶ 33, 45, 65, 68, 79.)

**\*2** Around November 2001, Plaintiffs decided to terminate the services of Linder, Joseph/Anthony, and Liz/Mar, and hired Zenith Administrators, Inc. ("Zenith") as the new third-party administrator. (*Id.* ¶¶ 36, 66.) Rita Becker, a Zenith employee, contacted Corey Harber, a Nationwide account manager in Columbus, Ohio, to introduce herself as the new administrator of the Funds. (*Id.* ¶ 36.) Harber told Becker that the Funds could not keep its investments with Defendants because Zenith was not a Preferred Pension Administrator, *i.e.*, a third-party administrator with whom the Defendants exclusively conducted business. (*Id.* ¶¶ 37, 66.) Harber directed Becker to another Nationwide employee, Robert Leahy, to discuss Zenith's becoming a Preferred Pension Administrator with Nationwide. (*Id.* ¶ 38.) Leahy further explained to Becker that Defendants expected Preferred Pension Administrators to do a certain volume of business due to the "revenue sharing" that is passed on to the Preferred Pension Administrators. (*Id.* ¶¶ 41, 42.) The Plaintiffs allege that this "revenue sharing" was "merely deductions from the accounts of the [Plaintiffs'] Fund participants that Defendants paid to Linder, Joseph/Anthony and /or Liz/Mar as part of a plan or scheme to secure and ensure Linder's continued recommendation that the Trustees maintain Plaintiffs' investments with Nationwide." (*Id.* ¶ 43.)

Counts I and II of the Complaint allege violations of RICO, specifically 18 U.S.C. § 1962(a) and (c). In Count I, Plaintiffs allege, among other things, that Linder directed Plaintiffs' investments to Defendants, who charged Plaintiffs various fees. (*Id.* ¶¶ 98-99.) From these fees, Defendants paid kickbacks and commissions to Linder, Joseph/Anthony, and Liz/Mar. (*Id.*) In Count II, Plaintiffs allege that Defendants violated 18 U.S.C. § 1962(a) by wrongfully depriving the Plaintiffs of moneys to which they were entitled. (*Id.* ¶ 114.) Plaintiffs contend that this money should have been invested on their behalf, but instead the money was illegally given to Linder, Joseph/Anthony, and Liz/Mar. (*Id.*)

Plaintiffs also ask that their contracts with Defendants be rescinded due to a unilateral mistake of fact and that each party be returned to their status *quo ante.* (*Id.* ¶¶ 116-38.)

*DISCUSSION*

**I. Count I: RICO Claim Pursuant to 18 U.S.C. § 1962(c)**

The first issue is whether Plaintiffs must plead a violation of 18 U.S.C. § 1962(c) pursuant to Rule 8 or 9(b). To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). A pattern of racketeering activity, elements (3) and (4), includes at least two predicate RICO acts committed within a ten-year period. 18 U.S.C. § 1961(5); *see Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 728 (7th Cir.1998). These predicate racketeering acts are specifically enumerated in 18 U.S.C. § 1961(1) and include unlawful employee pension fund payments, indictable under 18 U.S.C. § 1954, and embezzlement from pension and welfare funds, indictable under 18 U.S.C. § 664, which are the predicate acts alleged in the instant case. *See* 18 U.S.C. § 1961(1).

**\*3** Defendants argue that Plaintiffs cannot rely on "boilerplate" allegations and must plead with particularity facts that support each element of a RICO claim, citing *Goren v. New Vision International, Inc.,* 156 F.3d at 727. Defendants' reliance on *Goren,* however, is misplaced because the plaintiffs in that case alleged the predicate acts of mail and wire fraud, and therefore the allegations were subject to the heightened pleading requirements of Rule 9(b), rather than the more liberal standards of Rule 8. *See id.* at 729. Thus, *Goren* does not require this Court to apply Rule 9(b)'s pleading standard to predicate acts that do not allege fraud.

Defendants fail to provide, and the Court has not found, any authority to support the contention that RICO complaints alleging predicate acts of embezzlement from pension and welfare funds, *see* 18 U.S.C. § 664, or unlawful employee pension fund payments, *see* 18 U.S.C. § 1954, must meet the heightened pleading standard for fraud under Rule 9(b). In fact, cases decided in this district and elsewhere have declined to apply Rule 9(b) to RICO claims pleading embezzlement under 18 U.S.C. § 664 as a predicate act. *Daniels v. Bursey,* 313 F.Supp.2d 790, 815 (N.D.Ill.2004); *Nystrom v. Associated Plastic Fabricators, Inc.,* Nos. 98 C 134, 98 C 4282, 1999 WL 417848, at \*9 (N.D.Ill. June 18, 1999); *Am. Tel.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

*& Tel. Co. v. Empire Blue Cross & Blue Shield,* No. Civ. 93-1224, 1994 WL 16057794, at *22 (D.N.J. July 19, 1994). In addition, at least one court has declined to apply Rule 9(b) to a RICO claim alleging unlawful employee pension fund payments under 18 U.S.C. § 1954 as a predicate act. *Nat'l Elec. Benefit Fund v. Heary Bros. Lightning Protection Co.,* 931 F.Supp. 169, 191 (W.D.N.Y.1995). Finding these cases persuasive, this Court holds that allegations of the predicate acts of embezzlement and unlawful employee pension fund payments do not involve averments of fraud within the meaning of Rule 9(b). Thus, the Court will evaluate Plaintiffs' RICO claims under Rule 8.

Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Under this liberal notice pleading standard, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (internal quotations omitted). Moreover, the court must accept all well-pleaded factual allegations in the light most favorable to the plaintiff. *Colfax Corp. v. Ill. State Toll Highway Auth.,* 79 F.3d 631, 632 (7th Cir.1996).

A. Plaintiffs Sufficiently Plead the Existence of an Enterprise and That Defendants Conducted, or Participated in Conducting, the Affairs of the Enterprise.

The term " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4). In addition, an association in fact is a type of enterprise defined by the statute as a "union or group of individuals associated in fact although not a legal entity." *Id.; see Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 646 (7th Cir.1995).

*4 Plaintiffs have alleged two possible enterprises, one consisting of Nationwide Mutual Insurance Co., which was conducted by Defendants as a vehicle for racketeering activity, (Compl.¶¶ 86, 89), and an association in fact consisting of the named Defendants, Joseph/Anthony, and other unknown third-party administrators, (*id.* ¶ 92). The Court will address each enterprise theory in turn.

RICO plaintiffs must allege "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). " 'Person' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Unless the defendant person and the enterprise are distinct, there can be no violation of RICO. *Baker v. IBP, Inc.,* 357 F.3d 685, 691-92 (7th Cir.2004) (citing *Sedima,* 473 U.S. at 479). Plaintiffs must allege that the "person" associated with the enterprise conducted or participated, "directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Richmond,* 52 F.3d at 645; 18 U.S.C. § 1962(c). A corporate subsidiary can be deemed the RICO "person" conducting the affairs of its parent, the RICO enterprise. *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227 (7th Cir.1997). However, "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting 18 U.S.C. § 1962(c)).

Plaintiffs have alleged an enterprise distinct from Defendants themselves, their corporate parent, Nationwide Mutual Insurance Co. (*Id.* ¶ 86.) In addition, Plaintiffs have alleged that the Defendants "directly and/or indirectly conducted and/or participated in the conduct" of the affairs of Nationwide Mutual Insurance Company, the alleged enterprise. (*Id.* ¶ 89.)

On the issue of whether Defendants, as RICO persons, participated in the "operation or management" of Nationwide Mutual Insurance Company, the alleged RICO enterprise, Defendants argue that the complaint fatally alleges that Nationwide Mutual Insurance Co. "transacts ... business through its subsidiaries," not vice versa. (*Id.* ¶ 87.) The Court does not agree that this allegation is fatal to Plaintiffs' RICO claim. As stated, this Court may dismiss this complaint only if it is clear that no relief could be granted under any conceivable set of facts that could be proved consistent with Plaintiffs' allegations. Plaintiffs' allegations do not preclude them from showing that Nationwide Mutual Insurance Co. transacts business through its subsidiaries, as Plaintiffs allege, and that Defendants also participated in the "operation or management" of the enterprise, as

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

required by _Reves v. Ernst & Young,_ 507 U.S. at 179. Accordingly, Plaintiffs have sufficiently alleged that Nationwide Mutual Insurance Co. is an enterprise and that Defendants are RICO persons who have some part in directing its affairs.

**\*5** Turning to the other enterprise theory, Plaintiffs have sufficiently alleged that the association in fact is a RICO enterprise consisting of the named Defendants, Joseph/Anthony, and other unknown third-party administrators. (Compl.¶¶ 92-93.) A RICO enterprise, including an association in fact, is "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." _Richmond,_ 52 F.3d at 644. "The continuity of an informal enterprise and the differentiation among roles can provide the requisite 'structure' to prove the element of 'enterprise.' " _United States v. Rogers,_ 89 F.3d 1326, 1337 (7th Cir.1996). Further, the association in fact must have "a common purpose of engaging in a course of conduct." _Id._ at 645 (citations omitted). Lastly, the defendants must have conducted or participated in the conduct of the enterprise's affairs, not just their own affairs. _Reves,_ 507 U.S. at 185.

