Not Reported in F.Supp., 1995 WL 842002 (N.D.Ill.)
**(Cite as: 1995 WL 842002 (N.D.Ill.))**

838 F.2d 242, 244 (7th Cir.1988); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1357 at 299.) Therefore, all the submitted evidentiary materials except those properly attached to the complaint and incorporated in the complaint are excluded from consideration in regard to the present motion.

**\*3** Federal Rule of Civil Procedure 12(f) authorizes us to strike from the pleadings "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, such motions are not favored, and will only be granted if the "language of the pleading has no possible relation to the controversy and is clearly prejudicial." *Simmons v. John F. Kennedy Medical Ctr.,* 772 F.Supp. 440, 442 (N.D.Ill.1989) (quoting *Garza v. Chicago Health Clubs, Inc.,* 346 F.Supp. 955, 962 (N.D.Ill.1972). With these principles in mind, we turn to the motion to dismiss.

### The THERMOS Trademark

The validity and enforceability of the THERMOS trademark and the federal registration of the mark has been previously litigated. Thermos has the right to enforce its THERMOS trademark and to prohibit competitors from using the word "thermos" on products covered by its federal registration. *American Thermos Prod. Co. v. Aladdin Indus., Inc.,* 207 F.Supp. 9 (D.Conn.1962), aff'd sub nom. *King-Seeley Thermos Co. v. Aladdin Indus., Inc.,* 321 F.2d. 577 (2d Cir.1963), injunction modified, 320 F.Supp. 1156 (D.Conn.1970). The decisions however also found that the term "thermos" had become generic with respect to vacuum-insulated bottles and therefore allowed other competitors to sell *vacuum-insulated* bottles using the term "thermos" so long as it was used in lower case letters and was preceded by the possessive form of the word Aladdin (the competitor's brand name).[FN1] The exemption was later expanded to allow the use of "Thermos" when capitalization was grammatically correct. When Igloo began to market a *foam-insulated* container using the federally registered marks "THERMOS" and "Thermos," this litigation was commenced.

After a trademark has been federally registered for five years it achieves "incontestable" status. This incontestable status eliminates other persons' ability to attack the registrant's right to use and to exclude others from using the mark because of descriptiveness or prior use. Section 33(b) of the Lanham Act provides that the registration is "conclusive evidence" of mark validity and ownership and "of the registrant's exclusive right to use the mark in commerce." That the THERMOS mark has reached such a pinnacle of trademark status is undeniable.

Additionally, Thermos possesses a federal certificate of trademark registration. Such certificate of registration is "*prima facie* evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods ..." as specified in the certificate. 15 U.S.C. § 1057(b).

### Counts II-VII Immunity From Antitrust Liability Under The Noerr-Pennington Doctrine

Counts II-VII purport to state counterclaims against plaintiffs for violations of Federal Antitrust Laws (Counts II, III, and IV) and violations of the Texas Free Enterprise And Antitrust Act of 1983 (Counts V, VI, VII and VIII). The *Noerr-Pennington* doctrine yields antitrust immunity to those who would protect their legal rights (i.e. trademark registrations) and includes prelitigation rights as in the instant case. "It would be absurd to hold that it (Noerr-Pennington) does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." *McGuire Oil Co. v. Mapco, Inc.* [1992-1 TRADE CASES ¶ 69,799], 958 F.2d 1552, 1560 (11th Cir.1992).

**\*4** The exception to such immunity is the worthless or "sham" lawsuit. The U.S. Supreme Court has recently addressed the issue of what an antitrust plaintiff must show to demonstrate that a defendant has engaged in a "sham" litigation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* [1993-1 TRADE CASES ¶ 70,207], 113 S.Ct. 1920, 1928 (1993). In order to qualify as a sham the lawsuit "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Additionally, the lawsuit must conceal an attempt to interfere directly with the business relationships of a competitor, through the use of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Not Reported in F.Supp., 1995 WL 842002 (N.D.Ill.)**
**(Cite as: 1995 WL 842002 (N.D.Ill.))**

governmental process-as opposed to the outcome of that process-as an anti-competitive weapon. *Id.* As Judge Andersen noted, this is clearly not such a "sham" litigation. The plaintiffs' complaint attempts to protect a trademark "THERMOS" that has been previously held valid and enforceable with a very narrowly defined exception. The allegations in plaintiffs' complaint contain facts which would, if true, take Igloo's use of the word "thermos" out of the narrow exception carved out by prior court orders. The plaintiffs' complaint therefore, alleges a clear violation of its valid trademark. As such it is clearly not a sham complaint. Nor is it necessary to resolve disputed issues of fact to reach this conclusion. The exhibits in Igloo's own Second Amended Answer and Counterclaim (at pages 5 and 6) alone are sufficient to see that the use of the term "thermos" by Igloo could, in a variety of ways be violative of the plaintiffs' rights. This is not to prejudge the issue, but merely to state the obvious from examining these exhibits and the pleadings, i.e., plaintiffs' complaint is not one for which no reasonable litigant could realistically expect success on the merits.

Contrary to Igloo's assertion their allegation of "unwarranted demands" is insufficient to save these counterclaims from the Noerr-Pennington doctrine. I agree with plaintiffs that under the Noerr-Pennington doctrine, their efforts in policing their mark's usage is a First Amendment protected activity, immune from antitrust activity. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 113 S.Ct. 1920, 1926 (1993) (discussing *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.* [1961 TRADE CASES ¶ 69,927], 365 U.S. 127 (1961), and *United Mine Workers v. Pennington* [1965 TRADE CASES ¶ 71,462], 381 U.S. 657 (1965)). The plaintiffs in the instant case sent trademark policing letters to alleged infringers of their federally registered trademark in the form of cease and desist letters. It has long been the law of this circuit that a "trademark holder has the right to defend himself against infringement and to warn purchasers from the alleged infringer that they too, might be liable to him" through the sending of infringement letters. *Spangler Candy Co. v. Crystal Pure Candy Co.,* 235 F.Supp. 18, 32 (N.D.Ill.1964); *Lucien LeLong, Inc. v. Dana Perfumes,* 138 F.Supp. 575, 579 (N.D.Ill.1955); *Chromium Indus., Inc. v. Mirror Polishing & Plating Co., Inc.* [1979-2 TRADE CASES ¶ 62,855], 448 F.Supp. 544, 558 (N.D.Ill.1978) (infringement warning letters in a patent case); *Airtex Corp. v. Shelley*

*Radiant Ceiling Co.,* 400 F.Supp. 170, 177 (N.D.Ill.1975) (infringement warning letters in a patent case). The mere conclusory allegation that in this case such letters contained unwarranted demands is insufficient to state a claim in the face of such a well established right.

**\*5** To be sure in paragraph 7 of it's counterclaims Igloo does allege further that plaintiffs have been engaged in a course of conduct to harass and restrain competitors and retailers from using the word thermos in reference to thermal bottles-something, which if done in the manner specified by the court in *King-Seely Thermos Co. v. Aladdin Indus., Inc.* 321 F.2d 577 (2d Cir.1963), competitors are allowed to do. Igloo further alleges a systematic practice of making trademark infringement claims against others without regard to the legal merits of the claims. Further describing these claims as spurious, invalid and made with intent to restrain free trade. However its description of what it is about these claims that makes them sham claims fall far short of what is necessary to establish a claim that no reasonable litigant could realistically expect to win such claims. In addition the allegations are mostly conclusory and lacking in substantial detail. Given the nature of the allegations, essentially alleging bad faith, fraud and abuse of process, and the fact that the conduct complained involves the exercise of First Amendment protected activity, much more detailed pleadings would be needed to state a cause of action. Finally, Texas courts have ruled that because Sections 15.05(a) and 15.05(b) are patterned from, and comparable to, the Sherman Act, they are to be construed in harmony with in harmony with federal law interpreting the Sherman Act. See *Caller-Times Publishing Co. v. Triad Communications, Inc.* [1992-1 TRADE CASES ¶ 69,746], 826 S.W.2d 576, 580 (Tex.1992); *DeSantis v. Wackenhut Corp.* [1990-2 TRADE CASES ¶ 69,147], 793 S.W.2d 670, 687 (Tex.1990), *cert. denied,* 498 U.S. 1048 (1991). In view of the fact that this is Igloo's second attempt at establishing this cause of action, I recommend that Counterclaims II-VII be dismissed.

*COUNTS IV, V, VI and VIII-IGLOO'S CONSPIRACY CLAIMS UNDER SECTION 1 OF THE SHERMAN CANNOT BE DETERMINED FOR PURPOSES OF THIS MOTION TO DISMISS*

Thermos' second argument essentially contends that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 842002 (N.D.Ill.)
**(Cite as: 1995 WL 842002 (N.D.Ill.))**

Igloo's claims in Counts IV, V, VI and VIII are un-availing for the additional reason that, as sibling cor-porations with the same ultimate parent, they are le-gally incapable of engaging in concerted action with in the meaning of the antitrust laws because the anti-trust laws do not reach actions under taken by a sin-gle entity or those undertaken by two or more entities that, are as a matter of law, considered as one. *Copperweld Corp. v. Independence Tube Corp.* [1984-2 TRADE CASES ¶ 66,065], 467 U.S. 757 (1984). In *Gucci v. Gucci Shops, Inc.* [1986-2 TRADE CASES ¶ 67,386], 651 F.Supp. 194 (S.D.N.Y.1986) this doctrine was applied to foreign affiliated corporations. Thermos has submitted vari-ous documents supporting its position that it is a wholly owned subsidiary of NSN and therefore un-der *Copperweld* cannot be held liable for conspiring un-der Section 1 of the Sherman Act with NSN. This court, however, for purposes of this motion to dis-miss is prohibited from looking to such because this is a factual determination that takes the court beyond the face of the pleadings. To be sure, Judge Andersen has permitted discovery of these incorporation docu-ments, but this in no way permits them to be analyzed for purposes of this motion. Therefore, if the Court rejects our previous recommendation to dismiss these Counts under the Noerr-Pennington Doctrine, Counts IV, V, VI and VII should remain.

