of the agreement actually made. The covenant thus cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN9]Under California law, the tort of intentional interference with contract is closely related to the tort of intentional interference with prospective economic advantage; the two torts share almost all elements and are frequently raised in the same cases. This relationship is not purely based on the overlap of elements; many cases have treated claims of interference with voidable and terminable contracts as coming within the cause of action for interference with prospective advantage.

*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN10]In California, the law is settled that a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract and that this tort may be predicated upon interference with an at-will contract, including an at-will employment relationship. Despite the availability of this kind of tort liability, because public policy favors competition, certain competitive conduct is nonactionable when it interferes with the at-will contract relations of another. Prior California cases observed that advertising, price-cutting, and hiring employees of another are typically not torts. Although these precedent cases did not focus on at-will employment contracts, the California Supreme Court has concluded that the same considerations apply to at-will employment contracts. The economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts.

*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN11]Under California law, if a party to a contract with the plaintiff is free to terminate the contractual relation when he chooses, there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of a contracting party there is no breach of it. The competitor is therefore free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination. Thus, he may offer better contract terms, as by offering an employee of the plaintiff more money to work for him or by offering a seller higher prices for goods, and he may make use of persuasion or other suitable means, all without liability. Under this analysis, an interference with an at-will contract properly is viewed as an interference with a prospective economic advantage, a tort that similarly compensates for the loss of an advantageous economic relationship but does not require the existence of a legally binding contract.

*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN12]Under California law, as a matter of law, a claim for interference with contract is improper if the contract is "at-will."

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN13]To state a claim for intentional interference with economic advantage, a plaintiff must allege: 1) an existing economic relationship or one containing the probability of future economic benefit; 2) knowledge by the defendant of the relationship; 3) acts by the defendant designed to disrupt the relationship; 4) actual disruption of the relationship; 5) damages proximately caused by the acts of the defendant. The California Supreme Court has added what functions as a sixth element that the act must be wrongful by some legal measure other than the fact of interference itself. Thus, it is the plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's conduct was independently wrongful.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > Distinct & Separate Principle*
*Mergers & Acquisitions Law > Liabilities & Rights of Successors > General Overview*
[HN14]It is a general principle of corporate law deeply ingrained in the economic and legal systems that a parent corporation is not liable for the acts of its subsidiaries.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN15]The first element of intentional interference with prospective economic advantage is an existing economic relationship or one containing the probability of future economic benefit. California state law requires proof that it is reasonably probable that the lost economic advantage would have been realized but for the defendant's interference.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN16]Under California law, the plaintiff in a suit for intentional interference with prospective economic advantage must plead the second element, knowledge by the defendant of the relationship with which the interference occurred.

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN17]The California Court of Appeal has stated that it is not persuaded knowledge of the injured party's specific identity or name is a prerequisite to recovery for intentional interference with prospective economic advantage. On consideration of this element as related to intentional interference with contract, the United States Court of Appeals for the Ninth Circuit has similarly stated that when the defendant performs the act that causes the interference, the defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship. The person inducing a breach must be aware that there is a contract, but need not know the specific parties to the contract.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN18]To survive a motion to dismiss, a plaintiff alleging intentional interference with prospective economic advantage must plead acts by the defendant designed to disrupt the relationship. California law clearly establishes an intent requirement for this element. The third element has been recited as intentional acts on the part of the defendant designed to disrupt the relationship. Substantial certainty is not a pleading requirement, but is an alternative to pleading intent: While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN19]Under California law, the plaintiff in a suit for intentional interference with prospective economic advantage must plead the fifth element, damages proximately caused by the acts of the defendant.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN20]Under California law, in the context of a suit for intentional interference with prospective economic advantage, it is a plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's conduct was independently wrongful.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN21]Under 18 U.S.C.S. § 1962(c), it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN22]In the RICO context, three non-exhaustive factors should be analyzed to determine whether an injury is "too remote" to allow recovery: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to the defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN23]In the RICO context, the United States Court of Appeals for the Ninth Circuit has distinguished between uncertainty in the fact of damage and in the amount of damage; the possibility of intervening factors does not signify the absence of a relationship between the alleged actions and the claimed injury.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > Fraud*
[HN24]In the RICO context, the direct relation test of proximate cause requires a direct relation between the injury asserted and the injurious conduct alleged. Plaintiffs can recover in a variety of circumstances where their injuries result directly from the defendant's fraudulent misrepresentations to a third party.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN25]Although the standard rule in the Ninth Circuit is that a complaint alleging fraud must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity, the United States Court of Appeals for the Ninth Circuit has also held that the general rule that allegations of fraud based on information and belief do not satisfy Fed. R. Civ. P. 9(b) may be relaxed with respect to matters within the opposing party's knowledge. In such situations, plaintiffs can not be expected to have personal knowledge of the relevant facts.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN26]Fed. R. Civ. P. 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN27]Heightened pleading standards apply to allegations of fraud.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
[HN28]In the RICO context, a plaintiff is free to name all members of an association-in-fact enterprise as individual defendants; an association-in-fact enterprise requires pleading an ongoing organization, formal or informal, and that the various associates function as a continuing unit.

**COUNSEL:** [*1] For Transcription Communications Corporation, a California corporation, Plaintiff: Kenneth C. Mennemeier, LEAD ATTORNEY, Landon David Bailey, Mennemeier Glassman & Stroud LLP, Sacramento, CA.

For John Muir Health, a California corporation doing business as Mt. Diablo Medical Center, doing business as John Muir Medical Center, Defendant: Adam Wolff Hofmann, LEAD ATTORNEY, Batya Floryn Swenson, James Douglas Holden, Hanson Bridgett LLP, San Francisco, CA.

For Focus Enterprises Limited, a Delaware corporation doing business as Focus Informatics, Inc., Nuance Communications, Inc., a Delaware corporation, Defendants: Brian Gregory Mendonca, LEAD ATTORNEY, David J. Berger, James A. DiBoise, Wilson Sonsini Goodrich & Rosati, A Professional Corporation, San Francisco, CA.

For eScription, Inc., a Delaware corporation, Defendant: James A. DiBoise, LEAD ATTORNEY, Wilson Sonsini Goodrich & Rosati, Professional Corporation, San Francisco, CA.

**JUDGES:** Thelton E. Henderson, United States District Judge.

**OPINION BY:** Thelton E. Henderson

**OPINION**

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

This matter came before the Court on Monday, February 2, 2009, on the Motions to Dismiss of Defendant John Muir Health and of Defendants Focus Infomatics, [*2] Inc., eScription., Inc., and Nuance Communications, Inc. Having carefully considered the parties' written and oral arguments, John Muir Health's Motion to Dismiss is

GRANTED and the Motion to Dismiss of Focus, eScription, and Nuance is GRANTED IN PART and DENIED IN PART for the reasons set forth below.

