**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., <u>et al</u>., | ) ) ) | Case No. 07 CV 2898 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Sidney I. Schenkier |
| ACE INA HOLDINGS, INC., <u>et al</u>., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, <u>et al</u>., | ) ) ) | |
| Counter-Claimants, | ) ) | |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., <u>et al</u>., | ) ) ) | |
| Counter-Defendants. | ) ) | |
| _____ | ) ) | |
| SAFECO INSURANCE COMPANY OF AMERICA and OHIO CASUALTY INSURANCE COMPANY, individually, and on behalf of a class consisting of members of the National Workers Compensation Reinsurance Pool, | ) ) ) ) ) ) ) | Case No. 09 CV 2026<br><br>Judge Robert W. Gettleman<br><br>Magistrate Judge Sidney I. Schenkier |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC., <u>et al</u>., | ) ) ) | |
| Defendants. | ) ) | |

**JOINT STATEMENT REPORTING ON MEETING BETWEEN BERKLEY RISK
ADMINISTRATORS COMPANY, L.L.C., CHUBB & SON, CINCINNATI INSURANCE
COMPANY, TRUCK INSURANCE EXCHANGE, ADVANTAGE WORKERS
COMPENSATION INSURANCE COMPANY, ALASKA NATIONAL INSURANCE
COMPANY, AMTRUST FINANCIAL SERVICES, INC., HARLEYSVILLE MUTUAL
INSURANCE COMPANY, MEMIC INDEMNITY COMPANY, SAFECO INSURANCE
COMPANY OF AMERICA, AND UTICA MUTUAL INSURANCE COMPANY AND
AIG REGARDING DISPUTES ON AIG'S DOCUMENT PRODUCTION REQUESTS**

Pursuant to the Court's December 11, 2009 Order revising the procedure applicable to
discovery motions in the above-captioned cases (the "Discovery Motion Protocol"), Berkley
Risk Administrators Company, L.L.C. ("Berkley Risk"), Chubb & Son, a division of Federal
Insurance Company ("Chubb"), Cincinnati Insurance Company ("Cincinnati"), Truck Insurance
Exchange ("Truck"), Advantage Workers Compensation Insurance Company, Alaska National
Insurance Company, AmTrust Financial Services, Inc., Harleysville Mutual Insurance Company,
MEMIC Indemnity Company, Safeco Insurance Company of America, and Utica Mutual
Insurance Company (collectively the "Defendants," "Pool Board Members," or "Non-
Underreporters")[1] and American International Group, Inc. et al. ("AIG" or "Plaintiffs") file this
Joint Statement reporting on their meet-and-confer in an attempt to resolve their dispute
concerning AIG's First Requests for the Production of Documents ("Requests").

## I.      AIG'S DOCUMENT PRODUCTION REQUESTS

In accordance with the Court's October 6, 2009 Order scheduling merits discovery, AIG
served its First Requests for the Production of Documents upon the Pool Board Members on
October 30, 2009.  The Defendants served Objections and Responses to AIG's Requests on
December 14, 2009.  Attached hereto as Exhibit A are copies of those Objections and Responses,
which set forth each specific request and the responding party's objections and responses to each.

## II.     REPORT ON MEET AND CONFER

Pursuant to the Discovery Motion Protocol, AIG and each of the Defendants exchanged
letters regarding their disagreements arising from the Defendants' objections to Plaintiffs'
document production requests on January 12, 2010 and January 22, 2010, respectively.
Additionally, Neal, Gerber & Eisenberg, on behalf of certain of its clients, sent a letter dated
February 3, 2010, correcting a formatting error that affected the substance of its letter dated
January 22, 2010.  Counsel met and conferred on February 4, 2010, to resolve their disputes as

---

[1]    In connection with this Joint Statement, the parties have been unable to agree on the use of the term "Non-
Underreporters."  AIG suggests that the term is "argumentative," and, as a result, has refused to use the term in its
sections of this statement or in the sections relating to both parties.  The Non-Underreporters disagree.  They believe
the term "Non-Underreporters" is descriptive and more specifically identifies the group than "Pool Board Members"
or "Defendants," both of which are overly inclusive terms, as they sweep within them all defendants in this action.
The term Non-Underreporters (or Non-Underreporting Pool Board Members) has been used throughout this
litigation, by the Court, by the fourteen defendants which are not alleged in AIG's First Amended Complaint to have
underreported premium (thereby distinguishing them from the alleged "Underreporters") and by AIG itself to
describe those fourteen defendants.  Moreover, as previously recognized by the Court, shorthand use of the term
"Underreporters" is not to be considered an acknowledgement of the underreporting alleged.  The same reasoning
should apply to use of the term "Non-Underreporters."

required by Paragraph 3 of the Discovery Motion Protocol.  Those participating in the meet-and-confer were Kevin Reed (for AIG), Christopher Thompson (for Chubb), Christine Van Gelder (for Berkley Risk), Omar Odland (for Cincinnati), Stacy Allen (for Truck), Michael Sher and Emily Mulder Milman (for Advantage Workers Compensation Insurance Company, Alaska National Insurance Company, AmTrust Financial Services, Inc., Harleysville Mutual Insurance Company, MEMIC Indemnity Company, Safeco Insurance Company of America, and Utica Mutual Insurance Company), William Hannay and Charles Peters and Rowe Snider (for the Pool).  The parties were in the process of preparing a joint statement as of the February 11, 2010 conference and, with the benefit of guidance provided by the Court at that conference, revised the joint statement and continued the meet-and-confer process during the following weeks.

