**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., et al. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 07 CV 2898 ) |
| | ) Judge Robert W. Gettleman ) |
| ACE INA HOLDINGS INC., et al. | ) ) Magistrate Judge Sidney I. Schenkier |
| Defendants. | ) |

## THE POOL'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OR HEARING PURSUANT TO FEDERAL RULE OF EVIDENCE 201(E)

Defendant National Workers Compensation Reinsurance Pool ("NWCRP" or "the Pool"), by its attorneys, submits this memorandum of law in support of its motion for reconsideration of the portions of the Court's Memorandum Opinion and Order dated June 30, 2010, in which this Court denied NWCRP's motion to dismiss all claims asserted against it in AIG's Corrected First Amended Complaint. (Docket Entry 649 at 16-17) (the "Opinion").

This Court *sua sponte* took judicial notice that "the NWCRP became the National Workers Compensation Reinsurance Association" ("NWCRA" or "the Association") on January 1, 2010. (Opinion at 16-17) The Court further ruled that this judicially noticed "fact" mooted the NWCRP's argument in support of dismissal: that it is not an entity capable of being sued and that AIG is estopped from arguing otherwise. (*Id.*) The Pool does not dispute that a new corporation called the NWCRA was organized and that it commenced overseeing reinsurance of risks arising on and after January 1, 2010 under various state residual market plans. But the

NWCRP did not "become" the NWCRA, and this Court's conclusion to the contrary is an error both of fact and of law.[1]

The NWCRA is a not-for-profit corporation, separate and distinct from the contractual arrangement known as the NWCRP. The NWCRA was organized to oversee only the reinsurance of residual market risks arising on and after January 1, 2010 under state Workers Compensation Insurance Plans that are authorized by the NWCRA Board of Directors. This reinsurance arrangement overseen by the NWCRA was filed with and approved by state insurance regulators as expressly set forth in Section 2 of the NWCRA's Bylaws:

> Commencing on January 1, 2010, these Bylaws shall be applicable to each Authorized Insurance Plan for terms of three (3) calendar years, unless action is taken pursuant to Article V, Section 8.

A true and accurate copy of the NWCRA Bylaws is attached as Ex. A.

The NWCRP continues to be responsible for overseeing reinsurance of risks arising prior to policy year January 1, 2010 under state Workers Compensation Insurance Plans that were previously authorized by the NWCRP Board of Governors. The NWCRP participating companies amended Section 2 of Article II of the NWCRP Articles of Agreement to reflect this fact:

> Notwithstanding anything to the contrary, these Articles of Agreement shall not be applicable to any Insurance Plan's or Authorized Insurance Plan's calendar year incepting after the Insurance Plan's or Authorized Insurance Plan's state regulator has approved the reinsurance mechanism governed by the National Workers Compensation Reinsurance Association NFP.

Consequently, the NWCRP was and still is the contractual arrangement for the run off of policy years 1970 through and including 2009. In other words, the contractual arrangement

---

[1] This issue has potential ramifications beyond this case. The public, and other potential future litigants, should not have any misperception that the NWCRA is somehow the legal successor to the NWCRP. This motion for reconsideration is intended, at least in part, to make sure the record is clarified appropriately.

known as the NWCRP continues to this day. It was not merged into or acquired by or otherwise subsumed by the NWCRA. It did not transfer any assets or liabilities to the NWCRA.

As noted above, this arrangement was filed with and approved by insurance regulators in various states. NCCI, in its capacity as Administrator, filed the NWCRA's Bylaws and related documents with these insurance regulators and explained that the new corporation would oversee the reinsurance of risks arising under the Workers Compensation Insurance Plans for policy years 2010 and subsequent years, but the 2009 and prior policy years would be handled under the existing NWCRP governance and oversight structure. This means that for 2009 and prior policy years, the existing NWCRP Articles of Agreement, the NCCI/NWCRP Administration Agreement, and all procedures and rules that currently govern the operation and administration of the reinsurance agreements did not change.

The NWCRP is mindful that "'[t]his Court's opinions are not intended to be mere first drafts,'" and that reconsideration is an exceptional remedy that is warranted only in exceptional circumstances. *The Majestic Star Casino, LLC v. Trustmark Ins. Co.*, 667 F. Supp. 2d 809, 821-22 (N.D. Ill. 2009) (quoting *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1998)). However, it is appropriate to seek reconsideration when, as here, the Court "has made a decision outside the adversarial issues presented ... by the parties." *United States v. Funds in the Amount of Three Hundred Fourteen Thousand Nine Hundred Dollars ($314,900.00)*, No. 05 C 3012, 2006 WL 794733, at *1 n.1 (N.D. Ill. Mar. 21, 2006) (internal quotation omitted).

Accordingly, the NWCRP requests that the Court withdraw its judicial notice and reconsider the Pool's argument – that AIG's claims against it should be dismissed because the Pool is not an entity that can be sued – based on the arguments, authority and material the parties actually submitted. Alternatively, NWCRP requests an opportunity to be heard pursuant to

Federal Rule of Evidence 201(e) so that it can present evidence demonstrating that NWCRA is an entirely separate legal entity from the NWCRP.

## I.    THE NWCRP DID NOT "BECOME" THE NWCRA.

The Court correctly noted in its Opinion that neither party brought the incorporation of the NWCRA to the Court's attention.  (Opinion at 17)  We presume that AIG did not bring the fact of NWCRA's incorporation to the Court's attention for the same reason that the NWCRP did not: the formation of the NWCRA has absolutely no bearing on the Pool's motion to dismiss.[2] The NWCRA did not commence overseeing any reinsurance of residual market risks under authorized insurance plans until January 1, 2010.  The allegations against the NWCRP in AIG's Corrected First Amended Complaint (Docket Entry 502) have nothing to do with the governance or oversight of the residual market reinsurance for 2010 and subsequent policy years, but rather concern earlier years that are now in run off.

Up until the end of policy year 2009, the NWCRP reinsurance arrangement provided reinsurance for the residual market risk plans in a number of jurisdictions (that varied from year to year).  Nat'l Council on Compensation, Inc. ("NCCI"), Residual Market Management Summary 2009 at 6, https://www.ncci.com/Documents/RM-Mgmt-Summary-2009.pdf.  By contrast, the NWCRA commenced overseeing reinsurance of risks arising out of authorized residual market plans effective January 1, 2010.  *Id.*  As of January 1, 2010, the NWCRA took governance of Policy Year 2010 and *subsequent* quota share reinsurance agreements.  *Id.*  The NWCRP, on the other hand, continues to operate as the contractual arrangement of the participating companies for all policy years prior to 2010.

---

[2] AIG, as a participating company in the NWCRP, was fully informed about the incorporation of the NWCRA.

