IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTERNATIONAL GROUP, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 2898 |
| v. | ) ) | |
| | ) | Judge Robert W. Gettleman |
| ACE INA HOLDINGS, INC., ET AL., | ) ) | |
| Defendants. | ) ) | |
| | ) ) | |
| SAFECO INSURANCE COMPANY OF AMERICA, et al., individually and on behalf of a class consisting of members of the National Workers Compensation Reinsurance Pool, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 09 C 2026 |
| v. | ) ) | Judge Robert W. Gettleman |
| AMERICAN INTERNATIONAL GROUP, INC., ET AL., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After many years of litigation and regulatory action, American International Group, Inc. and its affiliated companies (together "AIG") have agreed to settle this putative class action for $450 million. The court's previous opinions [1] describe AIG's alleged decades-long, multi-billion dollar fraudulent underreporting of workers compensation premiums for the purpose of

---

[1] AIG, Inc. v. ACE INA Holdings, Inc., 722 F.Supp.2d 948 (N.D. Ill. 2010), vacated in part, AIG, Inc. v. ACE INA Holdings Inc., Nos. 07 C 2898, 09 C 2026, 2010 WL 3730980 (N.D. Ill. Sept. 16, 2010); see also NCCI, Inc. v. AIG, Inc., No. 07 C 2898, 2009 WL 2588902 (N.D. Ill. Aug. 20, 2009); NCCI, Inc. v. AIG, Inc., No. 07 C 2898, 2009 WL 466802 (N.D. Ill. Feb. 23, 2009).

reducing its share of the residual workers compensation market—and consequently increasing the residual market costs of the other members of the National Workers Compensation Reimbursement Pool ("NWCRP").[2]

The genesis of the proposed settlement began when eight states,[3] acting through the National Association of Insurance Commissioners ("NAIC"), decided to conduct a multistate examination of AIG, and appointed David Leslie as "Examiner in Charge" in January 2008.[4] Leslie retained Merlinos & Associates, Inc. (led by Matthew Merlino) as actuarial consultants, and concentrated on AIG's conduct primarily in the years after 1985, a period during which Merlino determined "the workers compensation market experienced usually high residual market obligations." The examination focused on two divisions of AIG: 50 and 51/55.[5]

Employing "a methodology for reallocating AIG's premium to line of business and state based on AIG's loss experience," Leslie and Merlino calculated that AIG had underreported approximately $2.1 billion of workers compensation premium up to 1996.[6] Merlino and Leslie's

---

[2] Members of the New Mexico Workers Compensation Assigned Risk Pool ("NMWCARP") are also part of the putative class of insurance companies in this action for settlement purposes. In this opinion, the court will refer to both as the "Pool."

[3] The "Lead States" in the Examination were Delaware, Florida, Indiana, Massachusetts, Minnesota, New York, Pennsylvania, and Rhode Island. The remaining 42 states and the District of Columbia (the "Participating States") participated in the Examination.

[4] The Examination built upon previous examinations and other investigations, including the New York Attorney General's investigation, examinations initiated by Indiana, Minnesota, and Rhode Island, and work performed by the NAIC Market Analysis Working Group.

[5] Division 51 was merged into Division 55.

[6] To be more precise, Merlino and Leslie "reallocated approximately $2.1 billion in premiums from the general and commercial automobile liability lines of business to workers compensation for calendar years 1985 to 2007."

cash flow damages model[7] calculated that this $2.1 billion of underreporting resulted in approximately $178,646,857 million of residual market damages to the class (members of the Pool). To account for the time value of money, Leslie and Merlino applied a yearly interest rate using data from A.M. Best,[8] resulting in an additional $196,035,542 in interest. The total compensatory damages was therefore calculated to be $374,682,399.

Acting on behalf of the states who retained him as Examiner, and in conjunction with other class members (described below), Leslie negotiated with AIG over an extended period of time, both developing the methodologies described above and arriving at a final settlement figure of $450 million to the class. Along with the approximately $375 million in economic damages (plus interest), the $450 million figure included an additional $70 million. Using this figure, Leslie and Merlino devised a plan of allocation to distribute the funds to each class member based upon their participation in the market. These distributions range from zero to tens of millions of dollars.

