IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN INTERNATIONAL GROUP, INC.,  )
AIG CASUALTY COMPANY f/k/a  )
BIRMINGHAM FIRE INSURANCE COMPANY  )
OF PENNSYLVANIA, AIU INSURANCE  )     No. 07 CV 2898
COMPANY, AMERICAN HOME  )
ASSURANCE COMPANY, AMERICAN  )     Judge Robert W. Gettleman
INTERNATIONAL PACIFIC INSURANCE  )
COMPANY f/k/a AMERICAN FIDELITY  )
COMPANY, AMERICAN INTERNATIONAL  )
SOUTH INSURANCE COMPANY  )
f/k/a AMERICAN GLOBAL INSURANCE  )
COMPANY, AMERICAN INTERNATIONAL  )
SPECIALTY LINES INSURANCE  )
COMPANY f/k/a ALASKA INSURANCE  )
COMPANY, COMMERCE AND INDUSTRY  )
INSURANCE COMPANY, INC.,  )
GRANITE STATE INSURANCE  )
COMPANY, ILLINOIS NATIONAL  )
INSURANCE COMPANY, INSURANCE  )
COMPANY OF THE STATE OF  )
PENNSYLVANIA, NATIONAL UNION  )
FIRE INSURANCE COMPANY OF  )
PITTSBURGH, and NEW HAMPSHIRE  )
INSURANCE COMPANY,  )
  )
             Plaintiffs,  )
        v.  )
  )
ACE INA HOLDINGS, INC., ADVANTAGE  )
WORKERS COMPENSATION INSURANCE  )
COMPANY, ALASKA NATIONAL  )
INSURANCE COMPANY, AMTRUST GROUP,  )
BERKLEY RISK ADMINISTRATORS CO.  )
LLC, CHUBB GROUP OF INSURANCE  )
COMPANIES, CINCINNATI INSURANCE  )
COMPANY, COMPANION PROPERTY &  )
CASUALTY INSURANCE COMPANY,  )
THE COVENANT GROUP, CRUM &  )
FORSTER, GUARD INSURANCE COMPANY,  )
GENERAL CASUALTY INSURANCE  )
COMPANIES, HARLEYSVILLE  )
INSURANCE GROUP,  )

THE HARTFORD FINANCIAL SERVICES ）
GROUP, INC., LIBERTY MUTUAL GROUP, ）
INC., MEMIC INDEMNITY COMPANY, ）
SAFECO CORPORATION, TRAVELERS ）
INSURANCE GROUP, SENTRY INSURANCE ）
GROUP, TRUCK INSURANCE EXCHANGE, ）
and UTICA NATIONAL INSURANCE CO., ）
）
       Defendants. ）
———————————————————————— ）
）
SAFECO INSURANCE COMPANY OF ）
AMERICA and OHIO CASUALTY ）    No. 09 C 2026
INSURANCE COMPANY, individually ）
and on behalf of a ）    Judge Robert W. Gettleman
class consisting of members of the National ）
Workers Compensation Reinsurance Pool, ）
）
       Plaintiffs, ）
）
ACE INA HOLDINGS, INC., AUTO-OWNERS ）
INSURANCE CO., COMPANION PROPERTY ）
AND CASUALTY INSURANCE CO., ）
FIRSTCOMP INSURANCE CO., ）
THE HARTFORD FINANCIAL SERVICES ）
GROUP, INC.; TECHNOLOGY INSURANCE ）
CO., THE TRAVELERS INDEMNITY ）
COMPANY, individually and on behalf of a ）
settlement class consisting of Participating ）
Companies in the National Workers ）
Compensation Reinsurance Pool and the New ）
Mexico Residual Market Pool, ）
）
       Plaintiffs-Intervenors, ）
）
      v. ）
）
AMERICAN INTERNATIONAL GROUP, INC., ）
AIG CASUALTY COMPANY f/k/a ）
BIRMINGHAM FIRE INSURANCE COMPANY ）
OF PENNSYLVANIA, AIU INSURANCE ）
COMPANY, AMERICAN HOME ）
ASSURANCE COMPANY, AMERICAN ）
INTERNATIONAL PACIFIC INSURANCE ）
COMPANY f/k/a AMERICAN FIDELITY ）

2

COMPANY, AMERICAN INTERNATIONAL )
SOUTH INSURANCE COMPANY )
f/k/a AMERICAN GLOBAL INSURANCE )
COMPANY, AMERICAN INTERNATIONAL )
SPECIALTY LINES INSURANCE )
COMPANY f/k/a ALASKA INSURANCE )
COMPANY, COMMERCE AND INDUSTRY )
INSURANCE COMPANY, INC., )
GRANITE STATE INSURANCE )
COMPANY, ILLINOIS NATIONAL )
INSURANCE COMPANY, INSURANCE )
COMPANY OF THE STATE OF )
PENNSYLVANIA, NATIONAL UNION )
FIRE INSURANCE COMPANY OF )
PITTSBURGH, and NEW HAMPSHIRE )
INSURANCE COMPANY, )
 )
         Defendants. )

## MEMORANDUM OPINION AND ORDER

In July 2011, the court certified a settlement class under Fed. R. Civ. P. 23(b)(3) and

preliminarily approved the settlement agreement in this class action, arising out of AIG's alleged

scheme of fraudulently underreporting workers compensation premium, the complex procedural

and factual history of which this court's previous opinions describe in some detail.[1]  Notice of

this action and the proposed settlement was sent to 1,346 class members in accordance with the

court-approved plan, pursuant to Fed. R. Civ. P. 23(c)(2)(B) and (e)(1).  Only three related class

members—Liberty Mutual and two of its subsidiaries, Safeco and Ohio Casualty—objected to

---

[1]  This memorandum opinion assumes familiarity with the factual background provided
in previous opinions, the most recent of which also describes the terms of the proposed
settlement agreement: AIG, Inc. v. ACE INA Holdings, Inc., Nos. 07 C 2898, 09 C 2026, 2011
WL 3290302 (N.D. Ill. July 26, 2011); AIG, Inc. v. ACE INA Holdings, Inc., 722 F.Supp.2d 948
(N.D. Ill. 2010), vacated in part, AIG, Inc. v. ACE INA Holdings Inc., Nos. 07 C 2898, 09 C
2026, 2010 WL 3730980 (N.D. Ill. Sept. 16, 2010); see also NCCI, Inc. v. AIG, Inc., No. 07 C
2898, 2009 WL 2588902 (N.D. Ill. Aug. 20, 2009); and NCCI, Inc. v. AIG, Inc., No. 07 C 2898,
2009 WL 466802 (N.D. Ill. Feb. 23, 2009).

the settlement agreement,[2] and just one—RLI Insurance Company—requested to be excluded from the class.

The proposed settlement agreement factors in approximately $375 million in economic damages (and interest), plus an additional $75 million, for a total of $450 million, allocated to the class members based on their participation in the market. The proposed settlement agreement's terms allow AIG to terminate the agreement if any potential class member with one percent or more of the class fund's allocation—other than Liberty and any of its affiliates, subsidiaries, divisions, or units (such as Safeco and Ohio Casualty)—elects to exclude itself from the class, or if potential class members—again excluding the Liberty companies—that together add up to at least five percent of $450 million elect to opt out.

In addition to the proposed settlement agreement, AIG has entered into a Regulatory Settlement Agreement ("RSA") with the states, conditioned on approval of the instant class action settlement by December 31, 2011. Under that agreement, AIG will pay the states $100 million in penalties and $46,507,385 in back taxes and assessments, and has agreed to reform its workers compensation reporting.