First, Plaintiffs have alleged facts consistent with an ongoing structure: Defendants' network of Preferred Pension Administrators. (Compl.¶ 35.) Defendants argue that Plaintiffs' allegation is the type of "nebulous, open-ended description of the enterprise" that the Seventh Circuit rejects. _Richmond,_ 52 F.3d at 645. The Court disagrees. Plaintiffs allege that third-party administrators are part of the association in fact, and allege the structure of the association in fact, which was comprised of Defendants and Preferred Pension Administrators, third-party administrators with which Defendants exclusively conducted business such as Joseph/Anthony. (_Id._ ¶¶ 36-42.) Therefore, Plaintiffs allegations of the structure of the association in fact are sufficient.

Second, Plaintiffs have alleged that Defendants, Joseph/Anthony and other unknown third-party administrators shared a common purpose. (_Id._ ¶¶ 36-42.) Specifically, Plaintiffs allege that Defendants have exclusive agreements with several select Preferred Pension Administrators that market and sell the Nationwide products. (_Id._ ¶ 37.) Defendants expect to conduct a certain volume of business with each of these Preferred Pension Administrators due to "reve-

nue sharing" that is passed on to each Preferred Pension Administrator. (_Id._ ¶ 42.) Plaintiffs further allege that this "revenue sharing" was "merely deductions from the accounts of the Fund participants that the Nationwide Defendants paid to Linder, Joseph/Anthony and /or Liz/Mar as part of a plan or scheme to secure and ensure Linder's continued recommendation that the [Fund] Trustees maintain the Fund's investments with Nationwide." (_Id._ ¶ 43.)

Defendants argue that the parties to this business relationship, Defendants and the third-party administrators, do not share the required common purpose because one seeks to earn more and the other seeks to pay less, citing _Baker v. IBP, Inc.,_ 357 F.3d at 691-92. In _Baker,_ the Seventh Circuit held that there was no common purpose between the defendant company, which sought to hire aliens at lower wages, and the recruiters, who wanted to be paid more by the defendant company for finding aliens for the company to hire. _Id._ The court reasoned that the recruiters wanted to be paid more for services rendered to the defendant company, while the company wanted to pay the recruiters less. _Id._ On the other hand, in the instant case, in the "revenue sharing" scheme alleged by Plaintiffs, both Defendants and the Preferred Pension Administrators benefit because Defendants maintain the Funds' investments while Preferred Pension Administrators receive money deducted from the accounts of Fund participants. Therefore, as pleaded, this mutually beneficial revenue sharing arrangement is a sufficient allegation of a common purpose.

**\*6** Third, Plaintiffs have alleged that the association in fact is organized in a manner amenable to hierarchical decision-making. (Compl.¶¶ 36-42.) In particular, Plaintiffs allege that Defendants decided to maintain exclusive agreements with Preferred Pension Administrators while declining to conduct business with third-party administrators who were not Preferred Pension Administrators. (_Id._ ¶ 37.) Joseph/Anthony, a Preferred Pension Administrator, was aware of this arrangement. (_Id._ ¶ 38.) On the basis of these allegations, Defendants decided that they would only deal with Preferred Pension Administrators and the Plaintiffs, in order to continue dealing with the Defendants, effectively had no choice but to agree to utilize a Preferred Pension Administrator. As pleaded, this means of decision-making within the association in fact sufficiently alleges a hierarchical decision-making structure.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

Finally, Plaintiffs have adequately alleged that the Defendants conducted, or participated in conducting, the affairs of the association in fact. (*Id.* ¶ 96.) Specifically, Defendants, through the association in fact, entered into contracts with various pension and welfare funds that were directed to Defendants by third-party administrators, like Joseph Anthony. (*Id.*) In order to entice third-party administrators to direct funds to Defendants, the fees which Defendants took from the individual participant accounts were used by Defendants to pay themselves for whatever services they claimed to be performing, with the additional fees used to pay commissions, kickbacks and fees to third-party administrators, like Linder, Joseph/Anthony, and/or Liz/Mar. (*Id.* ¶¶ 23, 55.) Moreover, paragraphs 36-43 of the complaint specifically allege that Defendants conducted, or participated in conducting, the affairs of the association in fact by limiting who could become part of the association in fact as a Preferred Pension Administrator, and on what terms, as well as limiting who would have access to the association in fact's services. Therefore, taking Plaintiffs' well-pleaded allegations in the light most favorable to Plaintiffs, they have adequately alleged an association in fact.

B. Plaintiffs Sufficiently Allege the Predicate Acts

Plaintiffs have sufficiently alleged the predicate acts required by RICO. (Com pl.¶¶ 99-108.) A pattern of racketeering activity, as required under 18 U.S.C. § 1962(c), includes at least two predicate RICO acts committed within a ten-year period. 18 U.S.C. § 1961(5). Plaintiffs allege that Defendants violated both 18 U.S.C. § 1954 and 18 U.S.C. § 664. *See* 18 U.S.C. § 1961(1).

1. Plaintiffs Sufficiently Allege That Defendants Violated 18 U.S.C. § 1954

Plaintiffs have sufficiently pleaded that Defendants violated 18 U.S.C. § 1954. (Compl.¶¶ 106-08.) Section 1954 precludes both receiving and giving "any fee, kickback, commission, gift, loan, money or thing of value" to individuals with the ability, or apparent ability, to influence the operation of employee benefit plans. 18 U.S.C. § 1954. However, 18 U.S.C. § 1954 is not violated by the payment of a "*bona fide* salary, compensation, or other payments made for goods or facilities actually furnished or for services

actually performed in the regular course of his duties." *Id.*

\*7 Defendants argue that the payments admittedly made to Linder were *bona fide,* and therefore legal, because they either were disclosed or should have been disclosed by Linder. Failure to disclose a payment precludes a finding that it was *bona fide* under section 1954. *United States v. Schwimmer,* 700 F.Supp. 104, 107 (E.D.N.Y.1988). However, Plaintiffs alleged that the commissions and fees were in fact not disclosed. (*Id.* ¶¶ 28, 33, 60, 65, 74.) Moreover, Plaintiffs' allegations in paragraphs 31 and 32 suggest that the Defendants actively participated in the non-disclosure of commissions and fees. In particular, Plaintiffs alleged that Defendants, at Linder's request, paid commissions to Liz/Mar, a sham corporation used by Linder to assist in the scheme to hide the commissions. (*Id.* ¶ 31.) Plaintiffs also allege that Defendants, in order to assist Linder in hiding the scheme, agreed to Linder's requests that all documentation regarding his compensation be directed solely to his attention and be marked personal and confidential. (*Id.* ¶ 32.) Furthermore, Plaintiffs have made numerous allegations that the payments made to Linder by the Defendants were for unlawful purposes. (*Id.* ¶¶ 14, 44, 45, 67, 68, 81-82, 103.) Also, for one of the Funds, Plaintiffs allege that the Defendants were told in advance that any contract must be "net of commissions." (*Id.* ¶ 20.) Once again, viewing these allegations in the light most favorable to the Plaintiffs, they have sufficiently pleaded that Defendants violated 18 U.S.C. § 1954.

2. Plaintiffs Sufficiently Allege That Defendants Violated 18 U.S.C. § 664

Plaintiffs have also sufficiently alleged that Defendants violated 18 U.S.C. § 664. Section 664 penalizes "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith." 18 U.S.C. § 664. Plaintiffs have alleged that Defendants "violated 18 U.S.C. § 664 by unlawfully and willfully converting moneys owned by the Funds, retaining some of that money, and paying the rest of it to Linder, Joseph/Anthony and/or Liz/Mar, in the form of unauthorized brokerage commissions

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
(Cite as: 2005 WL 711977 (N.D.Ill.))

and other commissions, like [Preferred Pension Administrator] fees. (Compl.¶ 108.) Therefore, taking this allegation in the light most favorable to the Plaintiffs, they have adequately alleged a <u>section 664</u> violation.

## II. Count II: RICO Claim Pursuant to <u>18 U.S.C. § 1962(a)</u>

In *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* the Seventh Circuit noted that in order to state a claim under <u>18 U.S.C. § 1962(a)</u>, "the majority of circuits hold that the use or investment of the racketeering income must proximately cause the plaintiff's injury; injury caused by the predicated racketeering acts is inadequate." <u>20 F.3d 771, 779 (7th Cir.1994)</u>. "Since *Vicom,* 'each court in this district addressing the issue has adopted the majority use or investment rule.' " *Carnegie v. Household Int'l, Inc.,* <u>220 F.R.D. 542, 546 (N.D.Ill.2004)</u> (quoting *Shapo v. O'Shaughnessy,* <u>246 F.Supp.2d 935, 965 (N.D.Ill.2002)</u>).