*COUNTS II, III & VII-IGLOO'S CONCLUSORY AL-LEGATIONS FAIL TO SUFFICIENTLY ALLEGE THE ELEMENTS OF A CLAIM FOR MONOPOLI-ZATION, ATTEMPTED MONOPOLIZATION OR CONSPIRACY TO MONOPOLIZE*

**\*6** The modern conception of the Sherman Act is of a statute that seeks to protect consumers from monopo-listic practices rather than competitors from competi-tive practices. *American Academic Suppliers, Inc. v. Beckly-Cardy, Inc.* [1991-1 TRADE CASES ¶ 69,296], 922 F.2d 1317, 1319 (7th Cir.1991). Section 2 of the Act reads as follows: "Every person who shall monopolize, or attempt to monopolize, or com-bine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ..." 15 U.S.C.A. § 2. We will explore Igloo's allegations of monopolization, attempted monopolization and conspiracy to mo-nopolize.

Igloo claims Thermos' acts of using its federally reg-istered trademark and its attempts to enforce this mark are violating Section 2 of the Sherman Act. For example in Count II of Igloo's second amended com-plaint Igloo claims that Thermos, had, and has, the specific intent of achieving a monopoly throughout the United States in the use of the name "thermos" for thermos bottles, and of achieving a monopoly in sale of thermos bottles by excluding competitors and retailers from using the common name of the prod-ucts they sell; that Thermos' conduct constitutes predatory, anticompetitive conduct in furtherance of its purpose to monopolize by unlawfully attempting to prevent competitors and retailers from fairly com-peting in the sale of thermos bottles; that there is a dangerous probability that Thermos will gain a mo-nopoly over the market of thermos bottles in the United States if its efforts to monopolize the generic name "thermos" are successful. Count III essentially repeats these same claims as to NSN, and Count VII is a counterclaim against Thermos & NSN for violat-ing Section 15.05(b) of the Texas Free Enterprise And Antitrust Act of 1983 by attempting to monopo-lize in restraint of trade and commerce.

Monopolization has two elements: first, the posses-sion of monopoly power in the relevant market, and second, the acquisition or maintenance of that power by other than such legitimate means as patents, supe-rior products, business acumen, or historic accident. *Barry Wright Corp. v. ITT Grinnel Corp.* [1984-1 TRADE CASES ¶ 65,787], 724 F.2d 227, 230 (1st Cir.1983), *quoting United States v. Grinnell Corp.* [1966 TRADE CASES ¶ 71,789], 384 U.S. 563, 570-571 (1966). Further, specific facts must be alleged to support each and every element of its claim. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984) *cert. denied,* 470 U.S. 1054 (1985). An attempted monopolization claim under Section 2 of the Sherman Act comprises three ele-ments (1) anticompetitive conduct; (2) intent to mo-nopolize; and (3) a dangerous probability of obtain-ing monopoly power. *Broadcast Music, Inc. v. Harst/ABC Viacom Entertainment Services* [1990-2 TRADE CASES ¶ 69,171], 746 F.Supp. 320, 327 (S.D.N.Y.1990). Also, Igloo must allege there is a substantial danger that Thermos' conduct if allowed to continue, will harm consumers. *American Aca-demic Supplies,* 922 F.2d at 1319. A conspiracy to monopolize claim entails two components, proof of concerted action deliberately entered with specific intent to achieve an unlawful monopoly, and an overt

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 842002 (N.D.Ill.)
**(Cite as: 1995 WL 842002 (N.D.Ill.))**

act in furtherance of the conspiracy. *Broadcast Music,* 746 F.Supp. at 327.

**\*7** At the outset, Igloo has attached as an exhibit to its *Motion For Leave to File Defendants Amended Answer, Affirmative Defenses,* and *Counterclaims* Exhibit B. Exhibit B contains a table referencing the court to look at numerous date stamped documents that Thermos has produced in discovery as well as various other documents. It is not clear whether Exhibit B is attached to the countercomplaint itself. What is clear, however, is that the contents of these documents have not been incorporated into the text of the countercomplaint and they are attempting to force the court to analyze factual issues. As stated earlier, this court cannot make factual determinations for purposes of a motion to dismiss. Further, Igloo has failed to articulate the relevant geographic market or product market. Igloo apparently contends that it competes in the "thermos bottle market" which, according to Igloo, includes "thermal bottles" such as "vacuum bottles." There are material difference between these products. Further, Igloo fails to discuss market share or market power or how the acquisition of this market share violated Section 2. Similarly, facts supporting the probability of obtaining monopoly power are absent. Rather, Igloo merely attempts to predict that a monopoly could eventually occur should Thermos be permitted to continue use of its federally registered marks. Finally, there is no support or even an allegation really that any, let alone all, of the plaintiffs where somehow involved in a conspiracy when it registered its marks and/or marketed its products with such marks. Therefore, it is recommended that Counts II, III and VII be dismissed with prejudice.

*Counts V, VI, VII and VIII*

Igloo's counterclaims V-VIII relate to state causes of action under Sections 15.05(a) and 15.05(b) of the Texas Free Enterprise and Antitrust Act of 1983. Notwithstanding Igloo's opinion of what it believes would be best for the health of the Texas economy, I agree with plaintiffs that both sections of the Texas statute are to be construed in harmony with federal law interpreting the Sherman Act. *Caller-Times Publishing Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex.1992); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 687 (Tex.1990), *cert. denied,* 498 U.S. 1048 (1991). Additionally, the *Noerr-*

*Pennington* doctrine would still function as a bar to causes of action alleging injury from First Amendment petitioning activity as plaintiffs have conducted herein. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 113 S.Ct. 1920, 1927 (1993); *Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 649-650 (7th Cir.1983). It is therefore recommended that Counts V, VI, VII and VIII be dismissed with prejudice.

*Counts IX and X*

Counts IX and X are counterclaims for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the common law of unfair competition. These counterclaims are based on Thermos' use of the word "genuine" in connection with advertising of its insulated bottles. I agree with the plaintiffs that the use of the word "genuine" on its own federally registered trademark cannot, as a matter of law, be false or misleading. Additionally, I agree with plaintiffs that Igloo has set forth nothing more than "mere conclusions" regarding Thermos's supposed bad faith efforts of trademark policing. Thermos' actions in policing the use of its trademarks were consistent with their "incontestable" federal registration. Additionally, the issue of whether "genuine" can be used by Thermos in connection with its trademarks has already been decided. *King-Seeley Thermos v. Aladdin Indus.,* 289 F.Supp. 155 (D.Conn.1968). The word "genuine" was held to be synonymous with "brand" in the minds of the public. Thermos was found to be within its rights to use the word "genuine." Thermos has truthfully and in a nonmisleading manner, used its own brand name in advertising. Igloo cannot support a claim under the Lanham Act or the common law of unfair competition. Thus counts IX and X should be dismissed with prejudice.

**\*8** The counterclaims posed by Igloo relating to antitrust violations and unfair competition (Second Amended Counterclaim, paragraphs 7-12 and affirmative defenses paragraphs 47(c) and 48 rely upon counts II-X and should be stricken pursuant to Federal Rule of Civil Procedure 12(f) because the counts on which they rely fail to state claims upon which relief may be granted.

*CONCLUSION*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 842002 (N.D.Ill.)
**(Cite as: 1995 WL 842002 (N.D.Ill.))**

For the reasons listed above, I recommend that Thermos' and NSN's motion to dismiss with prejudice counts II-X of Igloo's Second Amended Counterclaim be granted. I also recommend that Thermos' and NSN's motion to strike paragraphs 7-12 of Igloo's Second Amended Counterclaim and paragraphs 47(c) and 48 of the Second Amended Answer be granted.

> FN1. One of the ways that a mark can be challenged and potentially removed from the federal registration is if it becomes "generic." Examples of trademarks which have lost their unique status as marks and become generic include "cellophane" and "aspirin." *DuPont Cellophane Co. v. Waxed Products Co.,* 85 F.2d 75 (2d Cir.1936), *cert. denied,* 299 U.S. 601 (1936); *Bayer Co. v. United Drug Co.,* 272 F. 505 (S.D.N.Y.1921). A generic trademark has lost its connection with a particular source and is identified by the public as the genus or class of which the individual product or service is a member. *Park 'N Fly v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194 (1985). Section 14 of the Lanham Act provides for cancellation of a mark "at any time if the registered mark becomes the generic name for the goods or services, or a portion thereof." 15 U.S.C. § 1064(c). Thus, it is in the mark holder's best interest to maintain the connection in the public's mind between its trademark and its (own) source. The constant tension exists in the minds of the holder of the trademarks to, on the one hand actively promote their product while being vigilant to avoid the trademark becoming generic and susceptible to being stricken from the federal trademark register.

N.D.Ill.,1995.
Thermos Co. v. Igloo Products Corp.
Not Reported in F.Supp., 1995 WL 842002 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323
**(Cite as: 1995 WL 745832 (N.D.Ill.))**

**H**

United States District Court, N.D. Illinois, Eastern
Division.
The THERMOS COMPANY and Nippon Sanso
Netherlands B.V., Plaintiffs,
v.
IGLOO PRODUCTS CORPORATION, Defendant.
**No. 93 C 5826.**

Dec. 13, 1995.

*MEMORANDUM OPINION AND ORDER*

ANDERSEN, District Judge.