**FACTUAL AND PROCEDURAL BACKGROUND**

[HN1]Because this case is before the Court on Defendants' Motions to Dismiss, the Court must accept all facts as represented by the non-moving party, which here is Plaintiff Transcription Communications Corporation ("TCC"). This version of the facts is based upon that alleged in TCC's First Amended Complaint ("FAC"). TCC was founded in 2000 when representatives of John Muir Health ("JMH"), a medical group, approached Richard Spall and asked him to create a new medical transcription services company to provide John Muir Medical Center ("JMMC") with transcription services. JMH assured Spall that this would be a sustainable business opportunity, that his company would exclusively provide JMMC with transcription services, and that the relationship would continue so long as there was no cause or justification for termination of the relationship. Spall incorporated [*3] TCC in January of 2000, developed TCC from January to March of that year, and signed a contract, called a Services Agreement, with JMH to exclusively provide medical transcription services to JMMC starting in April of 2000.

In June of that year, JMH asked TCC to provide the same services to Mount Diablo Medical Center ("MDMC"). Although initially reluctant, in July of 2000 TCC entered a written agreement with JMH to provide MDMC with transcription services beginning in September of that year. By the end of 2000, TCC had accumulated nearly $ 300,000 in debt. In 2001, TCC invested approximately $ 50,000 more in materials to provide services to JMH.

The contracts with JMH provided for payment of $ .17 per line transcribed for the first twelve months of the contract, and for annual cost-of-living adjustments to TCC's rates. Both contracts provided for a five-year term of service, with the relationship with JMMC to terminate on April 16, 2005, and that with MDMC to terminate on September 24, 2005, except with MDMC's emergency room and radiation oncology dictation, which were to terminate on September 17, 2005. The contracts also contained a clause enabling either party to terminate the "Services [*4] Agreements" by giving the other party ninety days' written notice. The written agreements do not specify on the basis of what cause or circumstances would termination be permitted. TCC alleges that both parties understood at the time of entering the agreements that, absent valid justification or cause for termination, the agreements would terminate after five years and no sooner. TCC attached the Services Agreements to its complaint.

In September of 2002, TCC informed JMH that compliance with the new federal Health Insurance Portability and Accountability Act ("HIPAA") would require significant financial expenditures. The parties negotiated and agreed to a HIPAA surcharge of $ .003 per line for 59 months for HIPAA-compliant services, an extension of the contracts through December 31, 2007, and the cancellation of certain cost-of-living adjustments ("COLA") from the original contracts. This addendum was executed on January 31, 2003. TCC maintains that the consideration for this modification was that TCC would forego COLA increases in 2003 and 2007 and would purchase equipment and train staff as necessary for HIPAA compliance, in exchange for the HIPAA surcharge beginning in February [*5] of 2003 and the extension of the contracts to the end of 2007. TCC invested approximately $ 268,000 in equipment to comply with the terms of this addendum.

On November 3, 2003, JMH and TCC signed a second addendum, at JMH's request, in which TCC agreed that it would not use overseas transcriptionists. This addendum was signed following a medical records extortion scare in the medical community, in which an outsourced transcriptionist who was not paid for her work threatened to post private medical information on the internet if she did not receive her pay. TCC states that at all times it complied with this addendum.

From the beginning of the contract, TCC used Crescendo Systems Corporation ("Crescendo") software to fulfill its contract with JMH, and invested thousands of dollars in purchasing and maintaining these systems. In August of 2004, JMH invited the staff of TCC to attend a sales presentation on eScription's transcription software. Unlike the Crescendo software in use by TCC, the eScription presentation focused on its voice recognition software. The presentation represented to JMH that use of eScription software would result in significant monetary savings attributable to its [*6] technological advantages, and did not mention that eScription's preferred providers of services through its "MTSO Alliance Program" outsourced transcription work overseas. In response to JMH's interest in using voice recognition software, TCC had representatives of Crescendo present their voice recognition software to JMH. JMH responded positively, and TCC in 2004 invested another $ 60,000 to update its software and facilitate the use of Crescendo's voice recognition software.

In September of 2005, JMH advised TCC that JMH intended to pursue the direct purchase of eScription software from eScription. eScription continued to tell JMH that use of its software would result in significant savings over the rates JMH had been paying TCC. According to TCC, JMH remained unaware that much of these savings would be realized by use of outsourced

transcription services, including those offered by Focus, which was one of eScription's preferred transcription providers in its "MTSO Alliance Program." TCC maintains that this information was excluded from eScription's communications with JMH by false and/or misleading misrepresentations and material omissions. That October, eScription sold its software [*7] to JMH. JMH informed TCC that it did not expect to implement the use of the new software until July of 2006.

In February or March of 2006, JMH issued a Request For Proposals to provide transcription services to JMH ("RFP"). The RFP [*8] stated that the contractor would be required not to outsource transcription labor. TCC submitted a response to the RFP on March 10, 2006, in which it stated that it would be willing to continue to provide transcription services at a rate of $ .184 per line for John Muir and at $ .181 per line for Mount Diablo. TCC reminded JMH that it had already purchased and installed the Crescendo voice recognition software to meet JMH's request, and that it would not use the eScription software because it was expensive and would not improve quality or decrease costs. TCC asserted that any termination of the contracts prior to the end of 2007 would be breach of the agreement reached in January of 2003. Focus also submitted a bid to the RFP, quoting a rate far lower than that TCC had bid. Focus committed to provide services without resort to outsourced transcriptionists. TCC now alleges that Focus knew it did not intend to perform the contract using only domestic transcriptionists.

On July 17, 2006, TCC received written notice from JMH that JMH intended to terminate the contracts effective October 24, 2006, which was 99 days later. TCC maintains in its complaint that at no time did TCC perform unsatisfactory [*9] services pursuant to its contracts with JMH. JMH did not claim in its written notice that it had cause or justification for its termination of the contract, other than its desire to use eScription's software.

TCC brought suit against Defendants JMH, a medical services company, Focus, a medical transcription services company, eScription, a voice-recognition software company, and Nuance, a speech and imaging services company that acquired both Focus and eScription; TCC claims that Nuance is a successor-in-interest to claims against Focus and eScription. In the First Amended Complaint, TCC states four causes of action: 1) Breach of contract against JMH for terminating its contract, breaching the implied covenant of good faith and fair dealing, and/or violating a contemporaneous oral agreement that neither party would terminate a services agreement without valid justification or cause; 2) Intentional Interference with Contractual Relations claim against Focus, eScription, and Nuance for interfering with known contractual relationships between TCC and JMH; 3) Intentional Interference with Prospective Economic Advantage claim against Focus, eScription, and Nuance for interfering with the [*10] ongoing business relationship between JMH and TCC by inducing a disruption of that relationship; and 4) RICO claim against Focus, eScription, and Nuance for deliberately and actively deceiving multiple hospitals to believe that their product was technologically superior when in fact they achieved economic advantage by using outsourced labor.

All Defendants have filed motions to dismiss the FAC under Rule 12(b)(6) which are presently before the Court.