The parties reached the following agreements and seek the Court's assistance in resolving the following disagreements:

## III.   AGREEMENTS AND DISAGREEMENTS REGARDING SPECIFIC DOCUMENT PRODUCTION REQUESTS

### A.   Objection to Time Period (First Requests Instruction No. 1; General Objection No. 9)

The Defendants object to AIG's instruction on the applicable time period as January 1, 1970 to present as overbroad, and would limit any document production obligation to the time period April 26, 2005 to March 17, 2008.

#### Agreements

As a general matter, and reserving objections to particular requests, the Defendants have either agreed to produce documents created on or after January 1, 2005, or have represented that accepting that date as the beginning of the timeframe for production would not affect their response to AIG's document requests.  AIG has agreed to accept this start date for the majority of its requests.

#### Disagreement

There are certain requests as to which AIG seeks to begin the time frame for production earlier than 2005.  The Defendants do not agree.

#### AIG's Position

AIG, in the interest of compromise, will seek documents created prior to 2005 only with respect to Requests Nos. 21, 26 and 27.  Further, as to those requests, AIG will accept a production of documents created on or after January 1, 1985, rather than from 1970 forward, as originally demanded.

Request No. 21 seeks "All documents concerning underreporting practices by Participating Companies."  The Defendants have objected to producing any documents in response to this request.  We therefore address arguments concerning the applicable timeframe in a separate section about this request set forth below.

Request No. 26 seeks "all documents concerning NCCI's 1986 'Management Summary,' including documents concerning the accompanying audit of service carriers."  As alleged in paragraph 68 of AIG's First Amended Complaint, this Management Summary describes:

> the results of routine audits that NCCI conducted of the Pool servicing carriers — the carriers that issue and administer the actual workers compensation policies in the residual market — NCCI reported that one of the "major areas" in which it regularly found deficiencies was "incorrect premium reporting" by those carriers.  These audit findings are highly suggestive that these same carriers — which also wrote policies in the voluntary market and were thus Participating Companies in the Pool — were similarly misreporting their voluntary market premium that NCCI used to calculate residual market participation rates.  Indeed, in discussing the servicing carrier audit results, NCCI specifically noted that, since servicing carriers use the same data reporting systems for their voluntary market business as they do for their residual market servicing business, the deficiencies that NCCI had identified in its audits would equally "affect the processing of voluntary writings."  While NCCI did not identify the specific servicing carriers for which it had uncovered "incorrect premium reporting," several of the Underreporting Pool Board Members — Liberty Mutual, Travelers, and The Hartford — were among the Pool's top servicing carriers by volume of servicing carrier business at the time.

Request No. 27 seeks "all documents concerning the 2001 examination report of NCCI conducted by a team of experts retained by a consortium of 13 states to test the accuracy of NCCI's data and systems . . . ."  This report, too, is described in AIG's First Amended Complaint:

> 69.     These types of premium misreporting issues were echoed in a highly critical 2001 examination report of NCCI conducted by a team of experts retained by a consortium of 13 states to test the accuracy of NCCI's data and systems.  As part of that multi-state examination, the experts downloaded data from NCCI's system that had been reported to NCCI by six unidentified national carriers for ratemaking purposes.  The experts then took a sample of the data related to 181 specific workers compensation policies and compared it to the source policy files obtained from the six carriers to test whether the data had been properly reported by the carriers and recorded by NCCI.  The report states that the examiners anticipated an error rate of 2% — meaning that they expected to find discrepancies between the policy documents and the data reported to NCCI on only 3 to 4 of the 181 sampled policies.  However, the examiners actually found discrepancies between the NCCI data and the carriers' records on an astounding 120 of the 181 policies — reflecting an error rate that was above

60% and more than ***30 times*** higher than the examiners had
anticipated.

70.    Moreover, of the specific types of reporting errors the
examiners discovered, misreported premium was the most
prevalent.  In fact, from the 181 policies sampled, the report notes
that the examiners identified a full "eighty-one instances in which
the premium per the [examiners'] premium audit did not agree to
the premium reported to NCCI."

71.    These findings by the multi-state examiners, while not
conclusive, were nonetheless again highly suggestive of
misreporting with respect to premium data reported to NCCI for
the purpose of calculating Pool residual market participation rates.
While NCCI did not calculate those participation rates from the
type of ratemaking data reports that were the subject of the
examiners' audit, it did calculate the participation rates on the basis
of data reported from the same carriers for which the examiners
had found data reporting deficiencies.  Moreover, there is reason to
believe that the ratemaking data reported by these carriers was, if
anything, likely to be more accurate than the data that they had
reported for purposes of calculating Pool residual market
participation rates.  Both the incentive and opportunity for
misreporting with respect to residual market reporting is greater
than with ratemaking data since residual market reporting is done
on an aggregate basis, and it has a direct impact on Pool liabilities
rather than the indirect impact of ratemaking data on filed rates.

To the extent that any of the Pool Board Members, upon receiving these reports,
generated documents in which they agreed, disagreed or otherwise commented on the reports'
findings about misreporting of premium, such documents are relevant to AIG's offensive and
defensive contention that premium underreporting was both widespread and well known during
the time period at issue in this case.  Further, in light of this relevance and given that these
requests are limited to documents concerning only these reports, AIG does not believe that
searching for such documents imposes an undue burden upon the Non-Underreporters.