As a distinct corporation, the NWCRA can only be held responsible for providing the accounting that AIG seeks from the NWCRP if the NWCRA agreed to assume that responsibility or, in very limited circumstances, through the operation of law. It is a fundamental aspect of corporate law that a corporation generally *cannot* be held responsible for conduct occurring before its formation. *See GMAC, LLC v. Hillquist*, 652 F.Supp.2d 908, 917 (N.D. Ill. 2009) ("In Illinois, 'a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally from other corporations with which it may be affiliated.'" (quoting *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985))); *see also Arch Aluminum & Glass Co., Inc. v. Haney*, 964 So.2d 228, 234 (Fla. Dist. Ct. App. 2007) ("[T]he common law rule [is] that a 'corporation is not liable for torts ... committed before it came into existence.'" (quoting 1A Fletcher Cyclopedia Corporations § 218)). Although there are certain exceptions to this general rule, AIG has not alleged – nor can it allege, consistent with its obligations under Rule 11 – any facts that would support a conclusion that such an exception exists in this case.

Notably, the only counts asserted against the NWCRP are those seeking an accounting for policy years with which the NWCRA has no involvement. The NWCRP remains in place as the controlling contractual reinsurance arrangement for residual market policy years through 2009. The NWCRP did not, in any sense, "become" the NWCRA, and the NWCRA cannot be held responsible for an accounting by the Pool[3]. Accordingly, this Court should withdraw its judicial notice conflating the NWCRP and the NWCRA.

---

[3]In Illinois (as in most American jurisdictions) "actions taken by [a] predecessor corporation generally cannot be attributed to [a] successor corporation." *Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 208 F. Supp. 2d 918, 924 (N.D. Ill. 2002)(J. Gettleman); *see also Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1997). Although there are exceptions to the

## II.    THE COURT ERRED BY TAKING JUDICIAL NOTICE THAT THE NWCRP "BECAME" THE NWCRA.

The Court should not have taken judicial notice that the NWCRP "became" the NWCRA. "[T]he effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and in effect, directing a verdict against him as to the fact noticed." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997). Accordingly, courts should be cautious and "should strictly adhere to the criteria established by the Federal Rules of Evidence before taking judicial notice of pertinent facts." *Id.* at 1081. Judicial notice of a fact is appropriate only if the fact is "not subject to reasonable dispute" and "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Here, the judicially noticed fact is erroneous and therefore meets none of the requirements of Rule 201(b).

First, "[i]n order for a fact to be judicially noticed, *indisputability is a prerequisite*." *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (emphasis added); *see also United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). It is, therefore, reversible error for a court to take judicial notice of a fact that is reasonably disputed by a party. *See Doss v. Clearwater Title Co.*, 551 F.3d 634, 639-40 (7th Cir. 2008) (reversing district court's taking of judicial notice where plaintiff contended that judicially noticed public record "was not what it appeared to be"); *Gen. Elec. Capital*, 128 F.3d at 1083 (reversing district court's taking of judicial notice because it did not first determine whether the fact was reasonably disputable).

Here, the judicially noticed fact is not just subject to reasonable dispute, it is wrong. The NWCRP did not become the NWCRA. The NWCRA is a not-for-profit corporation with a

_____

general rule of successor nonliability, none of those exceptions apply here, and certainly should not be applied *sua sponte* through judicial notice.

different and separate legal status from the NWCRP. The NWCRP was not subsumed by or merged into the NWCRA when the NWCRA was formed. On the contrary, the contractual arrangement referred to as the NWCRP continues to operate, separate and distinct from the NWCRA, for reinsurance of residual market policy years prior to January 1, 2010. The NWCRA exists solely to oversee reinsurance of residual market policies issued on or after January 1, 2010, and has no connection to any of the conduct at issue in this litigation.

Moreover, judicial notice that the NWCRP "became" the NWCRA is improper because the noticed "fact" is neither "generally known" nor "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A "generally known" fact appropriate for judicial notice is one that "is so commonly known in the community as to make it unprofitable to require proof, and so certainly known as to make it indisputable among reasonable men." McCormick on Evidence § 329 (1954). While the existence of the NWCRA may be just such an indisputable fact, the notion that the NWCRP became the NWCRA is not only subject to dispute, it is erroneous. The noticed fact in this case is neither commonly nor certainly known by the community within this Court's jurisdiction.

The noticed fact also has not been readily determined by resort to sources whose accuracy is unquestionable. Fed. R. Evid. 201(b)(2). This Court relied on three internet postings to support judicial notice that the NWCRP "became" the NWCRA. (Opinion at 17 n.6) But the noticed fact cannot be readily determined by these sources, and the one source that states the NWCRP "became" the NWCRA lacks the "indicia of trustworthiness" that would properly support judicial notice.

The legal relationship between the NWCRP and the NWCRA cannot be "readily determined" by reviewing the content of two of the three internet postings cited by the Court.

7

One of the internet postings is cited merely to show that the NWCRA's bylaws became effective on January 1, 2010; the post says nothing whatsoever to suggest that the NWCRP "became" the NWCRA. *See* NCCI, National Workers Compensation Reinsurance Association NFP Bylaws, https://www.ncci.com/nccimain/ResidualMarkets/EmployerProducerCarrierResources/Carrier/Pages/NFPBylaws.aspx. And the second cited posting, a 2007 annual report published by the NCCI actually contains facts that *support* the NWCRP's contention that it did *not* "become" the NWCRA. NCCI, Residual Market Management Summary 2007 at 6 ("2007 Report"), https://www.ncci.com/documents/RM_Mgmt_Sum_2007.pdf. The 2007 Report states that "*future* policy year quota share reinsurance agreements" would be transferred to the NWCRA following its incorporation. 2007 Report at 6 (emphasis added). But as this article suggests, the NWCRP remains the contractual arrangement for oversight of reinsurance of the residual market risks for years prior to 2010, when all of the alleged underreporting at issue in this case is alleged to have occurred.

The third internet post that this Court relied on uses imprecise language in a summary headline to incorrectly state that the NWCRP became the NWCRA, but, again, that language is not accurate. At a minimum, the post does not possess "sufficient indicia of trustworthiness" to warrant judicial notice of its factual content. *See Gen. Elec. Capital*, 128 F.3d at 1084 (ruling that judicial notice should not be taken of fact reported in private document, as document had "none of the indicia of trustworthiness found in a public record or a well-established learned treatise"). The post is a brief summary note that appears on the "Public Information" section of the Indiana Compensation Rating Bureau ("ICRB")'s website. *See* Ron Cooper, ICRB, National Pool: Explanation of the National Workers Compensation Reinsurance Pool (NWCRP) (2009) ("ICRB Post"), http://sharepoint.icrb.net/public/CompClues/details.aspx?Item=180. The ICRB

is "a private non-profit, unincorporated association of all insurance companies licensed to write workers compensation insurance in Indiana," *See About ICRB*, http://www.icrb.net/about/about.htm (last visited on July 23, 2010). Indiana has not participated in the NWCRP since 2004 and the NWCRA does not provide reinsurance to the Indiana residual market plan, *see* ICRB Post, http://sharepoint.icrb.net/public/CompClues/details.aspx?Item=180; National Workers Compensation Reinsurance Association NFP Bylaws, https://www.ncci.com/nccimain/ResidualMarkets/EmployerProducerCarrierResources/Carrier/Pages/NFPBylaws.aspx.