The proposed settlement agreement also provides for an escape clause: AIG may terminate the agreement if any potential class member—excluding Liberty and any of its affiliates, subsidiaries, divisions, or units (a category that includes but is not limited to the Objectors, defined below)—with one percent or more of the class fund's allocation opts out,

---

[7] Specifically, Leslie and Merlino conducted a cash flow analysis of the residual market damages to the Pool as a result of AIG's underreporting, from which they developed a damages methodology. This methodology takes the amount of reallocated premium and, using the NCCI's historical reports of cash distribution and collection, determines the economic impact of the underreporting on other Pool members.

[8] AM Best data is a measure commonly used and relied on in the insurance industry.

and/or if potential class members—again excluding the Liberty companies—that together add up to at least five percent of the class fund's dollar amount opt out.

In addition to reaching the proposed settlement with the class, AIG also agreed to pay the states $100 million in penalties plus $46,507,385, in back taxes and assessments, and has agreed to reform its workers compensation reporting to comply with its legal obligations on a going-forward basis. This so-called Regulatory Settlement Agreement ("RSA") is conditioned on approval of the instant class action settlement by December 31, 2011.

The class settlement described above was the product of negotiations between AIG, the Examiner, and certain Pool (class) members (the "Settlement Class Plaintiffs"),[9] and has been approved by the insurance commissioners of all 50 states and the District of Columbia. Based on the support of the Settlement Class Plaintiffs, the Board defendants who have been dismissed and have agreed not to object or opt out, and one company that has expressed its support in a declaration, the aggregate dollar support for the proposed settlement is roughly $170 million, or 37 percent of the proposed settlement fund. If the Liberty companies opt out, 48 percent of the remaining allocable dollars have stated their support. The proposed settlement was reached over the strong objections of Safeco Insurance Company of America and Ohio Casualty Insurance Company (the "Objectors"), the two original class plaintiffs in Case No. 09 C 2026 (the " '09 Action").[10]

---

[9] ACE INA Holdings, Inc. ("ACE"), Auto-Owners Insurance Co. ("Auto-Owners"), Companion Property & Casualty Ins. Co. ("Companion"), FirstComp Insurance Co. ("FirstComp"), The Hartford Financial Services Group, Inc. ("Hartford"), Technology Insurance Co. ("Technology"), and The Travelers Indemnity Company ("Travelers").

[10] Although AIG has raised questions about the Objectors' standing to object to the settlement (and the propriety of their potential motives for opposing the settlement), this issue

On January 13, 2011, this court allowed the Settlement Class Plaintiffs to intervene, stayed the Objectors' fully-briefed motion for class certification (proposing the Objectors as class representatives and their attorneys as class counsel), and allowed the Settlement Class Plaintiffs to file the instant motion for class certification and preliminary approval of the above-described settlement. The Objectors agree that the Settlement Class Plaintiffs have met all of Fed. R. Civ. P. 23's requirements, with the notable exceptions of the adequacy of representation by the Settlement Class Plaintiffs and their counsel, and the reasonableness of the $450 million settlement amount.

The Objectors' overarching criticisms of the proposed class and settlement are twofold. First, the Objectors contend that because the proposed settlement agreement includes mutual releases by and of all class members and AIG, the Settlement Class Plaintiffs and their counsel are laboring under a serious conflict of interest. The purported conflict results from AIG's allegations in Case No. 07 C 2898 (the "'07 Action")[11] that nineteen insurance companies that served on the Board of Governors of the NWCRP Pool (the "NWCRP Board")—including three of the seven Settlement Class Plaintiffs (ACE, Travelers, and Hartford)—are, like AIG, guilty of underreporting workers compensation premiums during the relevant period. (These companies

---

need not be addressed until the final fairness hearing. The court assumes, for purposes of preliminary approval, that the Objectors have standing, but may consider this issue at a future time.