On November 29, 2011, the court held a final fairness hearing pursuant to Fed. R. Civ. P. 23(e)(2), and on December 21, 2011, the court held a hearing on the parties' various fee petitions. The next day, the court entered an order that granted final approval of the settlement (but stayed that ruling pending the court's determinations of fees and issuance of this memorandum opinion), granted Settlement Class Plaintiffs' first, second, and third interim fee

---

[2] Liberty Mutual, Safeco, and Ohio Casualty are collectively referred to as the "Objectors." The court incorporates the defined terms used in its July 26, 2011, memorandum opinion and order.

petitions, granted Settlement Class Plaintiffs' petition for incentive fee awards, granted in part Liberty Mutual's fee petition, and granted in part Safeco and Ohio Casualty's fee petition.[3]

## DISCUSSION

### I.    Final Approval of the Settlement

"Federal courts naturally favor the settlement of class action litigation." Isby v. Bayh, 75 F.3d 1191, 1196 (7th Cir. 1996). But the court may not approve a settlement that binds class members unless it finds, after a hearing, that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(3); e.g., Williams v. Rohm and Haas Pension Plan, 658 F.3d 629, 634 (7th Cir. 2011).[4] Whether a settlement is "fair" requires comparing class members against each other and against similarly situated non–class members. Manual of Complex Litig. § 21.62 (4th ed. 2004). Whether a settlement is "reasonable" calls for analysis of the class's claims in comparison to its terms. Id. Finally, whether a settlement is "adequate" demands assessing the settlement's terms with reference to what the class members might have obtained individually, absent a class action. Id.

In making these three determinations, the court considers five factors: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity,

---

[3] For reasons discussed below, Safeco and Ohio Casualty's petition is granted.

[4] Despite the Objectors' strenuous arguments to the contrary, nothing indicates that the Federal Rules of Evidence apply at a final fairness hearing. To the contrary, the authority on this subject indicates that the court need not enforce the Rules of Evidence. See Petrovic v. Amoco Oil Co. 200 F.3d 1140, 1149 (8th Cir. 1999); Williams v. Quinn, 748 F. Supp. 2d 892, 897 (N.D. Ill. 2010) (court can consider "any information [ ], including affidavits and other items not normally admissible at trial"). Something must distinguish the settlement approval process from a trial on the merits; otherwise, settlement would no longer serve its function of allowing parties to bring their disputes to a quicker, simpler, and less costly resolution. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974) (when evaluating a settlement agreeement, the court is not to turn the settlement "into a trial or a rehearsal of the trial"). ;

length and expense of continued litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed. Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006) (quoting Isby, 75 F.3d at 1199).

The court provisionally performed this analysis in determining that preliminary approval of the settlement was appropriate, and because the parties have not presented materially different arguments this time around, the court's review is more searching but the issues are fundamentally identical.[5] As the court concluded at preliminary approval, these five factors all support the court's conclusion that the settlement is fair, reasonable, and adequate.

## A.     Strength of Plaintiffs' Case Compared to Settlement Amount

The "most important factor" in evaluating a proposed settlement is "the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1132 n.44 (7th Cir. 1979) (quoted in Synfuel, 463 F.3d at 653). The Seventh Circuit instructs that "[a] district court must take special care in performing this assessment when the proposed settlement evinces certain warning signs." In Synfuel, that was a "settlement bias toward in-kind compensation" (Williams, 658 F.3d at 634 (citing Synfuel, 463 F.3d at 654)); in Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004), it was a "large subset of the class receiving 'a big fat zero' in settlement," Williams, 658 F.3d at 654 (quoting Mirfasihi, 356 F.3d at 785); and in Reynolds v. Beneficial Nat'l Bank, 288

---

[5]  The court conducts the Synfuel analysis anew at this stage, despite Safeco and Ohio Casualty's implicit suggestion that this is unnecessary because the court's memorandum opinion and order granting preliminary approval allegedly "strongly suggested . . . that it had already determined that the Proposed Settlement Agreement was fair."

F.3d 277, 283 (7th Cir. 2002), it was strong evidence of collusion between class counsel and the defendant.  But here, there is no indication of any similarly suspicious circumstances.  To the contrary, the circumstances affirmatively indicate that Settlement Class Counsel—whose fees are based on their standard 2010 hourly rates, not a contingency arrangement—is not selling out the class, and that the class members—who are all insurance companies—are well-positioned to protect their own interests.  The class members are in the risk assessment business themselves, and are certainly qualified to weigh the risks of litigation against the benefits of the settlement.  This does not mean that the court's role is usurped—but it does mean that the court need not view Settlement Class Counsel's predictions and calculations with the same suspicion that another sort of case might demand.

First, to determine the case's strength, the court is instructed to calculate the "net expected value of continued litigation to the class."  Reynolds, 288 F.3d at 284–85.  Once the net expected value of litigation is determined, the court proceeds to "estimate the range of possible outcomes and ascribe a probability to each point on the range."  Synfuel, 463 F.3d at 653 (citation and quotation marks omitted).  Although this might sound like an exact science, the Seventh Circuit recognizes that "a high degree of precision cannot be expected" in these calculations, which are by definition speculative.  Instead, courts are to provide a "'ballpark valuation'" of the class's claims.  Synfuel, 463 at 653 (quoting Reynolds, 288 F.3d at 285).

At the final fairness hearing, counsel for all parties helpfully devoted a substantial portion of their time to presenting their calculations of the net expected valuation of the class claims.  Somewhat less helpfully, however, Settlement Class Plaintiffs and the Objectors disagree on the amount of AIG's underreporting.  Thus, their analyses differ in significant and fundamental ways, and those divergent analyses result in vastly different estimates of how much a litigation

class could hope to recover.  Because courts are instructed to avoid "resolving the merits of the controversy or making a precise determination of the parties' respective legal rights," <u>E.E.O.C. v. Hiram Walker & Sons, Inc.</u>, 768 F.2d 884, 889 (7th Cir. 1985), the court is not in a position to resolve the dispute by performing its own analysis and making independent assessments of how much a litigation class's claims would be worth.  <u>See</u> <u>Schulte</u>, 805 F. Supp. 2d 560, 582 n.18 (N.D. Ill. 2011) (citing <u>Williams v. Gen. Elec. Capital Auto Lease</u>, No. 94 C 7410, 1995 WL 765266, at *4 (N.D. Ill. Dec. 26, 1995) ("It is neither appropriate nor necessary to resolve the merits of the conflicting positions in the case in order to evaluate the fairness of the settlement.").

But <u>Synfuel</u> does not bar settlement whenever the parties disagree on the value of plaintiffs' claims.  If that were the law, objectors could thwart settlement simply by presenting a facially plausible net valuation analysis that contradicts the settlement proponents' predictions.  Instead of scrutinizing the merits of the claims, though, the court's role is to ensure that the settlement proponents' analysis is a reasonable one.  Here, the court has ample assurances that the analysis is sound, from a number of competent and non-conflicted entities: Settlement Class Plaintiffs (who all sit on the NWCRP Board and have a duty to act in the best interest of all the NWCRP PCs); Settlement Class Counsel; the NWCRP Board's counsel, Locke Lord (who prepared the litigation risk analyses upon which Settlement Class Counsel partially relies); the multistate examiner, David Leslie; and regulators from every state and the District of Columbia, all of whom accepted Leslie's methodology.