**\*8** Plaintiffs merely allege that they were injured under <u>18 U.S.C. § 1962(a)</u> in the same way that they were injured under <u>18 U.S.C. § 1962(c)</u>: "the Funds and their participants were wrongly deprived of moneys by the Nationwide Defendants." (Compl.¶¶ 98, 114.) Plaintiffs concede that their injury was not caused by the use or investment of the alleged racketeering income, but instead by the racketeering acts themselves, and therefore Plaintiffs ask this Court to adopt the minority position. This Court declines to follow the minority position and adheres to the majority position because it is in keeping with the plain meaning of the statute's language: "Any person injured in his business or property *by reason of* a violation of <u>section 1962</u> of this chapter may sue therefor in any appropriate United States district court." <u>18 U.S.C. § 1964(c)</u> (emphasis added). Due to the "by reason of" language, in order to state a claim under <u>18 U.S.C. § 1962(a)</u>, a plaintiff must allege "proximate causation between the <u>§ 1962(a)</u> violation and plaintiffs' injury." *Heritage Ins. Co. of Am. v. First Nat'l Bank of Cicero,* <u>629 F.Supp. 1412, 1417 (N.D.Ill.1986)</u>. Plaintiffs fail to allege, or even argue, that the use or investment of the racketeering income proximately caused their injury, and thus, they lack standing to bring a claim pursuant to <u>18 U.S.C. § 1962(a)</u> under the majority rule. Accordingly, the Court grants Defendants' motion to dismiss as to Count II.

## III. Counts III-V: Rescission

Defendants argue that Counts III through V must be dismissed because Plaintiffs have failed to state claims for rescission of their contracts with NLIC. The Court disagrees.

"There are three conditions necessary before a contract will be rescinded for a mistake by one of the parties." *John J. Calnan Co. v. Talsma Builders, Inc.,* <u>67 Ill.2d 213, 10 Ill.Dec. 242, 367 N.E.2d 695, 698 (Ill.1977)</u>. "First, the mistake must relate to a material feature of the contract; second, it must have occurred despite the exercise of reasonable care; and third, the other party must be placed *in statu quo.*" *Id.*

First, the parties do not appear to dispute that the purported mistake relates to a material feature of the contract. Second, Plaintiffs have adequately pleaded that the mistake was not a result of the Plaintiffs' lack of due care. Defendants argue that Plaintiffs never inspected the contract with NLIC, instead relying on representations made by Linder regarding the contract terms. However, Plaintiffs have alleged that NLIC willfully concealed those contract terms. (Compl.¶¶ 120, 121, 122, 123, 129, 130, 131, 135, 137.) In particular, NLIC willfully concealed that Plaintiffs' contracts with NLIC required commissions to be paid to Linder, Liz/Mar, and/or Joseph Anthony out of Fund and participant moneys. (*Id.* ¶ 121, 10 Ill.Dec. 242, 367 N.E.2d 695.) Furthermore, NLIC assisted Linder in concealing reports from Plaintiffs by agreeing to communicate only with Linder regarding the Fund investments. (*Id.* ¶ 122, 10 Ill.Dec. 242, 367 N.E.2d 695.) Given Plaintiffs' allegations of willful concealment of the contract terms by NLIC, they have sufficiently alleged that the mistake was not a result of the Plaintiffs' lack of due care.

**\*9** Third, Plaintiffs have sufficiently pleaded that each party can be put in its *status quo ante.* Defendants argue that the money that Plaintiffs seek to recover is in Linder's hands and because Linder is not a party in this case, the parties cannot be restored to their original positions. The Court finds the Defendants' reliance on *Brzozowski v. Northern Trust Co.,* <u>248 Ill.App.3d 95, 187 Ill.Dec. 814, 618 N.E.2d 405, 409-10 (Ill.App.Ct.1993)</u>, is misplaced. In *Brzozowski,* where the plaintiff guarantor sought rescission of a guaranty agreement by which plaintiff guar-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
(Cite as: 2005 WL 711977 (N.D.Ill.))

anteed the indebtedness of Nicholas Ahrens to defendant. *Id.* at 407. The appellate court affirmed the trial court's ruling that rescission was improper in part because defendant could not be put in its *status quo ante* because defendant could not get the loaned money back from Ahrens, which is why it enforced the guaranty. *Id.*

*Brzozowiski* is distinguishable from the instant case. First, the plaintiff in *Brzozowiski* was denied rescission after a bench trial whereas the instant case is merely at the motion to dismiss stage. Second, Plaintiffs allege that NLIC paid the commissions and fees to Linder after deducting the money from the Funds' assets. (Compl.¶¶ 13, 14, 108). In essence, Plaintiffs allege that NLIC had the Funds' money but then gave it to Linder in the form of fees, kickbacks, and commissions. Accordingly, as alleged, it is possible that each party may be put in the *status quo ante*. Therefore, the Court denies Defendants' motion to dismiss as to Counts III-V.

## IV. Motion to Stay

With regard to the issuance of a stay, "a district court possesses substantial discretion to control its docket." *Employers Ins. of Wausau v. Shell Oil Co.,* 820 F.2d 898, 902 (7th Cir.1987). "[T]he granting of a stay is the exception, not the rule, and the party seeking the stay has the burden of demonstrating it is necessary." *RLJCS Enters., Inc. v. Prof'l Benefit Trust, Inc.,* No. 03 C 6080, 2004 WL 2033067, at *2 (N.D.Ill. Sept.2, 2004).

"While the Court has the inherent power to stay its proceedings, the Constitution does not require a stay of civil proceedings pending the outcome of criminal proceedings." *Jones v. City of Indianapolis,* 216 F.R.D. 440, 450 (S.D.Ind.2003). A court may consider the following factors in determining whether to stay civil proceedings where a similar criminal action is brought before the completion of the civil proceedings:

(1) whether the two actions involve the same subject matter; (2) whether the two actions are brought by the government; (3) the posture of the criminal proceeding; (4) the effect on the public interests at stake if a stay were to be issued; (5) the interest of the plaintiffs in proceeding expeditiously with this litigation and the potential prejudice to plaintiffs of

a delay; and (6) the burden that any particular aspect of the proceedings may impose on defendants.

*Cruz v. County of DuPage,* No. 96 C 7170, 1997 WL 370194, at *2 (N.D.Ill. June 27, 1997).

**\*10** Defendants do not supply, and the Court does not find, any authority addressing the precise situation in the instant case, *i.e.,* where parties in a civil proceeding, who are not facing criminal prosecution, seek a stay because individuals who are not parties to the civil proceeding may assert their Fifth Amendment right against self-incrimination in pending criminal proceedings against those individuals. Instead, Defendants primarily rely on the six factors discussed in *Cruz v. County of DuPage,* 1997 WL 370194, at *2.

In *Cruz,* the issue was whether the court should stay the civil proceedings to avoid placing the defendants in the civil case, who had been indicted for conduct arising from the same circumstances that led to civil suits against them, in the position of having to choose between risking a loss in the civil proceedings by invoking their Fifth Amendment rights or risking conviction in their criminal cases by waiving their Fifth Amendment rights and testifying in the civil proceedings. *Id.* at *3-4.

However, *Cruz* is distinguishable for two reasons. In the present case, Defendants who are seeking a stay have not been indicted and there is no indication that they will be indicted. Rather the indictments are against three non-parties to this case, Linder, Thomas Kisting, and Fred Schreier. Moreover, each of the Defendants is a corporation and "a corporation has no Fifth Amendment privilege," *see Braswell v. United States,* 487 U.S. 99, 105, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1998).

Out of an abundance of caution, however, the Court will nevertheless consider the general guidelines to determine whether a stay is warranted. The Court addresses each factor in turn.

## A. Whether the Two Actions Involve the Same Subject Matter

Although there are some common allegations between the criminal indictment and Plaintiffs' Complaint, there is not a sufficient overlap of issues to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

support an entry of a stay in the instant case. The current indictments of Linder, Kisting and Schreier concern specific conduct involving one-time gifts of motorcycles that Linder allegedly gave to Kisting and Schreier. On the other hand, the present case involves an alleged pattern of ongoing conduct in which Defendants paid Linder at least $1.5 million from 1997 to 2001. (Compl.¶¶ 101-12.) Therefore, this factor weighs against granting a stay.

**B. Whether the Actions Are Brought by the Government**

Defendants concede that this factor does not weigh in favor of a stay because the government is not a party to the instant case. As such, there is no danger that the government may use civil discovery to obtain evidence and information for use in its criminal prosecution, thereby circumventing the Fifth Amendment right against self-incrimination. *See Cruz,* 1997 WL 370194, at *3. Therefore, this factor weighs against the issuance of a stay.