*1 On September 27, 1995, Magistrate Judge Ronald
A. Guzmán filed and served upon the parties his Re-
port and Recommendation concerning the motion to
dismiss and the motions to strike. Magistrate Judge
Guzmán recommended that: (1) plaintiffs/counter-
defendants Thermos Company's ("Thermos") and
Nippon Sanso Netherlands B.V.'s ("NSN") motion to
dismiss with prejudice Counts II through X of
counter-plaintiff/defendant Igloo Products Corpora-
tion's ("Igloo") Second Amended Counterclaim be
granted; (2) Thermos' motion to strike paragraphs 7
through 12 of Igloo's Second Amended Counterclaim
be granted; and, (3) Thermos' motion to strike para-
graphs 47(c) and 48 of Igloo's Second Amended An-
swer be granted.

After a careful consideration of the above-referenced
motion to dismiss and motions to strike, the applica-
ble memoranda of law, other relevant pleadings, the
Magistrate Judge's Report, Igloo's objections thereto,
and Thermos' memorandum opposing Igloo's objec-
tions to the Magistrate Judge's Report, this Court
hereby adopts in full the Magistrate Judge's Report
and Recommendation on Thermos' motion to dismiss
Counts II through X of Igloo's Second Amended
Counterclaim and motions to strike paragraphs 7
through 12 of the Second Amended Counterclaim
and paragraphs 47(c) and 48 of the Second Amended
Answer.

*BACKGROUND*

Igloo's well-pleaded allegations, which the Court
treats as true and views in a light most favorable to
the counter-plaintiff for purposes of these motions to
dismiss and motions to strike, are as follows:

Thermos manufactures and sells a variety of con-
sumer products including vacuum-insulated bottles,
foam-insulated jugs and beverage containers, ice
chests, picnic coolers, school lunch kits, food jars,
coffee carafes, barbecue grills, and related accesso-
ries. To identify its products and distinguish them
from competitor's products, Thermos has extensively
used and advertised numerous trademarks, including
its company name and trademark THERMOS. The
United States Patent and Trademark Office has issued
federal trademark registrations for each of these
marks. These trademarks and their federal registra-
tions are currently owned by NSN and exclusively
licensed to Thermos for use in the United States.
Thermos filed this lawsuit for trademark infringe-
ment after Igloo allegedly infringed three of Thermos'
federally registered trademarks, including Thermos'
flagship mark THERMOS, on competitive products.

This lawsuit was filed after extensive attempts by
Thermos to deal with Igloo's alleged unlawful use of
Thermos' marks. These efforts began in January 1992
when Thermos objected to the form of Igloo's use of
the term "thermos" on its steel vacuum bottles. Simi-
lar to other trademark policing letters used by Ther-
mos, a 1992 letter to Igloo identified the relevant
Thermos registration number, cited *American Ther-
mos Prod. Co. v. Aladdin Industries, Inc., 207
F.Supp. 9 (D.Conn. 1962), aff'd sub nom., King-
Seeley Thermos Co. v. Aladdin Industries, Inc., 321
F.2d 577 (2d Cir. 1963), decree modified, 320
F.Supp. 1156 (D.Conn. 1970)*(discussed *infra*), speci-
fied how Igloo's use of "thermos" violated Thermos'
rights, and requested Igloo to cease its use of the
THERMOS mark. Igloo subsequently discontinued
use of the offending mark. In early 1993, however,
Thermos determined that Igloo had embarked on an-
other form of infringement by using the term
"THERMOS" on its foam-insulated containers.
Thermos again wrote to Igloo demanding that Igloo
cease this infringement. Subsequently, the parties
engaged in settlement negotiations. In return for an
agreement permitting Igloo to dispose of its existing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

inventories by July 31, 1993 (which Igloo sought to extend to September 30 as that deadline approached), and a release from Thermos' damages claims for Igloo's prior uses of the term "thermos," Igloo indicated its willingness to cease using "thermos" on the offending products and not to challenge Thermos' trademark rights in the future. Unfortunately, a final settlement agreement was never signed. Thermos subsequently filed this lawsuit in September 1993.

*2 In its Second Amended Counterclaim, Igloo contends that Thermos' efforts to enforce its federally registered trademarks through this lawsuit and pre-litigation policing letters, as well as Thermos' use of the word "genuine" in connection with its own federally registered trademark, THERMOS, constitute violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 (1990) ("Sherman Act"); the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann. §§ 15.05(a) and (b) (1991) ("Texas Antitrust Act"); Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1992); and the common law of unfair competition. In particular, Count II of Igloo's Second Amended Counterclaim alleges monopolization by Thermos in violation of the Sherman Act. Count III alleges monopolization by NSN in violation of the Sherman act. Count IV alleges Thermos and NSN engaged in a conspiracy to monopolize in violation of the Sherman Act. Count V alleges Thermos and NSN entered into a contract in restraint of free trade and commerce in violation of the Texas Antitrust Act. Count VI alleges that Thermos and NSN engaged in a conspiracy in restraint of free trade and commerce in violation of the Texas Antitrust Act. Count VII alleges that Thermos and NSN attempted to monopolize in restraint of free trade and commerce in violation of the Texas Antitrust Act. Count VIII alleges that Thermos and NSN conspired to monopolize in restraint of free trade and commerce in violation of the Texas Antitrust Act. Count IX alleges that Thermos violated Section 43(a) of the Lanham Act. Finally, Count X alleges that Thermos violated the common law of unfair competition.

Thermos contends that Counts II through X of Igloo's Second Amended Counterclaim should be dismissed for failure to state a claim upon which relief can be granted. Specifically, Thermos contends that Counts II through VIII are barred by the *Noerr-Pennington* Doctrine. In the alternative, Thermos argues that

Counts II through VIII fail to allege sufficiently the requisite elements for monopolization claims under the Sherman Act and the Texas Antitrust Act. Further, Thermos contends that Counts IX and X fail to state a claim because the issues raised in these counts have been previously litigated in *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 289 F.Supp. 155 (D.Conn. 1968), *vacated on other grounds,* 418 F.2d 31 (2nd Cir. 1969).

Also at issue in this case are certain paragraphs of Igloo's Second Amended Counterclaim and Second Amended Answer which relate to Counts II through X. Specifically, paragraph 7 of Igloo's Second Amended Counterclaim alleges that "Thermos is and has been engaged in a course of conduct calculated to harass, inhibit, restrain, and prevent Thermos' competitors, retailers and other members of the public from using the word 'thermos' in reference to thermal bottles in order to monopolize the word for its own commercial gain, all at the expense of Thermos' competitors, retailers, and other members of the public." Paragraph 7 further alleges that Thermos' lawsuit against Igloo is "meritless and a sham" and that the sole purpose of this litigation is "to harass and impede Igloo in its efforts to fairly compete in the United States market in the sales of thermos bottles."

*3 Paragraph 8 of Igloo's Second Amended Counterclaim alleges that Thermos maintains a "systematic practice of locating third parties who use the word 'thermos'" and subsequently files lawsuits for trademark infringement against those parties which have been "spurious, invalid and made with the intent to restrain trade by preventing advertisement and use of the name by which thermos bottles are commonly known and by intimidating retailers into not using the word 'thermos' except in referent to the Plaintiffs' product." Paragraph 8 further alleges that Thermos' conduct violates the Policing Order entered against its predecessor in title by the United States District Court for the District of Connecticut. Finally, paragraph 8 alleges that Thermos derives exclusive use of the "descriptive and generic word 'thermos' for its own profit and at the expense of its competitors."

Paragraph 9 of Igloo's Second Amended Counterclaim alleges that Thermos' trademark policing conduct confuses the public and induces the "public into believing either that the thermos bottles of competitors are actually products of Thermos or that the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323
(Cite as: 1995 WL 745832 (N.D.Ill.))

products of competitors are associated in some way with the products of Thermos, thereby depriving competitors of the right to have their products associated with the true source of origin of such products, or a combination thereof."

Paragraph 10 of Igloo's Second Amended Counterclaim alleges that "[NSN] has joined with Thermos to support and encourage the aforesaid actions by Thermos for its own financial gains and thereby has conspired with Thermos in the foregoing restraint of trade."

Paragraph 11 of Igloo's Second Amended Counterclaim alleges that Thermos and NSN have "willfully and intentionally embarked upon an unlawful strategy to suppress and thwart legitimate competition in the thermos bottle market." Paragraph 11 further alleges that this conduct warrants the "assessment of substantial exemplary damages."

Paragraph 12 of Igloo's Second Amended Counterclaim alleges that Thermos and NSN "have the market power and the financial resources to impose their unreasonable demands upon retailers, and in most if not all instances, the Plaintiffs have been successful in restraining trade by coercing retailers into acceding to the demands of Thermos that use of 'thermos' be discontinued."

Paragraph 47(c) of Igloo's Second Amended Answer alleges that "Plaintiffs conspired in violation of the common and federal laws to prevent Defendant as a competitor from using words and phrases which are available for use by the Defendant and the rest of the public in the manner used by Defendant."

Finally, paragraph 48 of Igloo's Second Amended Answer alleges that "Plaintiffs are barred from obtaining any relief herein by their use of the term 'THERMOS' to violate the antitrust laws of the United States."

Thermos contends that paragraphs 9 through 12 of Igloo's Second Amended Counterclaim and paragraphs 47(c) and 48 of Igloo's Second Amended Answer should be stricken because they relate to Counts II through X of Igloo's Second Amended Counterclaim which fail to state a claim upon which relief can be granted.