## DISCUSSION

### Legal Standard

[HN2]Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating the sufficiency of a complaint's allegations, a court must assume the facts alleged in the complaint to be true, construing all facts in the light most favorable to the plaintiff, unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions. Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). The court is not required "to accept as true allegations that are [*11] merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). A court should not grant dismissal unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).

### Discussion

As this order deals with two separate motions to dismiss, the Court will address them in turn.

### I. JMH's Motion to Dismiss

Defendant JMH moves the Court to dismiss the first amended complaint, asserting that: 1) TCC admits in its complaint that JMH met its contractual obligations by providing more notice for termination than the contract required; 2) extrinsic evidence of any understanding between the parties did not modify the written contract; 3) the implied covenant of good faith and fair dealing does not modify JMH's express right to terminate the contracts on proper notice; and 4) TCC failed to plead any contemporaneous oral agreement limiting the right to termi-

nate under the express terms of the agreement, nor can TCC enforce any such parol agreement.

Although JMH offers a number of rationales to justify dismissal of TCC's [*12] first cause of action for breach of contract, the gravamen of its legal argument is that the express terms of the first contract between JMH and TCC permitted termination because it included the following termination clause: "Either party may terminate this agreement by giving the other party 90 days written notice." FAC Ex. A at 3. In arguing for dismissal, JMH maintains that TCC admitted in its complaint that JMH fulfilled all of its obligations under the contract. Additionally, JMH denies the admissibility of any extrinsic evidence because the contract was integrated, arguing that even if extrinsic evidence were to be considered, the evidence that TCC seeks to include contradicts and adds terms rather than explaining existing terms.

TCC instead alleges that the parties "understood when they entered into the Services Agreements that, absent good cause for early termination, the Services Agreements would remain in effect at least until their expressly delineated termination dates." Pl.'s Opp. to Def. JMH's Mot. to Dismiss at 2. As a legal matter, TCC argues that the written contract was silent as to the acceptable grounds for termination, that the proper interpretation of the contracts [*13] requires good cause for termination, and that extrinsic evidence of the parties' intent must be admitted to show that good cause was required. TCC alleges that JMH committed breach by terminating the contract without valid justification or good cause and by using another transcription services provider instead of TCC, and furthermore breached the implied covenants of good faith and fair dealing through these actions.

## A. Breach of Contract

California contract law controls the contract issues in this case. *Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1083 (9th Cir. 1999). [HN3]"The construction of a contract, unless it turns on disputed facts, is a question of law." *Armstrong Petroleum Corp v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388, 11 Cal. Rptr. 3d 412 (2004). The elements of a breach of contract suit in California are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Id.* at 1391 n.6. Breach is the wrongful failure to perform a contract.

[HN4]In order to determine whether breach occurred, the Court must first determine what were the precise terms of the contract at issue. Under California Civil Code § 1625, [*14] "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." However, at times courts will supplement the written text of a contract with extrinsic evidence of additional or differing terms. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37, 69 Cal. Rptr. 561, 442 P.2d 641 (1968).

The California Courts of Appeal and the Ninth Circuit in applying California law have a split of authority as to "whether a provision in an employment contract providing for termination 'at any time' or upon specified notice is, without more, reasonably susceptible to an interpretation allowing for the existence of an implied-in-fact agreement that termination will occur only for cause," which the California Supreme Court has resolved. *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 389, 46 Cal. Rptr. 3d 668, 139 P.3d 56 (2006). [*15] Although the contract in question in this case is not an employment contract, both parties rely on this line of cases for authority. The Court likewise finds the rationale of the California Supreme Court regarding employment contracts to be sufficiently analogous to guide the Court's interpretation of the contract at question.

In *Dore*, the California Supreme Court reviewed the series of cases that address the issue of whether a contract specifying that termination may occur either at any time or on specified notice is potentially ambiguous or is silent at to whether cause is required, such that extrinsic evidence may be introduced. The Supreme Court rejected the holdings of the courts of appeal in several cases, and that of the Ninth Circuit in *Sherman v. Mutual Benefit Life Insurance Co.*, 633 F.2d 782, 784 (9th Cir. 1980), where the courts improperly concluded that such a contract "could reasonably be interpreted as consistent with an implied requirement of good cause for termination." *Dore*, 39 Cal. 4th at 390. Instead, [HN5]the California Supreme Court embraced the holding of the Court of Appeal that "a contract which provides that it may be terminated on specified notice cannot reasonably [*16] be interpreted to require good cause as well as notice for termination, unless extrinsic evidence establishes that the parties used the words in some *special sense*. Instead, such a contract allows termination with or without good cause." *Id.* at 390-91 (citing with approval *Bionghi v. Metro. Water Dist.*, 70 Cal. App. 4th 1358, 1369, 83 Cal. Rptr. 2d 388 (1999) (italics added in *Dore*). Thus, the Supreme Court disagreed with the assertion "that the verbal formulation 'at any time' in the termination clause

of an employment contract is per se ambiguous merely because it does not expressly speak to whether cause is required. As a matter of simple logic, rather, such a formulation ordinarily entails the notion of 'with or without cause.'" *Id. at 391*.

Although the Supreme Court's holding was articulated regarding the phrase "at any time," its consideration of precedent cases that also address contracts terminable upon specified notice leaves little room to doubt that its holding extends as far as the language in the present contract. Thus, [HN6]California law is clear that the formulation "by giving the other party 90 days written notice" is not per se ambiguous because it is silent on whether cause is required, and [*17] that as a matter of simple logic, this formulation ordinarily entails the notion of with or without cause.

Yet the Supreme Court did not end its consideration of this topic there. [HN7]That the phrasing of the specific contractual clause itself was unambiguous with respect to cause for termination of the contract did "not preclude the possibility that the [contract], when considered as a whole, contains ambiguity on the topic." *Id. at 391*. The Court then looked back to the *Pacific Gas* test, that extrinsic evidence may be admitted if "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *69 Cal. 2d at 37*. The Court concluded that the contract's discussion of additional employee reviews and assessments did not confer a for-cause term on the contract, and that the inclusion of a definition of at-will employment did not "introduce ambiguity rendering the letter susceptible of being interpreted as allowing for an implied agreement that [plaintiff] could be terminated only for cause." *Dore, 39 Cal. 4th at 392*. As a result, the Court found that the contract in question contained no ambiguity in its termination provision, and that as a result, there were [*18] no triable issues of fact with respect to the causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. *Id. at 393*.