With respect to Request No. 21, AIG is willing to narrow this request to all documents
created on or after January 1, 1985 which concern actual or potential efforts by any participating
company to lower the amount of voluntary workers compensation premium reported to NCCI.
Documents responsive to this request are unquestionably relevant to AIG's offensive and
defensive contention that premium reporting was both well known and widespread among the
participating companies. Further, by moving the start date for production from 1970 to 1985,
AIG significantly alleviates any burden and targets the request to the time period when all parties
agree the so-called "residual market crisis"—a situation in which high residual market costs
made writing voluntary workers compensation business almost cost prohibitive and maximized
the incentive for participating companies to lower the amount of voluntary premium reported to
NCCI—began. AIG believes it appropriate that production in response to this Request continue
through the present, as any recently-created document discussing underreporting by other

companies is likely to be relevant to AIG's contention that premium underreporting was both well known and widespread.

To the extent the Pool Board Members argue that their status as "Non-Underreporters" or the Court's December 8, 2008 decision with respect to production of "business practices" documents (requiring the Pool Board Members to produce PPGMs) relieves them of any obligation to respond to Requests Nos. 26 and 27 and AIG's narrowed Request No. 21, AIG disagrees. The transcript from December 8, 2008 (attached hereto as Exhibit B) indicates that the Court's decision to limit the Pool Board Members' "business practices" production to PPGMs was rooted in the Court's unwillingness to require them to search 40 years of policy-level files for evidence of underreporting by others. However, AIG has conceded that, in view of the December 8, 2008 Order, Requests Nos. 21, 26 and 27 do not require the Pool Board Members to search policy-level files. Moreover, the burden posed by these requests is substantially reduced by AIG's agreement to allow production in response to these Requests to begin in 1985, rather than 1970, which focuses the Requests on the time when responsive documents are most likely to be found. Additionally, AIG's First Amended Complaint contains allegations regarding underreporting by other companies during the post-1985 time period that are more detailed than those contained in the complaint that was operative when the Court issued its prior order, which provide increased justification for permitting AIG to explore this area in discovery. (See e.g. First Am. Compl. ¶¶114, 116, 120, 123, 125, 132, 134, 139.) The widespread awareness and practice of underreporting by Pool companies is directly relevant both to AIG's claims against the alleged Underreporters as well as to AIG's claims against the Pool Board Members based upon their willful ignoring of underreporting by any company other than AIG. Documents evidencing such things, to the extent not found in the Pool Board Members' policy-level files, should be discoverable.

It also bears noting, these litigations are now at a more advanced stage; discovery is now in full swing and to the extent the Court's prior order was guided by a desire to "stage" discovery and stagger burdens, AIG submits that it is now appropriate to require the Pool Board Members to search for documents that go to a significant part of AIG's claims and defenses.

The Court has recently ruled that the parties in these cases pursuing claims against AIG are entitled to discovery into alleged underreporting by AIG covering the period from 1970 through in or around 2005. AIG submits that, even if the scope of discovery allowed to each side in this case need not be precisely parallel, it is appropriate that AIG be allowed latitude at least similar to that afforded the other parties in this case. The Pool Board Members urge that the broad time period set for discovery against AIG is appropriate because AIG is an "admitted underreporter". However, AIG has not admitted that underreporting occurred prior to 1985 or after 1996, the years bracketing the time period addressed by the New York Attorney General and the Joye Memo (which was written in 1992), nor have the Defendants adduced any evidence suggesting that underreporting by AIG occurred outside that period. The Court nonetheless has granted the Defendants discovery against AIG going back to 1970 and forward to nearly the present, reasoning that the Defendants have alleged underreporting during that period and are entitled to try and prove it. AIG, for its part, has alleged that whatever underreporting took place was widely known and widespread among the insurance industry. (See First Am. Compl. ¶¶64-71.) Further, AIG has alleged specific instances of underreporting dating back to the mid-1980s. (See e.g. First Am. Compl. ¶¶ 68, 123, 125, 139.) Requests No. 21, 26 and 27 are targeted to find evidence supporting these allegations. AIG, like the Defendants, should be given sufficient

latitude in discovery to prove these key allegations underlying its claims.

Finally, contrary to the assertion by Berkley Risk below, AIG has not conceded that Request No. 21 is "improper". Rather, AIG agreed that to the extent Request No. 21 can be read to seek discovery precluded by the Court's Order of December 8, 2008, Berkley asserted a proper objection. However, as set forth above, Request No. 21 does not call for any such prohibited discovery. If the Court should conclude otherwise, AIG respectfully suggests that the December 8, 2008 Order should be modified and Defendants should be required to produce documents responsive to Request No. 21, as narrowed herein.