The ICRB post upon which the Court based its judicial notice, a news item provided "for informational purposes only," *see* ICRB Post, http://sharepoint.icrb.net/public/CompClues/details.aspx?Item=180, is not a source "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Cofield v. Alabama Pub. Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir. 1991) ("That a statement of fact appears in a daily newspaper does not of itself establish that the stated fact is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") (internal quotation omitted). It bears no "indicia of trustworthiness" that could support taking judicial notice of its factual content. *GE Elec. Capital*, 128 F.3d at 1084.

Although a court may take judicial notice *sua sponte*, Fed. R. Evid. 201(c), "[a] party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice," Fed. R. Evid. 201(e). "In the absence of prior notification, the request may be made after judicial notice has been taken." *Id.* Thus, if necessary, the NWCRP requests a hearing as to the propriety of judicial notice, at which the NWCRP will present affirmative evidence that

the NWCRA is an entirely separate legal entity from what is referred to as the NWCRP and that the NWCRA should not be held responsible for any of the conduct at issue in AIG's complaint.[4]

## CONCLUSION

Because the NWCRP did not "become" the NWCRA on January 1, 2010, and because, at any rate, the legal relationship between the two has not been properly determined "by resort to sources whose accuracy cannot reasonably be questioned," this Court should withdraw its judicial notice and should consider on its merits the NWCRP's argument that it is not an entity capable of being sued. (*See* Docket Entry 520; Docket Entry 521; Docket Entry 548). If the Court is unwilling to withdraw its judicial notice, then pursuant to Federal Rule of Evidence 201(e), the NWCRP seeks an opportunity to be heard as to the propriety of taking that judicial notice.

Dated: July 29, 2010

Respectfully submitted,

National Workers Compensation Reinsurance Pool

By: ___/s/ William M. Hannay_____
      William M. Hannay
      Marci A. Eisenstein
      Charles H.R. Peters
      SCHIFF HARDIN LLP
      233 South Wacker Drive
      Chicago, Illinois 60606

---

[4] At any such hearing, it would be AIG's burden to demonstrate that any facts subject to judicial notice are actually "indisputable." *See* Weinstein's Federal Evidence § 201.31[3] ("In a case in which the court takes notice on its own motion, the burden of convincing the judge that the fact is indisputable falls logically on the party bearing the burden of persuasion on the issue the fact tends to establish.").

## <u>CERTIFICATE OF SERVICE</u>

I, William M. Hannay, an attorney, hereby certify that I caused true and correct copies of the foregoing **Memorandum of Law in Support of the Pool's Motion for Reconsideration or Hearing Pursuant to Federal Rule of Evidence 201(E)** to be sent by the U.S. District Court CM/ECF e-filing system on this, the 29th day of July, 2010.

William M. Hannay

# EXHIBIT A

# BYLAWS
## NATIONAL WORKERS COMPENSATION REINSURANCE ASSOCIATION NFP

### ARTICLE I

**Definitions - Rules of Construction**

Unless otherwise provided herein, all terms defined in any Authorized Insurance Plan shall have the same meaning in these Bylaws.

The terms "net premiums written," "net workers compensation insurance premiums written," "workers compensation premiums written" and "workers compensation insurance premiums," wherever used in these Bylaws, shall mean the gross direct premiums charged less all premiums (except dividends and savings refunded under participating policies) returned to policyholders for all Workers Compensation and Occupational Disease Insurance, exclusive of premiums for risks subject to these Bylaws, and for risks written under National Defense Projects Rating Plan and under excess policies. (An excess workers compensation insurance policy is a policy issued to provide coverage for amounts above a self-insured retention.)

The term "Insurance Plan(s)" wherever used in these Bylaws shall mean workers compensation insurance plans or other assigned risk workers compensation insurance plans that are in effect in various states and which generally provide for the issuance of workers compensation policies to employers who are in good faith entitled to workers compensation insurance as defined in the insurance plans but are unable to procure such insurance in a regulatory manner.

"Authorized Insurance Plan" wherever used herein shall mean an Insurance Plan (i) approved by the insurance regulator in any state that provides workers compensation insurance to employers who are in good faith entitled to such insurance but are unable to procure such insurance in a regular manner and (ii) which has been authorized by the Board of Directors under Article V, Section 7.

The term "Workers Compensation" and the word "Workers" wherever used within these Bylaws mean Workers or Workmen's as applicable.

1

The term "Reinsurance Agreements" shall mean those quota share reinsurance agreements entered into among the Servicing Carriers and the Members in the capacities as licensed insurance companies, as provided for in these Bylaws. These Reinsurance Agreements reinsure the direct insurance obligations of the Servicing Carriers that issue insurance policies in their own names directly to policyholders under the Authorized Insurance Plans.

The term "Administrator" shall mean the entity designated by the Board of Directors to provide the necessary administrative services as are required to achieve the purposes of the Reinsurance Agreements.

The term "Servicing Carrier(s)" shall mean those licensed insurers which (i) have been selected pursuant to the Authorized Insurance Plans to issue to employers who are eligible for such coverage direct workers compensation insurance policies, as defined in those Plans, such policies being issued in the insurer's own name; and (ii) with respect to such policies, have ceded reinsurance pursuant to the Reinsurance Agreements.

**ARTICLE II**

**Purposes and Limitations**

1. **Purposes.** The purposes of the Corporation include those set out in the Corporation's Articles of Incorporation and to provide Members with an option for complying with Authorized Insurance Plan requirements by permitting the Members to share in the experience of certain assigned risks through reinsurance, thereby reducing both administrative costs and the annual fluctuation in the liability of Members arising from Authorized Insurance Plan participation. Under the Insurance Plans, an employer who qualifies for coverage is assigned to a carrier to issue and service the policy of insurance issued to such employer. Assignments are made to Servicing Carriers that are appointed pursuant to the Authorized Insurance Plans to write and service the policies issued to employers, which policies are then reinsured by the Members in their capacities as licensed insurance companies pursuant to the Reinsurance Agreements. The service provided by the Servicing Carriers is the provision of direct insurance, which includes underwriting and issuing the policy, auditing and collection of premiums, paying all premium and loss based taxes and assessments, providing loss control, and defending and

2

paying claims.