[11] NCCI, the attorney-in-fact for the NWCRP, was the original plaintiff in the '07 Action. After this court found that NCCI did not have standing to pursue the action, NCCI, Inc. v. AIG, Inc., No. 07 C 2898, 2009 WL 2588902 (N.D. Ill. Aug. 20, 2009), AIG (which had filed counterclaims against the NWCRP, the NCCI, nineteen insurance companies that had served on the NWCRP Board, including other AURs, and one additional AUR) became the plaintiff in that case. AIG v. ACE INA Holdings, Inc., 722 F. Supp. 2d 948 (N.D. Ill. 2010).

are referred to as the "alleged underreporters" or "AURs".)  The Objectors claim that the releases confer a significant benefit on ACE, Travelers, and Hartford and their counsel, while the releases are valueless to non-AUR class members.  Second, the Objectors criticize the methodology and motives of Leslie and Merlino, claiming that they, like the Settlement Class Plaintiffs and their lawyers, labor under a conflict of interest because they are representing the states, whose settlement agreement with AIG is conditioned on settling the class action by the end of this year.

The parties (the Settlement Class Plaintiffs, AIG, and the Objectors) have filed hundreds of pages of briefs, many more hundreds of pages of declarations (many of which read like briefs), and many thousands of pages of exhibits.  Despite this voluminous record, the sole issues before the court are whether the putative settlement class meets Rule 23's adequacy requirement, and whether the settlement should be preliminarily approved, allowing the members of the class, all insurance companies, to examine the terms and positions of the respective parties and voice any support or objections at a final fairness hearing.

**Class Certification**

Before assessing whether the settlement is within the range of reasonableness to allow it to proceed to a final fairness hearing, the court must conduct an independent class certification analysis.  This analysis "demand[s] undiluted, even heightened, attention" when applied to classes for which certification is sought for settlement purposes only.  Amchem Prods. v. Windsor, 521 U.S. 591, 620 (1997); Smith v. Sprint Commc'ns Co., 387 F.3d 612, 614 (7th Cir. 2004).  This heightened attention is necessary when certifying a settlement class because the court will not have the same opportunity to adjust the class throughout the course of extensive proceedings as it would for a litigation class.  See Amchem, 521 U.S. at 620.

The Objectors argue, and the court agrees, that the court "must not permit any perceived fairness of the settlement terms, the sophistication of the class members, the ability of Class members to opt-out, or the information contained in the proposed class notice to operate <u>as a substitute for</u> [a] thorough, rigorous [adequacy] analysis." (Emphasis added.) The Objectors, however, imprecisely deduce from that unobjectionable reading of <u>Amchem</u> that this court "must carefully scrutinize the adequacy of [Settlement Class Plaintiffs and Settlement Class Counsel], <u>independently</u> of considerations concerning the settlement's fairness." (Emphasis in original.) <u>Amchem</u> says no such thing. In fact, it says almost the opposite: while the court should not allow its "gestalt judgment or overarching impression of the settlement's fairness" to control its decision, "settlement is a factor in the calculus," and the court acts properly in "hom[ing] in on settlement terms" when assessing adequacy of representation. <u>Amchem</u>, 521 U.S. at 619. Consideration of the fact of settlement, and the settlement's terms, undoubtedly implicates the settlement's fairness. In conducting the class certification analysis, the court will therefore consider the existence of a proposed settlement and its terms, not as decisive factors, but as relevant considerations to the adequacy of the class representatives and class counsel. <u>See</u> <u>Smith</u>, 387 F.3d at 614; <u>AT&T Mobility Wireless Data Servs. Sales Litig.</u>, 270 F.R.D. 330, 340 (N.D. Ill. 2010) ("The fact that the parties have reached a settlement is a relevant consideration in the class-certification analysis.").