Settlement Class Plaintiffs have presented two different analyses of the class claims' worth, under either of which the $450 settlement figure is more than reasonable.  First, they point to the analysis performed by David Leslie, the appointed Examiner-in-Charge for the

nationwide examination of AIG's workers compensation premium underreporting, in conjunction with actuarial consultants Merlinos & Associates. After a lengthy period of review, meetings, and disagreement, AIG agreed with Leslie and Merlinos' finding that the amount of AIG's underreporting was approximately $2.1 billion. All 51 state insurance regulators approved this conclusion. Next, after considering a variety of damages theories, Leslie and Merlinos determined that a cash flow analysis approach would be the most reliable, in part because other theories depended on legal and factual assumptions that would require extraordinary expenses and protracted litigation to resolve. Having decided that a cash flow damages model provided the most accurate estimate of the actual damages caused by AIG's underreporting, Leslie and Merlinos calculated that the NWCRP's cash flow damages totaled $366,062,346 (including interest), and the NMCRP's cash damages plus interest was $8,620,053, for a total of $374,682,399. Leslie and Merlinos added $75 million to that figure—for a total amount slightly below $450 million—based on their conclusion that AIG had engaged in serious misconduct over a long period and had failed to acknowledge that wrongdoing even after its chief legal officer revealed it to senior management in 1992.

In addition, Settlement Class Plaintiffs offer a second, alternative way to value the class claims: five Litigation Risk Analysis presentations ("LRAs") that Locke Lord created for and presented to their client, the NWCRP Board, over a period of years. The LRAs were not prepared to help effectuate settlement; they constituted counsel's advice to their client, in the ordinary course of litigation, designed to allow the NWCRP Board to make a reasoned decision whether to settle or litigate. The LRAs conveyed the Leslie/Merlinos analysis but also offered alternative damages theories, information obtained from the Objectors' counsel, and Locke Lord's views, informed by the firm's expertise on, for example, the likelihood that the court

would certify the litigation class headed by Safeco and Ohio Casualty. They concluded that the expected value of the litigation was somewhere between $343 million and $534 million, with a number of caveats.

These caveats included the possibility that the original litigation class would not be certified, which Locke Lord initially estimated as an insignificant risk but came to see as a 35% likelihood. The certification motion was fully briefed before the instant settlement was reached, and it presented issues that certification of this settlement class (led by different class plaintiffs) did not. E.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.") (internal citations omitte); see id. at 622 ("settlement is a factor in the calculus" in determining whether certification is proper). This is not the only risk that a litigation class would have faced. Without settlement, the "range of possible outcomes" included a number of highly unfavorable ones, including losing a jury trial, a reversal from the Seventh Circuit, or AIG's successfully asserting an affirmative defense. See Schulte, 805 F. Supp. 2d at 582 ("Absent settlement, Class Members would face the real risk that they would win little or no recovery. What is assured is that any victory would come only after many months (or years) of hard-fought litigation.").

These LBAs, in combination with the Leslie/Merlino analyses, provide the court with more than sufficient information to evaluate the strength of the litigation class's claims. The Seventh Circuit next instructs the court to discount the value of the class claims based on possible defense theories. Synfuel, 463 F.3d at 653. In performing this analysis, the court should not evaluate the merits of those defenses. See Schulte, 805 F. Supp. 2d at 582 n.18; see

<u>Armstrong</u>, 616 F.2d at 313. AIG has identified several affirmative defenses that it would assert if the case were to proceed. These include: (1) the claims are barred by the doctrine of <u>in pari delicto</u>; (2) the claims are barred by the doctrine of unclean hands; (3) many of the class members knew or should have known about the alleged misconduct within the applicable statute of limitations period; and (4) many of the class members knew or should have known about AIG's underreporting decades ago, and delayed bringing their lawsuit, thereby making it more difficult for AIG to defend itself. Based on the history of this litigation, it is beyond doubt that AIG would mount a vigorous defense that would have resulted in costly, protracted litigation of each of these defenses.

In comparison to the uncertain and unknowable benefits of litigation, the benefits of this settlement agreement to the class are significant. First, as is typical, "a major benefit of the settlement is that Class Members may obtain these benefits much more quickly than had the parties not settled." <u>Schulte</u>, 805 F. Supp. 2d at 583. If the class members were "required to await the outcome of a trial and inevitable appeal, [ ] they would not receive benefits for many years, if indeed they received any at all." <u>AT & T Mobility Wireless Data Servs. Sales Tax Litig.</u>, 789 F. Supp. 2d 935, 961 (N.D. Ill. 2011). And here, repose is even more valuable than is typical, because the class members are all part of an industry that has been ravaged by this very litigation for the past half-decade. The viability and integrity of the NWCRP (and NMCRP), which allows employers in the residual market to obtain workers compensation insurance, is a shared concern among all class members. Although it is impossible to ascribe a cash value to this type of benefit, industry-wide peace is certainly valuable to the class members—and to the public. As one of the Settlement Class Plaintiffs stated, "[t]his intercompany warfare has gone

on too long already, and has been a drain on money, time, effort, and emotion. This does not benefit the PCs, or the clients they serve and want to serve."

In addition, a monetary value can be ascribed to a related benefit: the fact that the class members will no longer be obliged to pay legal fees and expenses in connection with this litigation. (Due to the indemnification obligations provided in the NWCRP Articles of Agreement, and the NWCRP Board's decision to advance litigation expenses, the NWCRP has advanced the class's attorneys fees and expenses.) As of January 2012, the NWCRP had incurred approximately $47 million in legal fees and expenses in this matter. In 2011, the NWRCP advanced an average of $2 million a month.

And it is not as if the $450 figure is insubstantial. In fact, it is the figure upon which the Leslie/Merlinos analysis landed, and it is in the center of the damages range that Locke Lord estimated. In light of these analyses and the defenses AIG is likely to mount, the net expected value to the class members of litigating their claims through judgment and appeal is not likely to exceed $450 million—and it is eminently possible that the class could recover substantially less, or nothing at all. Given the value of peace to the industry and the speculative nature of any recovery, the settlement figure is certainly reasonable.

## B.  Likely Complexity, Length, and Expense of Litigation

The likely complexity, length, and expense of trial strongly supports the settlement's fairness, reasonableness, and adequacy. One of the very few issues that have <u>not</u> been vigorously contested is how complex this litigation is. As for length, without a settlement the parties estimate that it will be at least three years before the litigation concludes. Settlement Class Plaintiffs submit that the case "probably will not end until 2015," and the Objectors predict that the case will be ready for trial two years after the discovery stay is lifted—the appeal that

would almost certainly follow a jury verdict would likely add at least another year. (In their objections to final approval, however, Safeco and Ohio Casualty claim that "if the case does not settle now, it likely will follow the same course as most other class actions and settle at a subsequent juncture.")

Further, the court has ample evidence with which to evaluate the litigation's expense. Based on the expenses incurred thus far as well as the parties' projections of future expenses should this matter proceed to trial, continuing on the path to trial will be quite costly for the NWCRP. From the inception of the '07 Action to January 13, 2012, the Objectors and Liberty claim to have paid approximately $19,458,003.32 in legal fees and expenses, and the NWCRP incurred (as stated above) around $47 million. As an estimate of fees going forward, the NWCRP spent an average of $2 million a month in 2011. If the NWCRP continued to spend that amount through 2015, the total cost to the NWCRP would approach $100 million.

## C.     Amount of Opposition to the Settlement

Because, in assessing the settlement's fairness, adequacy, and reasonableness, the court is instructed to act as a fiduciary for the class, a lack of opposition presumably merits minimal weight. But to the extent that this factor serves a valuable function, it is particularly meaningful here, where—as is not typically the case—the class members are all sophisticated insurance companies that been kept apprised of the litigation, the settlement negotiations, and the Objectors' opposition to it.

Out of a class of over thirteen hundred class members, only three (Liberty Mutual, Safeco, and Ohio Casualty) have objected, and just one has excluded itself from the class. Thus, using the number of class members as a metric, there has been almost no opposition to the settlement. This indicates that the class members consider the settlement to be in their best

interest.  See AT & T Mobility, 789 F. Supp. 2d at 964–65 ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object."); In re Mexico Money Transfer Litig., 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"), aff'd, 267 F.3d 743 (7th Cir. 2001); Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 101 (2d Cir. 2005) (fact that 18 out of 5 million class members objected weighed in favor of settlement's fairness, when many of non-objecting class members were "large and sophisticated merchants").