**C. The Posture of the Criminal Proceeding**

Defendants state that courts generally require that an indictment be issued before granting a stay. *United States v. All Meat & Poultry Prods.,* No. 02 C 5145, 2003 WL 22284318, at *2 (N.D.Ill. Oct.3, 2003). However, in *All Meat & Poultry,* the criminal indictments were against the civil defendants themselves. *Id.* at *1. On the other hand, in the present case, as stated above, Defendants have not been indicted, and there is no indication that they will be. Although the criminal proceedings are ongoing against Linder, Kisting, and Schreier, who are not parties to the civil proceedings, that fact still does not weigh in favor of a stay.

**D. The Effect on the Public Interests at Stake If a Stay Was to Be Issued**

**\*11** Defendants have not articulated how the public interest would be served by granting a stay. Defendants state that Linder, Joseph/Anthony and Liz/Mar no longer serve as third-party administrators for Plaintiffs and there is no threat that they could "engage in continuing wrong." *Cruz,* 1997 WL 370194, at *3. That may be true, but Defendants have not argued why this fact weighs in favor of a stay. Furthermore, Defendants opine that the stay would allow

the Departments of Labor and Justice to proceed without interference by civil litigants. However, Defendants have not given any indication how the present case interferes with the government's case against Linder. Accordingly, this factor does not weigh in favor of a stay.

**E. The Interest of Plaintiffs in Proceeding Expeditiously with this Litigation and the Potential Prejudice to Plaintiffs of the Delay**

Defendants have not demonstrated that Plaintiffs do not have an interest in prompt litigation of its claims or would not be prejudiced by the delay. Defendants argue that Plaintiffs have not pursued their claims with urgency. On the other hand, as Plaintiffs have correctly pointed out, they have brought their claims within the statutory period. Accordingly, the Court does not find Defendants' argument persuasive in establishing that Plaintiffs will not be prejudiced by a delay.

Defendants also argue that the fact that the 218(D) Fund, a separate and distinct fund from the 218(S) Plaintiff Fund, agreed to stay its arbitration claim against Linder weighs in favor of staying the present case. The Court does not find this fact relevant to the current inquiry because the 218(D) Fund is not a party to this case. Furthermore, counsel for the 218(D) Fund agreed to stay the arbitration with Linder, Joseph/Anthony, and Liz/Mar in exchange for assurances from Linder's counsel. Specifically, Linder Joseph/Anthony, and Liz/Mar agreed to assign to the 218(S) Fund any amounts that Defendants owed to Linder Joseph/Anthony, and Liz/Mar related to work involving the 218(S) Fund. In contrast, no such assurances have been made in the present case. Therefore, this factor weighs against granting a stay.

**F. The burden that any particular aspect of the proceedings may impose on Defendants**

Defendants have not established that they will be burdened in the absence of a stay. Defendants argue that the potential impact of the criminal proceedings on the ability of the defendants to conduct discovery and defend themselves weighs in favor of a stay. Defendants further speculate that Linder and Kisting will certainly assert their Fifth Amendment rights to avoid complying with discovery requests.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861
**(Cite as: 2005 WL 711977 (N.D.Ill.))**

Defendants rely on *Bruner Corp. v. Balogh*, 819 F.Supp. 811, 816 (E.D.Wis.1993), and *United States v. All Meat & Poultry Prods.*, 2003 WL 22284318, at *2, for the proposition that a civil action should be stayed where a civil defendant would not be able to conduct essential discovery because other parties had invoked their Fifth Amendment rights. In these cases, however, the civil defendant was seeking a stay because other civil defendants were invoking their Fifth Amendment rights, as opposed to the present case in which Defendants seek the stay because a non-party, Linder, may invoke his Fifth Amendment right. Therefore, the Court does not find Defendants' reasoning persuasive.

*12 Furthermore, mere speculation as to whether Linder and Kisting will invoke their Fifth Amendment rights in the present case is not a sufficient basis for the issuance of a stay. In this vein, the Court has considered whether Defendants could eventually be burdened by an adverse inference against them if non-parties, Linder and Kisting, invoke their Fifth Amendment rights as witnesses in this case. In order to impute a third-party's Fifth Amendment invocation to another party, the party seeking to use the invocation must establish some relationship of loyalty between the other two parties. *State Farm Mut. Auto. Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL 574466, at *6 (N.D.Ill. May 11, 2000) (citing *LiButti v. United States*, 107 F.3d 110, 122 (2d Cir.1997)). At this point, it is far too speculative to determine whether Plaintiffs could establish loyalty between Linder and/or Kisting and Defendants such that Linder and/or Kisting's invocation of the Fifth Amendment in this case would lead to an inference against Defendants. Furthermore, it is sheer speculation as to whether Linder or Kisting would ever waive his Fifth Amendment right in this case, even after his criminal proceeding has concluded. Thus, it is possible that even if the Court were to issue a stay in this case, the Court would have needlessly delayed this action waiting for testimony that may never be given. Accordingly, the potential of a possible burden on the Defendants is much too speculative at this point and does not weigh in favor of a stay.

Having considered the parties' arguments and the six general guidelines set forth in *Cruz*, the Court holds that Defendants have failed to satisfy their burden of demonstrating that a stay is necessary in this case. The Court thus denies the motion for a stay.

### CONCLUSION

For the foregoing reasons, the Court: (1) grants Nationwide Life Insurance Co., Nationwide Financial Services, Inc., Nationwide Trust Co., and Nationwide Financial Institution Distributors Agency, Inc.'s motion to dismiss as to Count II; (2) denies the motion to dismiss as to Counts I, III, IV, and V; and denies the motion to stay the case [doc. nos. 16-1, 16-2].

SO ORDERED

N.D.Ill.,2005.
Board of Trustees of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 711977 (N.D.Ill.), RICO Bus.Disp.Guide 10,861

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

LEXSEE



Analysis
As of: Dec 30, 2009

**D&K VENTURES, LLC, Plaintiff, v. MGC, LLC; HURST CONSULTING, LLC;
AUSTIN HURST; and ZACHARY HURST, Defendants.**

**Case No. 09-2084-JWL**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

**2009 U.S. Dist. LEXIS 46569**

**May 27, 2009, Decided
May 27, 2009, Filed**

**SUBSEQUENT HISTORY:** Motion to strike denied by
D&K Ventures, LLC v. MGC, LLC, 2009 U.S. Dist.
LEXIS 71024 (D. Kan., Aug. 12, 2009)

**CORE TERMS:** misrepresentation, disclaimer, projec-
tion, marketing, earnings, multi-level, fraud claim, negli-
gent misrepresentation, misrepresentation claims, web-
site, matter of law, written agreement, particularity, net
revenue, cause of action, reasonable reliance, fraudulent
misrepresentation, state-law, projected, investor, acreage,
user, general rule, tort claims, factual allegations, expres-
sions of opinion, fraudulent, web-based, venture, pleaded

**COUNSEL:** [*1] For D&K Ventures, LLC, Plaintiff:
James F.B. Daniels, R. Pete Smith, LEAD ATTOR-
NEYS, McDowell, Rice, Smith & Buchanan, PC -- KC,
Kansas City, MO.

For MGC, LLC, Hurst Consulting, LLC, Austin Hurst,
Zachary Hurst, Defendants: Jeffrey R. Siegel, LEAD
ATTORNEY, The Siegel Law Firm, Kansas City, MO.

**JUDGES:** John W. Lungstrum, United States District
Judge.

**OPINION BY:** John W. Lungstrum

**OPINION**

**MEMORANDUM AND ORDER**

Plaintiff D&K Ventures, LLC ("D&K") has brought
suit against defendants MGC, LLC ("MGC"), Hurst

Consulting, LLC ("Hurst"), Austin Hurst, and Zachary
Hurst, in which D&K asserts claims relating to its writ-
ten agreement with MGC by which D&K would invest
money in, and receive income from, a multi-level mar-
keting program. Plaintiff asserts statutory claims under
the federal Securities Act, the federal Securities Ex-
change Act, and the Missouri Securities Act. Plaintiff
also asserts state-law tort claims for fraud and negligent
misrepresentation. The matter presently comes before the
Court on defendants' motion to dismiss the state-law
claims pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. # 9).
For the reasons set forth below, the motion is **granted in
part and denied in part**. The motion is granted with
respect to defendants' [*2] argument that plaintiff did
not plead these claims with sufficient particularity pursu-
ant to Fed. R. Civ. P. 9(b); the claims are dismissed, but
plaintiff is granted leave to amend those allegations on or
before **June 8, 2009**. The motion is denied in all other
respects.

**I. Standards for Motion to Dismiss**

The court will dismiss a cause of action for failure to
state a claim only when the factual allegations fail to
"state a claim to relief that is plausible on its face," *Bell
Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct.
1955, 167 L. Ed. 2d 929 (2007), or when an issue of law
is dispositive, *see Neitzke v. Williams*, 490 U.S. 319, 326,
109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989). The com-
plaint need not contain detailed factual allegations, but a
plaintiff's obligation to provide the grounds of entitle-
ment to relief requires more than labels and conclusions;
a formulaic recitation of the elements of a cause of action

will not do. *See Bell Atlantic, 550 U.S. at 555*. The court must accept the facts alleged in the complaint as true, even if doubtful in fact, *see id.*, and view all reasonable inferences from those facts in favor of the plaintiff, *see Tal v. Hogan, 453 F.3d 1244, 1252 (10th Cir. 2006)*. Viewed as such, the "[f]actual allegations must be enough [*3] to raise a right to relief above the speculative level." *Bell Atlantic, 550 U.S. at 555*. The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*).