## DISCUSSION

### I. *Motion To Dismiss*

*4 The relevant standard for a motion to dismiss a counterclaim is identical to the standard for a motion to dismiss a complaint. Fed.R.Civ.P. 12(b). A motion to dismiss should not be granted unless it "appears beyond doubt that the [counter-plaintiff] can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Beam v. IPCO Corp.,* 838 F.2d 242, 244 (7th Cir. 1988); *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir. 1985), *cert. denied,* 475 U.S. 1047 (1986). We take the well-pleaded allegations of the [[[counter-claim]] as true and view them, as well as reasonable inferences therefrom, in the light most favorable to the [counter-plaintiff]. *Balabanos v. North American Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491 n.1 (N.D.Ill. 1988) *(citing Ellsworth, supra); see also Refco, Inc. v. Troika Inv. Ltd.,* 702 F.Supp. 684, 685 n.2 (N.D.Ill. 1988).

For purposes of a motion to dismiss, the court may not look beyond the face of the pleadings, or in this case, Igloo's counterclaims. Igloo, however, filed evidentiary and factual materials with its Motion for Leave to File Defendant's Second Amended Answer, Affirmative Defenses and Counterclaims or for Modification of Protective Order. We agree with the Magistrate Judge's determination that these extrinsic materials, as well as arguments derived from them, may not be considered with regard to a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Accordingly, the Magistrate Judge properly refused to consider all submitted evidentiary materials except those properly attached and incorporated in Igloo's Second Amended Counterclaim. *See Fleischfresser v. Directors of Sch. Dist. 200,* 15 F.3d 680, 684 (7th Cir. 1994); *R.J.R. Services, Inc. v. Aetna Cas. & Sur. Co.,* 895 F.2d 279, 281 (7th Cir. 1989); *Beam v. IPCO Corp.,* 838 F.2d 242, 244 (7th Cir. 1988).

Igloo now objects to this conclusion and argues that in the interests of justice the Magistrate Judge should have considered the "extrinsic" material submitted in interpreting Igloo's counterclaims. In its objections to Magistrate Judge Ronald A. Guzmán's Report and Recommendation, Igloo states:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323
**(Cite as: 1995 WL 745832 (N.D.Ill.))**

Judge Guzmán's Report essentially places Igloo in a "Catch 22" position. Igloo is under an order from Judge Andersen not to include in its public counterclaim the confidential factual information contained in the "extrinsic" material. At the same time, however, Judge Guzmán's Report concludes that the lack of such factual information renders Igloo's Counterclaims pleading defective and therefore subject to dismissal with prejudice.

(Defendant's Objections at 2). According to Igloo, this "extrinsic" material addresses such issues as "whether Thermos has a dominant market position, whether it has an intent to dominate the market, whether there is a likelihood of Thermos becoming a predominant player in the market, whether Thermos has a predatory intent, whether the name 'thermos' is generic of beverage jugs that are not vacuum bottles, whether and how Thermos may have misused its federal trademark registrations for THERMOS, whether and how Thermos may have made unwarranted demands on its competitors or other third parties in respect of any rights in the word 'thermos,' and whether and how Thermos may have violated the terms of the court orders entered in an earlier litigation involving Aladdin." *Id.*

*5 Igloo's objections to the Magistrate Judge's Report relating to this "extrinsic" material are hereby overruled. First, Igloo cites no authority, other than the "interests of justice," for its position that the Magistrate Judge should have considered this material. It is a well-established rule in this circuit that the court, for purposes of a motion to dismiss, may not consider evidentiary materials beyond the face of the pleadings. *Fleischfresser,* 15 F.3d at 684; *R.J.R. Services., Inc.,* 895 F.2d at 281; *Beam,* 838 F.2d at 244. The only exception to this rule is determining whether the court has subject matter jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189 (1936). However, this exception does not apply since we clearly have subject matter jurisdiction in this case.

Second, Igloo made no efforts to incorporate this "extrinsic" material in its Second Amended Counterclaim by seeking leave to file the pleadings under seal. Igloo offers no explanation for its failure to do so.

Further, Igloo's objections fail to demonstrate how this "extrinsic" material saves its counterclaims from dismissal. Igloo generally alleges that the material elaborates on issues which are "essentially the ones for which Judge Guzmán's Report concluded insufficient facts were set forth in Igloo's Counterclaims." (Defendant's Objections at 2). On the contrary, we find that this confidential "extrinsic" material is irrelevant to whether Igloo's counterclaims are barred by the *Noerr-Pennington* Doctrine in which the issue is not whether Thermos will ultimately prevail on its trademark claims but whether its lawsuit is objectively baseless. Issues such as Thermos' intent to dominate the market or whether the term "thermos" is generic are immaterial to such an inquiry. Accordingly, Igloo's objections concerning this "extrinsic" material are hereby overruled.

### A. *Counts II-VIII*

We now turn to Thermos' motion to dismiss Counts II through VIII of Igloo's Second Amended Counterclaim. Counts II through IV allege that Thermos and NSN engaged in monopolization, attempted monopolization, and conspiracy to monopolize in violation of the Sherman Act. Counts V through VIII allege similar state law claims under the Texas Antitrust Act. Thermos contends that these counts should be dismissed because they are barred by the *Noerr-Pennington* Doctrine or, in the alternative, because they fail to allege the required elements for monopolization claims under federal and state law.

#### 1) *Noerr-Pennington Doctrine*

We agree with the Magistrate Judge's reasoning that Igloo's federal and state antitrust claims are barred by the *Noerr-Pennington* Doctrine which yields antitrust immunity to those who seek to protect their trademark rights. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 113 S.Ct. 1920, 1926 (1993). It has been previously determined that Thermos has the right to enforce its THERMOS trademark and to prohibit competitors from using the word "thermos" on products covered by its federal registration. *See American Thermos Prod. Co. v. Aladdin Industries, Inc.,* 207 F.Supp. 9 (D.Conn. 1962), *aff'd sub nom., King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir. 1963), *decree modified,* 320 F.Supp. 1156 (D.Conn. 1970). Moreover, the Magistrate Judge correctly noted that it is well-established in this circuit that a "trademark

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323
**(Cite as: 1995 WL 745832 (N.D.Ill.))**

holder has the right to defend himself against infringement" by sending trademark policing letters to alleged infringers. See *Spangler Candy Co. v. Crystal Pure Candy Co.,* 235 F.Supp. 18, 32 (N.D.Ill. 1964), *aff'd,* 353 F.2d 641 (7th Cir. 1965); *Lucien Lelong, Inc. v. Dana Perfumes, Inc.,* 138 F.Supp. 575, 579 (N.D.Ill. 1955); *Chromium Industries, Inc. v. Mirror Polishing & Plating Co., Inc.,* 448 F.Supp. 544, 558 (N.D.Ill. 1978) (infringement warning letters in a patent case); *Airtex Corp. v. Shelley Radiant Ceiling Co.,* 400 F.Supp. 170, 177 (N.D.Ill. 1975)(infringement warning letters in a patent case), *aff'd,* 536 F.2d 145 (7th Cir. 1976). Accordingly, we conclude, as did the Magistrate Judge, that Thermos' lawsuit and the related actions it took to protect its federally registered trademark constitute a protected activity immune from antitrust liability.

*6 Further, Igloo has failed to show that plaintiffs have engaged in a "sham" litigation which would abrogate plaintiffs' antitrust immunity under the *Noerr-Pennington* Doctrine. See *Professional Real Estate Investors, Inc.,* 113 S.Ct. at 1928. A "sham" lawsuit "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* In this case, however, the allegations in Thermos' complaint, if true, clearly show a violation of Thermos' valid trademark and, therefore, Thermos' action is not a "sham" lawsuit because it attempts to protect a valid and incontestable trademark. See *American Thermos Prod. Co. v. Aladdin Industries, Inc.,* 207 F.Supp. 9 (D.Conn. 1962), *aff'd sub nom., King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir. 1963), *decree modified,* 320 F.Supp. 1156 (D.Conn. 1970). Accordingly, we grant plaintiffs' motion to dismiss with prejudice Counts II through VIII of defendant Igloo's Second Amended Counterclaim.

### 2) *Monopolization Claims*

Even if the *Noerr-Pennington* Doctrine did not serve as a bar to Counts II through VIII of Igloo's Second Amended Counterclaim, we further agree with the Magistrate Judge's conclusion that Igloo has failed to allege sufficiently the elements of a claim for monopolization, attempted monopolization, or conspiracy to monopolize under the Sherman Act (Counts II-IV) and the Texas Antitrust Act (Counts V-VIII). For purposes of this analysis, we construe the state law claims under the Texas statute in harmony with fed-

eral law interpreting the Sherman Act. See *Caller-Times Publishing Co., Inc. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex. 1992); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 687 (Tex. 1990), *cert. denied,* 498 U.S. 1048 (1991).

Monopolization consists of possession of monopoly power in the relevant market and acquisition or maintenance of that power by other than such legitimate means as patents, superior products, business acumen, or historic accident. *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir. 1983) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966)). Specific facts must be alleged to support each element of this claim. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir. 1984), *cert. denied,* 470 U.S. 1054 (1985). A claim for attempted monopolization under Section 2 of the Sherman Act requires four elements: (1) anticompetitive conduct; (2) intent to monopolize; (3) a dangerous probability of obtaining monopoly power; and, (4) a substantial danger that the conduct will harm consumers. *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,* 746 F.Supp. 320, 327 (S.D.N.Y. 1990); *American Academic Supplies, Inc. v. Beckley-Cardy, Inc.,* 922 F.2d 1317, 1319 (7th Cir. 1991). In addition, a claim for conspiracy to monopolize requires proof of concerted action with specific intent to achieve an unlawful monopoly and an overt act in furtherance of the conspiracy. *Broadcast Music, Inc.,* 746 F.Supp. at 327.