Here, TCC asks the Court to conclude that the contract on the whole is reasonably susceptible to an interpretation that the contract's silence as to acceptable terms of termination on 90 days' notice confers a for-cause term on the contract, in light of precedent cases where such a finding was reached. See *Esbensen v. Userware Int'l, Inc.*, 11 Cal. App. 4th 631, 636, 14 Cal. Rptr. 2d 93 (1992); *Sherman, 633 F.2d at 784*. *Dore* casts serious doubt on the continued validity of the holdings in those cases. Furthermore, under *Dore*, the Court's task is to assess whether the contract as a whole was so ambiguous as to be susceptible of such an interpretation. See *39 Cal. 4th at 391-92*. Here, the contract is unambiguous. The clause in question permitted either party to terminate the contract "by giving the other party 90 days written notice." A separate term articulated a process for notice-and-cure, and termination upon failure to cure. This notice-and-cure clause was utterly distinct from the 90-day notice clause, and offered the opportunity to terminate [*19] the contract on shorter notice in cases of defects in performance. Contrary to TCC's assertions, these clauses are completely consistent and unambiguous. Thirty days' notice is required to terminate after a failure to cure; ninety days' notice is required without cause. Accordingly, there is no ambiguity in the contract that would justify reliance on extrinsic evidence. JMH exercised its clear contractual rights in terminating the contract and is not liable for breach.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

TCC's cause of action against JMH additionally includes a claim for breach of the implied covenant of good faith and fair dealing, which TCC alleges that JMH breached by terminating the contracts without justification or cause.

> [HN8]The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*. The covenant thus cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific [*20] terms of their agreement.

*Guz v. Bechtel Nat., Inc.*, 24 Cal. 4th 317, 349-50, 100 Cal. Rptr. 2d 352, 8 P.3d 1089 (2000) (internal citations and quotation marks omitted, emphasis original to *Guz*). Because here, the contract is not susceptible to an interpretation that reads in a clause permitting termination only for cause, it necessarily follows that termination pursuant to the express terms of the contract cannot qualify as a violation of the implied covenants. TCC's first cause of action thus cannot succeed on this theory either.

### C. Conclusion

As these defects in TCC's pleading of its first cause of action are resolved as matters of law upon construction of the contract in question, there are no additional facts that TCC could plead as remedy. Accordingly, JMH's motion to dismiss is GRANTED, and TCC's first cause of action is DISMISSED with prejudice.

## II. Motion to Dismiss of Focus, Nuance, and eScription

TCC brought three causes of action against Defendants Focus, Nuance, and eScription: intentional interference with contractual relations, intentional interference with prospective economic advantage, and civil RICO. Focus, Nuance, and eScription move the Court to dismiss the three causes of action against them, asserting [*21] that: 1) TCC's second cause of action fails because TCC and JMH had an at-will contract; 2) TCC's second and third causes of action should be dismissed for failure to properly plead the elements; 3) TCC's second and third causes of action against Nuance should be dismissed for failure to allege intentional interference against Nuance; 4) TCC's third cause of action should be dismissed for failure to properly plead the elements; 5) TCC's RICO claim should be dismissed because TCC has failed to allege proximate cause and because its FAC fails to meet the applicable pleading standards; and 6) TCC's RICO claim against Nuance should be dismissed for failure to state a claim. The Court will address arguments regarding these three causes of action in turn.

### A. Intentional Interference With Contractual Relations Claim

Defendants Focus, Nuance, and eScription argue that because the contract between TCC and JMH was an at-will contract, any reliance TCC placed on the contract was a mere expectancy. TCC asserts that as the contracts between TCC and JMH were term agreements with clear end dates, they were not at-will contracts; they also claim that California law declares that contracts are at the [*22] will of the parties, not of persons outside the contract.

[HN9]The tort of intentional interference with contract is closely related to the tort of intentional interference with prospective economic advantage; the two torts share almost all elements and are frequently raised in the same cases. This relationship is not purely based on the overlap of elements; "[m]any cases have treated claims of interference with voidable and terminable contracts as coming within the cause of action for interference with prospective advantage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1128 n.4, 270 Cal. Rptr. 1, 791 P.2d 587 (1990) (collecting cases, and declining to resolve the issue). In *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148-52, 17 Cal. Rptr. 3d 289, 95 P.3d 513 (2004), the California Supreme Court discussed an array of cases that considered a related question of whether an at-will contract can be the source of a claim of intentional interference with contract. The primary question before the California Supreme Court in *Reeves* was whether "an employer may recover for interference with the employment contracts of its at-will employees by a third party when the third party does not show that its conduct in hiring the employees was justifiable or legitimate." [*23] *Id.* at 1148. Although the issue in question in this case is more general than that presented in *Reeves*, as this case does not focus on employment contracts or on the legitimacy of third-party conduct, the careful, detailed analysis of the relationship between competitive behavior and the at-will contract that the California Supreme Court offers there is instructive in this case as well.

In weighing these issues, the court first noted that [HN10]"in California, the law is settled that a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract" and that this tort may be predicated upon interference with an at-will contract, including an at-will employment relationship. *Id.* at 1148, 1148-49. Despite the availability of this kind of tort liability, because public policy favors competition, "certain competitive conduct is nonactionable when it interferes with the at-will contract relations of another." *Id.* at 1149. Prior California cases observed that advertising, price-cutting, and hiring employees of another are typically not torts. *Id.* Although these precedent cases did not focus on at-will employment contracts, the California Supreme Court [*24] concluded that the same considerations apply to at-will employment contracts. *Id.* at 1151. The court then observed that "the economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts." *Id.* It is worth quoting the court's rationale at length:

> But as the Restatement Second of Torts explains, [HN11]if a party to a contract with the plaintiff is free to terminate the contractual relation when he chooses, "there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of [a contracting party] there is no breach of it. The competitor is therefore free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination. Thus, he may offer better contract terms, as by offering an employee of the plaintiff more money to work for him or by offering a seller higher prices [*25] for goods, and he may make use of persuasion or other suitable means, all without liability." (Rest.2d Torts, § 768, com. I.) Under this

analysis, an interference with an at-will contract properly is viewed as an interference with a prospective economic advantage, a tort that similarly compensates for the loss of an advantageous economic relationship but does not require the existence of a legally binding contract.

*Id.* at 1151-52 (footnote omitted, alteration in the original).

The Court finds this rationale persuasive in the instant matter as well. As the Court has already concluded that the contract between TCC and JMH functioned as a contract terminable upon notice, either party was free to terminate the contractual relationship at any time upon provision of proper notice. In such a situation, taking TCC's pleadings on their face, any interference from Nuance, Focus, or eScription did not interfere in the contract but in the anticipated future benefit of that contract. Although TCC and JMH clearly had a contract, because it was terminable upon notice, any interference with the relationship between TCC and JMH is more properly viewed as interference with prospective economic advantage, [*26] not the contract itself. Accordingly, since the contract between TCC and JMH was terminable upon notice, a claim for interference with the contract is improper as a matter of law; TCC's second cause of action for intentional interference with contractual relations is hereby dismissed with prejudice.[1]

> 1 Notably, Judge Armstrong reached the same conclusion on consideration of this issue. *See Lovesy v. Armed Forces Benefit Ass'n*, 2008 U.S. Dist. LEXIS 93479, 2008 WL 696991, at *11 (N.D. Cal. 2008) ([HN12]"[A]s a matter of law, a claim for interference with contract is improper if the contract is 'at-will.'").