### The Non-Underreporters' Joint Position:

The Non-Underreporters are not similarly situated to AIG; they have not admitted that they intentionally underreported workers compensation premium, nor are they accused of having engaged in intentional and systematic underreporting.[2]   Despite its repeated references to the Non-Underreporters' purportedly conspiratorial conduct both in this Joint Statement and the conclusory allegations of the First Amended Complaint, AIG has not advanced a conspiracy claim against the Non-Underreporters or complied with the related heightened pleading standards for any such claim under FRCP 9(b).  The only claim advanced against the Non-Underreporters is for breach of fiduciary duty, based on their service on the National Workers Compensation Reinsurance Pool's Board of Governors.  AIG claims that the Non-Underreporters failed to properly carry out their fiduciary duties as Pool Board members when the Pool decided that AIG's settlement with the New York Attorney General was unworkable and authorized this litigation to be initiated.  (*See* AIG Amended Complaint at ¶193.)  While in its section of this Joint Statement AIG references the "more detailed allegations of underreporting by other participating companies," which it claims appear in its First Amended Complaint, none of those allegations pertain to the Non-Underreporters.  AIG's First Amended Complaint does not contain a single specific, non-conclusory allegation of intentional misconduct by any Non-Underreporter. Given the narrow scope of AIG's claim against the Non-Underreporters, AIG should not be permitted to engage in the expansive and burdensome discovery it seeks from the Non-Underreporters through its Requests for Production, based upon its conclusory accusation of "conspiracy" against the Non-Underreporters (which accusation is not asserted as a claim nor supported by any allegations of fact).  This should be so even if such discovery were somehow marginally relevant to AIG's broader claims.

In its First Amended Complaint, AIG alleges that what it characterizes as a conspiratorial scheme was "**hatched in April 2005**, soon after the Pool Board Members first learned of the New York Authorities' investigation of AIG." (Emphasis supplied.)  (AIG First Amended Complaint at ¶3.)  During the meet-and-confer process, AIG requested that the time period to be searched for potentially responsive documents begin on January 1, 2005, rather than April 2005, and the Non-Underreporters, as a compromise position, agreed that the time period of AIG's document requests will begin on January 1, 2005.

---

[2]   Moreover, AIG appears to equate its own intentional underreporting with misreporting of workers compensation premium to NCCI.  Unintended misreporting is not the equivalent of AIG's carefully designed underreporting, and why such misreporting would be of any relevance here is unclear.

Given AIG's own allegation that any alleged conspiracy did not even begin until April, 2005, there is no rational basis to compel the Non-Underreporters to search for documents created prior to January, 2005.  AIG initially demanded that the Non-Underreporters produce documents going back to January 1, 1970.  It now has agreed to the following time periods for production:  Request No. 21 (1985-present)[3], Request Nos. 26 and 27 (1985-March 17, 2008), Request Nos. 1, 4, 14, 16, 17 and 28 (2005-present), all remaining requests (January 1, 2005-March 17, 2008).  AIG seeks the most expansive discovery in connection with Request No. 21 ("all documents concerning underreporting practices of Participating Companies"), Request No. 26 ("all documents concerning NCCI's 1986 'Management Summary'") and Request No. 27 ("all documents concerning the 2001 examination report of NCCI").  Focusing solely on the temporal scope associated with Request Nos. 21, 26 and 27, without regard to any other specific objections, AIG's demand that each of the Non-Underreporters search its records going back some 25 years to determine if it has any responsive documents, which at best are of marginal relevance, is unreasonable.  In fact, in a very similar context, the Magistrate Judge has already determined that it would be unduly burdensome to require the defendants who are not alleged to have underreported to incur the time and expense required to conduct such a search.

In 2008, AIG sought to compel the Non-Underreporters to produce documents going back to 1970 related to methods or business practices, whether proposed or actual, regarding the structuring of policies and/or determination of premiums for workers compensation coverage and communications with other entities regarding pricing or competitive terms.  As with these current requests, AIG sought to justify those prior requests by claiming that responsive documents might reveal information within the possession of the Non-Underreporters concerning underreporting by others.  (See 12/8/08 Hrg. Tr., attached as Ex. B hereto, at 21-22.)  The Court determined that any marginal relevance such information might have was far outweighed by the burden involved in searching for responsive records over such a broad time period.  (Id. at 22.)  The Court explained, "The kind of search required to capture the documents . . . covers a period of decades, and as many as forty years, and would require of many of these entities thousands of hours of work over many months and substantial cost and disruption to their businesses."  (Id.)  The same is true of AIG's current requests.  AIG again seeks the production of documents covering a period of decades − this time 25 years − the production of which would impose similar burdens on the Non-Underreporters.  The documents it seeks include not only those regarding underreporting (Request No. 21), but also documents regarding two reports related to NCCI (Request Nos. 26 and 27).  AIG's explanation regarding the relevance of the latter category of documents, namely that they potentially could support AIG's "offensive and defensive contention that premium underreporting was both widespread and well known during the time period at issue in this case," falls far short of justifying the unduly burdensome search that these requests would necessitate.  Moreover, it conflates unintended misreporting by other participating companies with AIG's admitted intentional underreporting.  Requiring parties who are not even alleged to have engaged in any underreporting to search twenty-five years of correspondence and other files for the possible discovery of a document containing some reference to another company's reporting practices[4], or to two NCCI-related reports is extreme

---

[3]  The Non-Underreporters dispute AIG's statement at page 6 of this Joint Statement that "all parties agree" with its characterization of the so-called "residual market crisis," and its related conclusion that the time period for responses to its Requests for Production should be from 1985 through the present date.

[4]  This is especially so where a central objective of the conspiracy AIG has alleged against the alleged Underreporting Defendants is that those parties **concealed** their underreporting conduct from others.

and unjustified.  The burden would be particularly extraordinary given the fact that many, if not all, of the documents that pertain to the 1986 report (Request No. 26), and a large portion of those that potentially could pertain to underreporting (Request No. 21), would be in paper form, and therefore not capable of being searched electronically.