All Members must enter into Reinsurance Agreements with Servicing Carriers for the purpose of sharing through reinsurance, whether as separate or combined components, the premiums, losses, costs and/or expenses of the policies assigned to the Servicing Carriers. The Reinsurance Agreements distribute premiums, losses, costs and/or expenses and define the obligations among the Servicing Carriers and the Members in their capacities as reinsurers. The Corporation will: (1) facilitate the reinsurance by establishing uniform rules and procedures; (2) provide a framework which permits the Members to agree upon such rules and procedures in the future; and (3) provide a mechanism for resolving disputes arising under the Reinsurance Agreements and these Bylaws.

The relationship under the Reinsurance Agreements between the Servicing Carriers and the Members in their capacities as reinsurers shall be administered by a separate organization ("Administrator") as provided for in an administration agreement (herein "Administration Agreement"). The Administrator's duties and obligations with respect to such administration are established by: (i) the Authorized Insurance Plans; (ii) these Bylaws; and (iii) the Administration Agreement. The Administrator is also designated as an agent for the Members to enter into contracts on their behalf to carry out the purposes of these Bylaws including but not limited to the Reinsurance Agreements.

2.  **Limitations.** No Insurance Plan for any state shall be brought within the scope of these Bylaws and the rules and procedures adopted hereunder unless these Bylaws have been authorized for and incorporated as part of the Insurance Plan that has been filed with the insurance regulator in such state and approved, or the Bylaws are otherwise approved by the insurance regulator.

These Bylaws shall apply to policies issued to employers whose risks have been assigned to and accepted by Servicing Carriers in accordance with any Authorized Insurance Plan and the terms herein.

Commencing on January 1, 2010, these Bylaws shall be applicable to each Authorized Insurance Plan for terms of three (3) calendar years, unless action is taken pursuant to

3

Article V, Section 8. At the end of each such term, these Bylaws shall automatically renew for an additional three (3) year term unless the Board of Directors shall recommend to the Members that no such renewal should be extended to that Authorized Insurance Plan. Any such recommendation by the Board shall be presented to the Members no later than the regular meeting of Members to be held during June of the third year of any such term for a specific Authorized Insurance Plan. Any such recommendation is subject to ratification by the affirmative vote, in person or by proxy, of Members writing at least 66 2/3% of the total net workers compensation premium written by all Members in such state during the latest available calendar year.

## ARTICLE III

**Members**

1.  **Eligibility.** Any company licensed to write workers compensation insurance in any state that has an approved Authorized Insurance Plan may become a Member. Any state Workers Compensation Insurance Fund established by law also may become a Member. The Board of Directors may permit participation at its sole discretion to any group, organization, association or other entity it deems appropriate.

    A company that elects to become a Member need not participate in the reinsurance in all states where the Bylaws have been approved. If, however, a Member is part of a group or affiliation, its election as to which states it will participate must be the same for all companies affiliated in the group. At the time a company becomes a Member, it must identify all affiliated companies and notify the Administrator in which states it will participate. Thereafter, any Member may withdraw from providing reinsurance in any state by giving notice as required in paragraph 2 below subject to the withdrawal of all affiliated companies from such state or states.

2.  **Withdrawal.** Any Member may withdraw as a reinsurer with respect to the reinsurance in a given state or states only on December 31 of any year and must give ninety (90) calendar days' advance written notice to the Administrator. Any withdrawal must be made by all companies affiliated within a group.

3.  **Expulsion.** The Board of Directors, by affirmative vote of at least nine (9) directors then

4

holding office and eligible to vote, may at any time expel any Member which in the opinion of the Board shall have violated any of the provisions of these Bylaws or of the rules forming a part hereof as then constituted. Prior to any such action by the Board, the Member shall have the opportunity to present any relevant evidence to the Board concerning any such alleged violation after notice of no less than ten (10) calendar days by the Board which specifies the alleged violation. If, after the Member has presented evidence to the Board, the Board determines that a violation has occurred, the Board shall send the Member a notice of expulsion by mail, facsimile transmission, or delivery to such Member at its latest home office address appearing on the records of the Administrator. If the violation is not cured within fifteen (15) calendar days following the mailing, transmission, or delivery of such notice, the expulsion shall become effective at a date to be determined by the Board but no later than December 31st of the current calendar year. No member of the Board of Directors may vote in a proceeding to expel a Member by which it is employed or any of its affiliates.

Notice of an expulsion shall be given to the insurance regulator in each state where the expelled Member was providing reinsurance. The expelled Member shall have the right to request a review of the Board of Directors' decision by the insurance regulator pursuant to the Dispute Resolution Procedures under the applicable Authorized Insurance Plans.

4.    **Obligations After Termination.** Any Member which terminates participation by withdrawal or by expulsion or has withdrawn from providing reinsurance in a certain state or states shall, nevertheless, with respect to risks in force prior to midnight of the effective date of such termination or withdrawal, continue to be governed by these Bylaws, the Reinsurance Agreements, and the rules and procedures promulgated thereunder.

5.    **Insolvency.**

(a)    In the event any Member shall become insolvent, as hereinafter defined, participation by such company under these Bylaws and the Reinsurance Agreements shall be deemed terminated at the time such Member becomes insolvent subject to the further provisions of Section 5(e). As used herein,

"insolvent" means being the subject of receivership, conservatorship, rehabilitation, liquidation, or similar court proceedings, whether voluntary or involuntary, in any jurisdiction.

(b)    In the event a Servicing Carrier becomes insolvent, the Administrator, acting on behalf of each of the Members as directed by the Board of Directors, shall have the option to:

(i)    pay to the receiver, conservator, rehabilitator, liquidator or other appropriate representative all losses and expenses for which such insolvent Servicing Carrier shall have become liable arising out of policies reinsured under Reinsurance Agreements between the Member and such insolvent Servicing Carrier; or

(ii)    subject to the approval of the receiver, conservator, rehabilitator, liquidator or other representative, and subject to the approval of any court having jurisdiction over the proceedings, terminate the obligation of the Members to such insolvent Servicing Carrier under the Reinsurance Agreements with such insolvent Servicing Carrier for losses, costs and expenses for which the insolvent Servicing Carrier shall have become liable. If this option is exercised, and where appropriate in the jurisdiction involved, the Administrator shall make arrangements to have all risks that have been assigned to and are being serviced by such insolvent Servicing Carrier reassigned to another Servicing Carrier or third party service provider for servicing. Such successor Servicing Carrier or third party service provider shall assume all the duties and obligations of the insolvent Servicing Carrier and shall be entitled to the reinsurance provided by the Members. Payment made on account of such risks, including expenses for the servicing thereof, shall be apportioned prorata among the remaining Members in accordance with the method provided for the apportioning of assessments.