Indeed, the Objectors' primary argument against certifying the Settlement Class is that four[12] of the seven Settlement Class Plaintiffs are inadequate class representatives because they

---

[12] These are three AURs (ACE, Hartford, and Travelers) and one non-AUR NWCRP Board defendant (Companion), all of which AIG had accused of breaching their fiduciary duties as NWCRP Board members. On March 18, 2011, AIG dismissed its claims against Companion

7

are intractably conflicted, based on their alleged participation in collusive settlement negotiations to arrive at the $450 million figure. The Objectors claim that these four Settlement Class Plaintiffs pushed through a lowball settlement figure as an "explicit quid pro quo" with AIG agreeing to release its claims against them.[13] These attacks certainly invite the court to question the settlement's terms and its fairness. Putting that issue aside, the Objectors have presented no evidence to support their factual theory and no binding authority to support their legal argument.

The AUR Settlement Class Plaintiffs did not act improperly in negotiating global, mutual releases of all underreporting claims, because those releases benefit all the Settlement Class Plaintiffs and all potential class members. AIG has accused the entire industry of engaging in underreporting, and sought discovery from all Pool members. As a result of these industry-wide accusations, global releases are the only way to achieve industry-wide peace. Perhaps more importantly, the NWCRP is paying the AURs' legal fees (and was paying the Board defendants' legal fees as well, before they were dismissed), so all class members benefit from the AURs' no longer having to defend themselves against those allegations. Moreover, no legal authority supports the position that a putative class representative who is dismissing its counterclaims is conflicted.

Nor are the non-AUR Settlement Class Plaintiffs conflicted, despite the Objectors' speculation to the contrary. The Objectors claim that the non-AURs were "tainted" by the

---

in exchange for Companion's agreement not to opt out of the settlement.

[13] As AIG has noted, this argument is undermined by the fact that the Objectors have their own, perhaps more troubling, conflicts issues. This question is, however, not relevant to the instant proceeding.

settlement process because they were "dominate[d]" by the AURs, had the same counsel as the AURs, and failed to negotiate independently with AIG. The Objectors have not, however, cited any legal authority stating that class plaintiffs are inadequate if they rely on their counsel's settlement negotiations, nor have they pointed to any facts supporting their theory that the AURs controlled the non-AURs' decisions.

In this vein, the Objectors further contend that the history of the negotiations and the final settlement figure evinces the purported conflict, but this argument relies on a selective reading of the vast record of communication among the relevant parties. Nothing before the court shows that the settlement figure was, as the Objectors claim, discounted for AIG's claims against the AURs and Companion. Nothing indicates that the AUR Settlement Class Plaintiffs improperly influenced their non-AUR counterparts, all of whom have submitted declarations to the contrary. Ultimately, the complex negotiations leading up to the proposed settlement agreement do not demonstrate collusion, a reverse auction, self-dealing, or any of the other faults that the Objectors assign to them.

In fact, the manner in which the parties arrived at the settlement figure seriously undermines any notion of a collusive negotiation process. Leslie and Merlino's methodology, described with uncommon clarity in their declarations, is at least facially reasonable. The declarations also describe how Leslie considered, and rejected, other methodologies, lending credibility to his decision that this methodology would, in this case, be a superior method of calculating underreporting. Leslie's damages calculations, which were based on the $2.1 billion of underreporting estimated by that methodology, are by extension also reasonable, and have

9

been well-described to the court. This patina of reasonableness extends to the $450 million settlement figure, which is based on that methodology and those damages calculations.[14]

Moreover, that methodology is the same as that which Leslie used to advise the state regulators, all of which accepted the methodology. In addition to emphasizing the methodology's credibility and widespread acceptance, that fact undermines the Objectors' claim that Leslie has a conflict with the class because his clients, the states, were competing with the class members for recovery from AIG. Because the analysis for the states and for the instant proceeding was identical, Leslie could not have obtained a better deal for the states by minimizing AIG's underreporting. Finally, Leslie is an appointed Examiner with a fiduciary duty to his public clients, and the court has confidence in his integrity.