The Objectors insist that the court must consider the "amount of opposition" based not on the number of class members who oppose the settlement, but on the amount the opposing class members would recover under the settlement.  This measure obviously favors the Objectors, who in the aggregate will receive more than 22% of the settlement amount, but it has no basis in Seventh Circuit law.  In fact, the Objectors offer no authority to support this proposition.  Even if the percentage of expected recovery were the appropriate metric for the "amount" of opposition, however, the specific objections to this settlement do not cast doubt upon the value of the settlement to the class, for reasons discussed in the preliminary approval order and below.  This factor would therefore be entitled to less weight in this case.  See 7B Wright, Miller & Kane, Federal Practice and Procedure: Civil § 1797.1, at 77 (3d ed. 2005) (indicating that the weight a court gives to each factor depends on the circumstances of the case); Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982) ("The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.").

The Objectors speculate that they stand alone in objecting because other class members have similar concerns but, having read the court's previous opinion certifying the settlement class—in the course of which it addressed and rejected the Objectors' arguments against certifying the settlement class, which are essentially identical to their objections to the settlement—they thought it futile to make similar objections at final approval. This is disingenuous, for two reasons. First, it ignores the fact that the court specifically and unambiguously called for objections to the settlement: "At this point, the only way to gauge any additional opposition is to solicit it by sending notice of the settlement to the class and inviting its members to voice their opinions." AIG, Inc. v. ACE INA Holdings, Inc., Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *7 (N.D. Ill. July 26, 2011). The court made clear that it was not closing the door on entertaining opposition to the settlement, noting that "it is premature to fully assess this factor" at preliminary approval. Id. (citing AT & T Mobility Wireless Data Servs. Sales Tax Litig, 270 F.R.D. 330, 350 (N.D. Ill. 2010). Thus, any class members with legitimate objections were felt encouraged to bring those objections at the time of the final fairness hearing.

Second, the Objectors cannot have it both ways. The Objectors chose to file objections to the proposed settlement at the preliminary approval stage. Had the court not addressed their arguments, the Objectors would certainly, and rightly, have complained that their objections were being ignored. But the court did address those arguments, which had been fully presented to the court at that point and on which nothing credible has now been offered that would change the court's opinion. The court rejected the contentions that the Settlement Class Plaintiffs are conflicted, that the settlement figure was the product of collusion, and that it was discounted to account for AIG's claims against the class members who had also been accused of

underreporting.  Having asked the court to rule on those objections, the Objectors are not in a position to complain that the court should revisit those objections again.

The Objectors also ignore the fact that objecting was not the only option available to class members who were unsatisfied with the proposed settlement; they also had the option, which one class member exercised, to exclude themselves from the class.  Gauging "opposition" based on both opt-outs and objections, the court concludes that the meager amount of opposition strongly supports approval of the settlement.

Finally, the Objectors claim that the court should consider not the number of objectors or the percentage of the class fund they represent, but instead the "vociferousness" of the objections.  But it makes little sense to weigh opposition based on how strenuously it is made if the court concludes that the opposition lacks merit.  Below, the court considers these objections (to the extent they have not been thoroughly addressed before) and finds that they do not warrant denying approval.

**D.      Opinion of Competent Counsel**

"The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23."  AT & T Mobility, 789 F. Supp. 2d at 965; Schulte, 805 F. Supp. 2d at 586 (both citing Synfuel, 463 F.3d at 653).  When this court preliminarily approved the settlement, it noted that it had discovered "no legitimate reason to doubt [Settlement Class Counsel's] integrity and motives."  2011 WL 3290302, at *8.  Nothing has altered the court's analysis.  See AT & T Mobility, 789 F. Supp. 2d at 965.

Goldberg Kohn Ltd., and specifically Frederic R. Klein, acting as principal Settlement Class Counsel, has extensive experience in complex litigation.  According to affidavits presented to the court, Klein has litigated approximately forty class action lawsuits over the course of a

thirty-year career as a commercial litigator. Perhaps more importantly, the court has had extensive opportunities to evaluate Settlement Class Counsel's competence and has found its representation of the settlement class to be exemplary. The opinion of counsel is thus entitled to significant weight.

Klein opines that the settlement agreement "is a fair and reasonable compromise of these complex and disputed claims between the Settlement Class Plaintiffs, the class they wish to represent, and AIG." He further avers that "the settlement is in the public interest because of the positive impact the settlement is likely to have on the relationships between hundreds of workers compensation insurers and the regulatory bodies in virtually every state, and also because of the stability this will bring to the NWCRP." According great weight to these opinions, the court finds that they support the fairness, adequacy, and reasonableness of the settlement.

**E.      Stage of the Proceedings and Amount of Discovery Completed at Time of Settlement**

When the parties negotiated this settlement after over three years of vigorous litigation, substantial discovery had been completed. Although (as discussed above), the court is instructed to avoid resolving the merits of the controversy in determining whether a settlement should be approved, the stage of the proceedings and the discovery completed is "important**"** in determining whether a settlement is fair, reasonable, and adequate "because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee, 616 F.2d 305, 325 (7th Cir. 1980), overruled on other grounds by Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998). Although some courts have found that "the fact that Class Counsel negotiated a fair settlement is evidence that he had enough information to effectively represent the class," Schulte, 805 F. Supp. 2d at 588 (citing Mars Steel Corp. v. Continental Illinois Nat. Bank and Trust Co. of Chicago, 834 F.2d

677, 684 (7th Cir. 1987) ("The proof of the pudding was indeed in the eating.")), resorting to such circularity is unnecessary here, where it is clear from the litigation's protracted history that all parties have sufficient information to evaluate the class's claims.

Even the Objectors have represented to the court that "they have aggressively conducted this litigation, including discovery into AIG's underreporting practices." Among other things, they conducted over 40 depositions of AIG personnel, attended over 20 hearings, participated in numerous teleconferences and meetings convened by David Leslie, and served 43 interrogatories and 123 document requests on AIG. In response, AIG produced 2.7 million pages of documents. This is in addition to the 23,600 pages that NCCI produced, the 467,000 produced by Pricewaterhouse Coopers, 780 more produced by C.V. Starr & Co., Inc., 225 from Paul, Weiss, Rifkind, Wharton & Garrison LLP, and the 26,000 pages produced by Simpson Thatcher Bartlett LLP. Overall, 101 depositions have been taken.

Despite this record of extensive pre-settlement discovery, the Objectors have argued repeatedly that the court has not permitted sufficient discovery and contend that the court should have permitted them to conduct additional discovery in preparation for the final fairness hearing. The Objectors now claim that "the Court has an incomplete record" with which to evaluate the settlement. Certainly, as all parties acknowledge, it would be possible to conduct additional discovery. The Objectors have suggested that two years of additional discovery would be necessary if the court were to deny the motion to approve the proposed settlement, and Settlement Class Counsel agrees, stating that, in part because of "the amount of fact and expert discovery to be completed, . . . the case would not be trial ready before late 2013 or the first part of 2014."