## II. Allegations of the Complaint

In its complaint, plaintiff D&K has alleged the following facts:

D&K is a Missouri limited liability company whose only members are Dave Feyerabend and Kelly Yarborough. Defendants Austin and Zach Hurst are believed to be the only members of Hurst, a Kansas limited liability company. One or more of those defendants are believed to be the only members of MGC, a Missouri limited liability company. Beginning in August 2008, defendants approached plaintiff and its members to solicit their involvement in a new multi-level marketing venture to be known as "My Green Circle."

During a meeting on September 2, 2008, defendants [1] made the following representations to plaintiff:

> a. That Green Circle would be a "so-called multi-level marketing venture;

> b. That Green Circle/MGC would sell an "informative" [*4] DVD of thirty minute duration, highlighting the benefits of what were described as "Social Networks" and/or "Viral Marketing";

> c. That Austin, Zach, Hurst, MGC and/or Hurst's officer/employee Awan had developed a unique and proprietary "web-based system" which would provide those persons who visited MGC's Green Circle website with an equally unique "referral link";

> d. That this proprietary "web-based system" of marketing would involve a "participant site" which MGC/Green Circle would use to market the DVD to recruit new participants, to track sales, to

transfer money and to communicate with so-called "down line" participants.

(Complaint P 14.)

> 1 In its complaint, plaintiff consistently alleges representations made by one or more of a group including defendants and an employee of Hurst, Asim Awan, that were made to "D&K, Feyerabend and/or Yarborough." For ease of reference in this opinion, the Court refers to such alleged representations as having been made by defendants to plaintiff.

During the meeting on September 2, 2008, defendants provided plaintiff with an Information Sheet that contained the following representations:

> a. That Green Circle/MGC was to be "an online company" that promoted [*5] a "DVD that teaches viewers about viral marketing";

> b. That MGC had "created the DVD in-house and" would be "selling the DVD on" what was described as "the website";

> c. That MGC would offer "visitors to the website the ability to enroll in a program by which they [would] be compensated for referring other individuals to purchase the DVD";

> d. That "in order to receive a DVD, a user" would be required to "pay $ 12.99" and that "[i]n order for a use to benefit from the program", the user would be required to "register an account and refer other members" who would themselves "purchase a DVD";

> e. That for "every DVD purchase referral", there would be "a credit of $ 1.50 added to the referrers account" [sic] and that MGC would pay these credits to referrers once a month either "directly into Paypal accounts" by "traditional ACH wire transfer[]" or "in the form of a check" at the user's option.

(Complaint P 17 ([sic] added).) The Information Sheet contained a pyramid that purported to depict graphically the "potential opportunity" represented by the program. (Complaint P 18). The Information Sheet also included a series of ratio-based calculations identified as a "Pro-

jected Financial Statement," [*6] which contained the following representations:

 a. That in six months of operations, the number of persons "participating" in, i.e. "signing up" for, MGC's multi-level marketing scheme would increase from 1,000 participants to **32,768,000** participants;

 b. That in six months of operations, the number of "new" participants "signed-up" each month would increase from 1,000 to **28,672,000** participants;

 c. That in six months of operations, MGC's gross revenue could increase from $ 12,990 in "Month 1" to **$ 254,332,109**;

 d. That in six months of operations, MGC's "net revenue" would increase from $ 11,490 in "Month 1" to **$ 211,324,109** in "Month 6".

(Complaint P 19 (emphasis in original).)

On September 5, 2008, Mr. Awan, as an officer of Hurst, sent plaintiff an e-mail that included additional projections. The e-mail contained the following representations:

 a. That the "updated projections" which were attached were based upon otherwise unspecified "new found information";

 b. That "the original projections that were shown" to D&K "earlier [that] week" was the "main one to focus on";

 c. That these earlier projections were and remained "the conservative and more realistic projection [sic] based on all people [*7] participating at the same level";

 d. That, nevertheless, in the projections which Hurst/Awan had "done now", it/he had "assumed that people" would enter, i.e. participate in MGC's multi-level marketing scheme, in or at "different levels";

 e. That "based on the new projections, the net revenue [had] increased by approximately $ 75 [million]"; and

 f. That although these were "projections", they "should nevertheless "give" D&K "a good idea of how things work out based on what" Awan, Hurst, MGC, Austin and Zach were "expecting".

(Complaint P 22 ([sic] added).) The attached projections included the following representations:

 a. Under Hurst/Awan's "Level II Referral" scenario, MGC's total members/participants would increase from 1,000 in Month 1 to 266,605,691 in Month 6 or roughly 37,000,000 less than the total estimated population of the United States;

 b. MGC's total revenue would increase from $ 3,990 in Month 1 to $ 1,045,983,016 in Month 6; and

 c. MGC's net revenues would increase from $ 3,591 in Month 1 to $ 941,384,714 in Month 6.

(Complaint P 23.)

During the period of time from September 2, 2008, to September 12, 2008, defendants also made the following representations to plaintiff:

 a. That [*8] through an investment of $ 115,000, D&K would acquire a 2% ownership in and of MGC and Green Circle;

 b. That other investors were being solicited and that for each investment of $ 75,000, the investor would receive 1% of the ownership of MGC and Green Circle;

 c. That MGC would launch Green Circle on the internet on October 1, 2008;

 d. That the development and testing of the system, hardware and/or software that was to be and constitute MGC's unique, multi-level marketing system had been comprehensive and was nearly complete, and that such further development and testing as was necessary was fully on schedule; and

 e. That the promoters and persons in charge of MGC were highly experienced in "web" marketing and in "multi-level" marketing, that they were highly skilled in web design and implementation and that the concepts, devices, features and/or mechanisms which they intended to employ in the design of MGC's "website" were novel, attractive, useful, utilitarian and user friendly.

(Complaint P 24.)

"At some time during the period of September 2, 2008 through September 12, 2008," plaintiff entered into "and purchased" an "Investment Agreement" with defendants, and plaintiff paid $ 115,000 [*9] in exchange for that agreement. Plaintiff attached the Investment Agreement to the complaint and incorporated the document by reference. The agreement states that it "is made this 2nd day of September, 2008," between D&K and MGC. In the agreement, D&K agrees to pay $ 115,000 to MGC, and MGC agrees to pay D&K a portion of its net income from the "My Green Circle" program. The agreement provides that D&K does not gain any membership interest in MGC. The agreement also contains the following paragraphs:

> 8. Entire Agreement & Amendments. This Agreement constitutes the entire agreement of the parties hereto concerning the matters addressed herein, and shall supersede any prior or contemporaneous agreements, understandings, representations, negotiations, or communications between the parties concerning such matters. There are no other agreements or understandings between the parties concerning the matters addressed herein. In reaching this Agreement, the parties hereto are not relying upon any representation of any other person or entity other than the representations made in this Agreement. This Agreement may be amended or modified only by a written agreement of amendment signed by the parties [*10] hereto.

> . . .

> 10. Company Earnings Disclaimer. Company [MGC] makes no representations or warranties regarding any expected or anticipated future Net Revenue, Net Income, or any other related earnings from My Green Circle and Company expressly disclaims any such representations or warranties. Investor [D&K] agrees and acknowledges that Company has made no representations or warranties concerning expected or anticipated future Net Revenue, Net Income, or any other related earnings from My Green Circle.

The launch of the My Green Circle website was delayed until October 10, 2008. The website proved unsuccessful, and defendants subsequently launched a new site

with different products and programs. Plaintiff has not received any of the promised income under the agreement, and defendants have not responded to plaintiff's demand for the return of the $ 115,000 that it paid.

In Count I of the complaint, plaintiff has asserted claims under the federal Securities Act, 15 U.S.C. §§ 77a et seq., and the federal Securities Exchange Act, 15 U.S.C. §§ 78a et seq. In Count II, plaintiff asserts a claim under the Missouri Securities Act, Mo. Rev. Stat. §§ 409.1-101 et seq. In Count III, plaintiff asserts [*11] a claim for intentional fraud, based on the representations alleged in paragraphs 17, 18, 19, 22, 23, and 24 of the complaint. Plaintiff alleges that the representations were false for the reasons set forth in paragraphs 40 and 46 of the complaint. In those paragraphs, plaintiff states specific reasons why particular representations (those contained in paragraphs 14a, 14c, 19a-d, 22c-f, 23a-c, 24a-e) were false or fraudulent. Plaintiff also alleges in Count III that defendants intended that plaintiff act on those representations by its "purchase" of the Investment Agreement. In Count IV, plaintiff asserts a claim for negligent misrepresentation based on the same alleged representations that form the basis for Count III.