*7 The Magistrate Judge properly determined that Igloo's Second Amended Counterclaim does not contain the required elements for federal and state antitrust claims for monopolization, attempted monopolization, and conspiracy to monopolize. First, Igloo has not alleged the relevant geographic or product markets. Igloo vaguely alleges that it competes in the "thermos bottle market." Second, Igloo does not allege specific facts about market share, market power, or how Thermos' acquisition of this market violates Section 2 of the Sherman Act. Further, Igloo alleges no specific facts concerning the probability of obtaining monopoly power. Rather, Igloo generally predicts that a monopoly could occur should Thermos continue to use its federally registered trademarks. Finally, there are no allegations that Thermos and NSN were involved in a conspiracy when the marks were registered or the products were marketed. Accordingly, Counts II through VIII of Igloo's Second

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323
**(Cite as: 1995 WL 745832 (N.D.Ill.))**

Amended Counterclaim are dismissed with prejudice for failure to state monopolization claims under federal and state law. We reach this conclusion, as did the Magistrate Judge, without considering whether Thermos is a wholly owned subsidiary of NSN and, therefore, cannot be held liable for conspiring under Section 1 of the Sherman act with NSN. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984); *see also Gucci v. Gucci Shops, Inc.,* 651 F.Supp. 194 (S.D.N.Y. 1986). This inquiry requires a factual determination that goes beyond the face of the pleadings and is not permitted for purposes of a motion to dismiss.

## B. *Counts IX And X*

Count IX of Igloo's Second Amended Counterclaim alleges that Thermos' use of the word "genuine" in connection with advertising of its insulated bottles constitutes a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1992). Similarly, Count X alleges that the same conduct violates the common law of unfair competition. With regard to Thermos' motion to dismiss with prejudice Counts IX and X of Igloo's Second Amended Counterclaim, we agree with the Magistrate Judge's conclusion that Thermos' use of the word "genuine" in connection with its federally registered THERMOS trademark cannot, as a matter of law, be false or misleading so as to constitute a violation of the Lanham Act or the common law of unfair competition.

Thermos' actions in policing the use of its trademarks were consistent with its "incontestible" registration. Once a trademark has been federally registered for five years, such as the THERMOS mark, it achieves "incontestible" status. 15 U.S.C. § 1065 (1988). Moreover, a federal certificate of registration is *"prima facie* evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's right to use the mark in commerce in connection with the goods..." as specified in the certificate. 15 U.S.C. § 1057(b) (1988). We agree with the Magistrate Judge's conclusion that the THERMOS mark has achieved such "incontestible" status.

**\*8** Second, and more importantly, the issue of whether "genuine" can be used by Thermos in connection with its trademarks has been previously litigated in *King-Seeley Thermos Co. v. Aladdin Industries,* 289 F.Supp. 155 (D.Conn. 1968), *vacated on other grounds,* 418 F.2d 31 (2nd Cir. 1969). The *Aladdin* court determined that the word "genuine" was synonymous with "brand" in the minds of the public and, therefore, Thermos may use the word "genuine" in connection with its trademarks. *Id.* at 160. Igloo's conclusory allegations regarding Thermos' alleged bad faith policing efforts do not alter the fact that Thermos has used its brand name in a truthful and non-misleading manner in accordance with the *Aladdin* decision. Therefore, we grant Thermos' motion to dismiss with prejudice Counts IX and X of Igloo's Second Amended Counterclaim.

## II. *Motions To Strike*

Under Fed.R.Civ.P.12(f), the Court may strike from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, "[m]otions to strike under Federal Rule 12(f) are not favored and are usually denied unless the language in the pleading has no possible relation to the controversy and is clearly prejudicial." *Simmons v. John F. Kennedy Medical Center,* 727 F.Supp. 440, 442 (N.D.Ill. 1989)(*quoting Garza v. Chicago Health Clubs, Inc.,* 347 F.Supp. 955, 962 (N.D.Ill. 1972)).

### A. *Paragraphs 7-12 Of Second Amended Counterclaim*

Paragraphs 7 through 12 of Igloo's Second Amended Counterclaim allege, respectively, monopolization, restraint of trade, public confusion regarding product origin, conspiracy to restrain trade, unlawful strategy to suppress competition, and market power to restrain trade. We agree with the Magistrate Judge's conclusion that these paragraphs should be stricken pursuant to Fed.R.Civ.P. 12(f) because they rely on Counts II through X of Igloo's Second Amended Counterclaim which fail to state a claim upon which relief can be granted. Therefore, we grant Thermos' motion to strike. Paragraphs 7 through 12 of Igloo's Second Amended Counterclaim are hereby stricken.

### B. *Paragraphs 47(c) And 48 Of Second Amended Answer*

Finally, paragraphs 47(c) and 48 of Igloo's Second Amended Answer assert affirmative defenses based on conspiracy and violations of the antitrust laws. Again, we agree with the Magistrate Judge's conclu-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323
 **(Cite as: 1995 WL 745832 (N.D.Ill.))**

sion that these paragraphs should be stricken pursuant to Fed.R.Civ.P. 12(f) because they also rely on Counts II through X of Igloo's Second Amended Counterclaim which fail to state a claim upon which relief can be granted. Therefore, we grant Thermos' motion to strike. Paragraphs 47(c) and 48 of Igloo's Second Amended Answer are hereby stricken.

### *CONCLUSION*

Accordingly, this Court orders that: (1) Thermos' motion to dismiss with prejudice Counts II through X of defendant Igloo's Second Amended Counterclaim is granted; (2) Thermos' motion to strike paragraphs 7 through 12 of defendant Igloo's Second Amended Counterclaim is granted; and, (3) Thermos' motion to strike paragraphs 47(c) and 48 of defendant Igloo's Second Amended Answer is granted. Defendant Igloo's objections to the Magistrate Judge's Report and Recommendation are hereby overruled. It is so ordered.

N.D.Ill.,1995.
Thermos Co. v. Igloo Products Corp.
Not Reported in F.Supp., 1995 WL 745832 (N.D.Ill.), 1996-1 Trade Cases P 71,323

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

**H**Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Carol Weiner TIZES, et al., Plaintiffs,
v.
Joseph R. CURCIO, et al., Defendants.
**No. 94 C 7657.**

Aug. 9, 1995.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

**\*1** This case involves a dispute among neighbors that
has escalated into a full scale war; and the battle in
federal court has just begun. Plaintiffs, members of a
Jewish family (the "Tizes"), brought this action
against the North State Astor Lake Shore Drive As-
sociation (the "NSALSDA"), its officers individually
and in their official capacity, and other neighbors
claiming that the NSALSDA and the neighbors en-
gaged in an ethnically-motivated campaign to harass
the Tizes and delay the family's plans to renovate
properties in the historic Astor Street district of Chi-
cago, Illinois.

More specifically, in their eight-count complaint, the
Tizes seek equitable and monetary relief against the
Defendants for ethnic discrimination in violation of
42 U.S.C. § 1981, *et seq.* (1991), discriminatory in-
terference with Plaintiffs' property rights in violation
of 42 U.S.C. § 1982, *et seq.* (1991), violation of the
Fair Housing Act, 42 U.S.C. § 3601, *et seq.* (1988),
and various violations of Illinois state and common
law.

Defendants now move to dismiss all eight counts
under Fed. R. Civ. P. 12(b)(6) for failure to state a
claim and/or under Fed. R. Civ. P. 12(b)(7) for failure
to name a necessary party.[FN1] For the reasons set
forth below, we deny Defendants' motion to dismiss.

*BACKGROUND*

On November 1990, Dr. Reuben Tizes, on behalf of

himself, his wife, Carol Wiener Tizes, and his son,
Dr. Bruce R. Tizes, purchased two parcels of real
property commonly known as 38 East Schiller Street
in Chicago, Illinois and 1401 North Astor Street in
Chicago, Illinois (hereinafter, the "Astor-Schiller
street properties"). The buildings on these two prop-
erties are next to one another and share a common
party wall. These properties are located in a Chicago
Historical Landmark District.

The Astor-Schiller street properties were placed in an
Illinois land trust. The beneficiaries of the trust are
Dr. Bruce R. Tizes, Reuben Tizes and Carol Wiener
Tizes. The properties were purchased with the inten-
tion of creating a single family residence for Mary
Wiener Tizes (now deceased), Reuben Tizes (now
deceased), Carol Wiener Tizes, Dr. Bruce R. Tizes,
Simone Tizes, Andrea Tizes Feinberg, David
Feinberg and Rachel Feinberg. All members of the
Tizes family are American citizens of Jewish ances-
try.

In order to achieve the family's goal of converting the
two properties into a single family home, the Tizes
devised a plan to renovate, improve and restore the
Astor-Schiller street properties in conjunction with an
architectural firm and a law firm. Since the Astor-
Schiller street properties were located in a Historical
Landmark District, the family worked closely with
these experts to ensure that the renovations would be
in compliance with all of the pertinent zoning and
landmark laws, rules and regulations.

**\*2** From September 1992 through March 1993, the
Tizes family advised various members of the
neighborhood along with officials from the
NSALSDA, the local homeowners association, of the
family's intent to renovate and transform the proper-
ties into a single residence. The Tizes eventually
submitted their renovation and restoration plans to
the Chicago Landmark Commission and sent cour-
tesy copies of those plans to the NSALSDA.

Problems soon began to develop between the
neighbors, the officers of the NSALSDA and the
Tizes over the project. The Tizes were advised by
various members of the community that these com-
munity members would oppose and attempt to delay

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
(Cite as: 1995 WL 476675 (N.D.Ill.))

the Tizes' proposed renovation project. To this end, the Tizes were allegedly the subjects of an extortion attempt, wherein an individual defendant demanded $100,000.00 from the Tizes in order to ensure that the renovation plans would be approved. Further, as the Tizes pressed their plans before the Chicago Landmark Commission, a fountain on the Tizes' property was purportedly vandalized; racial slurs were directed towards the Tizes on various occasions; Leslie Soroka's car was mysteriously vandalized while parked on the Tizes' property; and a locked gate, which impeded the Tizes access to their residences, was placed on the Tizes' property.