**B. Plaintiff's Intentional Interference With Prospective Economic Advantage Claim**

Defendants Focus, Nuance, and eScription assert that TCC's third cause of action for intentional interference with prospective economic advantage is defective for a variety of reasons and should be dismissed. First, Defendants claim that there are no intentional interference claims pleaded against Nuance, so the third cause of action should be dismissed for failure to state a claim. Second, Defendants claim that TCC's first amended complaint inadequately alleges the elements of intentional interference with prospective economic advantage.

[HN13]"To [*27] state a claim for intentional interference with economic advantage, plaintiff must allege: 1) an existing economic relationship or one 'containing the probability of future economic benefit'; 2) knowledge by the defendant of the relationship; 3) acts by defendant designed to disrupt the relationship; 4) actual disruption of the relationship; 5) damages proximately caused by the acts of the defendant." *Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003) (citing *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal. 4th 376, 380 n.1 & 392-93, 45 Cal. Rptr. 2d 436, 902 P.2d 740 (1995)). The California Supreme Court has added what functions as a sixth element that "the act must be 'wrongful by some legal measure other than the fact of interference itself.'" *Id.* (citing *Della Penna*, 11 Cal. 4th at 393). "Thus, it is 'plaintiff['s] burden to prove, as an element of the cause of action itself, that the defendant['s] conduct was independently wrongful.'" *Id.* (citing *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 881, 60 Cal. Rptr. 2d 830 (1997)) (alterations added in *Accuimage*).

Defendants assert that the third cause of action should be dismissed as against Nuance [*28] because TCC makes no allegation that Nuance interfered with TCC's relationship with JMH, since Nuance did not acquire Focus and eScription until after the occurrence of the facts on which this case is based. TCC argues that as Nuance is successor-in-interest to claims against Focus and eScription, naming Nuance causes no prejudice. While there may be no prejudice, [HN14]"[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998) (internal citation and quotation marks omitted). In the absence of specific allegations of interference by Nuance, the third cause of action as brought against Nuance is dismissed without prejudice.

[HN15]The first element of intentional interference with prospective economic advantage is "an existing economic relationship or one 'containing the probability of future economic benefit.'" *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956 (citing *Della Penna*, 11 Cal. 4th at 392-93). Defendants claim that TCC failed to allege facts showing a reasonable probability of future economic benefit. California state [*29] law requires "proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." *Youst v. Longo*, 43 Cal. 3d 64, 71, 233 Cal. Rptr. 294, 729 P.2d 728 (1987) (emphasis in the original). By merit of demonstrating the existence of a contract between TCC and JMH, even one with a termination-on-notice clause, TCC has shown that there was a reasonable probability of future economic benefit from its relationship with JMH. *See* FAC, Ex. A and B. TCC has pleaded a claim that is plausible on its face un-

der the standard of *Twombly*. See 127 S. Ct. at 1974. Although Defendants have sought to poke holes in TCC's allegations, construing the facts in the light most favorable to Plaintiff, as the Court must on a motion to dismiss, it is clear that Plaintiff's complaint adequately pleads the first element.

[HN16]The plaintiff in a suit for intentional interference with prospective economic advantage must also plead the second element, knowledge by the defendant of the relationship with which the interference occurred. *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956. Defendants contend that TCC has failed to plead facts showing that Focus had knowledge of the relationship [*30] between TCC and JMH, thereby inadequately pleading the second element with regard to Defendant Focus. [HN17]The California Court of Appeal has stated that it is "not persuaded knowledge of the injured party's specific identity or name is a prerequisite to recovery for [intentional interference with prospective economic advantage]." *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1133, 225 Cal. Rptr. 120 (1986). On consideration of this element as related to intentional interference with contract, the Ninth Circuit has similarly stated that "[w]hen the defendant performs the act that causes the interference, the defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005) (observing that the Second Restatement of Torts, section 766, comment p states that "the person inducing a breach must be aware that there is a contract, but need not know the specific parties to the contract"). See also *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001) ("This Court agrees that in order to satisfy the second element of this tort [*31] under California law, the Plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted.") Thus, since the FAC states that Focus "is, and at all relevant times was, aware that JMH had a contractual relationship with TCC, or, at least, was aware that JMH had a contractual relationship with a party other than Focus," TCC's pleading is adequate as to the second element. FAC at P 71.

[HN18]To survive a motion to dismiss, the plaintiff alleging intentional interference with prospective economic advantage must plead "acts by defendant designed to disrupt the relationship." *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956. Defendants argue that TCC failed to allege that eScription and Focus had a substantial certainty that their actions would disrupt TCC's contract with JMH, thereby inadequately pleading the third element of intentional interference with prospective economic advantage. California law clearly establishes an intent requirement for this element. See *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153, 131 Cal. Rptr. 2d 29, 63 P.3d 937 (2003) (reciting the third element as "intentional acts on the part of the defendant designed to disrupt the relationship"). [*32] Substantial certainty is not a pleading requirement, but is an alternative to pleading intent: "While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Id.* at 1154. TCC clearly has met this standard. In its first amended complaint, TCC alleges that eScription knowingly misrepresented the source of the cost savings available with use of the eScription software. See FAC PP 41, 46, 47, 80, 82. Likewise, TCC alleges that Focus bid a lower price than TCC bid, and misrepresented its intent to use only domestic transcriptionists. See *id.* at PP 55-57, 81-82. The Court finds that these are not mere conclusory allegations but are assertions of intent based on specific allegations of fact. Assuming these facts to be true, as the Court must on a motion to dismiss, the pleading is sufficient to state a claim on which relief may be granted.

[HN19]The plaintiff in a suit for intentional interference with prospective economic advantage [*33] must also plead the fifth element, "damages proximately caused by the acts of the defendant." *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956. Defendants claim that TCC's pleading failed to allege that its damages were proximately caused by the Defendants' actions. TCC has adequately pleaded proximate cause by explaining how the acts of eScription and Focus interfered with the relationship that JMH had with TCC. See FAC PP 80-81, 83. Assuming these allegations to be true, the Court concludes that TCC's pleading is sufficient.

Finally, Defendants also assert that TCC failed to allege that their "interference was wrongful by some measure beyond the fact of the interference itself." *Della Penna*, 11 Cal. 4th at 393 (internal citation and quotation marks omitted). "Thus, [HN20]it is 'plaintiff['s] burden to prove, as an element of the cause of action itself, that the defendant['s] conduct was independently wrongful.'" *Accuimage Diagnostics Corp.*, 260 F. Supp. 2d at 956 (citing *Bed, Bath & Beyond of La Jolla*, 52 Cal. App. 4th at 881. As TCC's first amended complaint is replete with allegations that Focus and eScription engaged in acts of fraudulent misrepresentation, see FAC PP 41-42, 46-48, [*34] 55-57, 80-82, 96-98, an independently wrongful act, the pleading is sufficient. Accordingly, Defendants' motion to dismiss is DENIED as to the third cause of action against Focus and eScription.