Moreover, with respect to Berkley Risk,  AIG has conceded that Request No. 21 -- concerning underreporting practices by participating companies -- is improper.  In its January 12, 2010 letter, AIG's counsel wrote:  "Berkley has objected to Request No. 21 upon the ground (among others) that the Request seeks discovery that is not permitted by the Court's December 8, 2008 Order.  AIG recognizes the merit to this objection as applied to this request." (p. 2).  It is patently improper for AIG to acknowledge the merit of Berkley Risk's objection only to re-word Request No. 21 and seek to discover the identical subject matter.  The same reasoning that applies to Berkley should apply to all of the similarly situated Non-Underreporters, all of whom objected to Request No. 21 and refused to provide responsive documents based on those objections.

For these reasons, in the event that the Court orders the Non-Underreporters to produce documents over their non-time-period-related objections, the Non-Underreporters believe that the beginning date for AIG's Requests for Production 21, 26 and 27 should be January 1, 2005, not January 1, 1985.

## **Disagreement**

The Defendants do not agree to produce documents created after March 17, 2008, the date AIG filed its initial Third Party Complaint.

### AIG's Position:

AIG, in the interest of compromise, will seek documents created subsequent to March 17, 2008 only with respect to Request Nos. 1, 4, 14, 16, 17, 21 and 28.  As to these requests, AIG's position is that the Pool Board Members should be required to produce documents created through the present.

As an initial matter, AIG's October 9, 2009, First Amended Complaint states that the Pool Board Members, under the sway of the Underreporting Pool Board Members, engaged, and, to the extent still on the Pool Board, are engaging, in a *continuing* breach of their fiduciary duties to NWCRP participating companies, including AIG, by conspiring to disable the Workers Compensation Fund that resulted from the settlement of the New York Attorney General's investigation of AIG in 2005 and 2006, and by failing to investigate workers compensation premium underreporting by participating companies other than AIG.  In support of this claim, AIG has alleged that the Board failed to investigate underreporting even after AIG's complaint put the Board on notice that there was reason to suspect improper action by some of its members (*see* First Am. Compl. ¶ 7), and AIG contends that this dereliction of duty has continued after the filing of AIG's First Amended Complaint, which contains more detailed allegations of underreporting by other participating companies.  (*See* First Am. Compl. ¶107.)  Moreover, the Pool Board has continued to preclude interested parties from claiming against the Workers Compensation Fund.  Because this misconduct is ongoing, AIG continues to experience injury. Accordingly, AIG believes that the relevant time period for all Requests directed at the Pool

Board Members extends through the present.

As to a number of the requests at issue, the Pool Board Members object to producing documents through the present on the grounds that much of the requested material is privileged and covered by a joint defense agreement between them, and that logging such materials would be unduly burdensome. AIG is sensitive to this objection and does not, through the requests it presses here, seek to obtain day-to-day joint defense communications or require the Pool Board Members to log such documents. Rather, AIG has sought to tailor its requests to capture only documents of particular relevance and to avoid unnecessary burden. As to the particular requests:

Request No. 1, as originally stated, seeks all documents concerning the New York Attorney General's investigation of AIG (the "Investigation"). Request No. 4, as originally stated, seeks all documents concerning the settlement of that investigation (the "Settlement"). AIG, as a result of the meet and confer process, is agreeable to narrowing these requests to all documents concerning the impact of the Investigation and Settlement, and the Pool Board's actions related thereto, upon AIG's business, good will or reputation. Such documents are relevant to AIG's claim that the Underreporting Pool Board Members have wrongfully used the Pool Board to capitalize on the Investigation and Settlement by scapegoating AIG and making AIG the "poster child" for underreporting behavior that was, in fact a widespread practice. (*See e.g.* First Am. Compl. ¶¶99-100.) AIG does not expect there to be a voluminous amount of such documents created after March 17, 2008, and it is hard to imagine how a document commenting on the effect of the Investigation and Settlement on AIG's business or reputation could be privileged.

Request Nos. 8 and 9 seek the production of documents concerning amended statutory page 14s filed by AIG and the decision by the Board not to recalculate the participating companies' residual market shares and reallocate related adjustments based on such amended page 14s. AIG will not press these requests at this time but reserves the right to at a later date.

Request No. 14, as originally stated, seeks all documents concerning the so-called Ad Hoc Committee of the Pool Board, which was formed by the Pool Board in December 2006 to oversee the Pool's dispute with AIG. The Pool Board Members have objected that such documents are privileged and they object to the burden involved in logging them; in support of this argument, the Pool Board Members have represented that all activities of the Ad Hoc Committee are directed by counsel. AIG contends that the Ad Hoc committee is now the primary entity though which the Underreporting Pool Board Members are conducting their conspiracy against AIG, and thus documents evidencing the activities of the Ad Hoc Committee are highly relevant to AIG's claims. Nonetheless, if the Pool Board Members (or other parties to this litigation) will agree to produce documents sufficient to evidence the dates and attendees of Ad Hoc Committee meetings, as well as the topics discussed at such meetings (at a level of specificity required on a privilege log), AIG will agree that the Pool Board Members need not produce or log any other documents responsive to this request created after March 17, 2008 as to which they claim privilege, unless such documents were not sent from or to counsel. In advancing this proposal, AIG reserves all rights to challenge any assertion of privilege at a later time.