6

(c)     The outstanding liability to the Members of any insolvent Member, whether in its capacity as a Servicing Carrier or a Member or both, and except for the portion unexpended of any amount of premium retained for servicing by such insolvent Member (if a Servicing Carrier), shall, in event of such insolvency, and subject to any other or further provision with respect thereto which may be from time to time embodied in the rules and procedures adopted hereunder, be assumed by and apportioned among the remaining Members in the same manner in which liability for assessments is apportioned.  No premium distributions or refunds shall be made to such insolvent Member until all of its liabilities to the Members and all liabilities assumed by the Members by virtue of the provisions in this section shall have been fully settled and satisfied.

The Members shall have all the rights allowed by law against the estate or funds of such insolvent Servicing Carrier for recovery of funds disbursed (including the payment of losses, costs, expenses and unearned Servicing Carrier allowance) to insolvent Servicing Carriers which have been absorbed by the Members as herein provided.  The Administrator may assert and enforce such rights on behalf of the remaining Members, and is hereby appointed as their attorney-in-fact for this purpose, to assist and enforce such rights or any compromise on their behalf.

Upon the insolvency of a Servicing Carrier, all amounts due to such insolvent Servicing Carrier from the Members as a result of the reinsurance provided to such Servicing Carrier and all amounts due from the insolvent Servicing Carrier as a Member to other Servicing Carriers it reinsures shall be merged into one account and deemed mutual debts and credits which solvent Members and Servicing Carriers may offset.

In the event of the insolvency of a Member, any amounts owed to such insolvent Member from any Servicing Carrier under any Reinsurance Agreement may be offset from any amounts owed (either due or to become due) by such insolvent Member to any Servicing Carrier under the same Reinsurance Agreements.  It is the intent of this provision that all amounts due to or from an insolvent Member

7

under this provision will be treated as mutual debts and credits for purposes of offset rights.

(d)     The Board of Directors shall have the discretion to terminate participation of any or all affiliated companies of the insolvent Member. The termination of an insolvent Member or any or all companies described in this section shall not be deemed a violation of the requirement contained in Article III, Section I relating to all insurers in a group becoming Members. A decision to terminate an affiliate of an insolvent Member is reviewable under the applicable Authorized Insurance Plans.

(e)     Anything in this Section to the contrary notwithstanding, the Board of Directors may, in the event such action is in its judgment feasible and desirable, and in a manner equitable to all Members, elect not to terminate the participation of such insolvent Member, and permit such Member to continue its participation under these Bylaws upon such conditions as it may prescribe and subject in all respects to these Bylaws and the rules and procedures hereunder as then constituted.

(f)     No member of the Board of Directors that is either an employee or representative of the insolvent Member or affiliate thereof may vote in any proceeding under this Section.

## 6.     Member Obligations.

(a)     The Administrator is authorized to establish a financial credit policy designed to protect the interests of all Members by making sure that each Member, where appropriate, has adequate financial resources to meet its obligations under the Reinsurance Agreements. The financial credit policy may include, but need not be limited to, such things as: (i) financial reporting to the Administrator; (ii) minimum financial standards which must be met by each Member; (iii) actions to be taken by the Administrator when such standards are not met; (iv) obligations of Members in respect to such financial credit policy; and (v) right of appeal. After soliciting individual input from various Members, the Administrator shall be

responsible for the preparation and implementation of the financial credit policy and any subsequent amendments thereto.

(b)    Notwithstanding Section 6. (a) above and in the absence of a good faith dispute as determined by the Administrator, any Member that fails or has failed to make timely payment of its reinsurance obligations or any assessment made under these Bylaws shall become immediately liable as of the earliest date on which such failure to pay occurs, for all current assessments and reinsurance obligations and an additional amount equal to the commuted value on such date of all outstanding reinsurance obligations that such Member may have. For the purposes hereof, such commuted value shall total the amount of unearned premium reserves and incurred loss reserves then allocated to such Member hereunder, as determined by the Administrator and approved by the Board of Directors. The liability of the Member for such commuted value under this provision shall be deemed fixed, liquidated, and non-contingent as of the date of such failure to pay. The Administrator is hereby appointed the attorney-in-fact on behalf of all Members to assert and enforce such liability or any compromise thereof on their behalf.

(c)    In addition to Sections 6. (a) and (b) above, if the Administrator determines that there is a substantial likelihood that a Member's reserves are not adequate to meet its obligations under the Reinsurance Agreements, the Administrator shall have authority to order that all premium distributions or refunds due or that may become due to the Member be paid into escrow or trust with the Administrator, or otherwise be withheld from distribution to the Member, to secure the Member's obligations and that the Member provide a letter of credit or such other form of security and in such amount approved by the Administrator to secure the Member's future liabilities.

7.    **Authority to Commute.** The Board shall have the authority to direct the Administrator to enter into agreements on such terms as may be fair and reasonable for the following:

(a)    to commute with a Servicing Carrier all obligations owed by Members to such Servicing Carrier under the Bylaws or the Reinsurance Agreements;

(b)    to commute any specific policy year or years of an individual Member; or

(c)    to novate or reinsure policy years that have more than ten (10) years of experience.

When required under (a) or (c) above, such commutation or novation can only be effected with the agreement of the Servicing Carrier or carriers involved.

Any financial obligations arising under any agreement entered into under this Section 7 shall be binding upon the Member or Members.

## ARTICLE IV

**Member Meetings and Voting Rights**

1. **Regular Meetings.** The Members shall meet annually on the third Wednesday of June, or on such other date as the Board of Directors may determine, and at such place as the Board of Directors may determine.

2. **Special Meetings.** Special meetings of the Members may be called at any time by the Chair of the Board of Directors and shall be called by the Chair upon the written request of three (3) non-affiliated Members.

3. **Notice of Meetings.** Except as otherwise provided in Article IX, notice of all annual and special meetings shall be given or caused to be given by the Chair, in writing, mailed or delivered to, or by facsimile transmission or e-mail direct to, each Member at the latest address appearing upon the records of the Administrator, or by telephone communication to any executive officer of such Member. If notice is given by writing and mailed to the Member, such notice shall be placed in the mail not less than five (5) and not more than sixty (60) calendar days prior to the date of the meeting.

4. **Quorum.** A quorum at any annual or special meeting shall consist of Members represented in person or by proxy that write not less than 50.1% of the total net workers compensation premiums written by all Members during the latest calendar year for which information is available in all states where these Bylaws are operative. For purposes of determining a quorum and any vote taken hereunder, the net workers compensation premium written for each Member shall only include those states where such Member is providing reinsurance.

5. **Powers.** The purpose of any special meeting shall be stated in the notice thereof; but at

all such meetings and at annual meetings, Members may consider and act upon all matters brought before them, except where otherwise specifically provided in these Bylaws.

6. **Voting Rights.** Except where otherwise provided in these Bylaws, at all meetings action may be taken only upon affirmative vote of a majority of the Members that write not less than 50.1 % of the total net workers compensation premiums written by all Members during the latest calendar year for which information is available in all states where these Bylaws are operative. If such meeting is limited to matters involving one state by the terms of the notice of meeting, no action may be taken unless there has been an affirmative vote of Members that write not less than 50.1% of the total net workers compensation premiums written by all Members providing reinsurance in such state during the latest calendar year for which information is available in such state.