The Objectors also attempt to attack the adequacy of class counsel, the credentials of whom this court regards as excellent. Goldberg Kohn Ltd. ("Goldberg"), acting as principal counsel for the Settlement Class Plaintiffs, has extensive experience in complex litigation and with class action lawsuits. The fact that class counsel does not have extensive experience with insurance cases is irrelevant. Competent litigators (like judges) are generalists, not specialists, and often handle complex cases in a variety of fields. The Objectors also claim that Goldberg is

---

[14] The court also notes that the Objectors' proposed alternative methodology (sampling) is not, contrary to their assertions, "the court-approved methodology." Magistrate Judge Schenkier allowed the sampling method proposed in connection with the discovery and settlement proceedings that this court had assigned to him, but expressly informed the parties that he was not ruling on the admissibility of the results of the sampling. The sampling methodology may itself be far from perfect. For example, serious doubts exist as to whether the manner in which the methodology was implemented overemphasizes contract linkages, and the Settlement Class Plaintiffs have suggested that the subjectivity involved in the samples analyzed could lead to extensively protracted litigation. Whatever the virtues of the sampling methodology, there are open questions regarding that methodology's application. These can be addressed at the final approval stage.

inadequate because it did not participate in the negotiation of the $450 settlement figure, but that is not entirely true. In fact, Settlement Class Counsel negotiated the settlement term sheet, changing many of the key non-monetary terms. Nor is it entirely relevant. Locke Lord Bissell & Liddell LLP ("LLBL"), itself highly competent,[15] represented the NWCRP Board in negotiating the settlement figure. Settlement Class Counsel was not hired, or required, to re-negotiate the settlement amount; instead, its function was to evaluate the settlement's reasonableness and, finding it sufficiently reasonable, to present it to this court. Settlement Class Counsel is adequate.

For these reasons, the court grants the Settlement Class Plaintiffs' motion for class certification.

**Preliminary Approval of the Proposed Settlement**

Ultimately, this court will approve the proposed settlement only if it finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C); Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 652 (7th Cir. 2006). Under the Seventh Circuit's five-factor test, the court must consider: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed. Synfuel, 463 F.3d at 653; Isby v. Bayh, 75 F.3d 1191, 1999 (7th Cir. 1996). Courts "'do not focus on individual components of the settlement[], but rather view them in their entirety in evaluating their fairness.'" Isby, 75 F.3d at 1199.

---

[15] LLBL is the product of a 2007 merger of two well-respected firms. The reputation and integrity of these firms is well-known to this court.

At the preliminary approval stage, however, the court's task is merely to "determine whether the proposed settlement is within the range of possible approval," not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards under Synfuel. Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee, 616 F.2d 305, 314 (7th Cir. 1980) (internal citation, quotation, and footnote omitted) (noting that at the final fairness hearing, the court will "adduce all information necessary to enable [it] intelligently to rule on whether the proposed settlement is fair, reasonable, and adequate"), overruled on other grounds by Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998); see also In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (preliminary approval determines whether the settlement is "possibly fair, reasonable, and adequate"). Thus, although neither the Federal Rules of Civil Procedure nor binding case law requires it,[16] courts in this district have performed "a more summary version" of the final fairness inquiry at the preliminary approval stage. E.g., AT&T Mobility Wireless Data Servs. Sales Litig., 270 F.R.D. 330, 346 (N.D. Ill. 2010) (St. Eve, J.) (quoting Kessler v. Am. Resorts Int'l's Holiday Network, Ltd., Nos. 05 C 5944 & 07 C 2439, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (Kennelly, J.)) ("Although this [fair, reasonable, and adequate] standard and the factors used to measure it are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase."). Conducting that inquiry, the court finds that all factors weigh in favor of preliminarily approving the proposed settlement.

---

[16] The Seventh Circuit has explicitly held that "[a]lthough we believe such a hearing is better practice and the Manual for Complex Litigation recommends it," the district court is not required to hold a hearing on preliminary approval. In re General Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1133 (7th Cir. 1979).