But the inquiry is not whether, if the parties did not settle, additional discovery would occur before trial.  Rather, it is simply whether enough discovery has taken place to ensure "effective representation" of the settlement class.  Schulte, 805 F. Supp. 2d at 587 (quoting McBean v. City of New York, 233 F.R.D. 377, 384–85 (S.D.N.Y. 2006) ("[T]he question that this Court must answer is not how much or how little discovery was completed by the parties before they agreed to the settlement, but rather whether the discovery that was completed was sufficient for 'effective representation.'")); AT & T Mobility, 789 F. Supp. 2d at 966–67 (approving settlement when no formal discovery—only "considerable, extensive informal discovery"—had been conducted).  If the Objectors were correct that a final fairness hearing cannot be conducted without first allowing any objectors to conduct all the discovery they desire, it would undermine one of the primary purposes of settlement: to resolve the litigation and, in doing so, cease the vast expenditures of time and resources that the parties would otherwise devote to discovery.  See Molski v. Gleich, 318 F.3d 937, 959 (9th Cir. 2003) ("[W]e should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise.") (Graber, J., concurring), quoted in AT & T Mobility, 789 F. Supp. 2d at 967.

The information the parties have exchanged is more than sufficient to enable them, and the court, to evaluate the settlement.  A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery," Wal-Mart Stores, Inc., 396 F.3d at 116 (quoting Manual for Complex Litig. § 30.42 (3rd ed. 1995)), and here, such a presumption is appropriate.

III.     Objections to the Settlement

Although, as discussed above, the <u>Synfuel</u> analysis supports approving the settlement, three class members have objected: Liberty Mutual and two of its subsidiaries, Safeco and Ohio Casualty. The Objectors make much of the Seventh Circuit's instruction that, in approving a settlement, the district court has a "judicial duty to protect the members of a class in class action litigation from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class." <u>Reynolds</u>, 288 F.3d at 279. This proclamation that the district court acts as "a fiduciary of the class" was made in a context that presented many indicia of a classic "reverse auction" scenario, and where 17 million class members each received a modest sum ($15 or $30) and their lawyers (who appeared to be otherwise ineffectual) received astronomical fees. The court noted that, given such indica, "the circumstances demanded closer scrutiny than the district judge gave it." <u>Id.</u> at 283.

The circumstances in the instant case are the polar opposite of a typical consumer class action such as <u>Reynolds</u>. As the Seventh Circuit has even more recently reasoned, "[c]lass counsel owe a fiduciary obligation of particular significance to their clients when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf. That is why settlements of class actions require approval by the district court . . . ." <u>Creative Montessori Learning Centers v. Ashford Gear LLC</u>, 662 F.3d 913, 917 (7th Cir. 2011) (internal citations omitted).

The main concern is that "the structure of class actions under Rule 23 of the federal rules gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may

treat the class action lawyers better than the class." Thorogood v. Sears, Roebuck & Co., 627 F.3d 289, 293 (7th Cir. 2010) (emphases omitted).  But here, there is no indication that Settlement Class Counsel—who will receive less than one percent of the class fund—have an incentive to sell out the class for their own financial benefit.

This is not to deny that the primary purpose of assessing a class settlement is, in all types of cases, to ensure that the settlement is in the best interest of the class.  Nor does it mean that where the class members are sophisticated, the court need not apply as rigorous an analysis.  It simply means that when circumstances indicate that settlement class counsel is not taking advantage of helpless, uninformed class members, the court need not view the settlement with the same suspicious eye as it might a traditional consumer class action settlement represented by class counsel seeking large contingency fees.  This is particularly appropriate considering the policy favoring settlement of complex class actions.  See Isby, 75 F.3d at 1196.

Settlement Class Plaintiffs contend that the three class members who objected—rather than choosing to exclude themselves from the settlement class[6]—do not have in mind the best interests of the class as a whole.  But, although the circumstances cast substantial doubt on whether the Objectors are acting as altruistically as they claim to be, the court need not determine why the Objectors decided to object rather than opt out.  Nor need it decide whether it is appropriate, in weighing the validity of their objections, to consider the fact that the Objectors could have instead chosen to opt out—another issue that has been hotly contested in the course of these proceedings.  The court's function is to determine whether the Objectors' arguments

---

[6] The settlement agreement provides that the Objectors may opt out of the class without consequence to the settlement.

cast doubt upon the settlement's fairness, reasonableness, or adequacy, and none of these arguments do. For the following reasons, the objections are overruled.

## A.     Liberty Mutual's Objection

The crux of Liberty's objection is that the settlement agreement releases Liberty's purported non-Pool claims against AIG. Liberty contends that it has, in addition to $600 million of Pool-related claims, approximately $40 million of non-Pool claims, for which this settlement agreement gives it nothing. Because this objection is specific to one class member and is contrary to the interests of the rest of the class, it does not create an obstacle to approving the settlement. The court looks not to whether one class member is unsatisfied with the settlement agreement, which "must embody the best settlement available to the class as a whole." Salinas v. Roadway Express Inc., 802 F.2d 787, 790 (5th Cir. 1986). When a settlement is fair, reasonable, and adequate to the class as a whole—as the court has determined this settlement is—objections that apply only to an individual class member are insufficient to defeat the settlement. See, e.g., Thomas v. Albright, 139 F.3d 227, 233 (D.C. Cir. 1998) ("It is the obligation of the district court to . . . evaluate the fairness of the settlement to the class as a whole."); Parker v. Anderson, 667 F.2d 1204, 1211 (5th Cir. 1982) (reasoning that named plaintiffs who objected to a proposed settlement "should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands"). The court will not dismantle this settlement for the sake of one class member's unique demands, particularly when the class member, like Liberty, had the right (and the means) to opt out and pursue its individual claims without disturbing the settlement for the rest of the class.

**B.      Safeco and Ohio Casualty's Objections**

Safeco and Ohio Casualty claim that the court's memorandum opinion and order preliminarily approving the settlement agreement "strongly suggested that it had <u>definitively</u> rejected all of the objections that Objectors had advanced."  The court was certainly willing to entertain the objections again, particularly to the extent that the Objectors offered new facts or law.  Unless otherwise specified below, however, they have merely renewed the arguments addressed at class certification and preliminary approval.  For the following reasons, the court determines that Safeco and Ohio Casualty's eight objections do not cast doubt on the settlement's fairness, adequacy, or reasonableness.

Seven of the eight objections, according to Safeco and Ohio Casualty, go to the first <u>Synfuel</u> factor (the strength of plaintiffs' case compared to the benefits of settlement).  Of these, three objections present nothing at all new. Safeco and Ohio Casualty renew their claim that the settlement agreement is a product of collusion; that "the releases being given by members of the Settlement Class under the Proposed Settlement Agreement extend to claims that are beyond the scope of this litigation, based on factual predicates that are entirely different from the factual predicates of the claims alleged in this case"; and that the settlement agreement "grants preferential treatment to certain of the Settlement Class Plaintiffs and to the class segment to which those Settlement Class Plaintiffs belong."  The court need not give further consideration to these claims, which it has already found to be baseless.

The other four objections relevant to the first <u>Synfuel</u> factor are also largely repeats of previous objections, but demand slightly more of the court's attention.  First, Safeco and Ohio Casualty argue that "an entire segment of the Settlement Class"—the PCs that left the Pools before 1985—"is releasing claims against both AIG and certain of the class representatives in

return for no consideration." This is a sensible distinction and does not render the settlement unfair. Settlement Class Plaintiffs have presented ample evidence that the PCs incurred damages between 1985 and 1996. Thus, the PCs that left the Pools before 1985 did not suffer damages. As Settlement Class Plaintiffs point out, 67 PCs left the NWCRP or the NMCRP before 1985. Of these, five are affiliated with Liberty, nine are affiliated with Settlement Class Plaintiffs, two are affiliated with PCs that have filed documents with the court supporting the settlement agreement, and another twenty-nine are affiliated with PCs that will receive distributions under the plan of allocation. Six no longer exist or were not insurance companies.