### III. Analysis

#### A. Agreement's Disclaimer of Reliance

Defendants move to dismiss plaintiff's state-law tort claims [2] for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). As their first basis for dismissal, defendants argue that the disclaimers contained in the parties' written agreement preclude plaintiff's reasonable reliance on defendants' alleged misrepresentations as a matter of law. See, e.g., Verni v. Cleveland Chiropractic Coll., 212 S.W.3d 150, 154 (Mo. 2007) [*12] (elements of claim for fraudulent misrepresentation include "the hearer's reliance on [the representation's] truth, and the right to rely thereon"); Ryann Spencer Group, Inc. v. Assurance Co. of Am., 275 S.W.3d 284, 288 (Mo. Ct. App. 2008) (elements of negligent misrepresentation include the listener's justifiable reliance). Specifically, defendants cite (1) the statement in paragraph 8 of the agreement that the parties are not relying on any outside representation, and (2) MGC's disclaimer (and D&K's acknowledgment) in paragraph 10 of the agreement, which states that MGC has made no representations concerning expected revenue or earnings. Defendants have not cited any Missouri cases to support this argument.

> 2   The parties have assumed, without analysis, that Missouri law governs D&K's state-law claims. The Court applies the choice-of-law rules of its own state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Under Kansas law, tort ac-

tions are governed by the law of the state in which the tort occurred, that is, the state in which the wrong was felt. *See Ling v. Jan's Liquors*, 237 Kan. 629, 634-35, 703 P.2d 731, 735 (1985). In a tort case alleging financial injury, [*13] that plaintiff feels the wrong in the state in which he resides. *See, e.g., Thomas v. Talbott Recovery Sys., Inc.*, 982 F. Supp. 794, 798 (D. Kan. 1997). Plaintiff alleges that its place of business is in Missouri, where it is registered as a limited liability company. Accordingly, the Court agrees that, on the record before it, Missouri law should govern plaintiff's tort claims.

Plaintiff relies on the following general rule regarding such disclaimers: "Missouri law holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 767 (Mo. 2007) (quoting *Lollar v. A.O. Smith Harvestore Prods., Inc.*, 795 S.W.2d 441, 448 (Mo. Ct. App. 1990)); *accord Maples v. Charles Burt Realtor, Inc.*, 690 S.W.2d 202, 212 (Mo. Ct. App. 1985). The application of this rule would appear to dispose of defendants' argument, at least with respect to the fraud claim in Count III.

Defendants respond (again without citation to Missouri law) by attempting to distinguish the present case as one involving not merely a general merger clause, but also a disclaimer relating to specific representations [*14] about earnings. In fact, in one case, the Missouri Supreme Court upheld a trial court's finding that a defendant seller had adequately disclaimed any prior representations concerning the actual acreage of the land being sold to the plaintiff. *See Luli Corp. v. El Chico Ranch, Inc.*, 481 S.W.2d 246, 255-56 (Mo. 1972). In *Luli Corp.*, the court noted that the seller's "frank disclaimer . . . of any personal knowledge with respect to acreage" was "positive, direct, and to the point, even disclosing the source of the questioned representation." *Id.* at 256. The most the seller had represented in that case, therefore, was that he had *information* concerning the acreage; he made no assertion of that acreage as a fact. *Id.* at 255. In later cases, the Missouri Court of Appeals has distinguished *Luli Corp.* as a case involving the explicit disclaimer of specific representations, as opposed to the boilerplate disclaimers present in those later cases. *See Lollar*, 795 S.W.2d at 448; *Maples*, 690 S.W.2d at 213.

In the present case, the agreement's separate and specific disclaimer concerning earnings might fall within the scope of *Luli Corp.*, as that case has been distinguished by the Missouri Court of [*15] Appeals, and might therefore serve to rebut an allegation of reasonable reliance on the alleged misrepresentations specifically involving projected earnings. In *Luli Corp.*, however, the Missouri Supreme Court merely upheld a trial court's

factual findings against the plaintiff; it did not hold that the disclaimer precluded the plaintiff's reasonable reliance as a matter of law. Thus, even if defendants could circumvent the general rule regarding disclaimers in some way, with respect to some of the alleged misrepresentations, they have not provided any authority for the proposition that plaintiff cannot establish reasonable reliance as a matter of law. Accordingly, the court rejects this basis for dismissal of plaintiff's fraud claim.

A panel of the Missouri Court of Appeals has concluded that the same general rule against disclaimers applies also to negligent misrepresentation claims. *See Cabinet Distributors, Inc. v. Redmond*, 965 S.W.2d 309, 314 (Mo. Ct. App. 1998). The Eighth Circuit Court of Appeals, however, has stated that it is "not at all confident that if presented with the question the Supreme Court of Missouri would adopt the broad ruling in *Cabinet Distributors*." *Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc.*, 178 F.3d 1030, 1033 (8th Cir. 1999). [*16] This Court need not determine how the Missouri Supreme Court would answer this question at this time, however. Even if the general anti-disclaimer rule did not apply to some or all of the negligent misrepresentations alleged here (either by law or on the facts in light of *Luli Corp.*), there is no basis to conclude that plaintiff cannot have reasonably relied on such misrepresentations *as a matter of law*. Therefore, the Court also rejects defendants' disclaimer argument as it relates to Count IV.

Finally, defendants suggest that plaintiff cannot have reasonably relied on defendants' alleged misrepresentations, as a matter of law, in light of plaintiff's allegation that defendants' projections were "completely unrealistic." The Court rejects this argument as well. Plaintiff has not conceded in its complaint that the projections were objectively unrealistic, or unrealistic in plaintiff's eyes. Thus, viewing all inferences in plaintiff's favor, the Court concludes that plaintiff has sufficiently pleaded satisfaction of its tort claims' reasonable reliance element, and defendants' motion to dismiss is denied to that extent.

*B. Statements of Opinion*

As its second basis for dismissal of Counts [*17] III and IV, defendants argue that their alleged misrepresentations concerning projected earnings do not constitute representations of fact, as required, but instead constitute mere opinions. The Missouri Supreme Court has noted that a plaintiff may not base its fraud claim on a statement of opinion:

> In order for a [*18] petition to state a claim for fraudulent misrepresentation it is necessary for the petition to allege a representation that is a statement of fact. On the other hand, expressions of opinion

are insufficient to authorize a recovery for fraudulent misrepresentation because such expressions are deemed not to be material to a transaction. Puffing of wares, sales propaganda, and other expressions of opinion are common, are permitted, and should be expected. Those in the marketplace should recognize and discount such representations when deciding whether to go through with a transaction. If the trial court correctly determined that the representation alleged in the petition in this case was only an expression of opinion, then plaintiffs' petition failed to allege a material misrepresentation and it should have been dismissed for failure to allege all the elements of fraudulent misrepresentation.

*Clark v. Olson*, 726 S.W.2d 718, 719-20 (Mo. 1987) (citations omitted). The Missouri Court of Appeals has generally applied the same rules regarding fraud claims to claims of negligent misrepresentation. *See Ryann Spencer Group*, 275 S.W.3d at 291.

The projections alleged by plaintiff as misrepresentations [*19] in paragraphs 19 and 23 of the complaint must be considered opinions that ordinarily would not support a misrepresentation claim. Plaintiff cites the following exception under Missouri law, however:

> A representation of opinion only amounts to fraud if the representing party has, or holds himself out to have, special knowledge as to the value; and the representing party, knowing the other party is ignorant, makes a false representation as to value intending it to be relied on. The same rule applies to other representations of opinion, *such as future projections*.

*Arnold v. Erkmann*, 934 S.W.2d 621, 627 (Mo. Ct. APP. 1996) (citations omitted) (emphasis added); *see also Dancin Dev., L.L.C. v. NRT Missouri, Inc.*, 291 S.W.3d 739, 2009 WL 1120315, at *3 (Mo. Ct. App. 2009) (quoting *Arnold*). In paragraph 24 of the complaint, plaintiff has alleged that defendants represented that they were highly skilled and experienced with respect to the web-based multi-level marketing program at issue here. Accordingly, plaintiff has sufficiently pleaded causes of action for misrepresentation based on defendants' statements of projected earnings that fall within the "special knowledge" exception under [*20] Missouri law, and defendants' motion to dismiss is denied to that extent.

## C. Pleading Fraud with Particularity

Finally, defendants argue that Counts III and IV are subject to dismissal under Fed. R. Civ. P. 9(b), which provides that in alleging fraud, a party must state the circumstances constituting fraud with particularity. To comply with the rule, a complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006).

In Counts III and IV, plaintiff claims as misrepresentations the statements alleged in paragraphs 17, 18, 19, 22, 23, and 24 of the complaint. [3] In the first five of those paragraphs, the alleged statements appeared in written documents given to plaintiff on particular dates. In paragraphs 40 and 46 of the complaint, plaintiffs has set forth reasons why some of those alleged misrepresentations were false. There are no such allegations, however, explaining how the representations alleged in paragraphs 17, 18, 22a, and 22b were false or fraudulent. Thus, plaintiff's fraud claim runs afoul of Rule 9(b) to the [*21] extent based on those alleged representations.