The Chicago Landmark Commission eventually approved the Tizes' proposed renovation and restoration plan. As a result, a number of the Defendants, in turn, attempted to persuade a city alderman to introduce in the Chicago City Council an amendment to the Astor Street Historic District ordinance which would ban additions similar to those proposed by the Tizes. The Chicago Landmark Commission opposed such an amendment and, eventually, the sponsor of the amendment withdrew his support.

The Tizes then approached the Chicago Department of Zoning and the Chicago Department of Buildings to obtain the proper building permits. These permits were approved. The Defendants appealed the approval of the Tizes' zoning permit; however, the Zoning Board of Appeals affirmed the decision of the Department of Zoning.

The Defendants then filed a lawsuit in the Circuit Court of Cook County, Chancery Division, seeking review of the Chicago Zoning Board of Appeals decision. On May 16, 1995, the Circuit Court entered an order affirming the Board of Appeals' approval of the Tizes' zoning permit. The Defendants are presently pursuing an appeal of the Circuit Court's ruling in the Appellate Court of Cook County, Illinois.

Prompted by the Defendants' actions, the Tizes filed the eight-count complaint which initiated the present suit. In their Complaint, the Tizes seek equitable and monetary relief against the Defendants for ethnic discrimination in violation of 42 U.S.C. § 1981, et seq.; discriminatory interference with Plaintiffs' property rights in violation of 42 U.S.C. § 1982, et seq.; violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq.; and a number of other Illinois statutory

and common law violations. The Defendants subsequently filed the motion to dismiss the Tizes' Complaint that is presently before this court.

## DISCUSSION

**\*3** When considering a motion to dismiss, the Court examines the sufficiency of the complaint, not the merits of the lawsuit. *Triad Assocs. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir. 1989)*, cert. denied, 498 U.S. 845 (1990). The Court draws all inferences and resolves all ambiguities in the plaintiffs' favor and assumes that all well-pleaded facts are true. *Dimmig v. Wahl, 983 F.2d 86, 86 (7th Cir.)*, cert. denied, 114 S. Ct. 176 (1993). A motion to dismiss will be granted only if the Court finds that the plaintiffs can prove no set of facts that would entitle them to relief. *Venture Assoc. Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 432 (7th Cir. 1993)*; *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*. Keeping these standards in mind, the Court considers each of the three grounds for dismissal offered by Defendants separately.

### First Amendment Immunity

Defendants first asserted ground for dismissal is that their conduct, as detailed in the Complaint, is absolutely protected by the First Amendment right to "petition the Government for a redress of grievances." U.S. Const. amend. I. Defendants maintain that because the Complaint is premised upon the Defendants' attempts to stop or delay the Tizes' home renovations through various administrative and state court proceedings, and that because such conduct constitutes a lawful petition of the government, the Complaint fails to state a legally valid claim for relief.

Defendants are correct that, as a general rule, no cause of action is alleged when predicated solely on citizens' attempts to influence the legislature to pass laws or to influence the executive branch to enforce those laws. *United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965)*; *Eastern R. Presidents Conference v. Noerr Motor Freight Inc., 365 U.S. 127, 135-36 (1961)*. This rule is commonly known as the *No-err-Pennington* doctrine.

The Supreme Court has applied the *Noerr-Pennington* doctrine to grant immunity from suit not only to those who petition elected officials or the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

legislature, but also to those who petition administrative agencies and the courts. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 113 S. Ct. 1920, 1926 (1993); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). The *Noerr-Pennington* doctrine thus effectively grants constitutional immunity to citizens requesting governmental or judicial action from any and all liability ostensibly attributable to their petitioning activities. *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614-15 (8th Cir. 1980).

*\*4* In the present matter, Defendants argue that the conduct which forms the basis of the Tizes' Complaint--namely, Defendants' participation in proceedings before the Zoning Board of Appeals and Defendants' institution of suit in the Circuit Court of Cook County--is precisely the type of activity that is protected by the *Noerr-Pennington* doctrine. Defendants therefore maintain that they are immune from liability for the conduct alleged and that, consequently, the Tizes' Complaint must be dismissed.

Defendants' argument is fundamentally flawed in two major respects: (1) Defendants conveniently overlook the well-established exception to the *Noerr-Pennington* doctrine for governmental or judicial petition undertaken for fraudulent or unlawful purposes; and (2) Defendants ignore the totality of the harassing conduct alleged in the Tizes' Complaint. These two deficiencies are fatal to Defendants' First Amendment immunity claim.

Initially, Defendants' immunity argument overlooks an important exception to the *Noerr-Pennington* doctrine. According to the Seventh Circuit, immunity from suit under the First Amendment right of petition does not extend to citizens' use of administrative or judicial proceedings for fraudulent or unlawful purposes. *Wright v. DeArmond,* 977 F.2d 339, 347 (7th Cir. 1992), *cert. denied,* 113 S. Ct. 1945 (1993); *see also Mayer v. Wedgewood Neighborhood Coalition,* 707 F.2d 1020, 1023 (9th Cir. 1983) (the use of administrative or judicial proceedings may state a cause of action if employed for a purpose that is unlawful "and is other than and in addition to the goal sought openly in the proceedings itself").

Further, when individuals attempt to petition the government or the courts for redress with no real expectation of securing a favorable result, but simply to

force expense and delay on the other party, those individuals are not immune from liability. *City of Columbia v. Omni Outdoor Advertising,* 111 S. Ct. 1344, 1354 (1991); *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391 (7th Cir. 1993), *cert. denied,* 114 S. Ct. 1054 (1994). In other words, liability can be imposed when the purpose of petitioning activity is "not to induce government action but to injure the plaintiff directly." *Gorman Towers, Inc.,* 626 F.2d at 615.

In the context of § 1981 and § 1982 claims, if petitioning activity is motivated by racial animus or is intended to achieve discriminatory goals, such conduct is presumptively illegal and is not protected by the First Amendment. *LeBlanc-Sternberg v. Fletcher,* 781 F. Supp. 261, 265 (S.D.N.Y. 1991).

*\*5* While Defendants cite *Weiss v. Willow Tree Civic Association,* 467 F. Supp. 803 (S.D.N.Y. 1979), a factually similar case, for the proposition that an individual or group of individuals can, if done through proper channels, petition their government to take action which is incidentally harmful to another party no matter what the "motivations" of the individual or group may be, the Court finds that more recent Seventh Circuit and other authority-- including *Wright,* 977 F.2d at 347, *Mayer,* 707 F.2d at 1023, and *LeBlanc-Sternberg,* 781 F. Supp. at 265-67--offer a better reasoned and more compelling view of the First Amendment right to petition generally and the *Noerr-Pennington* doctrine specifically. These authorities establish that the legal and legislative processes are not "clubs" to wield over the heads of other citizens. Instead, as is clear from the language of the First Amendment itself, the right to petition is intended to permit citizens to have their grievances addressed by the government, not to provide citizens with a mechanism with which to harass or intimidate one another. U.S. Const. amend. I.

Indeed, in *LeBlanc-Sternberg,* a factually analogous case decided more than twelve years after *Weiss,* the United States District Court for the Southern District of New York (the same district in which *Weiss* was decided) specifically held that otherwise protected petitioning activities which are undertaken for discriminatory purposes may form the basis of § 1981 and § 1982 liability:

Discrimination through the exercise of government

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

power is illegal, to state the obvious. It is one thing to make use of a petition to achieve legitimate, though adverse, goals. It is quite another to use a legitimate process for illegal purposes. "Acts generally lawful may become unlawful when done to accomplish an unlawful end, and a constitutional power cannot be used by way of condition to attain an unconstitutional result."

... To allow individuals to avail themselves of first amendment protections when it is alleged that their conduct will lead to official misconduct in violation of the United States Constitution would defeat the purpose of the civil rights laws.... society's interest in protecting against discrimination must be accommodated. The value of the right to petition is not diminished by recognizing that the political process may not be subverted to achieve unlawful goals.

*LeBlanc-Sternberg,* 781 F. Supp. at 266-67 (quoting *Gomillion v. Lightfoot,* 364 U.S. 339, 345-46 (1960)).

Thus, so long as the Tizes' Complaint alleges that the Defendants used the petitioning process primarily, if not exclusively, to harass or to discriminate against the Tizes, the Complaint states a potentially valid claim for relief, the First Amendment right to petition and the *Noerr-Pennington* doctrine notwithstanding.[FN2]

**\*6** The allegations contained in the Tizes' Complaint are sufficient to suggest that the Defendants' petitioning activities were designed to harass and intimidate the Tizes, were motivated by ethnic animus, and were intended to achieve discriminatory goals. For instance, after the individual Defendants learned of the Tizes' intention to combine the Astor-Schiller street properties into a single family residence, Defendant Alport stated to Bruce Tizes that "you and your monkey both look like New York Jews." Similarly, shortly after the Landmarks Commission's hearing, Defendant Curcio purportedly explained to Bruce Tizes that Curcio opposed the Tizes renovation project because "we have irreconcilable genetic differences." The Tizes also point out that Defendants have not objected to renovations, similar to those proposed by the Tizes', made by other residents of area. Indeed, according to the Complaint, only one other family has met with such "strenuous objections and unprecedented opposition" from Defendants, and that

family was also Jewish.