## C. Plaintiff's RICO Claim

Defendants Focus, Nuance, and eScription ask the Court to dismiss TCC's fourth cause of action for violation of 18 U.S.C. § 1962(c), civil RICO. They argue that TCC's RICO claim should be dismissed because the Plaintiff has failed to allege proximate cause; because its FAC fails to meet the heightened pleading standard for fraud cases; and because it fails to state a claim against Nuance. The Court will address these three arguments in turn.

[HN21]Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Defendants argue that TCC has failed to allege proximate cause under RICO because their pleading does not comport with Ninth Circuit requirements under *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002). [*35] There, the Ninth Circuit declared that [HN22]three non-exhaustive factors should be analyzed to determine whether an "injury is 'too remote' to allow recovery: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Id.* at 1169 (interpreting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)). Defendants argue that because JMH can vindicate any wrongdoing and because attributing damages will be impossible, proximate cause is inadequate. However, in *Mendoza*, the Ninth Circuit concluded that there was proximate cause between a scheme of hiring undocumented workers and the depression of agricultural wages paid to local, documented immigrant workers. *Id.* at 1166, 1170. Since the undocumented workers could not "be counted on to bring suit for the law's vindication" the documented workers were able to bring suit. *Id.* at 1170. Likewise, [HN23]the Ninth [*36] Circuit "distinguish[ed] between uncertainty in the fact of damage and in the amount of damage," *id.* at 1171; the court concluded that the possibility of intervening factors did not signify the absence of a relationship between the alleged actions and the claimed injury, or that the case should have been dismissed on a Rule 12(b)(6) motion. *Id.* at 1170-71.

These factors are directly applicable to the instant situation. Here, just as the undocumented workers could not be enlisted as private attorneys general, so too is it unlikely that JMH would perform these tasks, since the benefits of Defendants' fraudulent misrepresentations also accrued to JMH, which received lower-priced transcription services as a result of its relationship with the other Defendants. It is therefore unreasonable to think that JMH is appropriately positioned to vindicate the law as private attorneys general. Likewise, although Defendants have asserted an array of intervening factors and argue that it will be difficult to attribute damages, this is not a defect in pleading under *Mendoza*.

A recent Supreme Court case on RICO, *Bridge v. Phoenix Bond & Indemnity Co.*, presents a similarly analogous situation. 128 S.Ct. 2131, 170 L. Ed. 2d 1012 (2008). [*37] Although *Bridge* focused primarily on whether reliance is an element of civil RICO claims, its analysis is instructive in the present matter. There, the plaintiff and defendant were regular participants in tax sales. *Id.* at 2135. Tax sales in their county often resulted in a tie between multiple bidders, which the county resolved by allocating the property on a rotational basis to ensure fair apportionment; for this rule to work, the county required each entity to bid only once on any individual property. *Id.* Plaintiff brought suit under RICO, claiming that defendant fraudulently gamed the system, contrary to the rules of the tax sales, by organizing groups to bid collusively on behalf of one business, thereby obtaining a greater number of liens than it otherwise would have obtained. *Id.* at 2136. Although proximate cause was not the central inquiry of *Bridge*, the Court approvingly applied [HN24]the direct relation test of proximate cause, which requires a "direct relation between the injury asserted and the injurious conduct alleged," and found no defect. *Id.* at 2142. Further, the Supreme Court clarified that "plaintiffs can recover in a variety of circumstances where, as here, their injuries [*38] result directly from the defendant's fraudulent misrepresentations to a third party." *Bridge*, 128 S.Ct. at 2141. Just as in *Bridge*, TCC may be able to recover for the injuries it alleges resulted from Defendants' fraudulent misrepresentations to JMH; whether such injuries occurred is inappropriate for resolution on a motion to dismiss.

Defendants further argue that TCC's complaint was inadequately pleaded because it lacked the particularity required by Fed. R. Civ. P. 9(b). [HN25]Although the standard rule in the Ninth Circuit is that a complaint alleging fraud "must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity," the Ninth Circuit has also "held that the general rule that allegations of fraud based on information and belief do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge. In such situations, plaintiffs can not be expected to have personal knowledge of the relevant facts." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

This latter situation is present in the instant matter. TCC has alleged the circumstances of the fraudulent communications that it claims [*39] eScription and Focus made. Although it has not specified the time and person details, TCC has alleged the content of the communications it claims were fraudulent, the benefits it argues eScription and Focus received, and the general timing of these communications. *See* FAC PP 41-42, 46-48, 55-57, 80-82, 96-98. Because eScription and Focus have knowledge of what content TCC alleges to be fraudulent, the purpose of [HN26]Rule 9(b), which "ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong," is fulfilled here. *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Accordingly, TCC's complaint adequately pleads the RICO claim as against eScription and Focus.

The same cannot be said for the allegations TCC made against Nuance. Defendants argue that Nuance is not properly named as a defendant in the fourth cause of action for RICO as there is no specific conduct attributed to Nuance. Further, as [HN27]heightened pleading standards apply to allegations of fraud, without alleging some specific conduct against [*40] Nuance, even if this standard were relaxed pursuant to *Neubronner*, the pleading is defective as to this Defendant. *See Moore v. Kayport Package Express., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (affirming dismissal where complaint did "not attribute specific conduct to individual defendants"). Also, although the Ninth Circuit has "concluded that [HN28]a plaintiff is free to name all members of an association-in-fact enterprise as individual defendants," *River City Markets, Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992), Plaintiff has failed to allege an association-in-fact enterprise, which requires pleading "an ongoing organization, formal or informal," and "that the various associates function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007). In the absence of any specific allegation of conduct against Nuance that would put Nuance on adequate notice to defend against the charge, the RICO claim against Nuance is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Transcription Communications Corporation's first cause of action against John Muir Health for breach of contract and breach of the implied covenant of good faith [*41] and fair dealing is DISMISSED with prejudice, as these defects in TCC's pleading are legal, not factual, and thus cannot be remedied by amendment. John Muir Health's motion to dismiss is hereby GRANTED.

For the foregoing reasons, the motion to dismiss of Defendants Nuance, eScription, and Focus is GRANTED IN PART and DENIED IN PART. Transcription Communications Corporation's second cause of action for intentional interference with contractual relations is DISMISSED with prejudice, as its defects are legal and cannot be remedied through amendment. The third cause of action for intentional interference with prospective economic advantage and fourth cause of action for violation of RICO are DISMISSED without prejudice as against Defendant Nuance; the third and fourth causes of action shall stand as brought against Defendants Focus and eScription.

**IT IS SO ORDERED.**

Dated: March 13, 2009

/s/ Thelton E. Henderson

Thelton E. Henderson

United States District Judge

Not Reported in F.Supp.2d, 2000 WL 631324 (N.D.Ill.)
(Cite as: 2000 WL 631324 (N.D.Ill.))