Request No. 16, as originally stated, seeks all documents concerning the Pool Board's

decision not to investigate the claims set forth in AIG's First Amended Complaint.  Relatedly, Request No. 17 seeks all documents concerning the Board's decision not to require the participating companies to confirm their own proper reporting subsequent to the filing of AIG's First Amended Complaint.  Discovery has already revealed that this action was proposed at least once and rejected by the Pool Board, which supports AIG's claim that the Pool Board Members are intentionally avoiding inquiry into underreporting by non-AIG companies in order to conceal their own wrongdoing.  These requests seek documents that are directly relevant to AIG's allegation that:  (i) the Pool Board Members currently on the Pool Board are engaged in a continuing breach of their fiduciary duties to AIG; and (ii) the Underreporting Pool Board Members are engaged in a continuing conspiracy to isolate and scapegoat AIG for widespread underreporting behavior.  AIG's position with respect to these requests is the same as its position with respect to Request 14:  If the Pool Board Members (or other parties to this litigation) will agree to produce documents sufficient to evidence the dates and attendees of Pool Board meetings and Ad Hoc Committee meetings, as well as the topics discussed at such meetings (at a level of specificity required on a privilege log), AIG will agree that the Pool Board Members need not produce or log any other documents responsive to this request created after March 17, 2008 as to which they claim privilege, unless such documents were neither sent from or to counsel.  In advancing this proposal, AIG reserves all rights to challenge any assertion of privilege at a later time.

AIG addresses Request No. 28 below.

The Non-Underreporters' Position(s)

AIG's request that the Non-Underreporters search for records after March 17, 2008, when AIG first asserted its claims against them, in connection with Request Nos. 1, 4, 14, 16, 17, 21 and 28, as modified by this Joint Statement, also is unreasonable.  AIG claims that it needs all responsive documents through the present because it has alleged that the Non-Underreporters are engaging in an ongoing conspiracy with the alleged Underreporters and a continuing breach of their fiduciary duties by failing to investigate underreporting by companies other than AIG.  But if that were the case, AIG would only need documents created after March of 2008 that relate to any investigation of underreporting by companies other than AIG.  That is not what AIG is seeking.  Instead, AIG is attempting to require all of the Non-Underreporters to produce documents created after March of 2008 that are responsive to the following requests, as modified:  Request 1 (documents concerning the Investigation), Request 4 (documents concerning the AIG Settlement), Request 14 (documents concerning the Ad Hoc Committee), Request 16 (documents concerning "the Board's decision not to investigate the claims set forth in AIG's First Amended Complaint"), Request 17 (documents concerning "the Board's decision not to require the Participating Companies to confirm their own proper reporting subsequent to the filing of AIG's First Amended Complaint"), Request 21 (documents concerning underreporting) and Request 28 (documents concerning communications regarding AIG).

The ongoing production obligation envisioned by these Requests is unduly burdensome.  That burden is particularly significant because these specific requests would call for the Non-Underreporters to produce or log documents directly related to their monitoring and oversight of this very litigation.  AIG's proposed modification of these requests seeks to compel the Non-Underreporters to produce on an ongoing basis documents evidencing the dates of each Ad Hoc Committee meeting and the topics discussed at those meetings.  The Ad Hoc Committee is a

committee established by the Pool's Board of Governors to help it monitor AIG's under-reporting and this litigation, and to work directly with the Pool's litigation counsel. Every one of the committee's meetings is attended by lawyers for the Pool Board, who actively participate throughout those meetings by discussing legal issues, strategy and the status of this lawsuit and answering the committee's questions. It would be a fundamental invasion of the Pool Board's work product and privileged communications to require the Non- Underreporters to identify for their litigation adversary on an ongoing basis throughout the course of this litigation each time that committee meets and what subjects it is discussing. As a general rule, the subject matter of privileged communications is not considered to be privileged because it would not reveal sensitive information, however, where, in instances like this one, revealing the subject matter could disclose the nature of privileged discussions or have a chilling effect on the clients willingness to discuss a particular subject, courts have repeatedly recognized that such disclosure invades the attorney-client privilege and/ or work product doctrine and should be prevented. *See, e.g., Royal Insurance Co. of America v. Laurelton Welding Service, Inc.*, No. 02-7781, 2003 WL 22717521 at *5 (E.D. Tenn. November 17, 2003)(witness not required to identify whether he discussed particular subjects at meetings with lawyers); *Arthur Teacher's Franchise Litigation*, 92 F.R.D. 429, 435 (E.D. Pa. 1981)(ordering that deponents need not identify the subjects discussed at privileged meetings); *Lee National v. Deramus*, 313 F. Supp. 224, 226-27 (D. Del. 1970)(requiring litigants to identify subjects discussed during meetings with their lawyer would create an improper implication that the subjects were either suspect or vulnerable, undercut the public policy inherent in the attorney-client privilege and, if stated in sufficiently general terms provide little meaningful value to the litigation).

To the extent that AIG believes that there is some evidentiary value in establishing that the Ad Hoc Committee continues to meet, the Non-Underreporters are willing to stipulate that the Ad Hoc Committee meets regularly to discuss AIG's underreporting and the pending litigation. Requiring the Non-Underreporters to produce documents evidencing each specific time they meet would add no measurable benefit, particularly when balanced against the corresponding burden. Any detailed identification of specific subjects discussed would be privileged, and any general description drafted to avoid disclosing privileged information would add no real benefit beyond the proposed stipulation. *See Lee National*, 313 F. Supp. at 227. There is no legitimate reason to require the Non-Underreporters to identify information about Ad Hoc Committee meetings on an ongoing basis.