7. **Proxies and Mail Votes.** Members may be represented at any meeting by proxy. Every proxy shall be in writing and signed by an authorized officer of the Member. No proxy shall be valid after the expiration of six (6) months after the date thereof. Every proxy shall be revocable at the pleasure of the Member executing it. Before any proxy can be voted, it shall first be filed with the Chair of the Board of Directors or the Chair's designee not later than one (1) full business day in advance of the meeting.

8. **Procedure / Minutes of Meetings.** Minutes of all meetings of the Members and of the Board of Directors shall be recorded and be available to all Members. Except as otherwise specifically provided in these Bylaws, all annual and special meetings shall be conducted in accordance with the rules of parliamentary procedure established in the most current edition of *Robert's Rules of Order*.

9. Action may be taken without a meeting in accordance with statutory requirements.

## ARTICLE V

**Board of Directors**

1. **Number and Term of Office.** Except for those powers specifically granted to the Administrator or an administrator under any Authorized Insurance Plan, these Bylaws and the Administrative Agreement, the operation, business and affairs of all matters

11

arising under these Bylaws shall be managed and controlled by a Board of Directors composed of twelve (12) individuals, none of whom are employees or representatives of the same Member. Only individuals who are employees or representatives of Members shall be eligible for election as Directors.

The Board shall be elected by the Members at the annual meeting of the Members. Board elections shall be made for staggered terms, with such terms effective immediately upon adjournment of the annual meeting of the Members.

Four (4) individuals shall be elected annually for a term of three (3) years. No individual serving on the Board for a full term shall succeed himself or herself, except where a sufficient number of non-succeeding individuals cannot be induced to serve on the Board.

No more than five (5) of the twelve (12) Board members shall be employees or representatives of Members that are Servicing Carriers.

To facilitate voting for members of the Board of Directors at annual meetings, at least sixty (60) days prior to each annual meeting the Board shall appoint a Nominating Committee consisting of four (4) Members. The Nominating Committee shall make nominations for the terms that are expiring at the next annual meeting. The Nominating Committee recommendations shall be reported to all Members at least one (1) week prior to the annual meeting. Any Member can make additional nominations at the annual meeting.

2.  **Vacancies.** If a vacancy occurs in the Board of Directors, the Board shall appoint a replacement which will serve until an election can be held at the next annual or special meeting of the Members to fill the unexpired term.

3.  **Place of Meetings.** All meetings of the Board shall be held at a place designated by the Chair.

4.  **Quorum and Voting Rights.** A majority of the Board of Directors shall constitute a quorum. Each Board member shall be entitled to one vote. Proxy voting shall not be permitted. Any Board action requires an affirmative vote of a majority of the Board present for the meeting at which a quorum is present. If such votes are not cast, the matter fails adoption except as provided for elsewhere in these Bylaws. In the absence of

a quorum, the Board, subject, however, to the provisions of Section 2 of this Article V relative to filling vacancies on the Board, shall have no power except that a majority of the Board of Directors in attendance may adjourn the meeting from time to time until a quorum shall attend.

5. **Meetings.** The Board shall meet within thirty (30) calendar days next following the annual election of the Board for the purpose of electing officers to serve for the next ensuing year and for the transaction of all other business within the powers of the Board. Other regular meetings of the Board of Directors shall be held at such places and on such dates as the Board may from time to time determine. Special meetings of the Board may be called at any time by the Chair, or by the Chair upon written request of three (3) non-affiliated Board members. Such notice of regular and special meetings of the Board shall be given as may be determined by the Board or, in the event the period or method of notice shall not have been prescribed, as the Chair shall deem reasonable. Board members may participate in meetings of the Board by means of a conference telephone, video conference, or similar communications method by which all persons participating in the meeting can hear each other at the same time, and participation by such means shall constitute presence in person at such meeting.

6. **Action Without Meeting.** Any action of the Board of Directors may be taken without a meeting if a consent in writing setting forth the action so taken is signed by all of the Board members then in office and is filed with the minutes of the Board of Directors. Such unanimous written consent shall have the same effect as a unanimous vote of the Board.

7. **Authorization.** These Bylaws shall not apply to any Insurance Plan unless the incorporation of these Bylaws into such Insurance Plan is first authorized by the Board of Directors, or the Board approves their application upon some other form of approval by the insurance regulator. The Board has the power, through such vote, to take necessary and appropriate steps to incorporate the Bylaws into such Insurance Plans through filings with the appropriate regulators for consideration and approval, or to otherwise obtain approval from appropriate regulators. In the event that amendments to these Bylaws are not approved by the insurance regulator in a particular state, the most recently approved

13

version of the Bylaws shall continue to apply to risks written through the Insurance Plan in that state.

8.  **Plan Changes.** The Board shall monitor and review any change in any Authorized Insurance Plan and any changes in the identity of the Plan Administrator for any such Plan. The Board shall assess the effect of any such changes on the interests of the Members and policyholders insured under any Authorized Insurance Plan and shall approve all such changes unless the Board finds that such changes would be inconsistent with the purposes of these Bylaws. If the Board does not approve such a change, the Board may elect to terminate reinsurance in accordance with the termination provisions of the applicable Reinsurance Agreement. Any decision by the Board to elect to terminate reinsurance shall be subject to the approval of the Members at any regular or special meeting thereof. At any time, the Board of Directors may develop and present proposed amendments, changes, or revisions to, or complete replacements for, an existing Authorized Insurance Plan or proposed Insurance Plan where the Board believes its proposal would be in the overall interest of the Members in a given state.

9.  **Organization and Procedure.** The members of the Board of Directors annually shall elect a Chair and a Vice-Chair. The Chair, or in his or her absence the Vice-Chair, or in the absence of both, a Chair pro tem elected by the Directors present, shall act as a Chair of every meeting of the Board; and the Chair shall appoint a person to act as secretary of the meeting, who shall keep a record of the Board's proceedings. The order of business at all meetings of the Board shall be determined by the Chair. Except as otherwise specifically provided in these Bylaws, all meetings of the Board shall be conducted in accordance with the rules of parliamentary procedure established in the most current edition of *Robert's Rules of Order*.

10. **Disputes and Appeals.** In addition to the powers elsewhere conferred upon it by these Bylaws, the Board of Directors shall constitute a committee with full authority to pass upon all disputes arising with respect to these Bylaws, including without limitation any questions as to the application, scope, and effect of these Bylaws. The ruling or a majority of the Board as then constituted on any such dispute or question following reasonable notice and an opportunity for a hearing shall be final. All disputes reviewed

14

by the Board of Directors and appeals therefrom shall be subject to and in accord with the Dispute Resolution Procedures provided for in the various Authorized Insurance Plans.