12

At preliminary approval, the court's role is not "resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985). Nonetheless, and somewhat paradoxically, the most important factor in evaluating the settlement at a final fairness hearing is the strength of the plaintiff's case compared to the amount of the settlement offer. Synfuel, 463 F.3d at 653 (quoting In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1132 n.44 (7th Cir. 1979)). At final approval, the court estimates the strength of Settlement Class Plaintiffs' case by calculating the "net expected value of continued litigation to the class," discounted to the present value using a reasonable interest rate. Reynolds v. Beneficial Nat'l Bank, 288 F3d 277, 284-85 (7th Cir. 2002); In re Gen. Motors, 594 F.2d at 1132 n.44 (strength of the plaintiff's case is the "product of (1) the probability of plaintiff's prevailing on the merits times (2) the present value of probable damages plaintiff would recover if he did prevail"). The court then "estimate[s] the range of possible outcomes and ascribe[s] a probability to each point on the range." Id. at 385 (quoted in Synfuel, 463 F.3d at 653). In evaluating the strength of the case, an important consideration is "the various risks and costs that accompany continuation of the litigation." Donovan v. Estate of Fitzsimmons, 778 F.2d 298, 309 (7th Cir. 1985).

The Objectors calculate, using the above method and with detail more appropriate to a final fairness hearing, that the minimum possible recovery for their litigation class, were the court to certify it, would be $428 million, and that the case's net expected value is $3 billion—roughly six times the proposed settlement amount.[17] But these complex calculations are disputed by the

---

[17] The Objectors' net valuation analysis relies upon the certainty of many factors that are, in fact, far from certain: for example, the reliability of the sampling methodology, which AIG has vigorously contested, and the chances of the Objectors' class certification motion being

13

Settlement Class Plaintiffs and by AIG and, regardless, they are the subject of the final fairness hearing, not preliminary approval. See Butler v. Am. Cable & Tel., LLC, No. 09 CV 5336, 2011 WL 2708399, at *9 (N.D. Ill. July 12, 2011) (citing Kaufman v. Am. Express Travel Related Servs Co., 264 F.R.D. 438, 448 (N.D. Ill. 2009)).

Ultimately, preliminary approval requires only that the settlement figure is within a reasonable range, and the Settlement Class Plaintiffs have established at least that much. As discussed above, their settlement figure is based on a facially plausible methodology and is the product of a non-collusive arms-length negotiation. It is clear that if litigation proceeds, resolution will take years. Given the complex nature of the claims, legal fees are astronomical, and recovery is far from certain. No more detail is required for the court to find at this stage that, compared to the strength of the case, the settlement figure is fair, adequate, and reasonable. See AT&T Mobility, 270 F.R.D. at 348-49 ("Movants have represented that hundreds of millions at dollars are at issue in this action, but they have not provided a more definite figure of how much is at issue or exactly how much Plaintiffs can expect to recover. That is not problematic at this stage, however, because it appears that Plaintiffs would receive a high percentage of what is at issue—whatever that dollar value may be under the Proposed Settlement Agreement.").

The second factor, the likely complexity, length, and expense of trial, weighs heavily in favor of the settlement's fairness, reasonableness, and adequacy. No one disputes that a trial on these claims, including RICO allegations, will be complex. The length and expense of litigation also supports preliminary approval. Continuing to litigate this case will require vast expense and

---

granted, which they estimate at a quite-high 90 percent. (NWCRP counsel, in contrast, has suggested 65 percent.) Nor does that calculation appear to adequately account for litigation costs to the class.

a great deal of time, on top of that already expended. According to a declaration NCCI submitted in support of the Settlement Class Plaintiffs' motion, the NWCRP has spent an average of $2 million per month over the past year—a figure the Objectors have not disputed. The Objectors predict that their case would be ready for trial approximately two years after the court lifted the current discovery stay, and optimistically provide for an additional year for appellate proceedings. Counsel for the Settlement Class Plaintiffs estimate that the case will end in 2015.