This leaves eleven companies that are not affiliated with PCs that are receiving monetary distributions and are not themselves receiving distributions. Of these, almost half (five) left their respective Pools in the 1970s, substantially before the relevant period; the others left in the early 1980s (including one which participated in the NWCRP for only one year). Further, none of these PCs filed objections or chose to opt out, even though they all received the notice of the proposed settlement, which made it clear that only PCs that were members of the Pools during the 1985–1996 period and suffered particular damages were entitled to recover from the class fund. See Cavin v. Home Loan Ctr., Inc., 236 F.R.D. 387, 393 (N.D. Ill. 2006) ("To the degree that such hypothetical conflicting interests are likely to exist, such cases can adequately be dealt with by providing a clear notice of the right to opt out, as required by Federal Rule of Civil Procedure 23(c)(1)(B).").

Relatedly, Safeco and Ohio Casualty argue that "a disproportionate share of the settlement payment that AIG would make under the Proposed Settlement Agreement is allocated to a favored class segment, at the expense of a disfavored segment." But the evidence presented to the court establishes that there were no material damages before 1985, and there is no conflict

24

between the PCs that were in the Pools both before <u>and</u> after 1985 and the PCs that did not join the Pools until after 1985.

Safeco and Ohio Casualty next object to two provisions of the settlement agreement that would preclude a group of affiliates from splitting up and having one company opt out while the other stayed in the settlement class. The settlement agreement defines "Settlement Class Members" as any insurance carrier that was an NWCRP member as well as that carrier's "parents, . . . subsidiaries and affiliates," and provides that the class members are releasing claims on behalf of themselves as well as their affiliates. This argument was merely speculative at the time of preliminary approval. As Settlement Class Plaintiffs point out, this concern remains theoretical. The one class member that opted out has not expressed concerns about the unduly restrictive nature of its opt-out rights, and the only class members that have advanced this argument did not, in fact, opt out.

Safeco and Ohio Casualty also continue to challenge the adequacy of the $450 million settlement figure. Most of these arguments are repeats, but they do present one novel argument: that the LRAs Locke Lord presented to the NWCRP Board are insufficient. This argument has been addressed above in evaluating the first factor of the <u>Synfuel</u> test, and for the reasons previously stated, the court finds that the LRAs offer more than sufficient analysis of the value of the class's claims, the risks of litigation, and the benefits of settlement.

Finally, Safeco and Ohio Casualty generally proclaim that "no other factor that is relevant to approval of the Proposed Settlement Agreement supports approval of the agreement as fair, reasonable, and adequate." The court has addressed these arguments in assessing the <u>Synfuel</u> factors, and need not reiterate its reasoning here.

**IV.    Class Notice**

Acting through professional class settlement administrator Kurtzman Carson Consultants LLC, Settlement Class Plaintiffs have fully complied with this court's July 26, 2011, order directing notice to the settlement class and the court's modifications to the notice plan that Settlement Class Plaintiffs had proposed at that time.  On August 19, 2011, class notice was sent by U.S. mail to 1,346 class members.  The mailings consisted of the "Notice of Proposed Class Action Settlement, Settlement Hearing, and Right to Appear" and an individual company supplement thereto, along with the settlement release provisions and the summary plan of allocation.  The individual company supplement showed each class member how much it was slated to receive (dependent, of course, on the court's decisions on fees) and explained why some class members were receiving zero.  By August 19, 2011, the Class Administrator published the notice and summary notice on the Administrator's website (www.WCPoolSettlement.com), making it available for class members to read and download. The website also provided additional information about the proposed settlement along with other relevant documents.  Also by that date, the Class Administrator established a toll-free phone number and trained a call center staff to answer questions regarding the details of the Settlement. Finally, by September 4, 2011, the Class Administrator published the short form of the notice in two trade publications, Business Insurance and National Underwriters.

Federal Rule of Civil Procedure 23 and constitutional due process require that the settlement class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  No one has challenged the sufficiency of the notice provided to the settlement class members, and the court agrees with Settlement Class Plaintiffs that it is the best practicable notice and has been reasonably calculated, under the circumstances, to apprise the

settlement class members of the litigation, the claims alleged therein, the effects of the settlement

agreement, their right to object, and their right to opt out of the settlement class. The notice and

the short form of the notice are written in a straightforward fashion that the settlement class

members (which are all sophisticated insurance companies) can easily understand. They, along

with the notice methodology described above, comport with due process requirements as well as

Fed. R. Civ. P. 23(c)(2)(B) and (e)(1).

**V.      Settlement Class Counsels' Fees, Costs, Expenses, and Incentive Award**

**A.      Attorneys' Fees, Costs, and Expenses**

In its order dated December 21, 2011, the court granted Settlement Class Plaintiffs' first,

second, and third fee petitions, in a total amount of $2,857,449.20, or around 0.6% of the $450

million class fund. In a class action, the court may award reasonable attorneys' fees "that are

authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In determining what fees

are reasonable, the court "balance[s] the competing goals of fairly compensating attorneys for

their services rendered on behalf of the class and of protecting the interests of the class members

in the fund." Skelton v. Gen. Motors Corp., 860 F.2d 250, 258 (7th Cir. 1988), cert. denied, 493

U.S. 810 (1989). The court may also "award . . . reasonable nontaxable costs that are authorized

by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Typically, when attorneys' fees

"are deducted from class damages, the district court must try to assign fees that mimic a

hypothetical ex ante bargain between the class and its attorneys." Williams, 2011 WL 3874460,

at *4 (citation omitted).

Here, however, it is unnecessary to perform such an exercise. Settlement Class Plaintiffs

agreed to pay Settlement Class Counsel at the firm's 2010 rates, which are "market" rates within

the community for complex litigation, and which the court presumes to be reasonable. See

<u>Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs</u>, 553 F.3d 487, 489–90 (7th Cir. 2009) (counsel seeking fees creates "a presumption that an hourly rate is reasonable where the attorney demonstrates that the hourly rate she has requested is in line with what she charges other clients for similar work"); <u>Assess. Tech. of WI, LLC v. WIREdata, Inc.</u>, 361 F.3d 434, 438 (7th Cir. 2004) ("The best evidence of the value of the lawyer's services is what the client agreed to pay him.") (citation omitted). Based on the documentation submitted to the court, Settlement Class Counsel's hourly rates are reasonable. Settlement Class Counsel has provided "detailed time statements of its attorneys showing who performed what task, how much time each task entailed and how the tasks were related to and required by the litigation." <u>Boulevard Bank Nat. Ass'n v. Philips Med. Sys. Int'l B.V.</u>, 15 F.3d 1419, 1423 (7th Cir. 1994) (affirming award of attorneys' fees and costs to Goldberg Kohn, Ltd.). This documentation establishes that the hours billed are reasonable.

As part of its third interim petition, Settlement Class Plaintiffs seek a $50,000 "premium" to compensate Goldberg Kohn for uncompensated work performed in early November 2010, when the firm was first retained and was not billing its time. The notice provided to class members described this $50,000 award.

Only one set of objections to Settlement Class Counsel's fee requests has been filed. The Objectors (again, Liberty Mutual, Safeco, and Ohio Casualty) do not contest Settlement Class Counsel's rates and hours. Instead, they launch a more global opposition to awarding <u>any</u> fees to Settlement Class Counsel. They make three arguments: (1) awarding this petition would benefit only AIG; (2) it was improper for the NWCRP to advance fees (and relatedly, as a procedural matter, the NWCRP, not Settlement Class Plaintiffs, should be asking for reimbursement); and (3) Settlement Class Counsel should not receive fees because they simply "rubber-stamped" a

settlement that they had no part in facilitating.  For the following reasons, none of these arguments is persuasive.

First, the Objectors reason that because the NWCRP has already been paying Settlement Class Counsel, this would not be a payment to counsel or a reimbursement to plaintiffs—it would be a reimbursement to the NWCRP, including AIG.  The NWCRP members are essentially identical to the class members (with the notable exception of AIG).  Thus, taking money from the class fund to reimburse the NWCRP will not result in any gain to the PCs that are also class members; the only positive transfer of money will be to AIG.  And, under this logic, the class members will all get a little less.