> 3   Although plaintiff's statutory claims stated in Counts I and II appear to be based also on the representations alleged in paragraph 14 of the complaint, Counts III and IV do not refer back to that paragraph.

Moreover, plaintiff has pleaded that the representations alleged in paragraph 24 of the complaint were made "during the period of and from September 2, 2008 through approximately September 12, 2008," without giving the precise dates or circumstances of the particular representations. As defendants note, in light of that failure and plaintiff's further allegation that it entered into (or "purchased") the Investor Agreement at some indefinite point within the same time period, it cannot be determined which representations preceded (and thus contributed to) plaintiff's execution of the agreement. [4] Plaintiff, citing *Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc.*, 178 F.3d 1030, 1033 (8th Cir. 1999), argues that it need not identify which representations preceded the agreement because post-contract misrepresentations may support a cause of action. In *Forklifts*, however, the plaintiff's reliance and damages for such post-contract [*22] misrepresentations did not necessarily relate to the formation of the contract. *See id.* In the present case, plaintiff has alleged no other acts taken in reliance on the alleged misrepresentations other than execution of the written agreement. The Court therefore concludes that plaintiff has not alleged its misrepresentation claims with sufficient particularity to the extent that it is unclear which alleged misrepresentations were made prior to plaintiff's execution of the written agreement.

4   In its opposition brief, plaintiff states that even though the agreement recites that it was "made" on September 2, 2008, plaintiff actually entered into that agreement at some point after that date, between September 2, 2008, and September 12, 2008, as it alleged in the complaint.

Moreover, with respect to the misrepresentations alleged in paragraph 24, plaintiff has not sufficiently identified the persons by whom and to whom the statements were made. Plaintiff relies on *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997), in which the court held that the plaintiff's failure to match specific misstatements with specific officers or directors of the defendant did not violate  [*23]  Rule 9(b) in that case. The court in *Schwartz*, however, based that ruling on its conclusion that "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Id*. Although the other alleged misrepresentations were contained in documents attributed to the corporate defendants, the representations set forth in paragraph 24 of the complaint are not alleged to have been made in written form. Accordingly, there is no basis not to apply the Tenth Circuit's usual standard for compliance with Rule 9(b), and the Court concludes that the allegations in paragraph 24 are also deficient in failing to identify the particular parties involved in those statements.

The parties have not addressed whether Rule 9(b) applies also to claims for negligent misrepresentation. The federal courts of appeal appear to be split on the question, which the Tenth Circuit has not addressed. Compare, e.g., *Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 583 (2nd Cir. 2005) (rule does apply), with *General Elec. Capital Corp. v. Posey*, 415 F.3d 391, 396 (5th Cir. 2005)  [*24]  (refusing to apply rule). The Court declines to resolve that split here.

In this case, in Count III and Count IV plaintiff has referred back to the same factual allegations of representations by defendants and the same reasons why those representations were false or fraudulent. Thus, in amending those factual allegations as they support the fraud claim, in order to comply with Rule 9(b), plaintiff will necessarily elaborate on the bases for his negligent misrepresentation claim as well. See *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003) (although Rule 9(b) does not apply to negligent misrepresentation claims by its terms, court applies the rule where the fraud and negligent misrepresentations claims are based on the same set of alleged facts).

Accordingly, in asserting the claims contained in Counts III and IV of its complaint, plaintiff has failed to comply with Rule 9(b), as set forth herein, and defendant's motion to dismiss those two claims is granted on that basis. The Court grants plaintiff leave to amend its complaint, however, to comply with the rule. Plaintiff shall file any such amended complaint on or before **June 8, 2009**.

IT IS THEREFORE   [*25]  ORDERED BY THE COURT THAT defendants' motion to dismiss Counts III and IV of the complaint (Doc. # 9) is **granted in part and denied in part**. The motion is granted with respect to defendants' argument that plaintiff did not plead those two counts with sufficient particularity pursuant to Fed. R. Civ. P. 9(b); the claims are dismissed, but plaintiff is granted leave to amend those allegations on or before **June 8, 2009**. The motion is denied in all other respects.

IT IS SO ORDERED.

Dated this 27th day of May, 2009, in Kansas City, Kansas.

/s/ John W. Lungstrum

John W. Lungstrum

United States District Judge

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
**(Cite as: 2003 WL 22859492 (N.D.Ill.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
EAZYPOWER CORPORATION, an Illinois corporation, Plaintiff,
v.
ALDEN CORPORATION, a Connecticut corporation, Defendant.
**No. 03 C 3164.**

Dec. 2, 2003.

Robert B. Breislatt, Kara Eve Foster Cenar, Joseph Eben Cwik, Philip Dale Segrest, Jr., Welsh & Katz, Ltd., Lee F. Grossman, Eric P Martin, Grossman & Flight, LLC, Chicago, IL, for Plaintiff.

Jeffrey Edward Schiller, Michael Daehyun Lee, Schuyler, Roche & Zwirner, Chicago, IL, Wm Tucker Griffith, John C Linderman, McCormick, Paulding & Huber, LLP, Hartford, CT, for Defendant.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

*1 This case is before the Court on Alden Corporation's motion to dismiss Eazypower's complaint. For the following reasons, the motion to dismiss is denied.

### BACKGROUND

Eazypower Corporation is a manufacturing company that sells screwdriver tips and related power tool accessories. One of its products is a broken screw remover set (the "Screw Remover Set"), which is used to remove broken or worn out screws. On or about April 4, 2000, Alden Corporation filed a patent application with the United States Patent and Trademark Office (the "Patent Office") for a screwdriver bit, which is used to remove damaged screws. Alden's patent application was published on October 4, 2001, and the Patent Office allowed the patent on March 19, 2003. At that time, Alden began to send notice

letters to potential infringers. However, Alden's patent did not issue until July 22, 2003.

On or about April 4, 2003, Alden sent a letter to Eazypower which stated that Alden had a pending patent that had been "allowed" by the Patent Office and that the soon-to-be-issued patent "will be infringed by, or contributorily infringed by" Eazypower's Screw Remover Set. About ten days later on April 14, 2003, Eazypower received a second letter from Alden that reiterated the infringement allegations and referenced the patent application as number 20010026737.

Eazypower responded to Alden's letter on or about April 23, 2003, in which Eazypower denied the alleged infringement and asserted that the allegations appeared to be baseless, made in bad faith and violated unfair competition law. Despite Alden's assurances that it would not contact any of Eazypower's customers, Ace Hardware, one of Eazypower's customers, did in fact receive a similar cease and desist letter from Alden. As a result, Eazypower corresponded with Alden again on or about April 30, 2003 and demanded that Alden cease writing letters to Eazypower's customers, alleging that Eazypower's Screw Remover Set infringes or contributorily infringes Alden's not-yet-issued patent. At that time, Eazypower also requested information from Alden about the patent claims and how Eazypower's Screw Remover Set allegedly infringed the patent. Alden responded that it needed Eazypower's production drawings in order to determine how the Screw Remover Set infringed Alden's anticipated patent.

On May 12, 2003, Eazypower filed a five-count complaint against Alden, including allegations of unfair competition and patent-related violations, resulting from Alden's infringement notice letters and soon-to-be issued patent. Specifically, the complaint contained the following claims: (1) Count I alleges a violation of section 43(a) of the Lanham Act for alleged false and/or misleading statements made to prospective customers of Eazypower; (2) Count II alleges a violation of Illinois' Uniform Deceptive Trade Practices Act; (3) Count III asserts a claim for tortious interference with prospective business relationships; (4) Count V alleges unclean hands; and (5)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
(Cite as: 2003 WL 22859492 (N.D.Ill.))

Count VI sought a declaratory judgment that Alden's soon-to-be-issued patent is invalid and/or not infringed by Eazypower's product. Noticeably, Eazypower did not include a Count IV in its original complaint.

**\*2** Alden then filed a motion to dismiss the complaint pursuant to Federal Rule 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim. Alden argues that Counts I, II, III, and V should be dismissed because its actions are immunized under the *Noerr-Pennington* doctrine. Alden also asserts that Count VI for non-infringement should be dismissed because its patent, at that time, had not issued and no actual justiciable controversy exists, and that Eazypower is simply seeking an advisory opinion.

On July 22, 2003, the day that the patent issued, Alden filed a patent infringement suit in the United States District Court for the District of Connecticut. That same day, Eazypower filed an amended complaint to include Count IV seeking declaratory judgment of non-infringement of Alden's now issued patent and amended Count IV seeking declaratory judgment of no provisional remedy. The other claims alleged in Eazypower's first complaint remain the same in the amended complaint.

Notwithstanding the filing of the amended complaint, the parties continued to brief the motion to dismiss that was filed before Eazypower amended its complaint. Although, Eazypower filed an amended complaint without leave from the Court, this Court would have granted leave. Therefore, the original complaint is moot, and we are considering this motion as a the motion to dismiss to the amended complaint.