The foregoing allegations represent only a small sampling of the numerous factual claims offered by the Tizes in support of their § 1981, § 1982, Fair Housing Act, and Illinois state law claims. These allegations provide a sufficient basis from which a reasonable fact-finder potentially could conclude that Defendants' petitioning activities were intended only to injure or to harass the Tizes and not to secure administrative or judicial relief. As previously explained, contrary to Defendants' contention, such conduct is not protected by the First Amendment's petitioning clause generally or the *Noerr-Pennington* doctrine specifically. Thus, taking the Tizes' allegations of Defendants' motive and goals as true, this Court is not prepared to conclude that Defendants' conduct is protected by the First Amendment.

In addition to overlooking the fraudulent or unlawful purpose exception to the *Noerr-Pennington* doctrine, Defendants virtually ignore the totality of the harassing conduct alleged in the Tizes' Complaint in advancing their First Amendment immunity argument. In asserting the *Noerr-Pennington* doctrine as a bar to suit, Defendants suggest that the only conduct alleged in, and relevant to, the Tizes' Complaint are Defendants' efforts to petition administrative agencies and the state courts for denial of the relevant building and zoning permits. Defendants argue that such petitioning activity, like the community association's petitioning activity in *Weiss,* is protected by the First Amendment and cannot provide the Tizes with a basis for legal relief.

The problem with Defendants' argument, however, is that the Tizes' Complaint alleges far more than the Defendants suggest. For instance, the Complaint asserts that, in addition to using the administrative and judicial processes as a tool to harass and intimidate the Tizes, Defendants engaged in a racially motivated *campaign* of activities to delay and/or derail the Tizes' renovation plans. This campaign included the repeated use of ethnic and religious slurs, the levelling of physical threats, attempted extortion, destruction of property, and interference with the Tizes' property rights (through the construction of a locked gate on the Tizes' land). These additional allegations distinguish the Defendants' conduct in this case from the community association's protected petitioning activity in *Weiss.* As this is a motion to dismiss, the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

Court assumes these facts, as set forth in the Tizes'
Complaint, to be true. As a result, the Court finds that
neither the First Amendment right to petition for
grievances nor the *Noerr-Pennington* doctrine which
derives from that right necessarily immunizes Defen-
dants from liability for their alleged conduct under §
1981, § 1982, or the Fair Housing Act. The Court
thus rejects Defendants' motion to dismiss on First
Amendment immunity grounds.

*Abstention Doctrines*

*7 Defendants second asserted ground for dismissal
is that the Anti-Injunction Act, the *Rooker-Feldman*
Doctrine, the *Younger* Doctrine, and the *Colorado
River* Doctrine all warrant rejection of the Tizes' fed-
eral action. Defendants appear to be using a shotgun
rather than a rifle in the hope that, by asserting four
different doctrines in support of their motion, one of
these doctrines might stick. The Court briefly exam-
ines these four doctrines and concludes that each is
inapplicable to the circumstances of the present case.

The Anti-Injunction Act, 28 U.S.C. § 2283 (1987),
prohibits federal courts from enjoining state court
proceedings unless authorized to do so by an Act of
Congress or other special circumstances. The state
court proceeding in the present case is Defendants'
appeal of the state trial court's decision to grant the
Tizes their zoning permit. In their Complaint, the
Tizes request "an order enjoining the defendants from
further racially motivated interference with plaintiffs'
use and enjoyment of the Astor-Schiller Street Resi-
dences." Defendants contend that because this re-
quest for relief is essentially a request to have this
court stay the Defendants' state court appeal, such a
request violates the Anti-Injunction Act and justifies
dismissal of the Tizes' Complaint.

While the Tizes' prayer for injunctive relief may or
may not be improper and beyond the scope of this
court's power, it is unnecessary for the Court to re-
solve this issue at the present time. Contrary to De-
fendants' contentions, the Tizes request not only in-
junctive relief, but also compensatory damages, puni-
tive damages and attorneys' fees in their Complaint.
These prayers for relief are entirely proper and do not
conflict with the prohibitions of the Anti-Injunction
Act. Thus, regardless of the propriety of their request
for injunctive relief, the Tizes state valid causes of
action and set forth legally appropriate prayers for

relief in their Complaint. The Anti-Injunction Act
does not, therefore, provide a basis for dismissal of
the Tizes' suit.

Defendants also attempt to invoke the *Rooker-
Feldman* doctrine as a basis for dismissing the Tizes'
complaint. The doctrine provides that a United States
District Court has no authority to review final judg-
ments of a state court. *Rooker v. Fidelity Trust Co.,
263 U.S. 413 (1923); District of Columbia Court of
Appeals v. Feldman, 460 U.S. 462, 482 (1983).*
Again, the judgment in this case is the Illinois state
court's affirmation of the Zoning Department's deci-
sion to grant the Tizes a zoning certificate. According
to Defendants, the Tizes' Complaint "is essentially a
request to have this court review the propriety of de-
fendants' conduct and the conduct of the state court
judges in issuing restraining orders prohibiting reno-
vation of the subject properties." Accordingly, De-
fendants argue that the Tizes' suit is "no more than a
request for this court to review and essentially re-
verse the state court's decisions," and that, conse-
quently, this court lacks jurisdiction under the
*Rooker-Feldman* doctrine.

*8 In advancing this argument, Defendants thor-
oughly misapprehend the nature of both the Tizes'
claims and the Tizes' prayers for relief. Nowhere in
the Complaint do the Tizes ask this Court to review
the state court's decision as to the zoning permits.
Indeed, since the state court ruled in their favor, it
would be contrary to the Tizes' best interests to make
such a request of this Court. Thus, Defendants' argu-
ment regarding the applicability of the *Rooker-
Feldman* doctrine to the present case is without merit
and does not constitute a valid basis for dismissal of
the Tizes' Complaint.

This Court similarly rejects Defendants' contention
that the *Younger* doctrine applies to the Tizes' case.
*Younger v. Harris, 401 U.S. 37, 44 (1971),* estab-
lished that principles of comity and federalism re-
quire that federal district courts abstain from granting
relief whenever doing so would substantially inter-
fere with ongoing state judicial proceedings. *See also
Nelson v. Murphy, 44 F.3d 497, 501 (7th Cir. 1995).*
*Younger* abstention is appropriate when "(1) there are
ongoing state judicial proceedings; (2) the state pro-
ceedings implicate important state interests; (3) the
state proceedings afford an adequate opportunity to
raise federal constitutional challenges; and (4) the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

plaintiff in the federal case has not demonstrated bad faith, harassment, or other unusual circumstances that would call for equitable relief." *South Boston Allied War Veterans Council v. Zobel,* 830 F. Supp. 643, 649 (D. Mass. 1993). In the present matter, the policies, interests and conditions supporting *Younger* abstention are not implicated. While there is a pending state court appeal, the Tizes' present action does not implicate "important state interests," as resolution of the Tizes' claims does not require interpretation of Illinois statutes or abrogation of Illinois state court orders. Rather, the Tizes' Complaint raises primarily federal law issues pertaining to § 1981, § 1982, and Fair Housing Act liability. Indeed, the Tizes' federal causes of action do not depend upon, and will not be affected by, the *outcome* of the state court proceedings. Further, the Tizes' federal suit will have little, if any, practical effect on Defendants' state court action; the Appellate Court of Cook County is free to make any determination that it sees fit. Consequently, *Younger* abstention is inapplicable to the present dispute and does not justify dismissal of the Tizes' federal claims.

Finally, Defendants argue that the *Colorado River* abstention doctrine provides a basis on which to dismiss the Tizes' Complaint. In *Colorado River Water Conservation District v. United States,* 424 U.S. 800 (1976), the Supreme Court established that a district court is empowered to stay federal proceedings where the dispute giving rise to the federal action are likely to be resolved in a pending state court proceeding. Yet, "the mere fact that an action is pending in state court ordinarily is not a bar to parallel federal proceedings." *La Duke v. Burlington Northern Railroad Company,* 879 F.2d 1556, 1558 (7th Cir. 1989). As discussed previously, the Tizes' § 1981, § 1982, and Fair Housing Act claims do not depend upon, and will not be affected by, the outcome of the state appellate court proceedings. Thus, since a stay or dismissal of the Tizes' federal action will not resolve the Tizes' federal claims, *Colorado River* is inapplicable in the present matter.

*Failure to Name Necessary Parties*

**\*9** Defendants' final argument in support of their motion to dismiss is that the Tizes failed to name as plaintiffs (1) the Illinois land trust in which the Astor-Schiller Street properties are held (the "land trust"), and (2) the estate of Reuben Tizes (the "estate"). Pur-

suant to Fed. R. Civ. P. 19(b), if these parties are deemed necessary and indispensable, the action should be dismissed.

Interestingly, Defendants offer no cases to bolster their contention that the land trust and/or the estate are necessary and indispensable parties to the present action within the meaning of Rule 19. Perhaps this is because this contention finds no support in the relevant case law.

Fed. R. Civ. P. 19 provides that a district court may dismiss an action if an absent party is determined to be "indispensable." Fed. R. Civ. P. 19(b). In applying Rule 19, the district court must first determine if an absent party is "necessary." Fed. R. Civ. Pro. 19(a). If a party is deemed to be necessary, the court must then determine if the party can be joined. If the party cannot be joined, the court finally must determine whether the party is indispensable so that "in equity and good conscience" the action should be dismissed. *Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1458 (9th Cir. 1994). As this Court finds that neither the estate nor the land trust are necessary to the present action, the Court does not address the second or third steps in the Rule 19 inquiry--propriety of joinder and indispensability.

Although there is no precise formula for whether a particular party is necessary to an action, Rule 19(a) contemplates a two-part analysis to aid the court in making that determination. Specifically, the court must consider (1) whether complete relief is possible among those parties already in the action, and (2) whether the absent party's interests will be prejudiced or whether the named parties will be subjected to a substantial risk of incurring inconsistent obligations. *Tillman v. Milwaukee,* 715 F.2d 354, 358 (7th Cir. 1983). Considering the land trust's and the estate's respective interests (or lack thereof) in the present matter, this Court finds that neither party is a necessary nor appropriate plaintiff to this action.