**H**Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.
UNIQUE COUPONS, INC., Plaintiff,
v.
NORTHFIELD CORPORATION, Defendant.
No. 99 C 7445.

May 16, 2000.

*MEMORANDUM OPINION AND ORDER*

LEINENWEBER, J.

*1 This is a patent infringement action brought by Unique Coupons, Inc. ("Unique") against Northfield Corporation ("Northfield"). Before the Court is Unique's motion to dismiss Northfield's counterclaims, pursuant to Fed.R.Civ.P. 12(b)(6).

BACKGROUND

The underlying action involves Unique's contention that Northfield's Model 3200 coupon inserter infringes two of Unique's patents, No. 5,079,901 ("the '901 patent") and No. 5,588,280 ("the '280 patent"). Northfield now brings eight counterclaims against Unique, chiefly based on alleged representations made by Unique to Northfield's customers that the Model 3200 infringes its patents and that Unique would sue anyone who bought or used the Model 3200. (Counterclaims, ¶¶ 16, 18). More specifically, Northfield alleges, via responsive brief, that Unique made public statements claiming Northfield is violating an earlier injunction won by Unique as to Northfield's Model 1600 coupon inserter, and that the Model 3200 is subject to that earlier injunction. (Def. Resp. at 7, n. 1). Unique seeks to dismiss all of Northfield's counterclaims.

DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. *See Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). As such, the court accepts the factual allegations of the complaint as true and draws all reasonable inferences in favor of the claimant. *See Travel All Over The World v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1428 (7th Cir.1996). A claim will be dismissed if it is beyond doubt that under no set of facts would the claimant's allegations entitle him to relief. *Id.* at 1429-30. In accordance with these standards, Unique's motion to dismiss is granted in part and denied in part.

Count I

In Count I of Northfield's counterclaims, Northfield seeks a declaration of invalidity and noninfringement as to four U.S. patents owned by Unique: No. 5,079,901 ("the '901 patent"), No. 5,588,280 ("the '280 patent"), No. 5,784,861 ("the '861 patent"), and No. 5,941,053 ("the '053 patent"). Insofar as Count I seeks a declaration of invalidity and unenforceability of the '901 and '280 patents, that claim is dismissed because the exact issue was previously litigated and resolved in favor of Unique in a prior litigation between the same parties. *See Northlake Marketing & Supply, Inc. v. Glaverbel, S.A.,* 986 F.Supp. 471, 475 (N.D.Ill.1997) (setting forth the elements of issue preclusion). During the course of an earlier litigation between Unique and Northfield regarding Northfield's Model 1600 coupon inserter, Judge Marovich clearly held the '901 and '280 patents to be valid and enforceable. (Marovich Mem. Op. and Order at 14). Therefore, the issue of invalidity and enforceability of the '901 patent and the '280 patent cannot be re-litigated here, regardless of the fact that this case is about the Model 3200. *See Zip Dee, Inc. v. Dometic Corp.,* 905 F.Supp. 535 (N.D.Ill.1995) (barring re-litigation of the issue of invalidity of a patent in a subsequent action even though defendant offers rationales not offered during the previous case).

*2 Count I as to the '861 patent and the '053 patent-the patents that were not at issue in the earlier litigation-is also dismissed for lack of subject matter jurisdiction. A district court has jurisdiction over a declaratory judgment action if, ultimately, the party seeking declaratory judgment demonstrates an objectively reasonable apprehension of being hauled into court. *BP Chemicals Ltd. v. Union Carbide Corp.,* 4

Not Reported in F.Supp.2d, 2000 WL 631324 (N.D.Ill.)
**(Cite as: 2000 WL 631324 (N.D.Ill.))**

F.3d 975, 979 (Fed.Cir.1993).

In this case, the only basis for Northfield's belief that it will be sued over the '861 and '053 patents is Unique's "piecemeal" litigation history with respect to the '901 and '280 patents. (Def. Resp. at 5). But that is not enough. Northfield fails to explain how the '861 and '053 patents relate at all to the '901 and '280 patents, the issues in this litigation, or the issues in the prior "piecemeal" litigations. Therefore, without a showing of an objectively reasonable apprehension on the part of Northfield, Count I as to the '861 patent and '053 patent must be dismissed.

### Scope of the Allegations

In Counts II through VIII, Northfield alleges a variety of federal and state unfair trade practices. These claims are based on Unique's allegedly false statements that the Model 3200 infringed Unique's patents. In response to Unique's motion to dismiss, Northfield further claims that Unique made public statements to the effect that Northfield is violating a permanent injunction issued in a prior action regarding Northfield's Model 1600 coupon inserter, and that the Model 3200 is subject to that prior injunction. (Def. Resp. at 7, n. 1).

As an initial matter, the Court finds that Northfield's additional allegations made in its responsive brief can be considered in addressing this motion to dismiss. A claimant need not put all of the essential facts in his or her complaint. _Hentosh v. Herman M. Finch University of Health Sciences_, 167 F.3d 1170, 1173 n. 3 (7th Cir.1999). The claimant may add them by affidavit or brief in order to defeat a motion to dismiss if such facts are consistent with the allegations in the complaint. _Id._ Here, because Northfield's additional allegations offered in response to the motion to dismiss comport with the allegations initially made in the counterclaims, they will be considered in deciding this motion to dismiss.

### Noerr-Pennington Doctrine

Taking into account the additional allegations contained in Northfield's responsive pleading, the Court finds that Unique cannot rely upon the Noerr-Pennington doctrine to dispose summarily the rest of Northfield's counterclaims. The Noerr-Pennington doctrine, first recognized in the context of federal antitrust cases, grants a party immunity from various federal, state, or common law unfair trade practices actions based on that party's solicitation of governmental action, including the initiation of lawsuits. See _Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc._, 365 U.S. 127 (1961); _United Mine Workers v. Pennington_, 381 U.S. 657 (1965). Some courts have extended this doctrine to immunize activity merely incident to or attendant upon the right to initiate litigation, such as communications with potential parties and third-parties. _See, e.g., Coastal States Marketing, Inc. v. Hunt_, 694 F.2d 1358 (5th Cir.1983). Recently, however, the Tenth Circuit has cast serious doubt as to whether the doctrine can be extended to such pre-litigation publicity in contexts not implicating federal antitrust laws. _Cardtoons L.C. v. Major League Baseball Players Assoc._, 208 F.3d 885, 2000 WL 358414, at *4 (10th Cir. April 7, 2000).

*3 Regardless of the ultimate implications of the relevant case law, however, the Court finds that Northfield's allegations can fairly be read to avoid triggering the Noerr-Pennington doctrine in the first place. According to Northfield's response to Unique's motion, Northfield's unfair trade practices claims are based upon Unique's alleged public statements that Northfield's Model 3200 was enjoined in the previous litigation between the parties. If that is the case, then Northfield does not seek to impose liability for any action incident to or attendant future litigation, but for misrepresentations as to the content and import of past litigation. Drawing all inferences and ambiguities in favor of the claimant, _Travel All Over the World, Inc._, 73 F.3d at 1428, the Court cannot conclude at this juncture that the Noerr-Pennington doctrine, even if unambiguously applicable in these contexts, can shield Unique. Therefore, the Court will now examine the merits of the individual claims on their own terms.

### Count II

Unique takes no issue with the merits of Count II, Northfield's counterclaim for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a). Accordingly, Count II survives the motion to dismiss.

### Counts III and VIII

In Count III, Northfield alleges that Unique's misrep-

Not Reported in F.Supp.2d, 2000 WL 631324 (N.D.Ill.)
**(Cite as: 2000 WL 631324 (N.D.Ill.))**

resentations with respect to the Model 3200 disparage Northfield's product, and have caused or is likely to cause Northfield's customers to be deceived as to the nature, origin, and character of the Model 3200, all in violation of the Illinois Uniform Deceptive Trade Practices Act. 815 ILCS 510/2. Count VIII recites the same allegations but under common law. The parties appear to agree that the common law claim will fall or stand with the statutory claim. (*See, e.g.,* Def. Resp. at 8-9).

The Court finds that these claims are sufficiently pled. The Uniform Deceptive Trade Practices Act allows claims for both "misleading trade identification or deceptive advertising" as well as for disparagement of claimant's goods and services by false and misleading representations of fact. 815 ILCS 510/2(2) and (8); see *Lynch Ford, Inc. v. Ford Motor Co., Inc.,* 957 F.Supp. 142, 147 (N.D.Ill.1997). Essentially, any conduct in a business which creates a likelihood of consumer confusion or misunderstanding is potentially actionable under the statute. *Unique Concepts, Inc. v. Manuel,* 669 F.Supp. 185, 191 (N.D.Ill.1987).

In this case, Northfield alleges that Unique represented to Northfield's customers that the Model 3200 was subject to the prior injunction; a statement, which, if proven, can be deemed a false statement designed to mislead the customers into believing that purchasing a Model 3200 would expose them to infringement liability. That is sufficient at this stage to survive a motion to dismiss.

Count IV

Count IV purports to state a claim under Illinois's Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/2, again based on Unique's representations regarding the Model 3200. Northfield's claim, however, must be dismissed pursuant to Federal Rule of Civil Procedure 9(b). Claims under the Consumer Fraud Act are subject to the heightened pleading standard under Rule 9(b). *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.,* 940 F.Supp. 176, 180 (N.D.Ill.1996). Compliance with Rule 9(b) requires the allegation of the who, the what, the where and the when of the alleged fraud or misrepresentation. See *Goren v. New Vision International, Inc.,* 156 F.3d 721, 730 (7th Cir.1998). Here, Northfield's allegations are too conclusory; there is no indication of who said what and when and how. Accordingly, the Consumer Fraud Act claim is dismissed.

Count V

*4 In Count V, Northfield alleges tortious interference with business relationship based on the same statements regarding the Model 3200 coupon inserter. In order to state a claim for tortious interference, the claimant must show (1) a reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the claimant's expectancy; (3) purposeful interference by the accused that prevents the claimant's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *International Marketing, Ltd. v. Archer-Daniels-Midland Co.,* 192 F.3d 724, 731 (7th Cir.1999).

In this case, Unique does not take issue with whether Northfield has met the elements, but rather asserts the privilege of competition. However, privilege is an affirmative defense. *Id.* And nothing on the face of the counterclaim so clearly indicates the existence of the defense that would warrant this Court to dismiss the claim without putting Unique to its proof. *Contrast Id.* In fact, Northfield has alleged that Unique's representations regarding the Model 3200 coupon inserter and the scope of the prior injunction was malicious and knowingly false. (Counterclaims, ¶¶ 16, 17); *Int'l Marketing, Ltd.,* 192 F.3d at 731 ("a competitor is ineligible for the competition defense if its conduct is motivated solely by spite or ill will"). That is enough to state a claim for tortious interference with business relationship.

Count VI

Count VI is Northfield's claim for trade libel *per se* or, in the alternative, *per quod.* Under Illinois common law, statements are libelous *per se* if they constitute "a serious charge of incapacity or misconduct in words so obviously and naturally harmful that proof of their injurious character can be dispensed with." *Quilici v. Second Amendment Foundation,* 769 F.2d 414 (7th Cir.1985). Northfield's paraphrase of Unique's alleged statements, however, fails to state a cause of action for libel *per se.* Northfield claims that Unique publicly represented that the Model 3200 is subject to the prior injunction. However, such statements can be innocently construed to mean that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 631324 (N.D.Ill.)
**(Cite as: 2000 WL 631324 (N.D.Ill.))**

Northfield was mistaken about the scope of the prior injunction-not that Northfield purposely or maliciously defied the prior injunction. *See Darvoec Marketing Group, Inc. v. Bio-Genics, Inc.,* 42 F.Supp.2d 810, 815 (N.D.Ill.1999) ("no cause of action [for libel *per se* ] will exist if the statement can also reasonably be given an innocent construction."). Therefore, without a showing that statements seriously impinge the integrity of Northfield as a business, its claim for libel *per se* is dismissed.

Northfield also does not state a claim for libel *per quod*. Statements are libelous *per quod* if they are found to be damaging by extrinsic facts or innuendo. *Audition Div., Ltd. v. Better Business Bureau, Inc.,* 120 Ill.App.3d 254 (1983). However, Northfield's counterclaim is devoid of allegations of special extrinsic facts that would render the alleged statements so libelous. Accordingly, Count VI is dismissed in its entirety.

Count VII

*5 Finally, the Court finds that Northfield also fails to state a cause of action for commercial disparagement in Count VII. Statements are considered commercially disparaging if they (1) "accuse a businessman of outright dishonesty or reprehensible business methods in connection with his goods," or (2) disparage the quality of his goods or services. *Unique Concepts, Inc. v. Manuel,* 669 F.Supp. 185, 190 (N.D.Ill.1987). But as discussed above, a reasonable construction of Unique's alleged statements does not singularly point to a charge of reprehensible conduct. *See Id.* (dismissing claim for commercial disparagement where statements could be reasonably construed to mean something other than a charge of reprehensible conduct). Furthermore, Unique's alleged statements are about the source of the technology for the Model 3200 and do not go to disparaging the quality of the Model 3200. Accordingly, Count VII for commercial disparagement is dismissed.

*CONCLUSION*

For the reasons stated above, Unique's motion to dismiss is GRANTED in part and DENIED in part. Counts I, IV, VI, and VII of Northfield's counterclaims are dismissed. Counts II, III, V, and VIII of Northfield's counterclaims remain.

IT IS SO ORDERED.

N.D.Ill.,2000.
Unique Coupons, Inc. v. Northfield Corp.
Not Reported in F.Supp.2d, 2000 WL 631324 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.