For the reasons stated above, the burden of producing documents sufficient to identify the requested information cannot be justified in the case of the Non-Underreporters when measured against their marginal relevance. Accordingly, in the event that the Court orders the Non-Underreporters to produce documents over their non-time-period-related objections, the end of the time period for AIG's document requests to the Non-Underreporters should be March 17, 2008.

**B.    Objection to Definition "Concerning" (First Request Definition No. 17; General Objection No. __)**

Berkley Risk, Chubb and Truck objected to AIG's definition of "concerning," which provided:

"Concern" and "Concerning," in addition to its customary and

-12-

usual meaning, shall mean "discussing," "evidencing," "relating to," "constituting," "referring to," "reflecting," "mentioning," "pertaining to," "containing an implicit reference to," "assessing," "characterizing," "recording," "describing," "touching upon," or "summarizing."

The Non-Underreporters initially took the position that they would produce only documents "which specifically and directly refer" to the subject of the Request to which they were responding. The Non-Underreporters objected to the definition of "concerning", on the grounds that such definition makes AIG's requests too vague and ambiguous to ascertain what AIG is seeking. Specifically, the Non-Underreporters took the position that they are not required to assume the unreasonable task of conjecturing whether or not a document contains "an implicit reference" or "assesses" a subject matter when the face of the document itself does not directly refer to the subject matter. AIG took the position that the limitation is without merit and all documents referencing the subject matter in the requests, regardless of whether the reference is "specific" and "direct," are discoverable. The parties have resolved this dispute by agreeing that the parties will undertake searches for discoverable documents using a reasonable interpretation of the Requests and not use the "specific and direct" limitation to exclude otherwise discoverable documents.

## C.   Request No. 21

The parties disagree as to whether the Non-Underreporters must produce documents in response to Request No. 21, which calls for all documents concerning underreporting practices by participating companies of the NWCRP.

<u>AIG's Position</u>

See Section III.A above.

<u>The Non-Underreporters' Position(s)</u>

The Non-Underreporters object to Request No. 21 in its entirety based on the Court's December 8, 2008 ruling, discussed above in Section III(A) at pages 5-7. Magistrate Judge Schenkier has already denied AIG's motion to compel production of documents on a substantively identical document request presented by AIG that sought "[a]ll documents concerning underreporting practices by the Participating Companies" going back to 1970. In ruling on AIG's motion to compel relating to that request, Magistrate Judge Schenkier found that "the **mere possibility** that there will be information in the files of non-underreporters about conduct by underreporters **does not justify imposing on the non-underreporting parties the burden** of search of records going back during the period that we're talking about." (See 12/8/08 Hrg. Tr., attached as Ex. B hereto, at 23 (emphasis added)). The Court further explained, "The kind of search required to capture the documents . . . covers a period of decades, and as many as forty years, and would require of many of these entities thousands of hours of work over many months and substantial cost and disruption to their businesses." *Id.* at 22. AIG did not challenge or appeal that ruling. AIG's current request must be denied because it unquestionably seeks the same information that Magistrate Judge Schenkier has already ruled is impermissible.

AIG's proposal to narrow the time period of this request from 40 years to 25 years does not change the burden that the Court has already found to be outside the permissible bounds of discovery. Rather, the burden of conducting a company-wide search over a 25 year time period (January 1, 1985 to present) for documents concerning conduct by other companies is excessively burdensome and such burden is not justified by the "mere possibility" that a Non-Underreporter may have information about the conduct of alleged underreporting companies. Specifically, requiring parties who are not even alleged to have engaged in underreporting to search through decades of correspondence and other files in the hope that such a search might find some reference to another company's reporting practices is extreme and unjustified. AIG's contention that it has "uncovered significant additional evidence of underreporting practices by participating companies"—which AIG stated for the first time in connection with the preparation of this joint statement—fails to articulate any reason why such a burdensome search is justified. AIG fails to identify the source of such alleged "evidence" or how such purported "evidence" makes it more than a "mere possibility" that a Non-Underreporter has information about conduct of alleged underreporting companies. Such silence shows that AIG clearly cannot justify imposing the burden to search for information of questionable relevance (if any). Accordingly, the Non-Underreporters' objections to AIG's Request No. 21 should be sustained.

### D.      Request No. 28

The parties disagree as to whether the Defendants must produce documents in response to Request No. 28, which calls for all communications with any participating company.

<u>AIG's Position</u>

As a result of the meet and confer process, AIG is willing to narrow this request to all communications occurring between January 1, 2005 and the present, concerning AIG, which took place between the responding Defendant and: (i) any of the Underreporting Pool Board Members (i.e., the alleged ringleaders of the conspiracy against AIG); (ii) the Pool, the Pool Board or any Pool Board Committee; or (iii) NCCI. Additionally, AIG will again agree that the Pool Board Members need not produce or log any other documents responsive to this request created after March 17, 2008 as to which they claim privilege, unless such documents were neither sent from or to counsel. In advancing this proposal, AIG reserves all rights to challenge any assertion of privilege at a later time.

AIG believes that, as narrowed, Request No. 28 is targeted to capture documents relevant to AIG's central claim that the Underreporting Pool Board members used their domination and control of the Board to induce the Pool Board Members (the other Pool Board Members) to breach their fiduciary duties to AIG. AIG further believes that this request does not impose an undue burden since, as narrowed, it does not require the Pool Board Members to search for and review every document mentioning AIG; rather, they can screen out any such document that was not a communication to one or more of a relatively small list of other entities.

<u>The Non-Underreporters' Position(s)</u>

AIG's proposal to rewrite Request No. 28 to seek production of communications "concerning AIG" between any of the Non-Underreporters, on the one hand, and any alleged

"Underreporting Pool Board Member," the Pool, the Pool Board, any Pool Board Committee, or the NCCI, on the other, remains overly broad, unduly burdensome, and is not properly limited to communications that are relevant or reasonably likely to lead to the discovery of admissible evidence. *See Ull v. Fire Safety, Inc.*, Civ. No. 09-081-DRH 2009 WL 4730955 (S.D. Ill. Dec. 8, 2009) (request for "all documents concerning Plaintiff from January 1, 2006 up to the present time" was "clearly overly broad"); *Technical Sales, Inc. v. Dresser, Inc.*, No. CIV 05-0556 ACT/DJS (D.N.M. September 19, 2007) (requests for "all documents relating to [defendant] and any of its affiliates" held to be "facially overly broad and unduly burdensome"). The request goes well beyond any of the allegations made against the Non-Underreporters because it is not limited to their service on the Pool Board, much less the NWCRP, worker's compensation insurance, or the reporting of worker's compensation insurance premiums to NCCI. Given the likelihood that certain of the Non-Underreporters' personnel may have had communications "concerning" AIG about any number of issues that have nothing to do with the issues in this case, including, for example, communications regarding industry-wide meetings or seminars where AIG may have been in attendance, such a search would involve sifting through massive amounts of wholly irrelevant documents and would be excessively burdensome for the Non-Underreporters to perform, if it could be performed at all. Thus, AIG's proposal far exceeds the permissible bounds of discovery. Finally, for the reasons stated above in the Non-Underreporters' Joint Position regarding the time-period objection, which the Non-Underreporters incorporate herein by reference, AIG's attempt to seek documents from January 1, 2005 to the present date is improper and should be rejected.

Dated:  March 9, 2010                          Respectfully submitted,


s/ Stephen Novack                              s/ Michael B. Carlinsky

Stephen Novack                                 Michael B. Carlinsky
P. Andrew Fleming                              Kevin S. Reed
NOVACK AND MACEY, LLP                          Jennifer J. Barrett
100 North Riverside Plaza                      QUINN EMANUEL URQUHART OLIVER
Chicago, IL 60606                              & HEDGES, LLP
(312) 419-6900                                 51 Madison Avenue, 22nd Floor
                                               New York, New York 10010
Attorneys for American International Group,    (212) 849-7000
Inc.
                                               Attorneys for American International Group,
                                               Inc.

s/ Kimball Ann Lane

Thomas R. Newman
Kimball Ann Lane
Christine Megna Van Gelder
DUANE MORRIS, LLP
1540 Broadway, Suite 1400
New York, New York 10036
Tel: (212) 692-1000

Attorneys for Berkley Risk Administrators
Company, LLC


s/ Christopher A. Thompson

David T. Moran
Christopher A. Thompson
JACKSON WALKER, L.L.P .
90 1 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 953-6000
Facsimile: (214) 661-6808 / (214) 953- 5822

Attorneys for Chubb & Son, A Division of
Federal Insurance Company


s/ Omar Odland

Daniel G. Litchfield
Omar Odland
LITCHFIELD CAVO LLP
303 W. Madison
Suite 300
Chicago, IL 60606
312/781-6669 (Mr. Litchfield)
312/781-6660 (Mr. Odland)
312/781-6630 (fax)

Attorneys for Cincinnati Insurance Company


s/ Stacy Allen

Stacy Allen
Jeffery R. Johnson
Marilyn Montano
JACKSON WALKER,LLP
100 Congress Avenue, Suite 1100
Austin, TX 78701
(512) 236-2000 - Telephone
(512) 236-2002 – Facsimile

Dan L. Boho
David Alfini
James Constantine Vlahakis
HINSHAW CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago , IL 60601
(312) 704-3000 – Telephone

Attorneys for Truck Insurance Exchange

s/ Michael D. Sher

Michael D. Sher
Emily Mulder Milman
Athanasios Papadopoulos
Meredith D. Schacht
NEAL, GERBER & EISENBERG, LLP
Two N. LaSalle St., Suite 1700
Chicago, IL 60602
Phone: 312-269-8085
Fax: 312-269-1747

Attorneys for Advantage Workers
Compensation Insurance Company, Alaska
National Insurance Company, AmTrust
Financial Services, Inc., Harleysville Mutual
Insurance Company, MEMIC Indemnity
Company, Safeco Insurance Company of
America, and Utica Mutual Insurance
Company

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served a copy of the foregoing **JOINT STATEMENT REPORTING ON MEETING BETWEEN THE NON-UNDERREPORTERS AND AIG REGARDING DISPUTE ON AIG'S DOCUMENT PRODUCTION REQUESTS** by causing copies thereof to be sent by U.S. District Court CM/ECF e-filing system on the 9th day of February, 2010.

/s/  Andrew D. Campbell