11. **Rules and Procedures.** The Board of Directors shall have the right to promulgate and adopt rules and procedures for the purpose of implementing the terms of these Bylaws and may also delegate their power to promulgate and adopt rules and procedures to the Administrator, subject to repeal by the Board.

12. **Authority of Administrator.** The Administrator is authorized to enter into agreements on behalf of the Members to carry out the purposes of these Bylaws, including but not limited to the Reinsurance Agreements. Upon direction by the Board of Directors, the Administrator is empowered to act as attorney-in-fact for each Member to prosecute, to defend, to submit to arbitration, to settle, and to propose or to accept a compromise with respect to, any claim existing in favor of, or against, such Member based on or involving any matter relating to the Bylaws or to intervene in any action or proceeding related thereto. The Administrator or an officer thereof is authorized to certify these Bylaws, acts taken by the Board or the Members, the tenure of, signatures, identity and acts of officers or other officials, or other official acts; and such certificates may be relied upon by any person to whom the same shall be given, until receipt of notice to the contrary.

13. **Chair.** The Chair shall be chief executive officer under these Bylaws, and shall have overall control of and responsibility for all activities subject to these Bylaws and other powers which are incidental thereto. The Chair shall serve for a term of one year and any individual serving as Chair for such term or any portion thereof may succeed himself or herself, provided further that the Chair shall be limited to two (2) consecutive one-year terms, unless otherwise approved by the Board of Directors. The Chair shall not vote in any matter requiring action by the Board of Directors under these Bylaws, except in the event of a tie vote among those Board members voting on any particular matter.

14. **Vice-Chair.** The Vice-Chair shall have immediate charge, subject to the direction and control of the Chair, of such matters as may be assigned to him or her. In the Chair's absence or inability for any reason to act as the Chair, his or her executive duties and powers under these Bylaws may, with like effect, be performed and exercised by the Vice-Chair or, if the latter also be absent or unable to act, by a Chair pro tem elected by

the Directors present.

15.   **Committees.** The Chair may from time to time appoint such committees, (which may include representatives from Members that are not represented on the Board), with such duties and subject to such rules or conditions, not inconsistent herewith, as the Chair may deem desirable. The Chair shall appoint a Chair of each committee, who shall have the same powers and duties with respect to the committee so chaired as the Chair of the Board of Directors has with respect to the Board as a whole. Committee meetings shall be convened and conducted, and action may be taken by each committee, in the same manner as is provided herein for meetings and action of the Board of Directors.

## ARTICLE VI

**Fiscal Matters**

1.   **Fiscal Year.** The Corporation's fiscal year shall be the calendar year unless otherwise established by the Board of Directors.

2.   **Accounts.** Funds held temporarily for the benefit of Members, including funds withheld pursuant to Article III, Section 6, shall be held by the Administrator and kept on deposit in such banks, trust companies or other depositories as may from time to time be designated and prescribed by resolution of the Board of Directors. The Administrator shall have full authority to deposit, withdraw, and invest such funds in order to carry out the purposes of these Bylaws and the Reinsurance Agreements. The Administrator shall keep accurate records to identify such deposits, withdrawals, and investments which shall be available for review by the Board at any time.

3.   Investment Income. All income on the funds held for the benefit of the Members shall, upon receipt thereof, become subject to all the appropriate provisions of these Bylaws and the Reinsurance Agreements, except for funds held pursuant to Article III, Section 6 in which case interest will be for the benefit of the Member that has provided the security required.

## ARTICLE VII

**Indemnification**

1.   **Indemnification in Actions Other than by or in the Right of the Corporation.** The

16

Corporation shall indemnify any person or Member who was or is a party, or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he, she or such Member is or was a director, officer, employee, member or agent of the Corporation, or (in the case of natural persons) who is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person or Member in connection with such action, suit or proceeding, if such person (or, in the case of a Member, the natural persons acting as representatives of such Member) acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person or representative did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation or, with respect to any criminal action or proceeding, that the person or representative had reasonable cause to believe that his or her conduct was unlawful.

2.    **Indemnification in Actions by or in the Right of the Corporation.** The Corporation shall indemnify any person or Member, except as provided in Section 13 below, who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person or member is or was a director, officer, employee, member or agent of the Corporation, or (in the case of natural persons) who is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by such person or Member in connection with the defense or settlement of such action or suit, if such person (or, in the case of a Member, the natural persons acting as representatives of such Member) acted in

17

good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation, provided that no indemnification shall be made in respect of any claim, issue or matter as to which such person, representative, or Member shall have been adjudged to be liable for negligence or misconduct in the performance of such party's duty to the Corporation, unless, and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such party is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

3.   **Notice to Corporation.** With respect to any action or suit to which this Article applies, the party to be indemnified hereunder shall give notice to the Corporation as soon as practicable of any such action or suit, and no expenses (including attorneys' fees) shall be incurred by such party, nor shall such action or suit be settled, without consent of the Corporation, such consent not to be unreasonably withheld.

4.   **Determination of Conduct.** Any indemnification under Sections 1 and 2 of this Article (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case, upon a determination by the board of directors that indemnification of the party seeking such indemnification is proper in the circumstances because such party has met the applicable standard of conduct set forth in Sections 1 or 2 of this Article. Such determination shall be made with respect to a person who is a director or officer at the time of the determination (a) by the majority vote of the directors who are not parties to such action, suit or proceeding even though less than a quorum; (b) by a committee of the directors designated by a majority vote of the directors, even though less than a quorum; (c) if there are no such directors, or if the directors so direct, by independent legal counsel in a written opinion; or (d) by the members entitled to vote, if any.

5.   **Payment of Expenses in Advance.** Expenses (including attorney's fees) incurred by an officer or director in defending a civil or criminal action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding, as authorized by the board of directors in the specific case, upon receipt of an undertaking by or on behalf of the director or officer, to repay such amount, unless it shall ultimately

18

be determined that he or she is entitled to be indemnified by the Corporation as authorized in this Article. Such expenses (including attorney's fees) incurred by former directors and officers or other employees, or by Members or agents may be so paid on such terms and conditions, if any, as the Corporation deems appropriate.

6.   **Indemnification Not Exclusive**. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any bylaw, agreement, vote of Members or disinterested directors, or otherwise, both as to action in such party's official capacity and as to action in another capacity while holding such office, and shall continue as to a party who has ceased to be a director, officer, employee, member or agent, and shall inure to the benefit of the heirs, executors, administrators and corporate successors of such a party.

7.   **Insurance**. The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article.

8.   **Notice to Members**. If the Corporation has paid indemnity or has advanced expenses under Section 2 of this Article to a director or officer, the corporation shall report the indemnification or advance in writing to Members entitled to vote with or before the notice of the next meeting of the Members entitled to vote.

9.   **References to Corporation**. For purposes of this Article, references to "the Corporation" shall include, in addition to the surviving corporation, any merging corporation (including any corporation having merged with a merging corporation) absorbed in a merger which, if its separate existence had continued, would have had the power and authority to indemnify its directors, officers, employees, members or agents, so that any party who was a director, officer, employee, member or agent of such merging corporation, or was serving at the request of such merging corporation as a director, officer, employee or agent of another corporation, partnership, joint venture,

19

trust or other enterprise, shall stand in the same position under the provisions of this Article with respect to the surviving corporation as such party would have with respect to such merging corporation if its separate existence had continued.

10.  **Other References: Benefit Plans.** For purposes of this Article, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation that imposes duties on, or involves services by such director, officer, employee or agent with respect to an employee benefit plan, its participants, or beneficiaries. A person who acted in good faith and in a manner he or she reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article.

11.  **Other References: Agent.** For purposes of this Article, the Administrator and officers and employees of the Administrator acting on behalf of one or more members as provided in these Bylaws shall not be deemed "agents" of the Corporation nor persons serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, and this Article shall not confer any indemnification rights on the Administrator or its officers and employees. However, nothing in this Article shall prohibit the Corporation from indemnifying the Administrator and its officers and employees or other affiliates by written contract, the terms of such indemnification to be set by such contract.

12.  **Apportionment and Assessment.** The Corporation's liability for any indemnity provided in this Article shall be apportioned among all Members, including any named (directly or through their directors, officers, employees or agents) in any threatened, pending or completed action or suit under Sections 1 or 2 of this Article, pursuant to Article X of these Bylaws. To the extent that such threatened, pending or completed action or suit concerns matters in one or more identifiable states in which reinsurance is provided to an Authorized Insurance Plan under these Bylaws and to particular policy years of such reinsurance, the liability for such indemnification shall be ratably

apportioned to the Members for those states and policy years in question. Consistent with this Section 12 and with Article X, the Administrator shall have power to assess Members as necessary to fund the indemnification obligations provided in this Article.

13. **No Indemnification for Member when Action Brought by Corporation.** Any Member that is made a party to a lawsuit by the Corporation or settles a dispute with the Corporation shall not be entitled to indemnification or reimbursement under this Article VII.

## ARTICLE VIII

**Dissolution**

Dissolution. Upon the dissolution of the Corporation or the winding up of its affairs, the assets of the Corporation shall be distributed in the discretion of the Board of Directors exclusively for the common business interests of its Members or to organizations which are exempt from Federal Income Tax under IRC Section 501(c)(6) of the Internal Revenue Code of 1986, or corresponding provisions of any subsequent federal tax laws.

## ARTICLE IX

**Amendments to Bylaws**

Amendments to Bylaws. Any and all provisions of these Bylaws and any amendments hereto shall be subject to amendment, alteration, repeal, or re-enactment at any annual meeting of the Members, or at any special meeting called for the purpose, by the affirmative vote of two-thirds (2/3) of the Members voting in person or by proxy and such two-thirds (2/3) of said Members shall write not less than 50.1% of the total net workers compensation premiums written by all Members during the latest available calendar year for which information is in all states where these Bylaws are operative. For purposes of this determination, the net workers compensation premium written for each Member shall only include those states where such Member is providing reinsurance under these Articles. Not less than fifteen (15) calendar days' written notice of any such meeting shall be given, or caused to be given, by the Chair, in which notice the action proposed to be taken shall be fully set forth. Any amendments to these Bylaws approved by the Members shall be binding on the Members for all outstanding policy years, but shall only be effective in those states where the amendments have been filed and approved by the

insurance regulator as part of the Authorized Insurance Plans in effect in such states, or as otherwise approved by the regulator.

## ARTICLE X

**Effective Date**

Effective Date. These Bylaws and any amendments thereto, as approved under the provisions of Article IX, shall become effective and binding on those Members that become Members hereto as of the date they become Members. Notwithstanding the foregoing, if pursuant to the terms of any statute, regulation, or Authorized Insurance Plan, any Member was under a legal duty to participate in the reinsurance provided under these Bylaws but failed or refused to become a Member as required, the application of these Bylaws shall relate back to the policy year when the Member first became obligated to become a Member.

## ARTICLE XI

**Assessments and Expenses**

1. **Expenses and Payments.** Expenses incurred by the Administrator in the administration of the affairs subject to these Bylaws, shall be a proper charge against, and shall be an obligation of the Members. A record shall be kept of all such expenses, and the amount thereof shall be apportioned to the Members in the ratio of their interest under the various Reinsurance Agreements. Such expenses may be paid out of funds held by the Administrator or shall be assessed against the Members.

2. **Audit.** An examination and audit of the Corporation's financial statements shall be made annually in accordance with generally accepted auditing standards by a Certified Public Accountant.

3. **Transactions, Accounts, and Financial Statements.** In addition to maintaining the Corporation's books and records, separate accounts shall be maintained by the Administrator covering transactions for each policy year in each state based on the information provided to the Administrator by the Servicing Carriers pursuant to the Reinsurance Agreements. The Administrator shall prepare and deliver to each Member a statement showing the apportionment of only that Member's obligations under the Reinsurance Agreements, including the expenses of administration provided for herein and the condition of each account. The Administrator shall distribute premium and

22

collect reinsurance recoverables as provided for in the Reinsurance Agreements. The Board shall select independent auditors for engagement by the Administrator to examine an annual special-purpose financial statement prepared by the Administrator for transactions pursuant to the Reinsurance Agreements. The preparation and examination of such special-purpose financial statement shall be performed pursuant to accounting policies and standards that may be adopted from time to time by the Board. As part of this process, the auditors shall make such actuarial determinations as are necessary and appropriate, including the validation of appropriate reserves for each policy year. Upon Board approval of the special-purpose financial statement examination report, the Administrator shall make a copy of such examination report available upon request to any Member.

4.    **Actuarial Opinion.** A statement of actuarial opinion for the reserves on policies issued pursuant to Authorized Insurance Plans and reinsured under Reinsurance Agreements shall be prepared and certified by an actuary of the Administrator who meets the qualification standards of the American Academy of Actuaries and the Casualty Actuarial Society, upon the conclusion of each fiscal year. The Administrator shall make a copy of such statement of actuarial opinion available upon request to any Member.

## ARTICLE XII

**Miscellaneous Provisions**

1.    **Titles.** The titles to the various articles and sections hereof are for reference purposes only and shall not be used in the construction or interpretation of these Bylaws.

2.    **Severability.** In the event any term or provision of these Bylaws shall to any extent be held to be illegal, invalid, unenforceable, or nonoperative as a matter of law, the remaining terms and provisions hereof shall not be affected thereby, and each such term and provision shall be valid and shall remain in full force and effect.

CHI1 1303518v.6