Next, insofar as it is proper to consider at preliminary approval the amount of opposition to settlement among affected parties, this third factor weighs in favor of approving the proposed settlement. See AT&T Mobility, 270 F.R.D. at 350 ("Because the parties have not yet sent the notice, it is premature to fully assess this factor."). Currently, only the two Objectors, both affiliates of Liberty, have voiced opposition to the court's preliminary approval of the $450 million settlement.[18] This is particularly meaningful in light of the fact that, since 2007, LLBL has kept all class members up to date regarding settlement negotiations. Each class member, therefore, has been made aware of the developing settlement and the Objectors' opposition to it—yet none, apart from the Objectors, have expressed any concern with the settlement amount or its terms. At this point, the only way to gauge any additional opposition is to solicit it by sending notice of the settlement to the class and inviting its members to voice their opinions. See, e.g., In re M3 Power Razor Sys. Mktg. & Sales Practice Litig., 270 F.R.D. 45, 63 (D. Mass. 2010) ("[T]he only practical way to ascertain the overall level of objection to the proposed settlement is

---

[18] Further, as mentioned above, 37 percent of the settlement fund (in terms of allocable dollars) has expressed its support; if the Liberty companies opt out, that figure rises to 48 percent of the remaining allocable dollars.

15

for notice to go forward, and to see how many potential class members choose to opt out of the settlement class or object to its terms at the Final Fairness Hearing.").

Fourth, the opinion of competent counsel supports preliminarily approving the settlement. The court is "entitled to rely heavily on the opinion of competent counsel," Armstrong, 616 F.2d at 325, and has no legitimate reason to doubt the integrity and motives of Settlement Class Counsel, which as discussed above is competent and experienced. The fact that Settlement Class Counsel has an hourly fee arrangement (with a possible modest bonus at the election of its clients), rather than a contingency fee agreement, lends credibility to his opinion. Settlement Class Plaintiffs estimate that counsel's recovery, based on a $450 million settlement, will be less than .4 percent of the class fund. Cf. AT&T Mobility, 270 F.R.D. at 350 (in evaluating this factor, finding that fee arrangement showed that settlement was not collusive and counsel's opinion was persuasive, when class counsel was to receive fees no greater than the lesser of 10 percent of the settlement's aggregate value or 25 percent of the aggregate value of class damages actually recovered).

Fifth and finally, "the stage of proceedings and amount of discovery completed at the time of settlement" strongly suggests that the proposed settlement is fair, reasonable, and adequate. "The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." Armstrong, 616 F.2d at 325. More than sufficient discovery has been undertaken to provide the parties with information about their respective litigation positions. Even the Objectors acknowledge, in arguing that the complexity, length, and expense of litigation does not favor preliminary approval, that "discovery is almost completed." They nonetheless (and

16

inconsistently) argue that if the discovery stay were lifted, they would conduct additional sampling that would purportedly show that AIG had underreported in other divisions as well. Even if that was true—the Settlement Class Plaintiffs and AIG have vigorously disagreed with this contention—the standard under this factor is not whether it is conceivable that more discovery could possibly be conducted. Rather, courts have preliminarily approved settlements where there was merely, for example, "a significant amount of informal discovery," AT&T Mobility, 270 F.R.D. at 350, or where no discovery at all was conducted before the settlement agreement was reached, Kaufman, 264 F.R.D. at 447. See also Butler, No. 09 CV 5336, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011). Here, in contrast, extensive discovery has undisputedly been completed, and the court has been presented with volumes of argument, declarations, and exhibits. Thus, it is impossible to say that the court and the parties are unable to evaluate the merits of this case. Therefore, finding that this proposed settlement is within the range of possible approval, the court preliminarily approves it, contingent on some minor modifications as described below.

**Settlement Agreement and Notice**

The Objectors argue that the court must either approve or disapprove the proposed settlement agreement as a whole, and cannot require the parties to alter the terms of the settlement agreement or notice. For this proposition, they cite three cases: Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998); In re Lupron Marketing & Sales Practices Litig., 345 F. Supp. 2d 135, 137 n.4 (D. Mass. 2004); and Blanchard v. Edgemark Financial Corp., 175 F.R.D. 293, 303 (N.D. Ill. 1997). But none of these cases stand for the proposition that the court cannot make preliminary approval contingent on modifications to the settlement agreement and notice.

Hanlon upheld a district court's approval of a settlement class (at final fairness, not preliminary approval) over an amicus objection to one paragraph of the settlement agreement. In coming to that conclusion, the Ninth Circuit emphasized that because the district court's approval of a settlement should defer to the "private consensual decision of the parties," the court "was not free to redraft the agreement, or strike out certain parts it found to be problematic." Hanlon, 150 F.3d at 1027, 1028. The Objectors thus take the Ninth Circuit's observation that a "settlement must stand or fall in its entirety" out of context to conclude that Hanlon bars the court from making its preliminary approval decision contingent on modifications to the settlement agreement.

Blanchard is similarly inapposite. In that case, the defendants executed a settlement agreement with certain parties without presenting it to the court. Ruling on the plaintiff's motion for sanctions as a result of the defendants' conduct, the court acknowledged the defendants' argument that the court could not afford certain relief the plaintiffs requested because it would require the court to rewrite the settlement agreement. Blanchard, 175 F.R.D. at 303 n.13 ("While the Defendants are correct in asserting that the Court's authority under Rule 23 only enables the Court to approve or disapprove the settlement agreement, the Court need not redraft the settlement agreement to provide the relief sought.").

Finally, a footnote in In re Lupron cites Hanlon for the proposition that "[a]t the preliminary approval stage, the judge must either approve or disapprove the proposed settlement. He cannot rewrite the agreement." 345 F. Supp. 2d 135, 137 n.4 (citing Hanlon, 150 F.3d at 1026). Despite its overbroad reading of Hanlon, which did not address preliminary approval, this citation is the closest to being on point. Still, it says only that the court cannot itself unilaterally

18

modify, delete, or insert a clause in the settlement agreement—not that the court cannot make its preliminary approval contingent on the settling parties' agreement to make revisions.

In fact, contrary to the Objectors' argument, district courts frequently grant preliminary approval contingent on specified alterations to the settlement agreement (or to the notice). E.g., In re Classmates.com Consol. Litig., No. C09-45RAJ, 2011 WL 2680566, at *3 (W.D. Wash. July 8, 2011) ("Having decided to preliminarily approve the revised settlement, a few issues remain. First, the court's approval is conditioned upon the parties agreeing (if they have not already) to the additional revisions to the revised settlement agreement . . . ."); In re M3 Power Razor, 270 F.R.D. at 64 (in preliminarily approving a settlement class, explaining that after notice and the final fairness hearing, the court "may require modifications . . . to the settlement provisions as a condition to approval of the settlement"); Kakani v. Oracle Corp., No. C 06-06493, 2007 WL 2221073, at *5 (N.D. Cal. Aug. 2, 2007) (granting motion for preliminary approval of a proposed settlement agreement, "subject to" the parties' revision of the notice per the court's instructions).

Consistent with these principles, the court has instructed the Settlement Class Plaintiffs and AIG that it will preliminarily approve the settlement, contingent on certain modifications that the parties have agreed to make. The Objectors and the settling parties disagree on how the notice should describe the objections to the settlement; the court will address this dispute after reviewing the revised notice and settlement agreement.

## III. Conclusion

Thus, for the foregoing reasons, the court grants the motion and certifies a settlement class consisting of all Participating Companies in the NWCRP and the NMWCARP, excluding AIG, from 1970 through the execution date of class certification. The court appoints as class

representatives the following plaintiffs: ACE INA Holdings, Inc., Auto-Owners Insurance Co., Companion Property & Casualty Ins. Co., FirstComp Insurance Co., The Hartford Financial Services Group, Inc., Technology Insurance Co., and The Travelers Indemnity Company. The court appoints Frederic R. Klein of Goldberg Kohn Ltd. as Settlement Class Counsel. Further, the court finds that the proposed settlement is within the range of possible approval under Fed. R. Civ. P. 23(e) and approves the notice plan, subject to modifications pursuant to the court's instructions. The court appoints Kurtzman Carson Consultants as the notice and settlement administrator.

These findings will be entered in and become effective upon entry of the Findings and Order Preliminarily Certifying a Settlement Class and Preliminarily Approving Proposed Settlement, which will be presented to the court for entry on August 5, 2011, at 10:00 a.m.

**ENTER:** **July 26, 2011**

_____
**Robert W. Gettleman**
**United States District Judge**