This claim is vastly overstated and, to some extent, factually inaccurate.  AIG is <u>not</u> the only company that will benefit financially, because all of the NWCRP PCs (from 1985–1996) have contributed to paying Settlement Class Counsel's fees—but some of those companies will receive no part of the settlement class fund.  For those companies, reimbursement actually results in a monetary benefit .

Moreover, no party (the Objectors included) complained at the time about attorneys' fees coming from the class fund.  As Settlement Class Plaintiffs stress, no other class member has expressed concerns about it now.  The Settlement Term Sheet and Settlement Agreement provide for all attorneys' fees to come from the class fund, and the Notice (both long and short forms) stated that "all attorneys' fees and expenses awarded to Settlement Class Counsel by the Court shall be paid from the Class Fund."  That answers the Objectors' concern that "[i]t is unclear why Settlement Class Plaintiffs—whose attorneys' fees and costs have already been paid by the NWCRP—filed a fee petition that provides a substantial benefit to no one other than AIG."  They are asking for fees to be reimbursed from the class fund because that is where everyone

agreed they should come from. And finally, the Objectors are also asking for reimbursement from the class fund, so it is clear that they do not view fees being paid from the class fund as a problem.

Second, the Objectors argue that the fact of the NWCRP's having advanced Settlement Class Counsel's fees evinces the NWCRP's conflict of interest, because the Board decided to fund Settlement Class Plaintiffs' intervention to settle the litigation against AIG in the face of the Objectors' opposition.[7] It makes little sense, however, to complain about both the NWCRP paying the settlement class's attorneys' fees and Settlement Class Counsel's attempt to reimburse the NWCRP for those fees.

Third, the Objectors contend that Settlement Class Counsel served no valuable function in this litigation and settlement, and therefore are entitled to no fees. Having reviewed Settlement Class Counsel's fee petitions, the thorough declaration offered by Klein, and the volume of Settlement Class Counsel's work product in connection with this settlement, the court cannot agree.

**B.      Incentive Payments**

Settlement Class Plaintiffs have filed a petition for incentive fee awards of $25,000 for each of the seven Settlement Class Plaintiffs. Incentive payments are not awarded as a matter of course; they are awarded only if they are "justified" by the class members' unwillingness to serve as named plaintiffs without the lure of cash. In re Synthroid Mktg. Litig., 264 F.3d 712, 722 (7th Cir. 2001) (citations omitted). If "the market rate for incentive reimbursements" is "zero"—if a class member would agree to represent the class without the promise of additional

_____

[7] In the same vein, they claim that as a procedural matter, the NWCRP—not counsel—should be asking for reimbursement.

compensation—then the court should not award incentive payments. Id. at 723; see In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992). In determining whether incentive awards are appropriate, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998) (citation omitted).

Liberty, Safeco, and Ohio Casualty have objected to this request for incentive fees, contending that because Settlement Class Plaintiffs are, in fact, conflicted and the settlement was, in fact, the product of collusion, being subjected to those allegations is not a reason to award incentive fees. The court has found these allegations to be unsupported, and thus affords no weight to this contention. They also argue, however, that incentive fees are inappropriate because Settlement Class Plaintiffs failed to comply with Synthroid's requirement that a party requesting an incentive award show that no class representative "would have stepped forward without the lure of an 'incentive award.'" Synthroid, 264 F.3d at 723.

Despite those contentions, the record reflects that no class member was otherwise willing to serve as a named plaintiff for the settlement class. This was doubtless at least in some part because of the heated litigation that had been ongoing for years when the proposed settlement was reached. As Settlement Class Plaintiffs stress, they were subjected to Liberty's threats of litigation and the Objectors' accusations of corrupt behavior. See Cook, 142 F.3d at 1016 ($25,000 incentive fee warranted when class representative faced threat of workplace retaliation as result of prosecuting class action); Theodore Eisenberg & Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 U.C.L.A. L. Rev. 1303, 1305 (2006)

(explaining that incentive awards may be granted when the class representatives have borne unique costs "in the form of retaliation or loss of reputation").

The court thus concludes that incentive fees are warranted. Further, the $25,000 figure is a reasonable one. The total $175,000 amounts to less than 0.039% of the settlement fund—well below the mean incentive fee awarded in complex commercial class actions. See Eisenberg & Miller, 53 U.C.L.A. L. Rev. at 1339 (mean incentive award in commercial cases is 0.066% of class recovery; mean incentive award across all cases is 0.16%). It also amounts to a lower percentage of the settlement fund than incentive fees awarded in this circuit. See Cook, 142 F.3d at 1016 (affirming $25,000 incentive fee award to class representative out of $14 million fund).

## VI.    Objectors' Fee Petitions

Safeco and Ohio Casualty have filed a motion for reimbursement of attorneys' fees, costs, and expenses in the amount of $14,800,890.22, for work performed through January 13, 2011, the day the court permitted intervention and stayed discovery. Liberty has filed a motion for reimbursement of its fees and costs through the same date.

To encourage a "'broad range of participants in the [class action] fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally,'" the Seventh Circuit permits objector's counsel who "contribute materially to the proceeding to obtain a fee." Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 697 (7th Cir. 2008) (quoting Reynolds, 288 F.3d at 288); see Manual for Complex Litig. § 21.643 (4th ed. 2004) ("An objector who wins changes in the settlement that benefits the class may be entitled to attorneys' fees, either under a fee-shifting statute or under the 'common fund' theory. Fee awards made on the basis of insignificant or cosmetic changes in the settlement serve to condone and encourage improper use of the objection process."). An objector's work benefits the class

only when counsel can show that the work "produce[d] an improvement in the settlement worth more than the fee" being sought.  Reynolds, 288 F.3d at 288.

Settlement Class Plaintiffs have objected to both of these fee petitions, and have been joined in their opposition by a number of other class members: Allstate Insurance Company; Arrowood Indemnity Company; Crum & Forster Indemnity Company, Crum & Forster Insurance Company, The North River Insurance Company, and Westchester Fire Insurance Company (collectively "Crum & Forster"); Fairmont Specialty Insurance Company and TIG Insurance Company; and State Farm Fire and Casualty Company.  These class members contend that because the Objectors litigated the case at their own expense and for their own benefit, and generally failed to improve the class's position, "a large portion of their request for attorneys' fees and expenses should be denied."

AIG has filed a "statement of position" on the Objectors' fee petitions, arguing that they should be denied for three reasons, which are directed at Liberty's petition: (1) David Leslie, not Liberty, was the driving force behind the settlement; (2) Liberty has continuously acted in its own self-interest at the expense of the class; and (3) Liberty's inflated settlement demands and sampling process did not increase AIG's settlement offer.

A.    **Safeco and Ohio Casualty's Motion for Reimbursement of Attorneys' Fees, Costs and Expenses**

Safeco and Ohio Casualty have requested $14,800,890.22 from the settlement class fund. In its order dated December 21, 2011, the court granted this request in part.  Because Safeco and Ohio Casualty are not seeking fees for their work as objectors, to some extent the objections to its fee petition and the debate over the value of their work as objectors are misplaced.  Rather, they are seeking fees for their work as the named plaintiffs for the litigation class.  In that

context, they indeed provided work of value to the class. Had these two class members not served as named plaintiffs for the litigation class, there might not have been a class action in the first place, and Settlement Class Plaintiffs would have had nothing to settle. Indeed, as Safeco and Ohio point out, Settlement Class Plaintiffs were asked to join as litigation class representatives, but all declined.

On the other side of the same coin, Settlement Class Plaintiffs contend that Safeco and Ohio's fees should be offset by Goldberg Kohn's fees, because if the original litigation class had been able to negotiate a $450 million settlement, there would have been no need for Settlement Class Plaintiffs to intervene, hire lawyers, and expend vast resources to achieve this settlement. Settlement Class Plaintiffs, however, have pointed to no case law supporting this contention in the context of a party who litigated on behalf of the class before objecting to the settlement of that litigation, and the court finds no reason to apply such a rule in this case.

Settlement Class Plaintiffs also object that fees should be reduced because it was unnecessary for Safeco and Ohio to hire two law firms: Grippo & Elden in Chicago, and Nutter McClennen & Fish in Boston. But there have been no specific objections to the amount of work those two firms performed, to the number of lawyers used, or to the type of work performed. Absent that, and based on documentation indicating that there was minimal duplication of efforts across the firms, the court cannot conclude that it was unreasonable for Safeco and Ohio Casualty to have been represented by two law firms—particularly when AIG and the Settlement Class Plaintiffs have been represented by multiple firms.

The final objection is that any award should not account for any fees, costs, or expenses incurred after May 8, 2010, when Liberty attended an unauthorized meeting with AIG in breach of a written agreement with the NWCRP Board. But although Settlement Class Plaintiffs have

made this argument generally as to all Objectors, they offer no particular reason why the court should attribute Liberty's misbehavior to its subsidiaries. The court cannot conclude that there is a principled reason to limit Safeco and Ohio Casualty's fees in this manner.

To the contrary, Safeco and Ohio zealously litigated this case on behalf of the class. Their work preserved the class's claims against potential statute of limitations defenses. They defeated AIG's motion to dismiss on all but one claim. Over the course of an extensive discovery period, they developed evidence regarding AIG's liability and the class's potential damages. It would be unfair to allow the class to benefit from Safeco and Ohio's efforts without reimbursing their out-of-pocket fees and expenses in litigating on behalf of the class, particularly when the NWCRP has directly reimbursed Settlement Class Counsel for their services. Because Safeco and Ohio's prosecution of the class's claims "produced a beneficial result for the class," Fed. R. Civ. P. 23(h) Advisory Committee Note (2003), they are entitled to reasonable fees for those efforts.

Further, Safeco and Ohio's rates and hours, which have gone unchallenged, are reasonable. Counsel billed their time at standard rates, and Safeco and Ohio paid those bills each month. Therefore, the court presumes these fees, market rates paid by sophisticated companies, to be reasonable. See Jeffboat, LLC, 553 F.3d at 489–90; Assess. Tech. of WI, LLC., 361 F.3d at 438. The fees for expert work ($3,180,153.69), and costs and expenses ($552,458.01), are reasonable and were important to Safeco and Ohio's litigation of the class's claims before Settlement Class Plaintiffs intervened.

For the foregoing reasons, the court grants Safeco and Ohio Casualty's fee petition in the amount of $14,800,890.22.

**B.**     **Liberty's Motion to Intervene and Motion for Reimbursement of Fees and Costs**

Liberty has filed a fee petition requesting $4,680,556.41 in fees, "which include[s] only those incurred in prosecuting the case against AIG prior to the stay of discovery entered on January 13, 2011." On December 21, 2011, the court granted in part Liberty's fee petition in an amount based on the attorneys' fees and costs Liberty incurred to "create, discover, increase, or preserve" the common fund, up to—but not including—May 8, 2010. In re Diet Drugs, 582 F.3d 524, 540 (3d. Cir. 2009). The court further directed Liberty to provide an in camera calculation of those fees and costs, along with its billing statements. Liberty has complied with that request. Its submissions indicate that it expended $412,826.08 in costs and expenses incurred before May 8, 2010, in connection with prosecuting the claims against AIG, including $284,315.87 spent on expert fees and costs, for a total of $2,001,662.08 in fees and expenses before May 8, 2010.

The court would be well within its discretion in awarding Liberty no fees at all, based on its actions—most importantly, the unauthorized meeting with AIG's CEO on May 8, 2010—that effectively ensured that the class could never extract more than $450 million in settlement. Nonetheless, without Liberty's prosecution of the claims now advanced by Settlement Class Plaintiffs, those claims would now be time-barred. Liberty's efforts generated material evidence of AIG's liability and the PCs' damages, and had the effect of pressuring AIG to negotiate a settlement. Finally, when no other PC was willing to step forward and serve as a named plaintiff, Liberty volunteered two of its subsidiaries, Safeco and Ohio Casualty, to fill that role. Thus, the court determines that an award of $2,001,662.08, the amount in fees, costs, and expenses Liberty incurred up until May 8, 2010, is an appropriate award in this case.

**VII.    Motions to Strike**

**A.     Liberty's Motion to Strike the Third Declaration of David Appel**

Also pending is Liberty's motion to strike the third declaration of AIG's expert, David Appel, which AIG submitted in support of its response to Liberty's objections to approving the settlement. Liberty argues that, for the same reasons it and the other Objectors moved to strike previous declarations (e.g., Dkt. 520-1), which this declaration refers to and incorporates, the court should not consider this declaration. But the court has denied those previous motions to strike—based on the claim that the declarations are hearsay and suffer other evidentiary defects—and Liberty has suggested no reason why the court should revisit those rulings. The motion is denied.

**B.      Objectors' Motion to Strike the Third Supplemental Declaration of J. David Leslie**

Finally, the court has taken under advisement the Objectors' motion to strike Leslie's third supplemental declaration. Leslie submitted this declaration on October 13, 2011, in support of Settlement Class Plaintiffs' objection to the Objectors' motions for fees and costs. The Objectors argue that the first eight paragraphs of this declaration suffer from the same defects of Leslie's previous declarations—namely, not having been subject to cross-examination and failure to meet the admissibility requirements of Fed. R. Evid. 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Because, as the court has already ruled, the Federal Rules of Evidence and the requirements of Daubert and its progeny do not apply at a fairness hearing—and similarly do not apply at a hearing on fees and costs—the court denies this request, mindful that the Objectors' position goes to the weight that the court ascribes to Leslie's declaration.

The Objectors further contend that paragraphs nine and ten of Leslie's third supplemental declaration "are rife with inadmissible hearsay and rank speculation," and consist of "implausible and disputed" "self-serving speculation" as to why AIG made a $450 million settlement offer. Specifically, Leslie states that AIG's General Counsel, Thomas Russo, told him that AIG increased its offer to $450 million as "an accommodation to its regulators," and claims that it is his "belief" that the $450 million offer "was the direct result of regulatory pressure."

For the same reasons the court has previously determined that the Federal Rules of Evidence do not apply to the instant proceedings, this motion is denied.

## **CONCLUSION**

1.      The court enters a final order and judgment:

a.      approving the Settlement Agreement; and

b.      finding that:

    i.      The Settlement Class has been properly certified.

    ii.      The Settlement Class Plaintiffs are appropriate class representatives.

    iii.      Frederic R. Klein of Goldberg Kohn Ltd. Has been properly appointed as Class Counsel.

    iv.      The notice communicated by the court-approved Class Administrator to class members has been appropriate as to content and method of delivery.

2.      Liberty's Motion to Strike the Third Declaration of David Appel is denied.

3.     The Objectors' Motion to Strike the Third Supplemental Declaration of J. David Leslie is

       denied.

4.     Safeco & Ohio Casualty's Motion for Reimbursement of Attorneys' Fees, Costs and

       Expenses is granted in the amount of $14,800,890.22.

5.     Liberty's Motion for Reimbursement of Fees and Costs is granted in part in the amount

       of $2,001,662.08.

**ENTER:       February 28, 2012**


**Robert W. Gettleman**
**United States District Judge**