DISCUSSION

In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Szumny v. Am. Gen. Fin., Inc. .*, 246 F.3d 1065, 1067 (7th Cir.2001). The purpose of a motion to dismiss is not to decide the merits of the challenged claims but to test the sufficiency of the complaint. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir.1996). A court will grant a motion to dismiss only if it is impossible for the plaintiff to prevail under any set of facts that could be

proven consistent with the allegations. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir.2000).

I. Counts I, II, III and V of Eazypower's Amended Complaint State Claims for Relief

Alden contends that Counts I, II, III and V of Eazypower's amended complaint should be dismissed pursuant to Federal Rule 12(b)(6) for failure to state a claim on which relief could be granted. Counts I, II, III and V allege violations of the Lanham Act and Illinois Deceptive Trade Practices Act, tortious interference with prospective trade practices and unclean hands. These allegations are based on Alden's correspondence with Eazypower and its customers relating to the issuance of Alden's patent and allegations that Eazypower's Screw Remover Set would infringe the anticipated patent. Alden argues that the *Noerr-Pennington* doctrine immunizes its conduct from suit.

The *Noerr-Pennington* doctrine is based on Sherman Act considerations as well as the First Amendment right to petition the government. *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir.1999) ("[P]arties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted might harm the interests of others."). Originally, the doctrine was limited to antitrust actions, but has been extended to protect acts reasonably related to the petitioning process, including the sending of cease and desist letters to alleged infringers. *See e.g., Versatile Plastics v. Sknowbest, Inc.*, 247 F.Supp.2d 1098, 1103 (E.D.Wis.2003); *Thermos Co. v. Igloo Products Corp.*, 1995 WL 842002, at \*4-5 (N.D.Ill. Sept.27, 1995).

**\*3** In *Versatile Plastics*, the plaintiffs filed an action seeking a declaratory judgment of non-infringement and also asserted claims of tortious interference, trade libel, antitrust and conspiracy resulting from infringement notice letters sent on behalf of the defendants. 247 F.Supp.2d at 1099. The court discussed the *Noerr-Pennington* doctrine and its transition from the antitrust arena into protecting acts "reasonably related to the petitioning litigation process," specifically the sending of cease and desist letters to alleged patent infringers. *Id.* at 1103-04. The court recognized that patent laws explicitly sanction and require notice letters to be sent to potential infringers in certain situations in order for the patent owner to recover damages. *Id.* at 1104. More importantly, the court

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
(Cite as: 2003 WL 22859492 (N.D.Ill.))

acknowledged that the Federal Circuit, which has exclusive jurisdiction over patent appeals, has held that a patent owner "has the right to ... enforce its patent, and that includes threatening alleged infringers with suit." *Id.* at 1105 (quoting *Zenith Electronics Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1353 (Fed.Cir.1999)). Ultimately, the court concluded that a patent holder who sends a cease and desist letter to persons believed to be infringing is entitled to some protection from liability for damages. *Id. at 1105.*

We agree. However, the protection afforded to patent owners under the *Noerr-Pennington* doctrine is not unlimited. In *Zenith Electronics Corp. v. Exzec, Inc.,* the Federal Circuit held that a patentee was not shielded from liability for unfair competition under the Lanham Act for statements made in the marketplace about potential infringement if such statements were made in bad faith. 182 F.3d 1340, 1353 (Fed.Cir.1999). Thus, *Noerr-Pennington* immunity may not extend to Alden's infringement notice letters if its correspondence with Eazypower and/or its customers was conducted in bad faith or without a reasonable belief that Eazypower's Screw Remover Set, in fact, would infringe Alden's patent.

Specifically, Eazypower has alleged that Alden's allegations of infringement were made in bad faith and without any knowledge that Eazypower's Screw Remover Set did, in fact, infringe Alden's soon-to-be-issued patent. Eazypower also argues that, although Alden stated that it would not contact any of Eazypower's customers, Alden, in fact, did correspond with some of Eazypower's customers about potential infringement. Eazypower also claims that Alden did not comply with the actual notice provisions of the relevant patent laws.

Even though Alden ultimately may be protected by the *Noerr-Pennington* doctrine, we believe that Eazypower has alleged sufficient facts of bad faith to withstand a motion to dismiss. Thus, the motion to dismiss Counts I, II, III and V is denied.

II. The Filing of the Amended Complaint Cures Count IV's Jurisdictional Defect

In Count IV of the amended complaint, Eazypower seeks a declaratory judgment of infringement and/or invalidity with respect to Alden's patent, which had not been issued at the time Eazypower filed its original complaint. Alden argues this Court lacks subject matter jurisdiction to consider this claim as there is no actual justiciable controversy as required by the Declaratory Judgment Act.

*4 Eazypower contends that the jurisdictional defect was cured by the filing of its amended complaint after Alden's patent issued. However, Alden argues that Eazypower did not seek leave from this Court to supplement its pleading as required by Federal Rule 15(d). Regardless, this Court would have granted leave to amend. Thus, the filing of the amended complaint did cure the jurisdictional defect relating to Count IV, and Alden's motion to dismiss Count IV of the amended complaint is denied. Finally, the motion to dismiss does not address Count VI, which seeks a declaration of no provisional remedy under 35 U.S.C. 154(d). For this reason, Count VI withstands this motion to dismiss.

CONCLUSION

For the foregoing reasons, Alden's motion to dismiss is denied.

N.D.Ill.,2003.
Eazypower Corp. v. Alden Corp.
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 65236 (N.D.Ill.), 90 U.S.P.Q.2d 1055
**(Cite as: 2009 WL 65236 (N.D.Ill.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Stephen FRAYNE, Jr., Plaintiff,
v.
CHICAGO 2016, United States Olympic Committee,
and Domain Trade, Inc., Defendants.
**No. 08 C 5290.**

Jan. 8, 2009.

West KeySummary
**Constitutional Law 92 ☞967**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
      92VI(C) Determination of Constitutional
Questions
         92VI(C)1 In General
            92k964 Form and Sufficiency of Objection, Allegation, or Pleading
               92k967 k. Particular Claims. Most
Cited Cases
Domain name holder's allegation that corporation
violated domain name holder's free speech and equal
protection rights was sufficient under a notice-
pleading standard. Corporation asserted that domain
name holder's constitutional claims could not stand
because it was not a state actor; however, domain
name holder alleged that corporation was a state actor
based on its relationship with the City of Chicago.

Robert S. Grabemann, Timothy M. Schaum, Daspin
& Aument LLP, Chicago, IL, for Plaintiff.

Matthew W. Walch, Kristine Laudadio Devine,
Nicholas A. Lambrecht, Latham & Watkins LLP,
AUSA, United States Attorney's Office, Kevin An-
drew Thompson, Davis, Mannix & McGrath, Chi-
cago, IL, for Defendants.

***MEMORANDUM OPINION AND ORDER***

MATTHEW F. KENNELLY, District Judge.

*\*1 Plaintiff Stephen Frayne, Jr. (Frayne) has sued
Chicago 2016, an Illinois corporation, the United
States Olympic Committee (USOC), and Domain
Trade, Inc. for declaratory relief regarding various
trademarks (counts 1-3), for reverse domain name
highjacking and attempted reverse domain name
highjacking under a provision of the Lanham Act, 15
U.S.C. § 1114(2)(D) (counts 4-5), and for declaratory
and other relief for violations of various provisions of
the United States and Illinois Constitutions (counts 6-
9). The constitutional claims are directed solely at
Chicago 2016. Chicago 2016 and the USOC have
moved to dismiss counts 4 through 9.[FN1] For the rea-
sons stated below, the Court grants the motion as to
counts 4 and 5 but otherwise denies the motion.

> FN1. Domain Trade filed a separate motion
> to dismiss. At the parties' request, the Court
> has delayed consideration of that motion
> while the parties discuss settlement. Accord-
> ingly, references to "defendants" in this de-
> cision refer only to Chicago 2016 and the
> USOC unless otherwise indicated.

**Facts**

When considering a motion to dismiss, the Court
accepts as true the complaint's factual allegations and
draws reasonable inferences in favor of the plaintiff.
*See, e.g., Killingsworth v. HSBC Bank Nevada, N.A.,*
507 F.3d 614, 617 (7th Cir.2007).

In July 2006, the City of Chicago allegedly incorpo-
rated Chicago 2016 to serve as the City's agent as
part of its efforts to bring the 2016 Olympic Games
to Chicago. Frayne alleges that "Chicago 2016, al-
though a private entity, is the official representative
and agent of the City of Chicago ...." Compl. ¶ 23.
On November 28, 2006, Chicago 2016 filed to regis-
ter "CHICAGO 2016" as a trademark. That trade-
mark was registered on April 22, 2008. Chicago 2016
assigned its interest in the CHICAGO 2016 mark to
the USOC in April 2007. The USOC subsequently
licensed to Chicago 2016 the right to use the CHI-
CAGO 2016 mark.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.