Initially, the Illinois land trust into which the Astor-Schiller Street properties have been placed is not a necessary party because its interests will not be affected by the outcome of the Tizes' suit and because complete relief is possible among the parties already named in the Tizes' Complaint.[FN3] In Illinois, legal title in property held in a land trust lies with the trustee. *People v. Chicago Title & Trust Co.,* 389 N.E.2d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

540, 543 (Ill. 1979); *IMM Acceptance Corp. v. First Nat. Bank and Trust Co.*, 499 N.E.2d 1012, 1015 (Ill. App. Ct. 1986). All other rights pertaining to property in a land trust-- including rights of creation, modification, management, income and termination--belong to the beneficiaries. *Id.* The land trust itself has no interest separate and apart from that of the trustee or the beneficiary. Thus, the land trust containing the Astor-Schiller Street properties could only be deemed necessary to the Tizes' lawsuit if the suit's outcome turns on, or would directly affect, legal title to the properties.

*10 In their Complaint, the Tizes allege that Defendants effectively interfered with the Tizes' use and enjoyment of the Astor-Schiller Street properties. The Tizes do not claim that Defendants in any way impaired legal title to those properties. Consequently, resolution of the Tizes' present action will affect only the beneficial interests in the Astor-Schiller Street properties, and will not impact upon the trustees's legal interest in those properties. Thus, the proper parties in interest in this suit are the beneficiaries of the land trust--Carol Weiner Tizes, Bruce R. Tizes and Reuben Tizes--, not the land trust itself nor the trustee. Because these beneficiaries are already named plaintiffs in this action, Defendants' argument that the Tizes' Complaint should be dismissed for failure to name necessary and indispensable parties must fail.

The estate of Reuben Tizes similarly is not a necessary party to this suit because Bruce R. Tizes, who is special administrator of the estate, is presently named as a plaintiff. Fed. R. Civ. P. 17(b) provides that "capacity to sue or be sued shall be determined by the law of the state in which the district court is held." *Van Dusen v. Barrack*, 376 U.S. 612, 640 (1964); *Rocky Partners, Ltd. v. Seco Properties, Int'l*, No. 87 C 1310, 1987 WL 7311 (N.D. Ill. Feb 20, 1987). As this Court is located in the Northern District of Illinois, Illinois law controls.

In Illinois, "[i]t is well established that estates are not natural or artificial persons and lack capacity to sue or be sued." *Precision Components, Inc. v. Estate of Kuntz*, 445 N.E.2d 449, 450 (Ill. App. Ct. 1983). As a result, actions by or against an estate must be brought by or against the administrator or the executor of that estate, not by or against the estate itself. *Id.* Because Bruce Tizes and Carol Weiner Tizes have not been

appointed as co-administrators of the estate to date, it would be premature to require that they be named as parties to this claim in such a capacity.

Yet, while Bruce Tizes has not formally been named an administrator or executor of the estate, he has been appointed as "special administrator" for Reuben Tizes. Under controlling Illinois law, a "special administrator" may prosecute or defend a personal action on behalf of a deceased party where no petition for letters of office for the party's estate have been filed. 735 ILCS 5/2-1008 (1994). Thus, until such time as co-administrators are officially named, Bruce Tizes may continue to act as special administrator for the estate of Reuben Tizes in this action. Accordingly, the Court rejects Defendants' motion to dismiss for failure to name the estate as a necessary and indispensable party.

*CONCLUSION*

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Complaint is denied.

> FN1. In the first draft of the Defendants' motion to dismiss, a number of other possible grounds for dismissal were set forth. On March 9, 1995, this Court ordered the Defendants to submit a new motion to dismiss limiting the scope of the motion to the following jurisdictional issues: (1) the applicability of the First Amendment's petitioning clause immunity; (2) the propriety of various abstention doctrines; and (3) the alleged failure to properly name two necessary parties. Therefore, this memorandum opinion and order denying Defendants' motion to dismiss is only in response to the motion based on the aforementioned grounds.

> FN2. Like their reliance on *Weiss*, Defendants' reliance on an opinion from this district, *Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523 (N.D. Ill. 1990) is misplaced. In *Westfield*, there were no allegations that the defendants had in any way harassed, intimidated, extorted monies, damaged property, or engaged in a pattern of racially motivated conduct. Consequently, Judge Norgle concluded that the defendants' petitioning of Wayne Township officials amounted to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)
**(Cite as: 1995 WL 476675 (N.D.Ill.))**

nothing more than the exercise by citizens of their First Amendment right to petition for grievances. *Id.* at 526. However, Judge Norgle explicitly recognized that there is an exception to this First Amendment immunity when "it can be shown that an ostensible campaign to petition the government is actually a cover for nothing more than an attempt to harass." *Id.* at 526 n.10. Given that the Tizes allege that Defendants' conduct was just that, an attempt to harass, the Tizes' Complaint sets forth a legally cognizable claim for relief.

FN3. Because it is an Illinois land trust, Illinois law is determinative on the categories of interest in a land trust. *In re Romano,* 426 F. Supp. 1123, 1127 (N.D. Ill. 1977).

N.D.Ill.,1995.
Tizes v. Curcio
Not Reported in F.Supp., 1995 WL 476675 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

LEXSEE



Cited
As of: Dec 30, 2009

**TRANSCRIPTION COMMUNICATIONS CORPORATION, Plaintiff, v. JOHN MUIR HEALTH et al., Defendants.**

**NO. C 08-4418 TEH**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2009 U.S. Dist. LEXIS 25151**

**March 13, 2009, Decided**
**March 13, 2009, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff medical transcription company sued defendants, a medical services company, a competitor, a software company, and an acquiring company, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with contractual relations, intentional interference with prospective economic advantage, and violation of RICO. Defendants moved to dismiss.

**OVERVIEW:** The medical transcription company entered into contracts with the medical services company regarding transcription services. The contracts contained a clause enabling either party to terminate the service agreements by giving the other party 90 days' written notice. After seeking bids for transcription services, the medical services company terminated the contracts. The court determined that the breach of contract and breach of the implied covenant of good faith and fair dealing claims against the medical services company failed under Cal. Civ. Code § 1625 because the contract unambiguously provided that the 90 days' notice was required without cause. The intentional interference with contractual relations claim against the three remaining defendants was improper because the contract was terminable upon notice. The claim for intentional interference with economic advantage against the competitor and the software company survived dismissal because, inter alia, it was alleged that the software company knowingly misrepresented the source of the cost savings available with use of its software and the competitor misrepresented its intent to use only domestic transcriptionists.

**OUTCOME:** The court granted the medical services company's motion to dismiss. The court granted the remaining defendants' motion to dismiss as to the intentional interference with contractual relations claim and granted the motion as to the intentional interference with prospective economic advantage and RICO claims against the acquiring company, but otherwise denied the motion.

**CORE TERMS:** causes of action, termination, intentional interference, notice, economic advantage, transcription, software, terminate, at-will, extrinsic evidence, implied covenant, good faith, fair dealing, employment contract, proximate cause, fraudulent, good cause, contractual relations, susceptible, written notice, terminable, bid, services agreement, contractual relationships, misrepresentation, transcriptionist, outsourced, addendum, breach of contract, economic relationship

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN1]Where a case is before a court on defendants' motions to dismiss, the court must accept all facts as represented by the non-moving party.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN2]Dismissal is appropriate under Fed. R. Civ. P. 12(b)(6) when a plaintiff's allegations fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In evaluating the sufficiency of a complaint's allegations, a court must assume the facts alleged in the complaint to be true, construing all facts in the light most favorable to the plaintiff, unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions. The court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. A court should not grant dismissal unless the plaintiff has failed to plead enough facts to state a claim to relief that is plausible on its face.

*Contracts Law > Breach > Causes of Action > Elements of Claims*
*Contracts Law > Contract Interpretation > General Overview*
[HN3]The construction of a contract, unless it turns on disputed facts, is a question of law. The elements of a breach of contract suit in California are (1) the contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damages to the plaintiff. Breach is the wrongful failure to perform a contract.

*Contracts Law > Breach > General Overview*
*Contracts Law > Contract Interpretation > General Overview*
[HN4]In order to determine whether breach occurred, the court must first determine what were the precise terms of the contract at issue. Under Cal. Civ. Code § 1625, the execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. However, at times courts will supplement the written text of a contract with extrinsic evidence of additional or differing terms. The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Performance > Discharges & Terminations*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview*
[HN5]The California Supreme Court has embraced the holding of the California Court of Appeal that a contract which provides that it may be terminated on specified notice cannot reasonably be interpreted to require good cause as well as notice for termination, unless extrinsic evidence establishes that the parties used the words in some special sense. Instead, such a contract allows termination with or without good cause. Thus, the Supreme Court disagreed with the assertion that the verbal formulation "at any time" in the termination clause of an employment contract is per se ambiguous merely because it does not expressly speak to whether cause is required. As a matter of simple logic, rather, such a formulation ordinarily entails the notion of "with or without cause."

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Performance > Discharges & Terminations*
[HN6]California law is clear that the formulation "by giving the other party 90 days written notice" is not per se ambiguous because it is silent on whether cause is required, and that as a matter of simple logic, this formulation ordinarily entails the notion of with or without cause.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Performance > Discharges & Terminations*
[HN7]Under California law, that the phrasing of a specific contractual clause itself is unambiguous with respect to cause for termination of the contract does not preclude the possibility that the contract, when considered as a whole, contains ambiguity on the topic. Extrinsic evidence may be admitted if relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN8]Under California law, the covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits